IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BLOCK DRUG COMPANY, INC.,               )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )        C.A. No. 06-350-KAJ
                                        )
SEDONA LABORATORIES, INC., and          )
NUTRI-HEALTH SUPPLEMENTS, LLC           )
d/b/a SEDONA LABORATORIES,              )
                                        )
        Defendants.                     )
                                        )

**PLAINTIFF'S ANSWERING MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION TO
<u>DISMISS OR, ALTERNATIVELY, TO TRANSFER VENUE</u>**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

Steven D. Glazer
David Greenbaum
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
212-310-8000

Dated:  October 4, 2006

## TABLE OF CONTENTS

**Page**

Preliminary Statement....................................................................................................1

STATEMENT OF FACTS ..............................................................................................2

ARGUMENT ...................................................................................................................5

    I.  DEFENDANT'S VENUE ARGUMENTS
        ARE LEGALLY WRONG...............................................................................5

   II.  PERSONAL JURISDICTION IS PROPER IN DELAWARE .....................6

       A.  Personal Jurisdiction Over Defendant in
           Delaware is Proper Under the Delaware Long-Arm Statute .....................7

       B.  Personal Jurisdiction Over Defendant in Delaware is
           Proper under Due Process..........................................................................9

  III.  DEFENDANT'S ARGUMENT THAT SERVICE OF
        PROCESS IN DELAWARE WAS INSUFFICIENT HAS BEEN MOOTED
        BY ITS RECENT AGREEMENT TO ACCEPT PERSONAL SERVICE OF
        PROCESS ....................................................................................................11

CONCLUSION................................................................................................................11

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page (s)**

3D Sys., Inc. v. Aarotech Labs., Inc.,
   160 F.3d 1373 (Fed. Cir. 1998)................................................................ 7

Beverly Hills Fan Co. v. Royal Sovereign Corp.
   21 F.3d 1558 (Fed. Cir. 1994)........................................................ 7, 9, 10

*Boone v. Oy Paratek Ab*,
   724 A.2d 1150 (Del. Super. Ct. 1997) ........................................... 8

*Denver & Rio Grande W. R.R. Co. v. Brotherhood of R.R. Trainmen*,
   387 U.S. 556 (1967)...................................................................... 5

*DUSA Pharms., Inc v. River's Edge Pharms., LLC*,
   No. 06-1843 (SRC), 2006 U.S. Dist. LEXIS 29852 (D.N.J. May 15, 2006)............... 5

*La Nuova D&B, S.p.A. v. Bowe Co.*,
   513 A.2d 764 (Del. 1986) ............................................................. 8

*Merck & Co. v. Barr Labs., Inc.*,
   179 F. Supp.2d 368 (D. Del. 2002)............................................... 9

*Motorola Inc. v. PC-TEL, Inc.*,
   58 F. Supp.2d 349 (D. Del. 1999)................................................ 10

*North Am. Philips Corp. v. Am. Vending Sales, Inc.*,
   35 F.3d 1576 (Fed. Cir. 1994)..................................................... 6, 10

*Philips Elecs. N. Am. Corp. v. Contec Corp.*,
   No. 02-123-KAJ, 2004 U.S. Dist. LEXIS 3940 (D. Del. Mar. 11, 2004).................... 9

*Telcordia Tech. Inc. v. Telkom SA, Ltd.*,
   458 F.3d 172 (3d Cir. 2006)........................................................ 6

*VE Holding Corp. v. Johnson Gas Appliance Co.*,
   917 F.2d 1574 (Fed. Cir. 1990).................................................. 5, 11

*Wright v. Am. Home Prods. Corp.*,
   768 A.2d 518 (Del. Super. 2000).................................................. 6


**STATUTES**

28 U.S.C. § 1391(c) ............................................................................ 5

## TABLE OF AUTHORITIES (cont'd)

**Page (s)**

28 U.S.C. § 1400(b) ............................................................................................ 1

10 *Del. C.* § 3104 ............................................................................................... 8

Plaintiff Block Drug Company, Inc. ("Block Drug") respectfully submits this answering memorandum of law in opposition to the Motion To Dismiss Or, Alternatively, To Transfer Venue ("Defendant's Motion") filed by defendant Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories ("Defendant").

## Preliminary Statement

Defendant's Motion relies on erroneous legal principles and irrelevant arguments in an attempt to transfer this first-filed patent infringement action to Arizona in favor of Defendant's duplicate later-filed declaratory judgment action. Defendant's motion is principally based on its misplaced argument that venue is improper in Delaware under 28 U.S.C. §1400(b). However, the law is unambiguous since 1988 that, for the purposes of venue, 28 U.S.C. §1391(c) applies to the instant action, not Section 1400(b).

Defendant also briefly suggests that this Court lacks personal jurisdiction over it, and wrongly states that "the complaint is silent as to the basis of personal jurisdiction." Defendant's Motion (D.I. 13) at 15. However, the factual bases for personal jurisdiction are clearly set forth in the Complaint, and the legal and factual bases for this Court's exercise of personal jurisdiction over Defendant are detailed in this opposition. Additionally, Defendant's argument of lack of service of process has been mooted by its agreement to accept personal service, which has now occurred.

Accordingly, because Defendant has not contested – and cannot dispute – that its later-filed declaratory judgment action in Arizona involves the same patent and the same accused infringing products, and arises out of the same conduct, set forth here in this action, Defendant's Motion should be denied, and Block Drug's instant earlier-filed patent infringement action should remain venued in the District of Delaware.

1

## STATEMENT OF FACTS

Block Drug is the owner of U.S. Patent No. 6,344,196 ("the '196 patent"), titled "Composition and Method for Reducing Gastro-Intestinal Distress Due to Alpha-D-Galactosidase-Linked/Containing Sugars," which issued on February 5, 2002. On May 25, 2006, Block Drug filed the instant infringement action based on the '196 patent. D.I. 1 [Complaint]. The Complaint specifically targeted the sale of infringing products "to purchasers in Delaware, including those products sold to and by Eckerd [drug stores], as well as those sold on the Web via the Internet." *Id.*, ¶¶ 9.

The original May 25 Complaint recited the defendant's name as "Sedona Laboratories, Inc.," in reliance on Defendant's own current Web site, which refers to the entity that is responsible for the accused infringing products as "Sedona Laboratories, Inc." For example, the Web site recites the contact mailing address as "Sedona Laboratories, Inc.," and states that all product labels used by private-label distributors (such as Eckerd) must be approved by "Sedona Laboratories, Inc." Exhibit 1 [www.sedonalabs.com].

Block Drug intended at all times to name as a party whatever entity was responsible for making and selling the accused infringing products. "Sedona Laboratories, Inc." was named as the original defendant in this case because that was (and still is) how Defendant Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories identifies itself on its own Web site.

On May 25, the same day it filed the Complaint, Block Drug also provided direct notice (by Federal Express) of the filed Complaint by sending a copy to two of Defendant's senior-most officers, its Chief Executive Officer (Fred Auzenne) and its President (Tracy King), at their corporate address. Exhibit 2 [Letter of May 25, 2006]; *see also* Exhibit 1

2

[www.sedonalabs.com/company/managementTeam.html].  It could not have been clearer to Defendant that it was the intended party in this Delaware action.

On June 8, shortly after the May 25 letter was delivered to Defendant's Chief Executive Officer and President at their place of business – where the infringing product is manufactured and marketed – counsel for Block Drug received a letter from counsel for Sedona Laboratories, Inc. stating that they were "interested in commencing a dialog with you to explore an amicable resolution of the matters discussed in your letter."  Exhibit 3 [Letter of June 8, 2006].  Significantly, the letter made no mention that Defendant was a different entity than the party named in the Complaint.  To the contrary, the letter failed to mention the existence of "Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories," and suggested that the officers of Defendant who received the letter from Block Drug understood that their company was the accused infringer.  The June 8 letter states, "Please be advised that I and my firm represent Sedona Laboratories, Inc.  Fred Auzenne and Tracy King have supplied me with your letter dated May 25, 2006 together with the enclosures."  *Id.*  Both Mr. Auzenne and Ms. King were also copied on the letter.  *Id.*

Subsequently, on June 30, 2006, Defendant filed a declaratory judgment Complaint against Block Drug in Arizona, and later asserted for the first time that "NHS d/b/a Sedona Laboratories" and "Sedona Laboratories, Inc." were separate entities.  Exhibit 4 [Arizona Declaratory Judgment Complaint]; Exhibit 5 [Arizona First Amended Declaratory Judgment Complaint], ¶ 8.  According to the Arizona amended declaratory judgment Complaint, "In January 2006, NHS acquired all rights and interest of Sedona Laboratories [Inc.] in a product (the "Sedona/NHS Product") containing the alpha-galactosidase enzyme, and since has manufactured and offered for sale the Sedona/NHS Product."  Exhibit 5, ¶ 8.  Defendant thus

admits that it is currently engaging in the manufacture and sale of the accused product and was doing so at the time of the filing of this lawsuit. *Id.*, ¶¶ 7-8 & 12. And declarations filed by Defendant in support of the instant motion indicate that Defendant's infringing activity even preceded January 2006. For example, the Declaration of Fred Auzenne, Defendant's CEO, states that "NHS has produced a private labeled version of GasAway+TM for Eckerd Corporation ("Eckerd"), pursuant to a private-labeling agreement entered into by the parties in or around the late winter of 2003 or early spring of 2004." Auzenne Decl., exhibit to D.I. 13, at ¶ 11.

Accordingly, on July 11, even though Defendant's own Web site continued to refer to Defendant as "Sedona Laboratories, Inc.," out of an abundance of caution, Block Drug amended its Complaint in the instant case solely to specifically add "Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories" as a named defendant. D.I. 5 [First Amended Complaint].

Significantly, Defendant does not dispute that, pursuant to Fed. R. Civ. P. 15(c), Block Drug's July 11 First Amended Complaint relates back to the filing date of the original Complaint on May 25, and is the first-filed lawsuit having priority.[1] Instead, Defendant's Motion relies entirely on various inapposite, legally wrong and mooted arguments to dismiss the instant first-filed Delaware action in favor of its later-filed declaratory judgment action in Arizona. Defendant's Motion should be denied.

---

[1] Defendant has properly not contested venue in Delaware in favor of its later filed Arizona amended declaratory judgment Complaint under the "first to-file rule." Based on the well-established "first-to-file" rule, on September 27, 2006, Block Drug filed in Arizona a Rule 12 Motion To Dismiss Complaint or Transfer Action to the District of Delaware in response to the Arizona amended declaratory judgment Complaint. Exhibit 6.

**ARGUMENT**

## I.    DEFENDANT'S VENUE ARGUMENTS ARE LEGALLY WRONG

Incredibly, Defendant's primary argument, underpinning virtually its entire brief, is based on a clearly erroneous principle of law. Defendant relies on inapposite pre-1988 legal authority – interpreting a later-amended statutory scheme – to argue that venue is improper in Delaware under Section 1400(b) of Title 28, while asserting that Block Drug's application of 28 U.S.C. § 1391(c) to support venue is incorrect. Defendant argues in its motion that, "This is a patent infringement action to which the specific patent infringement venue statute, Section 1400(b) of Title 28, applies rather than the general venue statute, Section 1391(c)." Defendant's Motion at 1. This argument is simply and demonstrably wrong, as a matter of law.

Defendant ignores the current statutory scheme and controlling legal precedent holding that 28 U.S.C. § 1391(c) – not 28 U.S.C. § 1400(b) – is the proper venue statute for a corporate defendant in a patent infringement action. *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1584 (Fed. Cir. 1990) (venue in a patent case where defendant is a corporation includes any district in which the court has personal jurisdiction over the defendant at the time the suit is commenced). As explained in *VE Holding Corp.*, § 1400(b) was superseded for corporate entities when § 1391(c) was amended in 1988. *Id.* Thus, in the instant action, under 28 U.S.C. § 1391(c), a corporate defendant such as Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories "resides" where it is subject to personal jurisdiction. *Id.*

In this case, although Defendant is an L.L.C., it is nevertheless to be treated as a corporation. *See Denver & Rio Grande W. R.R. Co. v. Brotherhood of R.R. Trainmen*, 387 U.S. 556, 559-63 (1967) (holding that an unincorporated business entity is treated as a corporation for venue purposes); *DUSA Pharms., Inc v. River's Edge Pharms., LLC,* No. 06-1843 (SRC), 2006 U.S. Dist. LEXIS 29852, at *5 n.1 (D.N.J. May 15, 2006) (holding that venue for a limited

liability company is proper in any judicial district in which the L.L.C. is subject to personal

jurisdiction) (Exhibit 7). Therefore, "[v]enue lies ipso facto" if the Delaware District Court

holds that it has personal jurisdiction over Defendant in this case. *North Am. Philips Corp. v.*

*Am. Vending Sales, Inc.*, 35 F.3d 1576, 1577 n.1 (Fed. Cir. 1994) (citing *VE Holding Corp.*).

Here, venue is proper in Delaware because, as discussed below, personal jurisdiction is proper in

the District of Delaware.


## II.    PERSONAL JURISDICTION IS PROPER IN DELAWARE

              To begin, all factual disputes regarding any personal jurisdiction issues must be

resolved in Block Drug's favor as the plaintiff in this action. *Telcordia Tech. Inc. v. Telkom SA,*

*Ltd.*, 458 F.3d 172, 176 (3d Cir. 2006); *Wright v. Am. Home Prods. Corp.*, 768 A.2d 518, 526

(Del. Super. 2000). Moreover, Defendant has admitted many of the facts necessary for personal

jurisdiction to apply in Delaware. It has admitted that it is currently engaging in the manufacture

and sale of the accused product and that it was doing so at the time of the filing of this action.

Exhibit 5, ¶¶ 7-8 & 12. Furthermore, Fred Auzenne, Defendant's CEO, has stated that, "[Nutri-

Health Supplements, LLC, d/b/a Sedona Laboratories] has produced a private labeled version of

GasAway+TM for Eckerd, pursuant to a private-labeling agreement entered into by the parties in

or around the late winter of 2003 or early spring of 2004." Auzenne Decl., exhibit to D.I. 13, at

¶ 11. Significantly, it is undisputed that the Eckerd stores that receive the infringing products

from Defendant are primarily located in the eastern United States, including the State of

Delaware, in which state there are more than twenty Eckerd stores. Exhibit 8 [SEC Form 40-F,

Ex. 1 - Annual Information Form], p. 4; *see also* D.I. 1, ¶¶ 6-9. In fact, Sedona Laboratories,

Inc., the other defendant in this action – who allegedly sold its business to Defendant – admitted

in its Answer that it has "manufactured and distributed over-the-counter digestive products and

nutritional supplements for consumer use and has marketed products to regional grocery and drug chains, such as Eckerd Drug Stores." D.I. 9, ¶ 9. Moreover, Defendant's infringing private-label product was (and continues to be) offered for sale in Eckerd's drug stores in Delaware at the time of the filing of the Complaint in the instant action. *See* Declaration of Tiffany Geyer Lydon, ¶¶ 2-5.

In patent cases, this court should look to the law of the Federal Circuit, instead of that of the Third Circuit, regarding personal jurisdiction. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564-65 (Fed. Cir. 1994). Under Federal Circuit law, "Personal jurisdiction over an out-of-state defendant is appropriate if the relevant state's long-arm statute permits the assertion of jurisdiction without violating federal due process." *3D Sys., Inc. v. Aarotech Labs., Inc.,* 160 F.3d 1373, 1376-77 (Fed. Cir. 1998). "While [the Federal Circuit] defer[s] to the interpretation of a state's long-arm statute given by that state's highest court, particularly whether or not the statute is intended to reach the limit of federal due process, when analyzing personal jurisdiction for purposes of compliance with federal due process, Federal Circuit law, rather than regional circuit law, applies." *Id.* at 1377 (citations omitted). Accordingly, the Federal Circuit's three-part test for determining jurisdiction considers whether the defendant "purposefully directed" activity at forum residents, whether the "claim arises out of or relates to those activities," and whether personal jurisdiction is "fair and reasonable." *Id.* at 1378 (citations omitted).

A.     **Personal Jurisdiction over Defendant in Delaware is Proper under the Delaware Long-Arm Statute**

Under the first step of the analysis, personal jurisdiction is proper over Defendant in the District of Delaware under the Delaware long-arm statute, sections 3104(c)(1) and

3104(c)(4) of the Delaware Code.[2]  Defendant contracted with Eckerd to produce a private

labeled version of GasAway+TM.  Auzenne Decl., exhibit to D.I. 13, at ¶ 11 ("[Defendant] has

produced a private labeled version of GasAway+TM for Eckerd, pursuant to a private-labeling

agreement entered into by the parties in or around the late winter of 2003 or early spring of

2004.").  It is not disputed that Eckerd is a well-known regional chain located in only thirteen

states in the eastern United States with more than twenty stores in Delaware.  Exhibit 8, p. 4; *see

also* D.I. 1, ¶¶ 6-9; D.I. 9, ¶ 9.  Indeed, according to the rules publicized on its own Web site,

Defendant approved the Eckerd private label used in Delaware on its infringing product.

Exhibit 1.  Accordingly, Defendant cannot now credibly claim that it did not intend for its

products to be sold by Eckerd in its distribution chain, with Delaware within the intended

regional market, thus satisfying jurisdiction under § 3104(c).

     In applying the Delaware long arm statute, the Delaware Supreme Court has

stated that the statute "has been broadly construed to confer jurisdiction to the maximum extent

possible under the due process clause." *La Nuova D&B, S.p.A. v. Bowe Co.*, 513 A.2d 764, 768

(Del. 1986); *Boone v. Oy Paratek Ab,* 724 A.2d 1150, 1156-57 (Del. Super. Ct. 1997).  Given

this standard, jurisdiction is proper over Defendant in Delaware because its actions intentionally

---

[2] Section 3104(c) states

> As to a cause of action brought by any person arising from any of the acts
> enumerated in this section, a court may exercise personal jurisdiction over any
> nonresident, or a personal representative, who in person or through an agent:
>   (1) Transacts any business or performs any character of work or service in the
> State;...
>   (4) Causes tortious injury in the State or outside of the State by an act or
> omission outside the State if the person regularly does or solicits business,
> engages in any other persistent course of conduct in the State or derives
> substantial revenue from services, or things used or consumed in the State;

10 *Del. C.* § 3104 (2006).

employed a distribution channel that caused its products to be sold and distributed in Delaware. *See id.* at 1158 (holding that the Delaware court had jurisdiction over a Finnish company who engaged a New York company to be its exclusive distributor of asbestos to the United States, because "implicit in [their] agreement is the fact that [the distributor] solicit[s] business from the Country as a whole, including Delaware"); *Philips Elecs. N. Am. Corp. v. Contec Corp.,* No. 02-123-KAJ, 2004 U.S. Dist. LEXIS 3940, at *14 (D. Del. Mar. 11, 2004) (Judge Jordan) (holding that the Court had jurisdiction over defendant under § 3104(c)(1) because there was evidence of an established distribution channel, where the accused products were present in Delaware, present prior to the filing of the suit, and as a result of defendant's manufacturing the accused product for a company that sells in Delaware).[3]

**B.     Personal Jurisdiction over Defendant in Delaware is Proper under Due Process**

Personal jurisdiction under the stream of commerce theory over Defendant in the District of Delaware comports with due process and is proper under Federal Circuit precedent. Defendant is "acting in consort" with Eckerd. When it "placed the [accused product] in the stream of commerce, [it] knew the likely destination of the products, and [its] conduct and connections with the forum state were such that [it] should reasonably have anticipated being brought into court there." *Beverly Hills Fan,* 21 F.3d at 1566; *see id.* at 1564-66 (holding Ultec, the accused fan manufacturer incorporated in China, and Royal, the importer and distributor incorporated in New Jersey, were both subject to jurisdiction in Virginia, because numerous Ultec fans were present in Virginia bearing Royal's warranty, which demonstrated a distribution

---

[3] The case upon which Defendant primarily relies, *Merck & Co. v. Barr Labs., Inc.,* 179 F. Supp. 2d 368 (D. Del. 2002), is inapposite to this action because the parties in *Merck* conceded that specific jurisdiction was not available. *Id.* at 371. Unlike *Merck,* the infringing conduct in this case directly arises from Defendant's actions that placed the infringing product in Delaware.

channel, where defendants "knew, or reasonably could have foreseen, that a termination point of the channel was Virginia"). By entering into a private label agreement, Defendant established an ongoing relationship with Eckerd, and thus could reasonably foresee that Delaware was the likely destination for its products, which is sufficient to establish personal jurisdiction over Defendant.

Under the Federal Circuit due process analysis, Defendant's actual control of the distribution channel is not necessary. *Motorola Inc. v. PC-TEL, Inc.,* 58 F. Supp. 2d 349, 355 (D. Del. 1999). Indeed, "by contracting with" Eckerd to supply private-label product and requiring approval of the private label itself, Defendant established an ongoing relationship with Eckerd and "can hardly be heard to complain that it did not know the likely destination of some of its products would include [Delaware]." *Id.* To the contrary, Defendant should have reasonably foreseen that Delaware was the likely destination for its products, which is sufficient to establish personal jurisdiction over Defendant in Delaware. *See North Am. Philips Corp.*, 35 F.3d at 1578-81 (holding that defendants were subject to personal jurisdiction where they "voluntarily placed a substantial quantity of infringing articles in to the stream of commerce conscious that they were destined for Illinois," where they "could foresee that the articles would be resold in Illinois," even when all goods destined for Illinois were delivered "free on board" in Texas and California) (citations omitted).

Lastly, personal jurisdiction over Defendant comports with the concept of "fair play and substantial justice," because Block Drug has a product that services a nationwide market, including Delaware, and thus Block Drug has an interest in protecting its patent rights in Delaware. *See Beverly Hills Fan*, 21 F.3d at 1568.

10

For all the foregoing reasons, personal jurisdiction over Defendant is proper in the District of Delaware.  Accordingly, venue is also proper in Delaware.  *See VE Holding Corp.*, 917 F.2d at 1584.

## III.    DEFENDANT'S ARGUMENT THAT SERVICE OF PROCESS IN DELAWARE WAS INSUFFICIENT HAS BEEN MOOTED BY ITS RECENT AGREEMENT TO ACCEPT PERSONAL SERVICE OF PROCESS

Defendant's motion included an argument of improper service of process on the basis that service had not occurred in this Delaware action.  This argument is now moot.  On October 2, 2006, during the interim between the filing of Defendant's Motion and this Opposition, Defendant agreed to accept personal service, which has now occurred.  Exhibit 9.  Accordingly, because service of process was accomplished within 120 days of the filing of the Amended Complaint, this issue is now moot.  *See* Fed. R. Civ. P. 4(m).

## CONCLUSION

For the foregoing reasons, this Court should not dismiss or transfer the instant first-filed action.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

Steven D. Glazer
David Greenbaum
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
212-310-8000

Dated:  October 4, 2006
173897.1

12

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of October, 2006, the attached **PLAINTIFF'S**

**ANSWERING MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**

**MOTION TO DISMISS OR, ALTERNATIVELY, TO TRANSFER VENUE** was served

upon the below-named counsel of record at the addresses and in the manner indicated:


John W. Shaw, Esquire                                    HAND DELIVERY
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

David B. Goldstein, Esquire                          VIA ELECTRONIC MAIL
Hymson Goldstein & Pantiliat, P.C.
14646 N. Kierland Boulevard
Suite 255
Scottsdale, AZ  85254

David S. Eagle, Esquire                                  HAND DELIVERY
Klehr, Harrison, Harvey, Branzburg & Ellers
919 Market Street
Suite 1000
Wilmington, DE  19801

Roger L. Cohen, Esquire                              VIA ELECTRONIC MAIL
Jaburg & Wilk, P.C.
3200 N. Central Ave., Ste. 2000
Phoenix, AZ  85012


*/s/ John G. Day*
_____
John G. Day


173515.1

# EXHIBIT 1

 *For Your Health - Since 1987*

Contact Us      Company      Products      Purchase      Partners

**Mailing address:**
Sedona Laboratories, Inc.
211 Jennifer Lane
Cottonwood, AZ 86326 USA

**Phone:** 1.888.816.8804
**International calls:** 1.928.634.8807
**FAX:** 1.866.887.8489
**International FAX:** 1.928.634.8817

**E-Mail:**

- **Sales Department**
- **Product Support**
- **Webmaster**

**copyright | privacy policy | employment**

The information on this website is for educational purposes only. The statements presented on the Sedona Labs website have not been evaluated by the FDA. Our products are not intended to diagnose, treat, cure or prevent any disease. Be sure to consult your physician before beginning any supplementation program. Our products are non-prescription and are not intended to replace physician's care or prescribed medication.

211 Jennifer Lane :: Cottonwood, Arizona 86326
888.816.8804 :: info@sedonalabs.com



## SEDONA LABS™
*For Your Health - Since 1987*

home | contact

**News**    Company    Products    Purchase    Partners

Private
Labeling

Contract
Manufacturing

Analytical
Services

International
and Regional

Relevant
Links

## Private Labeling

### Our Product, Your Label

Sedona Laboratories will manufacture the product you desire and bottle it with your company's private logo and label. All our products are manufactured under strict FDA guidelines and tested thoroughly to ensure maximum quality. Our ingredients are derived from only the finest raw materials to ensure a natural finished product.



Private labelling provides your company with the opportunity to market our products customized to your way of doing business. Many of the product's features can be altered to fit into your marketing strategy, brand identity, and product line.

Sedona Laboratories even offers custom graphic design and label printing in-house!* With small minimum quantities (144 bottles), reasonable pricing and custom labels, Sedona Laboratories provides small or large companies with the flexibility not typically offered in this industry. Please **contact us** with any questions you may have about this service.

*\* All labels subject to approval by Sedona Laboratories, Inc.*

copyright |
privacy policy
| employment

The information on this website is for educational purposes only. The statements presented on the Sedona Labs website have not been evaluated by the FDA. Our products are not intended to diagnose, treat, cure or prevent any disease. Be sure to consult your physician before beginning any supplementation program. Our products are non-prescription and are not intended to replace physician's care or prescribed medication.

SedonaProducts.com

Case 1:06-cv-00380-SLR-MPT    Document 1-2    Filed 10/04/2006    Page 4 of 22

211 Jennifer Lane  ::  Cottonwood, Arizona 86326  ::  888.816.8804 :: Intl. 928.634.8807  ::  E-mail Sedona Labs



 **SEDONA LABS** ™  *For Your Health - Since 1987*

home | conta

**Company    Products    Purchase    Partners**

**CEO Welcome**

**Mission & Vision**

**Management Team**

**Certifications**

**Employment**

## Who We Are



**Fred Auzenne**
*Chief Executive Officer*

Fred spent seven years in the military, followed by a successful 15-year career in sales and marketing within the casino, pharmaceutical and medical device industry for Merck and Medtronic. He has completed his MBA at UNR. He became an entrepreneur in 2004, buying and managing the largest re-vegetation company in the area, A Great Southwest Cactus and Tree Spade.



**Tracy King**
*President*

Tracy spent 14 years in marketing, brand management, and general management in the consumer products industry. She has worked for Dial and Kellogg's before moving on to more entrepreneurial companies serving the personal care market. She has an MBA/MIM from American Graduate School of International Management (Thunderbird).



**William Nist**
*Vice President*
Will is the former Assistant Vice President of Ponderosa Systems Inc., and President of Saint Elmo's Enterprises Inc. He graduated from Cornell University with a degree in Institutional Management and Economics, and has a graduate degree in Economics from Pennsylvania State University. Will also teaches Economics and Business at Yavapai College, in Cottonwood, Arizona.



**Ellen Stewart**
*National Sales Manager*
Ellen attended Oklahoma State University specializing in chemical engineering. Ellen then entered a 15-year career with W.L. Gore, a medical implants firm, in the capacity of sales. During this time she set up the customer service and insides sales departments for the Regenerative Technologies Division in Flagstaff, Arizona. Ellen then developed customer service and sales departments, for a genetic testing firm and a natural health supplements wholesaler before coming to Sedona Labs.



Case 1:06-cv-00320-SLR-MPT    Document 17-2    Filed 10/04/2006    Page 6 of 22

**Mairi Ross**
*Marketing Coordinator*
Mairi graduated with a B.A. with Highest Honors from the
University of California, Davis. She has studied dietary
supplements and herbs for over 30 years and is a
published herbalist, health writer and academic
researcher.



**Tad Stewart**
*Purchasing and Inventory Control Manager*
Tad received a B.S in Microbiology with a Chemistry
minor from Northern Arizona University. In addition to
purchasing and inventory responsibilities, he also plays a
key role in product development and product information.



**Susan Hook**
*Graphics Manager*
Susan is in charge of designing and developing all of
Sedona Labs' print and marketing materials.



**Mike Howell**
*Manufacturing & Distribution Manager*
Mike has managed distribution centers for Arizona Art
Wholesale & Retailers. He also worked production at
Hercules, Inc., a DOD contractor in Magna Utah. At
Hercules Mike worked as a Prototype Developer with
graphite composites as well as mix/cast and finishing in
missle production.



**Sharon Cogan**
*Accounting / Data Manager*
Sharon has worked as a Bookkeeper / Tax Preparer for
H&R Block, as well as taught tax courses to their new
hires. She has also been a Staff Accountant and Office
Manager.

 *For Your Health - Since 1987*

Contact Us     Company     Products     Purchase     Partners

**Mailing address:**
Sedona Laboratories, Inc.
211 Jennifer Lane
Cottonwood, AZ 86326 USA

**Phone**: 1.888.816.8804
**International calls:** 1.928.634.8807
**FAX:** 1.866.887.8489
**International FAX:** 1.928.634.8817

**E-Mail:**

- **Sales Department**
- **Product Support**
- **Webmaster**

**copyright | privacy policy | employment**

The information on this website is for educational purposes only. The statements presented on the Sedona Labs website have not been evaluated by the FDA. Our products are not intended to diagnose, treat, cure or prevent any disease. Be sure to consult your physician before beginning any supplementation program. Our products are non-prescription and are not intended to replace physician's care or prescribed medication.

**211 Jennifer Lane :: Cottonwood, Arizona 86326**
**888.816.8804 :: info@sedonalabs.com**

 **SEDONA LABS**™ *For Your Health - Since 1987*

[en españo

home | conta

**News**          **Company**          **Products**          **Purchase**          **Partners**

**Private Labeling**

Private
Labeling

Contract
Manufacturing

Analytical
Services

International
and Regional

Relevant
Links

## Our Product, Your Label



Sedona Laboratories will manufacture the product you desire and bottle it with your company's private logo and label. All our products are manufactured under strict FDA guidelines and tested thoroughly to ensure maximum quality. Our ingredients are derived from only the finest raw materials to ensure a natural finished product.

Private labeling provides your company with the opportunity to market our products customized to your way of doing business. Many of the product's features can be altered to fit into your marketing strategy, brand identity, and product line.

Sedona Laboratories even offers custom graphic design and label printing in-house!* With small minimum quantities (144 bottles), reasonable pricing and custom labels, Sedona Laboratories provides small or large companies with the flexibility not typically offered in this industry. Please **contact us** with any questions you may have about this service.

*\* All labels subject to approval by Sedona Laboratories, Inc.*

**copyright |
privacy policy
| employment**

The information on this website is for educational purposes only. The statements presented on the Sedona Labs website have not been evaluated by the FDA. Our products are not intended to diagnose, treat, cure or prevent any disease. Be sure to consult your physician before beginning any supplementation program. Our products are non-prescription and are not intended to replace physician's care or prescribed medication.

**SedonaProducts.com**

211 Jennifer Lane  ::  Cottonwood, Arizona 86326  ::  888.816.8804 :: Intl. 928.634.8807  ::  E-mail Sedona Labs

 **SEDONA LABS**™ *For Your Health - Since 1987*

 home | conta

**Company     Products     Purchase     Partners**

### Who We Are

**CEO Welcome**

**Mission & Vision**

**Management Team**

**Certifications**

**Employment**



### Fred Auzenne
*Chief Executive Officer*

Fred spent seven years in the military, followed by a successful 15-year career in sales and marketing within the casino, pharmaceutical and medical device industry for Merck and Medtronic. He has completed his MBA at UNR. He became an entrepreneur in 2004, buying and managing the largest re-vegetation company in the area, A Great Southwest Cactus and Tree Spade.



### Tracy King
*President*

Tracy spent 14 years in marketing, brand management, and general management in the consumer products industry. She has worked for Dial and Kellogg's before moving on to more entrepreneurial companies serving the personal care market. She has an MBA/MIM from American Graduate School of International Management (Thunderbird).



### William Nist
*Vice President*

Will is the former Assistant Vice President of Ponderosa Systems Inc., and President of Saint Elmo's Enterprises Inc. He graduated from Cornell University with a degree in Institutional Management and Economics, and has a graduate degree in Economics from Pennsylvania State University. Will also teaches Economics and Business at Yavapai College, in Cottonwood, Arizona.

### Ellen Stewart



**National Sales Manager**
Ellen attended Oklahoma State University specializing in chemical engineering. Ellen then entered a 15-year career with W.L. Gore, a medical implants firm, in the capacity of sales. During this time she set up the customer service and insides sales departments for the Regenerative Technologies Division in Flagstaff, Arizona. Ellen then developed customer service and sales departments, for a genetic testing firm and a natural health supplements wholesaler before coming to Sedona Labs.



**Mairi Ross**
*Marketing Coordinator*
Mairi graduated with a B.A. with Highest Honors from the University of California, Davis. She has studied dietary supplements and herbs for over 30 years and is a published herbalist, health writer and academic researcher.



**Tad Stewart**
*Purchasing and Inventory Control Manager*
Tad received a B.S in Microbiology with a Chemistry minor from Northern Arizona University. In addition to purchasing and inventory responsibilities, he also plays a key role in product development and product information.



**Susan Hook**
*Graphics Manager*
Susan is in charge of designing and developing all of Sedona Labs' print and marketing materials.



**Mike Howell**
*Manufacturing & Distribution Manager*
Mike has managed distribution centers for Arizona Art Wholesale & Retailers. He also worked production at Hercules, Inc., a DOD contractor in Magna Utah. At Hercules Mike worked as a Prototype Developer with graphite composites as well as mix/cast and finishing in

missle production.



**Sharon Cogan**
*Accounting / Data Manager*
Sharon has worked as a Bookkeeper / Tax
Preparer for H&R Block, as well as taught tax
courses to their new hires. She has also been a
Staff Accountant and Office Manager.

# EXHIBIT 2

# WEIL, GOTSHAL & MANGES LLP

767 FIFTH AVENUE

NEW YORK, NY 10153

(212) 310-8000

FAX: (212) 310-8007

AUSTIN

BOSTON

BRUSSELS

BUDAPEST

DALLAS

FRANKFURT

HOUSTON

LONDON

MIAMI

MUNICH

PARIS

PRAGUE

SILICON VALLEY

SINGAPORE

WARSAW

WASHINGTON, D.C.

STEVEN D. GLAZER

DIRECT LINE (212) 310-8806

E-MAIL: steven.glazer@weil.com

May 25, 2006

**BY FEDERAL EXPRESS**

Fred Auzenne, Chief Executive Officer
Tracy King, President
Sedona Laboratories, Inc.
211 Jennifer Lane
Cottonwood, Arizona  86326

Re:    Infringement of U.S. Patent No. 6,344,196

Dear Mr. Auzenne and Ms. King:

This letter is to notify you that as successors in interest to Block Drug Company, Inc., GlaxoSmithKline ("GSK") holds all right, title and interest in the subject patent, which is titled "Compositions and method for reducing gastro-intestinal distress due to alpha-d-galctosidase-linked/containing sugars." This patent protects GSK's food-enzyme dietary supplement Beano®. For your convenience, a copy of the patent is enclosed.

It is believed that  Sedona is infringing one or more claims of this patent. We direct your attention to a product manufactured and sold by Sedona called "GasAway+".  According to your Web site, GasAway+ employs the natural food enzyme alpha-galactosidase in capsule form, which "helps digest oligo-sugars found in beans and other legumes, and in cruciferous vegetables," so as to "prevent uncomfortable gas." A copy of a flyer for this product, obtained from your Web site, is enclosed. We further understand Sedona is providing private-label-branded versions of this product to various retailers, such as Meijer and Eckerd chain stores.

Just as GSK respects the intellectual-property rights of others, GSK expects that companies will respect its rights. In that regard, you should be aware that two federal courts previously entered judgments against Perrigo Company and AccuMed, Inc. for their alpha-galactosidase, gas-prevention products, permanently enjoining them from making and selling such products that infringe GSK's patent rights. To that end,

WEIL, GOTSHAL & MANGES LLP

Fred Auzenne
Tracy King
May 25, 2006
Page 2

today we filed a complaint for patent infringement against Sedona in the United States District Court for the District of Delaware. A courtesy copy of the complaint is enclosed, as well as copies of the two prior judgments against other infringers of a related patent also covering Beano®.

In order for you to avoid litigation of this matter, we ask that you immediately cease all further production and sales of your infringing alpha-galactosidase products, including any and all private-label-branded versions of the product. You should contact either Darren Singer (tel. 973.889.7364), Beano®'s brand manager, or GSK in-house counsel Ted Furman, Esq. (tel. 610.270.6857) to discuss the details of Sedona's immediate withdrawal of its infringing products from the marketplace. If you fail to do so and continue to infringe, GSK will seek all relief available under the patent law for Sedona's deliberate and intentional infringement of GSK's patent rights, including treble damages, interest, and GSK's attorney fees, as well as a permanent injunction, as described in the attached complaint.

Very truly yours,

Steven D. Glazer

cc:    Darren Singer
       Ted Furman, Esq.

SDG/sw
Enclosures:    U.S. Patent No. 6,344,196
               GasAway+ flyer
               Complaint for patent infringement
               Consent Judgment against Perrigo Company
               Consent Judgment against AccuMed, Inc.

# EXHIBIT 3

**HG&P**

**HYMSON GOLDSTEIN**
**& PANTILIAT, P.C.**
ATTORNEYS & COUNSELORS

14646 N. Kierland Boulevard
Suite 255
Scottsdale, Arizona 85254
Telephone: 480-991-9077
Facsimile: 480-443-8854
www.legalcounselors.com

IRVING HYMSON
CERTIFIED REAL ESTATE SPECIALIST
ALSO ADMITTED IN NEW YORK

DAVID B. GOLDSTEIN

EDDIE A. PANTILIAT

LOREN MOLEVER

GORDON E. DUDLEY

STEVEN C. MAHAFFY
ALSO ADMITTED IN IDAHO

CHRISTOPHER D. LONN
ALSO ADMITTED IN CALIFORNIA

RANDY J. HURWITZ

YVETTE D. ANSEL
ALSO ADMITTED IN NEW YORK
AND MINNESOTA

KARINE A. ISAYEV

JENNIFER B. RUBIN

CHAD H. CONELLY

TIFFANY M. CHRISTIANSON

OF COUNSEL
PETER T. VAN BAALEN
ALSO ADMITTED IN CALIFORNIA

MARTIN W. SALTZMAN
ALSO ADMITTED IN NEW JERSEY, NEW
YORK AND NEVADA

June 8, 2006

File No. 11958-00

*Via regular mail and facsimile (212) 310-8007*

Steven Glazer
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, New York 10152

  *Re: Sedona Laboratories, Inc: General: Your letter dated May 25, 2006*

Dear Mr. Glazer:

  I left you a message on June 8, 2006. Please be advised that I and my firm represent Sedona Laboratories, Inc. Fred Auzene and Tracy King have supplied me with your letter dated May 25, 2006 together with the enclosures. We are in process of investigating and analyzing the claims made in your letter and the Complaint. At this stage, we are interested in commencing a dialog with you to explore an amicable resolution of the matters discussed in your letter. Of course, we will need to complete our analysis and investigation before we reach that resolution, but at present, we wish to discuss the matter with you to determine what the objectives of the GlaxoSmithKline are in connection with GSK's food-enzyme dietary supplement Beano.

  I look forward to your return call. If I am unavailable, please contact my assistant Any Steele to schedule a telephone conference where we can discuss the matter.

    Very truly yours,

    *David B Goldstein*

    David B. Goldstein

DBG/als

Copy to: Fred Auzenne (via electronic mail)
    Tracy King (via electronic mail)

324440v1

# EXHIBIT 4

1   Roger L. Cohen, #004409
    Email: rlc@jaburgwilk.com
2   Michelle C. Lombino, #016252
    Email: mcl@jaburgwilk.com
3   **JABURG & WILK, P.C.**
    3200 North Central Avenue, Suite 2000
4   Phoenix, Arizona 85012
    (602) 248-1000
5
    Attorneys for Plaintiff
6

7

8

9            **IN THE UNITED STATES DISTRICT COURT**

10               **FOR THE DISTRICT OF ARIZONA**

11   NUTRI-HEALTH SUPPLEMENTS, LLC
     D/B/A SEDONA LABORATORIES,          Case No:
12
              Plaintiff,                          **COMPLAINT**
13
        v.
14
     BLOCK DRUG COMPANY, INC.,
15
              Defendant.
16

17

18       For its Complaint, Plaintiff Nutri-Health Supplements, LLC, d/b/a Sedona

19   Laboratories, alleges as follows:

20                      **NATURE OF THE ACTION**

21       1.    This is an action seeking declaratory judgment that U.S. Patent No.

22   6,344,196 (the "Patent"), entitled "Compositions and Method for Reducing Gastro-

23   intestinal Distress Due to Alpha-D-Galactosidase-Linked/Containing Sugars," which,

24   upon information and belief, was issued on February 5, 2002, is invalid, unenforceable,

25   and void for failure to comply with the provisions of 35 U.S.C. §§ 101, *et. seq.*

26                     **JURISDICTION AND VENUE**

27       2.    This Court has subject matter jurisdiction over this action pursuant to 28

28   U.S.C. §§1331, 1338(a), and 2201 *et. seq.*

*(margin, left side)* JABURG & WILK, P.C. ATTORNEYS AT LAW 3200 NORTH CENTRAL AVENUE SUITE 2000 PHOENIX, ARIZONA 85012

3.    Venue is proper in this District pursuant to 28 U.S.C. §§1391 (b)(2), and (c).

## PARTIES

4.    Plaintiff Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories ("NHS"), is an Arizona limited liability company, with its principal place of business in Cottonwood, Arizona.

5.    Upon information and belief, Defendant Block Drug Company, Inc. ("Block") is a corporation organized under the laws of the State of New Jersey, and wholly owned by GlaxoSmithKline plc, U.K. ("Glaxo").

6.    Upon information and belief, Block is and was at all relevant times the owner of the Patent, and either itself or through Glaxo, engaged in the manufacture, sale and distribution of over-the- counter drug products, including a dietary supplement containing the enzyme alpha-galactosidase.  Block sells products throughout the United States, including Arizona, and regularly ships such products within the United States in interstate commerce.

7.    NHS is a manufacturer and seller of various nutritional supplements, including a dietary supplement containing the enzyme alpha-galactosidase.

8.    NHS and Block Drug are competitors in the manufacture and sale of dietary supplements containing the enzyme alpha-galactosidase.

## CLAIM FOR DECLARATORY JUDGMENT

9.    Upon information and belief, Block Drug is the owner of the Patent.

10.    Upon information and belief, the individuals (collectively, the "Applicant") associated with the filing or prosecution  of the application (the "Application") to the U.S. Patent and Trademark Office ("PTO") for the Patent, including each inventor named in the Application, each attorney or agent who prepared or prosecuted the Application, every person involved in the preparation or prosecution of the Application and who was associated with the inventor, with the assignee, or with anyone to whom there is an obligation to assign the Application, breached their duty of good faith and candor to the PTO, in violation of 37 C.F.R. §157, by among other things, affirmatively misrepresenting

2

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

1   material facts to the PTO, failing to disclose material information to the PTO, and

2   submitting to the PTO false material information.

3       11.   The alleged invention that is the subject of the Patent is not new, novel or

4   original.

5       12.   The prior art makes clear that the use of galactosidases by humans to

6   alleviate gas was known prior to the filing date of the Application.

7       13.   The alleged invention was derived at least indirectly from information that

8   was known or obvious in the trade, and was patented, in public use, on-sale and disclosed

9   by publication more than a year before the filing of the Application.   The Patent,

10  therefore, is invalid for obviousness.

11      14.   At the time it made the Application, the Applicant knew that: (a) the alleged

12  invention which is the subject of the Patent was not new, novel or original, (b) prior art

13  made clear that the use of galactosidases by humans to alleviate gas was known, and (c)

14  the alleged invention was derived at least indirectly from information that was known or

15  obvious in the trade, and was patented, in public use, on-sale and disclosed by publication

16  more than a year before the filing of the Application, all of which were material to the

17  PTO's examination of the Application (collectively, the "Material Facts").

18      15.   Despite its knowledge of the Material Facts, and knowing that it could not

19  rely on the merits of the claimed invention to procure a patent, Applicant nonetheless

20  failed in a timely, proper and honest manner to disclose to the PTO the Material Facts.

21      16.   Upon information and belief, Applicant, among other things, (a) relied on

22  arguments to the PTO that were inconsistent from one response to another, (b) relied on

23  skewed interpretation of selected phrases or terminology to distinguish its claims from

24  prior art, (c) repeatedly submitted to the PTO self-serving affidavits, unreliable scientific

25  information, and other misrepresentations.

26      17.   The PTO relied upon Applicant's misrepresentations, and concealment, and

27  non-disclosure of Material Facts and was thereby induced to approve the Patent.

28

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

3

1    18.    Applicant's acts and omissions were intentional, deliberate, wrongful, and

2    willful.

3    19.    As a result of the foregoing, the Patent is unenforceable due to obviousness,

4    and the inequitable conduct of Applicant before the PTO in violation of 37 C.F.R. § 1.56,

5    entitling NHS to entry of declaratory judgment that the Patent is invalid, void, and

6    unenforceable.

7    WHEREFORE, Plaintiff Nutri-Health Supplements, LLC respectfully seeks

8    judgment as follows:

9    1.    declaring the Patent invalid, void and unenforceable;

10    2.    awarding Plaintiff costs and reasonable attorney fees pursuant to 35 U.S.C.

11    § 285; and

12    3.    granting such other relief to Plaintiff as is proper and just.

13

14    DATED this 30th day of June, 2006.

15    **JABURG & WILK, P.C.**

16

17    /s/ Michelle C. Lombino , #016252
      Roger L. Cohen
18    Michelle C. Lombino
      Attorneys for Plaintiff

19

20

21

22

23

24

25

26

27

28

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

4

# EXHIBIT 5

1  Roger L. Cohen, #004409
   Email: rlc@jaburgwilk.com
2  Michelle C. Lombino, #016252
   Email: mcl@jaburgwilk.com
3  **JABURG & WILK, P.C.**
   3200 North Central Avenue, Suite 2000
4  Phoenix, Arizona 85012
   (602) 248-1000
5
   Attorneys for Plaintiff
6

7

8

9              **IN THE UNITED STATES DISTRICT COURT**

10                **FOR THE DISTRICT OF ARIZONA**

11 NUTRI-HEALTH SUPPLEMENTS, LLC
   D/B/A SEDONA LABORATORIES,            Case No: CV06-1673-PCT-DGC
12
              Plaintiff,                 **FIRST AMENDED COMPLAINT**
13
14      v.

15 BLOCK DRUG COMPANY, INC.,

16            Defendant.

17

18      For its Complaint, Plaintiff Nutri-Health Supplements, LLC, d/b/a Sedona

19 Laboratories ("NHS"), alleges as follows:

20                    **NATURE OF THE ACTION**

21      1.    This is an action seeking declaratory judgment that: (a) a nutritional

22 supplement containing the enzyme alpha-galactosidase manufactured and sold by NHS

23 does not infringe U.S. Patent No. 6,344,196 ("the '196 Patent"), entitled "Compositions

24 and Method for Reducing Gastro-intestinal Distress Due to Alpha-D-Galactosidase-

25 Linked/Containing Sugars," which issued on February 5, 2002, and (b) the '196 Patent is

26 invalid, unenforceable, and void for failure to comply with the provisions of 35 U.S.C. §§

27 101, *et. seq.*

28

*(left margin vertical text)* JABURG & WILK, P.C. ATTORNEYS AT LAW 3200 NORTH CENTRAL AVENUE SUITE 2000 PHOENIX, ARIZONA 85012

**JURISDICTION AND VENUE**

2.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1338(a), and 2201 *et. seq.*

3.    Venue is proper in this District pursuant to 28 U.S.C. §§1391 (b)(2), and (c).

**PARTIES**

4.    NHS is an Arizona limited liability company, with its principal place of business in Cottonwood, Arizona.

5.    Upon information and belief, Defendant Block Drug Company, Inc. ("Block") is a corporation organized under the laws of the State of New Jersey, and wholly owned by GlaxoSmithKline plc, U.K. ("Glaxo").

6.    Upon information and belief, Block is and was at all relevant times the owner of the '196 Patent, and either itself or through Glaxo, engaged in the manufacture, sale and distribution of over-the-counter drug products, including a dietary supplement containing the enzyme alpha-galactosidase.  Block sells products throughout the United States, including Arizona, and regularly ships such products within the United States in interstate commerce.

7.    NHS and Block Drug are competitors in the manufacture and sale of dietary supplements containing the enzyme alpha-galactosidase.

8.    In January 2006, NHS acquired all rights and interest of Sedona Laboratories in a product (the "Sedona/NHS Product") containing the alpha-galactosidase enzyme, and since has manufactured and offered for sale the Sedona/NHS Product.

9.    Block Drug has filed a civil action against Sedona Laboratories, Inc. ("Sedona Laboratories") in the United States District Court for the District of Delaware, alleging that the Sedona/NHS Product infringes the '196 Patent.

10.    Subsequent to the filing of the present action by NHS, Block Drug amended its complaint to name NHS as a party in the Delaware case.

11.    There is a substantial and continuing justiciable controversy as to Block Drug's right to maintain suit for infringement of the '196 Patent, as to the validity,

2

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

1  enforceability and scope of the '196 Patent, and as to whether the Sedona/NHS Product

2  infringes any valid claim of the '196 Patent.

3  **GENERAL ALLEGATIONS**

4      A.       **THE SEDONA/NHS PRODUCT.**

5      12.    The Sedona/NHS Product is a proprietary enzyme blend, containing alpha-

6  galactosidase, for the aiding of digestion.  The Sedona/NHS Product is sold in a two-piece

7  capsule form.  Each capsule contains 150 GAIU of alpha-galactosidase, 140 SU of

8  invertase, and trace amounts of hemicellulase, beta-glucanase, and phytase.  The two-

9  piece capsule is made from gelatin and rice starch.

10      13.    The instructions printed on the packaging for the Sedona/NHS Product

11  provide: "One capsule per serving of gassy food at the beginning of the meal.  A typical

12  meal consists of 2 to 3 servings of food.  For best results you may have to adjust the

13  number of capsules according to the number of servings of problem food that you eat."

14      B.       **PROSECUTION HISTORY OF THE '196 PATENT.**

15      14.    The '196 Patent claims priority to an application filed with the United States

16  Patent Office ("USPTO") on May 16, 1989, which is the parent application for a string of

17  six applications that ultimately resulted in the issuance of the '196 Patent over 12 years

18  later.  The six applications are as follows: (i)  U.S. Patent Application 07/352,441 filed

19  May, 16, 1989 (the "1989 Application"), (ii)  U.S. Patent Application 07/780,563 filed on

20  October 21, 1991, (iii)  U.S. Patent Application 08/183,639, filed January 18, 1994, (iv)

21  U.S. Patent Application 08/487,871, filed June 7, 1995 (the "1995 Application"), (v)  U.S.

22  Patent Application 09/444,855, filed on November 22, 1999, and (vi)  U.S. Patent

23  Application 09/634,088, filed August 8, 2000 (the "2000 Application").

24      15.    On November 23, 1999, the USPTO issued U.S. Patent No. 5,989,544 (the

25  '544 Patent") based on the 1995 Application.

26      16.    The 1995 Application is the only other of the six applications to result in the

27  issuance of a patent.

28

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

3

17.    The 2000 Application adds four new independent claims, each of which focuses on a claimed new form of delivery of alpha-galactosidase "in tablet, capsule, similarly shaped pill, or solid ingestible form."

18.    On October 11, 2000, in connection with its 2000 Application, the applicant ("Applicant") filed with the USPTO a petition to make special (the "Petition to Make Special") under 37 C.F.R. § 1.102, requesting that the 2000 Application be advanced out of turn for examination because of alleged actual infringement of the claimed invention. The Petition to Make Special included a declaration that a careful and thorough search of the prior art had been made, and all references to the prior art were submitted with the 2000 Application on August 8, 2000.  As evidenced by Applicant's subsequent actions, its statements concerning the prior art are false.

19.    On April 2, 2001, Applicant filed a second preliminary amendment (the "Second Preliminary Amendment") with the USPTO.

20.    In the Second Preliminary Amendment, Applicant first discloses the existence of U.S. Patent No. 5,179,023 (the "'023 Patent").  The Second Preliminary Amendment also contains four additional references which were not included in the 2000 Application.

21.    The '023 Patent discloses the use of alpha-galactosidase A formulated into a conventional dosage form, including tablets and capsules, for oral administration for the purpose of replacement enzyme therapy in the treatment of Fabry disease.

22.    Applicant acknowledges in the Second Preliminary Amendment that the application for the '023 Patent was filed before the earliest effective filing date of the 1989 Application, and admits that the application for the '023 Patent was cited in a May 6, 1992, European search report related to Applicant's prosecution of the European application that corresponds to the 1989 Application.   Applicant therefore was aware of the application for the '023 Patent for *ten years* before it filed the 2000 Application and yet failed to include it in the 2000 Application.

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

4

23.    The USPTO granted the Petition to Make Special on April 12, 2001, just ten days after the Second Preliminary Amendment was filed.

24.    The USPTO did not consider Applicant's belated citation of the '023 Patent, and the other four references in the Second Preliminary Amendment prior to granting the Petition to Make Special,  but instead first considered these citations on June 29, 2001, *ten weeks after* the Petition to Make Special was granted.

25.    The Applicant associated with the filing or prosecution  of the  2000 Application, including the inventor named in the Application, each attorney or agent who prepared or prosecuted the Application, every person involved in the preparation or prosecution of the Application and who was associated with the inventor, with the assignee, or with anyone to whom there is an obligation to assign the Application, breached their duty of good faith and candor to the USPTO, in violation of 37 C.F.R. §1.56, by among other things, affirmatively misrepresenting, and failing to disclose material facts to the USPTO, and submitting to the USPTO false material information including, but not limited to, Applicant's failure to provide evidence of commercial success with respect to a capsule or similarly shaped pill for containing the alpha-galactosidase, and failing to timely disclose the '023 Patent to the USPTO at the time of filing the Petition to Make Special while simultaneously representing in the Make Special Petition that a careful and thorough search of the prior art was made and that the prior art references were submitted to the USPTO simultaneously with the 2000 Application.

<u>**COUNT ONE**</u>
**(NON-INFRINGEMENT)**

26.    NHS repeats and realleges all of the prior allegations as if set forth at length.

27.    The '196 Patent is directed to reducing gastric distress in mammals due to ingestion of solid food containing alpha-D-galactoside-linked sugars and includes 26 claims, four of which are independent, i.e., claims 1, 12, 13 and 16.  The independent claims either relate to a method, composition, or kit that includes a capsule or similarly

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

5

1   shaped pill in ingestible form and containing an amount of alpha-galactosidase effective to

2   hydrolyze the sugars in vivo to their simplest absorbable constituents.

3       28.     The specifications for the '196 Patent indicate that an effective amount of

4   alpha-galactosidase to perform the function of hydrolyzing the alpha-D-galactoside-linked

5   sugars to their simplest form is between 675 and 2,250 GalU of alpha-galactosidase.

6       29.     Each of the independent claims clearly indicates that the effective amount of

7   alpha-galactosidase (i.e., between 675 GalU and 2,250 GalU) is contained in a *single*

8   capsule or similarly shaped pill.  The specification and prosecution history of the '196

9   Patent do not provide any contrary interpretation of this portion of the independent claims.

10  Hence, independent claims 1, 12, 13 and 16 are limited to a single capsule or similarly

11  shaped pill containing between 675 GalU and 2,250 GalU of alpha-galactosidase to

12  hydrolyze the sugars in vivo to their simplest absorbable constituents.

13      30.     The Sedona/NHS Product does not include a single capsule containing

14  between 675 GalU and 2,250 GalU of alpha-galactosidase.  Instead, a single capsule of

15  the Sedona/NHS Product includes only 150 GalU, which is outside the range of the

16  effective amount of 675 GalU to 2,250 GalU set forth in the independent claims of the

17  '196 Patent.

18      31.     The result of ingesting a single capsule of the Sedona/NHS Product

19  containing 150 GalU will not produce substantially the  same result as ingestion of a

20  single capsule of alpha-galactosidase containing 675 GalU, as is required in the claims of

21  the '196 Patent.

22      32.     Based on the foregoing, the '196 Patent is not infringed by the Sedona/NHS

23  Product, entitling NHS to entry of declaratory judgment that the Sedona/NHS Product

24  does not infringe the '196 Patent.

25              ## COUNT TWO

26          **(INVALIDITY AND UNENFORCEABILITY
27          BASED ON OBVIOUSNESS)**

28      33.     NHS repeats and realleges all of the prior allegations as if set forth at length.

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

6

34. In establishing non-obviousness of its claimed invention based on commercial success, Applicant was required to provide evidence that commercial success is attributed specifically to the feature that is the subject of the patent claim.

35. In allowing the claims of the '196 Patent, the examiner (the "Examiner") of the 2000 Application declared that the claims of the 2000 Application are the same as the claims in the '544 Patent, "with the exception of the change in the description of the ingestible form as being a 'capsule or similarly shaped pill.'" The Examiner also noted that the evidence presented for the '544 Patent was drawn to the commercial success and unexpected result of a solid, shaped formulation such as capsule or tablet, and was deemed by the examiner of the 1995 Application to be sufficient indicia of non-obviousness to overcome a prima facie finding of obviousness, and deemed the language of the claims of the 2000 Application to be commensurate with the showing in the 1995 Application, and therefore allowable over the prior art.

36. In fact, Applicant failed to provide sufficient evidence of non-obviousness.

37. Neither the 2000 Application nor any of its parent cases include any evidence whatsoever of commercial success directed to either a capsule (much less a two-piece capsule) or a similarly shaped pill containing alpha-galactosidase, which are the claimed features of the 2000 Application and '196 Patent.

38. During the prosecution of the parent cases of the '196 Patent, the only evidence of commercial success was limited to that pertaining to liquid drops and capsules. Hence, all of the presented commercial success evidence was directed to features unclaimed by the 2000 Application, and the '196 Patent.

39. Based on the foregoing, the alleged invention that is the subject of the '196 Patent is not new, novel or original, and the '196 Patent is invalid as a result of Applicant's failure to provide sufficient evidence of non-obviousness.

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

7

## COUNT THREE

### (INVALIDITY AND UNENFORCEABILITY BASED ON INEQUITABLE CONDUCT)

40.    NHS repeats and realleges all of the prior allegations as if set forth at length.

41.    Applicant, with intent to mislead or deceive the Examiner, failed to disclose material information, and submitted materially false information to the USPTO during prosecution of the '196 Patent.

42.    The Petition to Make Special succeeded in expediting the USPTO's examination of the 2000 Application, and so, all statements made by Applicant in the Petition to Make Special are material as a matter of law.

43.    In the Petition to Make Special, Applicant declared that a "careful and thorough search of the prior art has been made, and the references were submitted with the application on the filing date of August 8, 2000."

44.    The '023 Patent discloses an enzyme called alpha-galactosidase A, which can be administered in hard or soft shell gelatin capsules or tablets, or incorporated directly with food for treating Fabry disease.  The disclosure of hard and soft gelatin capsules or tablets as delivery methods of alpha-galactosidase is relevant to Applicant's claims of patentability of a capsule or similarly shaped pill as a delivery method of alpha-galactosidase.

45.    The '023 Patent is material to the patentability of the '196 Patent.

46.    Applicant failed to disclose the '023 Patent and four other references in its Petition to Make Special.

47.    As set forth in paragraph 22 above, Applicant acknowledges in the Second Preliminary Amendment that the application for the '023 Patent was filed before the earliest effective filing date of the 1989 Application, and admits that the application for the '023 Patent was of record in the prosecution of the European application that corresponds to the 1989 Application.  Applicant therefore was aware of the application for

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

8

1    the '023 Patent for *ten years* before it filed the 2000 Application, and yet failed to disclose

2    it in the 2000 Application.

3        48.    Based on the foregoing, Applicant intentionally failed to disclose to the

4    USPTO the '023 Patent and four additional references.

5        49.    Applicant engaged in inequitable conduct by intentionally misleading the

6    Examiner by failing to disclose material information (i.e., the '023 Patent and the four

7    additional references) upon filing of the Petition to Make Special.

8        50.    Applicant intentionally misled the USPTO by affirmatively misrepresenting

9    in the Petition to Make Special that all of the relevant references were submitted upon the

10   filing of the 2000 Application, when in fact the '023 Patent was withheld.

11       51.    The balance of the levels of materiality and intent weigh in favor of the '196

12   Patent being rendered unenforceable.

13       52.    The USPTO relied upon Applicant's misrepresentations, and concealment,

14   and non-disclosure of the foregoing material facts and was thereby induced to approve the

15   '196 Patent.

16       53.    Applicant's acts and omissions were intentional, deliberate, wrongful, and

17   willful.

18       54.    As a result of the foregoing, the '196 Patent is unenforceable due to

19   obviousness and the inequitable conduct of Applicant before the USPTO in violation of

20   37 C.F.R. § 1.56, entitling NHS to entry of declaratory judgment that the '196 Patent is

21   invalid, void, and unenforceable.

22       WHEREFORE, Plaintiff Nutri-Health Supplements, LLC respectfully seeks

23   judgment as follows:

24       1.    declaring that the Sedona/NHS Product does not infringe the '196 Patent;

25       2.    declaring the '196 Patent invalid, void and unenforceable;

26       3.    awarding Plaintiff costs and reasonable attorney fees pursuant to 35 U.S.C.

27           § 285; and

28       4.    granting such other relief to Plaintiff as is proper and just.

JABURG & WILK, P.C.<br>
ATTORNEYS AT LAW<br>
3200 NORTH CENTRAL AVENUE<br>
SUITE 2000<br>
PHOENIX, ARIZONA 85012

9

1     DATED this 24th day of July, 2006.

2                                          **JABURG & WILK, P.C.**

3
                                          /s/ Michelle C. Lombino, #016252
4                                          Roger L. Cohen
                                          Michelle C. Lombino
5                                          Attorneys for Plaintiff

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

12751-1/MCL/RLC/538422_v3

# EXHIBIT 6

1   Sid Leach (#019519)
    SNELL & WILMER L.L.P.
2   One Arizona Center
    400 E. Van Buren
3   Phoenix, Arizona 85004-2202
    Telephone: (602) 382-6372
4   Facsimile: (602) 382-6070
    Email: sleach@swlaw.com
5
    Attorneys for Block Drug Company, Inc.
6
              IN THE UNITED STATES DISTRICT COURT FOR THE
7                           DISTRICT OF ARIZONA
8
9   Nutri-Health Supplements, LLC d/b/a
    Sedona Laboratories,
10                                              No. 3:06-cv-1673-PCT-DGC
11              *Plaintiff*,
                                                **DEFENDANT BLOCK DRUG**
12  *vs*.                                       **COMPANY'S RULE 12 MOTION TO**
                                                **DISMISS COMPLAINT OR**
13  Block Drug Company, Inc.,                   **TRANSFER ACTION TO THE**
                                                **DISTRICT OF DELAWARE**
14              *Defendant*.
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snell & Wilmer
———— L.L.P. ————
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF FACTS................................................................................. 1

    A.    The First-Filed Delaware Action............................................................. 1

    B.    The Second-Filed Arizona Declaratory Judgment Action ........................... 3

II.   ARGUMENT ............................................................................................... 4

    A.    The Arizona Declaratory Judgment Complaint Should Be Dismissed
        Or Transferred To The District Of Delaware............................................. 4

        1.    Dismissal or Transfer of a Later Filed Action to the Venue of
                the First Filed Action is the General Rule............................................ 4

        2.    The Action Was First Filed in Delaware............................................. 5

    B.    Jurisdiction Over Plaintiff Is Proper In The District Of Delaware ............. 10

        1.    Venue is Proper in the District of Delaware ..................................... 11

        2.    Personal Jurisdiction over Plaintiff is Proper in the District of
                Delaware....................................................................................... 11

        3.    Personal Jurisdiction over Plaintiff in Delaware in Proper
                under the Delaware Long-Arm Statute.............................................. 12

        4.    Personal Jurisdiction over Plaintiff in Delaware is Proper
                under Due Process ......................................................................... 13

IV.   CONCLUSION .......................................................................................... 14

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1

# INDEX OF AUTHORITIES

2

**Page**

3

**Cases**

*3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373 (Fed. Cir. 1998) .............................. 12

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558
   (Fed. Cir. 1994) ........................................................................................ 12, 13, 14

*Boone  v. Oy Paratek Ab*, 724 A.2d 1150 (Del. Super. Ct. 1997) .................................... 13

*Centuori v. Experian Info. Solutions, Inc.*, 329 F. Supp.2d 1133
   (D. Ariz. 2004) ................................................................................................... 9

*Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738
   (9th Cir. 1979) ................................................................................................... 4

*E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 621 F.
   Supp. 310 (D. Del. 1985) .......................................................................... 7, 8, 10

*Edwards v. Occidental Chem. Corp.*, 892 F.2d 1442 (9th Cir. 1990) ........................... 6, 7

*Korn v. Royal Caribbean Cruise Line, Inc.*, 724 F.2d 1397
   (9th Cir. 1984) ............................................................................................. 7, 10

*La Nuova D&B, S.p.A. v. Bowe Co.*, 513 A.2d 764 (Del. 1986) .................................... 13

*Motorola Inc. v. PC-TEL, Inc.*, 58 F. Supp.2d 349 (D. Del. 1999) ............................... 14

*Nelson v. Adams USA, Inc.*, 529 U.S. 460 (2000) ....................................................... 9

*North Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576
   (Fed. Cir. 1994) ............................................................................................... 11

*Pac. Atl. Trading Co., Inc. v. M/V Main Express*, 758 F.2d 1325
   (9th Cir. 1985) ................................................................................................. 11

*Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93 (9th Cir. 1982) ........................... 4, 5

*Philips Elecs. North Am. Corp v. Contec Corp.*, No. 02-123-KAJ,
   2004 U.S. Dist. LEXIS 3940 (D. Del. Mar. 11, 2004) ..................................... 13

*Precise Exercise Equip., Inc. et al v. Kmart Corp. et al.*, No. ED CV
   00-312 RT (VAPx), 2000 U.S. Dist. LEXIS 21499
   (C.D. Cal. Oct. 24, 2000)................................................................................... 8

*Singletary v. Penn. Dep't of Corrections*, 266 F.3d 186
   (3rd Cir. 2001) ............................................................................................... 7, 8

*Sorrels v. Sears, Roebuck & Co.*, 84 F.R.D. 663 (D. Del. 1979) .............................. 7, 8, 9

*VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574
   (Fed. Cir. 1990) ............................................................................................... 11

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

# INDEX OF AUTHORITIES

**Page**

*Wright v. Am. Home Products*, 768 A.2d 518 (Del. Super. 2000) .................................... 11

**Statutes**

10 Del. C. §3104 (2006) ...................................................................................... 12

**Other Authorities**

6A Charles A. Wright et al., *Federal Practice and Procedure* § 1499
    (2d ed. 1990) ................................................................................................... 8

**Rules**

Fed. R. Civ. P. 15(c) ...................................................................................... 3, 6

- iii -

Pursuant to the first-to-file rule, Defendant Block Drug Company, Inc. ("Block Drug") moves to dismiss or transfer this declaratory judgment action filed against it by Plaintiff Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories ("Plaintiff") to the United States District Court for the District of Delaware.  The first-filed Delaware case involves the same patent, the same accused infringing products, and the same parties, and this case arises out of the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original Complaint filed in the Delaware action within the meaning of Rule 15(c) of the Federal Rules of Civil Procedure.  This case is nothing more than a mirror image of the earlier case in Delaware.  The first-filed patent infringement action in Delaware is entitled to priority over this duplicate declaratory judgment action here in Arizona.  Plaintiff has failed to state a legitimate claim upon which declaratory relief can be granted in this action.

## I.     STATEMENT OF FACTS

### A.     The First-Filed Delaware Action

Block Drug is the owner of U.S. Patent No. 6,344,196 ("the '196 patent"), titled "Composition and Method for Reducing Gastro-Intestinal Distress Due to Alpha-D-Galactosidase-Linked/Containing Sugars," which issued on February 5, 2002.  On May 25, 2006, Block Drug filed a patent infringement action in the District of Delaware based on this patent.  Exhibit 2.  In reliance on Plaintiff's own current website, which refers to the entity that is responsible for the infringing products as "Sedona Laboratories, Inc.," the original Delaware Complaint recited the defendant's name as "Sedona Laboratories, Inc." The Delaware action is styled *Block Drug Company, Inc. v. Sedona Laboratories, Inc.*, No. 06-350-KAJ (D. Del.).

Block Drug's Delaware Complaint was directed to the same conduct and infringing transactions and occurrences at issue in this case, including the manufacture, sale and distribution of infringing product "through regional grocery and drug chains, such as Eckerd drug stores," which are "primarily located in the eastern United States, including the State of Delaware, where there are more than twenty Eckerd stores."

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    Exhibit 2, ¶¶ 6-7.   Block Drug's Delaware action is based upon a claim that the

2    "Sedona/NHS Product" infringes Block Drug's patent, and it is clear that Block Drug

3    intended at all times to name as a party whatever entity was responsible for making and

4    selling that infringing product.  The only reason "Sedona Laboratories, Inc." was named

5    as the defendant in the Delaware case was because that is how Plaintiff identified the

6    entity responsible for the infringing product on Plaintiff's own web site.

7         On May 25, Block Drug provided notice of the Delaware Complaint to two

8    of Plaintiff's senior-most officers (the Chief Executive Officer and the President).  Exhibit

9    3.  The Delaware Complaint alleged that the defendant's principal place of business was

10   in Cottonwood, Arizona.   Exhibit 2, ¶5.   Plaintiff's principal place of business is in

11   Cottonwood, Arizona.  Doc. #4, ¶4.  It should have been clear to Plaintiff that it was the

12   intended party in the Delaware action.  In fact, the Delaware action is the sole basis for

13   Plaintiff's allegation of the existence of an "actual controversy" required to sustain a

14   declaratory judgment action in this case.

15        Shortly after the letter was delivered to Plaintiff's President and Chief

16   Executive Officer, counsel for Block Drug received a letter from counsel for Sedona

17   Laboratories, Inc. stating that they were "interested in commencing a dialog with you to

18   explore an amicable resolution of the matters discussed in your letter."   Exhibit 4.

19   Significantly, the letter made no mention that Plaintiff was a different entity than the party

20   named in the Complaint.  To the contrary, the letter failed to mention the existence of

21   "Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories," and suggested that

22   Plaintiff's officers who received the letter from Block Drug apparently understood that

23   their company was the accused infringer.  The letter states, "Please be advised that I and

24   my firm represent Sedona Laboratories, Inc.  Fred Auzene and Tracy King have supplied

25   me with your letter dated May 25, 2006 together with the enclosures." *Id.*

26        On July 11, 2006, Block Drug amended its Complaint in Delaware

27   specifically adding "Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories" as a

28   named defendant, based upon assertions by Plaintiff that, contrary to what is stated on

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    Plaintiff's web site, the entity responsible for the conduct, transactions and occurrences at

2    issue in the Delaware case is "Nutri-Health Supplements, LLC, d/b/a Sedona

3    Laboratories," and not "Sedona Laboratories, Inc." Exhibit 5.

4         Pursuant to Fed. R. Civ. P. 15(c)(2) and (c)(3), Block Drug's July 11

5    Amended Complaint clearly relates back to the filing date of the original Delaware

6    Complaint on May 25. Block Drug's first-filed patent infringement action in Delaware is

7    entitled to priority, and Plaintiff's mirror-image declaratory judgment action here in

8    Arizona should be dismissed or should be transferred to Delaware.

9    **B.      The Second-Filed Arizona Declaratory Judgment Action**

10        Plaintiff is seeking to take advantage of the fact that the earlier Delaware

11   Complaint identified the only apparent infringing party as "Sedona Laboratories, Inc.," –

12   which is what Plaintiff calls itself on its own website – instead of "Nutri-Health

13   Supplements, LLC, d/b/a Sedona Laboratories." Some six weeks after the Delaware

14   action was filed, on June 30, 2006, Plaintiff filed this declaratory judgment Complaint

15   against Block Drug in Arizona, and subsequently represented that "Nutri-Health

16   Supplements, LLC, d/b/a Sedona Laboratories" and "Sedona Laboratories, Inc." were

17   separate entities. According to the amended declaratory judgment Complaint filed here in

18   Arizona, "In January 2006, NHS acquired all rights and interest of Sedona Laboratories in

19   a product (the "Sedona/NHS Product") containing the alpha-galactosidase enzyme, and

20   since has manufactured and offered for sale the Sedona/NHS Product." Doc. #4, ¶ 8. The

21   "Sedona/NHS Product" referred to in the amended declaratory judgment Complaint in this

22   case is the same accused product in Block Drug's earlier filed Delaware lawsuit. The

23   patent at issue in this case is the same patent that is at issue in the Delaware case.

24        Plaintiff Sedona Laboratories admits that it is currently engaging in the

25   manufacture and sale of the accused product and was doing so at the time of the filing of

26   the lawsuits in Delaware and Arizona. Doc. #4, ¶¶ 7 & 12. According to the amended

27   declaratory judgment Complaint filed in this case, "In January 2006, NHS acquired all

28   rights and interest of Sedona Laboratories in a product (the "Sedona/NHS Product")

- 3 -

1  containing the alpha galactosidase enzyme, and since has manufactured and offered for

2  sale the Sedona/NHS Product." Doc. #4, ¶ 8. However, declarations filed in the

3  Delaware case imply that Plaintiff's infringing activity preceded January 2006. For

4  example, the Declaration of Fred Auzenne, Plaintiff's CEO, states that "NHS has

5  produced a private labeled version of GasAway+TM for Eckerd Corporation ("Eckerd"),

6  pursuant to a private-labeling agreement entered into by the parties in or around the late

7  winter of 2003 or early spring of 2004." Exhibit 1, at ¶ 11.

8  **II.    ARGUMENT**

9  **A.    The Arizona Declaratory Judgment Complaint Should Be Dismissed Or
10       Transferred To The District Of Delaware**

11       **1.    Dismissal or Transfer of a Later Filed Action to the Venue of the
             First Filed Action is the General Rule**

12           Pursuant to the first-to-file rule under the doctrine of federal comity, a court

13  should "decline jurisdiction over an action when a complaint involving the same parties

14  and issues has already been filed in another district." *Pacesetter Sys., Inc. v. Medtronic,*

15  *Inc.*, 678 F.2d 93, 95 (9th Cir. 1982). Thus, this instant declaratory judgment action

16  initiated by Plaintiff *after* Block Drug had previously filed its action involving the same

17  parties and same issues in Delaware, should be dismissed or transferred. "[W]hen two

18  judicial actions are filed in courts of concurrent jurisdiction, the court which first acquired

19  jurisdiction should try the lawsuit and no purpose would be served by proceeding with a

20  second action." *Id.* Motions under this rule save time and expense and are therefore

21  readily granted, because the rule serves to promote efficiency and "should not be

22  disregarded lightly." *Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738,

23  750 (9th Cir. 1979). Under this doctrine, the instant action should not be allowed to

24  proceed, because to do so would be wasteful of judicial resources. Moreover, in applying

25  this rule a court should properly recognize a plaintiff's interest in choosing a forum.

26  *Pacesetter*, 678 F.2d at 97. Block Drug chose to proceed in Delaware.

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

"Declaratory relief is intended to serve a unique function in patent disputes, eliminating multiple litigation and protecting competitors from infringement actions that are threatened but not pursued." *Id.*   However, contrary to those policies, Plaintiff's declaratory judgment action multiplies litigation and creates waste and duplication, and thus should be dismissed or transferred.   If the instant action is not dismissed or transferred, piecemeal resolution of the issues will result because, *inter alia*, Sedona Laboratories, Inc. has already answered in the Delaware action and the case is proceeding in that venue.   Exhibit 6.

### 2.   The Action Was First Filed in Delaware

#### (a)   The original Delaware Complaint was directed to the same conduct, transaction, or occurrence as this action.

On May 25, 2006, Block Drug filed its patent infringement action in the District of Delaware.   Exhibit 2.   In reliance on Plaintiff's apparently improper and misleading use of the name "Sedona Laboratories, Inc.," the original Delaware Complaint identified the defendant as "Sedona Laboratories, Inc.," instead of "Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories."   And while Plaintiff alleges that it is an Arizona limited liability company, it continues to hold itself out as "Sedona Laboratories, Inc."   For example, the current website, identified in the Delaware Complaint – on which the accused product is advertised by the accused infringer – identifies the company name as "Sedona Laboratories, Inc."   Exhibit 7.   The website recites the contact mailing address as "Sedona Laboratories, Inc.," and states that all product labels used by private-label distributors (such as Eckerd) must be approved by "Sedona Laboratories, Inc."   *Id.*

However, despite the captioning, there was no confusion that Block Drug always intended to file its Delaware Complaint against Plaintiff, and Plaintiff knew on or about May 25 (the date of the filing) that it was the intended defendant.   The Delaware Complaint for patent infringement is directed toward the ongoing manufacturing and sales activities that Plaintiff admits to in its Arizona declaratory judgment Complaint, where it

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

- 5 -

1   concedes it competes with Block Drug "in the manufacture and sale of dietary

2   supplements containing the enzyme alpha-galactosidase," and that its product is an

3   "enzyme blend, containing alpha-galactosidase." *See* Doc. #4, ¶¶ 7 and 12.

> **(b)    Block Drug timely amended its Delaware Complaint to specifically identify the defendants as "Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories."**

6        On July 11, 2006, soon after Plaintiff filed the instant action, but before it

7   served its declaratory judgment Complaint in the instant action, Block Drug amended its

8   Complaint in Delaware specifically reciting "Nutri-Health Supplements, LLC, d/b/a

9   Sedona Laboratories" as a defendant.    Exhibit 5.    Plaintiff subsequently amended its

10  Arizona declaratory judgment Complaint on July 24, 2006, and served Block Drug for the

11  first time on August 1, 2006, after Block Drug already amended its Complaint in the

12  Delaware action.  Doc. #4.

> **(c)    Block Drug's Amended Complaint relates back to the filing of the original Complaint in Delaware.**

15       The July 11, 2006, Amended Complaint relates back to the filing date of the

16  original Complaint, filed on May 25, 2006.  *See* Fed. R. Civ. P. 15(c)(2) and (c)(3).  An

17  amendment to a pleading relates back to the date of the original pleading when "the

18  amendment changes the party or the naming of the party against whom a claim is asserted

19  if"

> [1] the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading [and];
>
> [2] within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

26  Fed. R. Civ. P. 15(c)(2) and (c)(3).

27       Merely amending the caption to specifically name "Nutri-Health

28  Supplements, LLC, d/b/a Sedona Laboratories," especially when it clearly had notice that

- 6 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    it was an intended defendant upon the service of the original Complaint, does not

2    constitute a different "conduct, transaction, or occurrence." *Edwards v. Occidental Chem.*

3    *Corp.*, 892 F.2d 1442, 1446-47 (9th Cir. 1990) (holding the second complaint meets the

4    "same transaction or occurrence test" when only the named defendant changed).    Thus,

5    "there is no doubt that the Rule's first provision has been satisfied.    The claim asserted in

6    the amended complaint is exactly the same as that set forth in the original pleading."

7    *Sorrels v. Sears, Roebuck & Co.*, 84 F.R.D. 663, 666 (D. Del. 1979); *see also E.I. DuPont*

8    *de Nemours & Co. v. Phillips Petroleum Co.*, 621 F. Supp. 310, 314 (D. Del. 1985)

9    (holding Rule 15(c)'s first requirement met when the complaint makes two relatively

10   minor changes – adding a defendant and expressly mentioning a plastic pipe is part of the

11   alleged infringing activity).

### (1)    Plaintiff had notice of the Delaware lawsuit

13   Adding "Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories" to the

14   Amended Complaint clearly relates back to the filing date of the original Complaint

15   because Plaintiff had notice and understood that its own infringing activity was the

16   intended target of the Delaware Complaint.    Furthermore, it had notice due to (1) the

17   proper listing of its place of business in the Delaware Complaint, (2) the May 25 letter

18   from Block Drug to its officers, and (3) as indicated by its own filing of a declaratory

19   judgment action alleging an "actual controversy" between Plaintiff and Block Drug based

20   upon the Delaware action.

21   "To satisfy the notice requirement of Rule 15(c), the plaintiff must show the

22   new defendant had actual notice of the action prior to the expiration of the limitations

23   period." *Edwards*, 892 F.2d at 1447.    Furthermore, "notice does not require actual service

24   of process on the party sought to be added." *Singletary v. Penn. Dep't of Corrections*, 266

25   F.3d 186, 195 (3rd Cir. 2001)    Rule 15(c)(3) notice may be "formal or informal." *Id.*

26   (citing *Korn v. Royal Caribbean Cruise Line, Inc.*, 724 F.2d 1397, 1399 (9th Cir. 1984)).

27   Notice occurs "when a party who has some reason to expect his potential involvement as a

28   defendant hears of the commencement of litigation through some informal means."

Snell & Wilmer
L.L.P.—
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

- 7 -

*Singletary*, 266 F.3d at 195 (citing *Varlack v. SWC Caribbean, Inc.*, 550 F.2d 171, 175 (3rd Cir. 1977) (holding that person added as defendant had adequate notice under 15(c)(3) when, within the relevant period, the person saw the complaint naming the place he worked and an "unknown employee," which he knew referred to him)).

Plaintiff had actual and prompt notice of the commencement of the Delaware action, because its senior-most officers received at their place of business direct notice of the original Complaint. Thus, Plaintiff "had notice of the filing of the original complaint within the 120 day period for service of the summons and original complaint" and within that 120 day period knew that, but for Block Drug's mistaken reliance, it "would have been named in the original complaint." *Precise Exercise Equip., Inc. et al v. Kmart Corp. et al.*, No. ED CV 00-312 RT (VAPx), 2000 U.S. Dist. LEXIS 21499, at * 5-6 (C.D. Cal. Oct. 24, 2000).

Moreover, even if actual notice is not found, Plaintiff had imputed notice under the "identity of interest" method. *See Singletary*, 266 F.3d at 196. Under "identity of interest" method, Plaintiff and Sedona Laboratories, Inc. "are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other." *Id.* at 266 F.3d at 197-98 (citing 6A Charles A. Wright et al., *Federal Practice and Procedure* § 1499, at 146 (2d ed. 1990)). The two corporations are sufficiently interrelated because Sedona Laboratories, Inc. originally manufactured and sold the infringing product, and then Plaintiff doing business as Sedona Laboratories continued the infringement – in the same building – after it purchased the business operation in January 2006 (Doc. #4, ¶ 8; Exhibit 1, at ¶¶ 3 and 11), thus providing notice of litigation against both. *See E.I. DuPont*, 621 F. Supp. at 314; *Sorrels*, 84 F.R.D. at 667 (holding that the newly added corporation had notice of an action through the originally sued - but now nonexistent - corporation where the two corporations were "past and present forms of the same enterprise," where the newly added corporations accepted mail addressed to the originally sued corporation, and where the

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  newly added corporation's personnel were aware that it was previously known as the

2  originally sued corporation).

### (2)    The original Complaint would have named "Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories" but for a mistaken reliance on Plaintiff's own actions

5       Block Drug named "Sedona Laboratories, Inc.," instead of naming both

6  "Sedona Laboratories, Inc." and "Nutri-Health Supplements, LLC, d/b/a Sedona

7  Laboratories," because of a mistake concerning the identity of the proper party, thus Rule

8  15(c) appropriately applies. *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 467 n.1 (2000);

9  *Centuori v. Experian Info. Solutions, Inc.*, 329 F. Supp.2d 1133, 1138 (D. Ariz. 2004)

10  ("properly construed, the rule encompasses both mistakes that were easily avoidable and

11  those that were serendipitous;" "a mistake is 'a wrong action or statement proceeding

12  from faulty judgment, inadequate knowledge, or inattention'") (citations omitted).

13       In determining whether a party made a mistake concerning identity, "the

14  relevant information is what [the party] knew or thought [it] knew when [it] filed the

15  original Complaint." *Id.* "Virtually by definition, every mistake involves an element of

16  negligence, carelessness, or fault – and the language of Rule 15(c)(3) does not distinguish

17  among types of mistakes concerning identity." *Id.* (citations omitted). In the instant

18  action, any mistake stemmed solely from Plaintiff's prior and current business practices

19  where they improperly hold themselves out to be "Sedona Laboratories, Inc.," the party

20  originally named by Block Drug in its May 25 Complaint. For example, Plaintiff's

21  current website, identified in the Delaware Complaint on which the accused product is

22  advertised, continues to list the company name as "Sedona Laboratories, Inc." Exhibit 2,

23  ¶ 8; Exhibit 7. "Where a potential defendant misleads a plaintiff into thinking that another

24  party should be sued, that defendant should not be able to claim surprise at its being

25  brought into the action." *Sorrels*, 84 F.R.D. at 667. Finally, Block Drug's "quick actions"

26  to amend its Complaint demonstrate that the failure to name Plaintiff (assuming Plaintiff

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    is in fact a separate entity) was the "result of a mistake rather than a strategic legal

2    decision." *Centuori*, 329 F. Supp.2d at 1138-39.

3    (3)    **Plaintiff will not be prejudiced by the allowance of the
     amendment**

4

5    Plaintiff will not be "prejudiced in maintaining its defense on the merits" by

6    the allowance of the amendment. *Korn*, 724 F.2d at 1399. Block Drug made every good

7    faith effort to uncover the true identity of the entity responsible for the alleged infringing

8    conduct. And once the true identity was revealed, Block Drug immediately amended its

9    Complaint to add Plaintiff as a party to the Delaware action with no substantive

10   amendments to the allegations. *See id.* at 1400 ("Timely notice, whether formal or

11   informal, is one way of assuring that the party to be added has received amply opportunity

12   to pursue and preserve the facts relevant to various avenues of defense."); *see E.I. duPont*,

13   621 F. Supp. at 314 (in determining whether to allow a proposed amendment, courts may

14   evaluate the good faith of the party seeking the amendment). Where no new facts are

15   alleged in the amended complaint, where there is no undue delay in amending the

16   complaint, and where the new defendant is in a close relationship with the originally

17   named defendant, addition of the new defendant does not prejudice the new defendant.

18   *Id.* at 315.

19   Given that Plaintiff had notice of the action in Delaware, had notice that it

20   was the intended defendant, and knew that it was not sued simply due to mistaken

21   identity, Block Drug's first-filed patent infringement action should remain venued in

22   Delaware and Plaintiff's later-filed declaratory judgment action should either be

23   dismissed, or should be transferred to Delaware.

24   **B.    Jurisdiction Over Plaintiff Is Proper In The District Of Delaware**

25   Plaintiff is seeking to take advantage of the fact that the earlier Delaware

26   Complaint identified the only apparent infringing party as merely "Sedona Laboratories,

27   Inc." (as Plaintiff calls itself on its own website), instead of "Nutri-Health Supplements,

28   LLC, d/b/a Sedona Laboratories." The declaratory judgment Complaint in Arizona is an

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

effort to transfer venue from Delaware to the District of Arizona. To this end, Plaintiff has filed a motion to dismiss or transfer Block Drug's Delaware lawsuit on grounds of improper venue and lack of personal jurisdiction.

**1.     Venue is Proper in the District of Delaware**

Venue is proper in Delaware, because personal jurisdiction is proper in the District of Delaware. For a corporate defendant, "[v]enue lies ipso facto" if the Delaware District Court holds that it has personal jurisdiction over it. *North Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1577 n.1 (Fed. Cir. 1994) (citing *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574 (Fed. Cir. 1990)).

**2.     Personal Jurisdiction over Plaintiff is Proper in the District of Delaware**

Personal jurisdiction over Plaintiff is proper in the District of Delaware. To begin, all factual disputes regarding any personal jurisdiction issues must be resolved in Block Drug's favor as the plaintiff in the Delaware action. *Pac. Atl. Trading Co., Inc. v. M/V Main Express*, 758 F.2d 1325, 1327 (9th Cir. 1985); *Wright v. Am. Home Products*, 768 A.2d 518, 526 (Del. Super. 2000). Moreover, Plaintiff has in fact admitted the facts necessary for personal jurisdiction to apply in Delaware. Plaintiff has admitted that it is currently engaging in the manufacture and sale of the accused product and that it was doing so at the time of the filing of both the Delaware and Arizona actions. Doc. #4, ¶ 8. Furthermore, Plaintiff's CEO Fred Auzenne has stated that "[Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories] has produced a private labeled version of GasAway+TM for Eckerd, pursuant to a private-labeling agreement entered into by the parties in or around the late winter of 2003 or early spring of 2004." Exhibit 1, at ¶ 11. Significantly, it is undisputed that the Eckerd stores that receive the infringing sales from Plaintiff are "primarily located in the eastern United States, including the State of Delaware, where there are more than twenty Eckerd stores." Exhibit 2, ¶¶ 6-7. Sedona Laboratories, Inc., has even admitted in its Answer that it has "manufactured and distributed over-the-counter digestive products and nutritional supplements for consumer use and has marketed

- 11 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  products to regional grocery and drug chains, such as Eckerd Drug Stores." Exhibit 6,

2  ¶ 9.

3          Second, the jurisdictional analysis must be based upon Federal Circuit law,

4  and is not governed by Ninth Circuit or Third Circuit precedents. *See Beverly Hills Fan*

5  *Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564-65 (Fed. Cir. 1994). Under Federal

6  Circuit law, "Personal jurisdiction over an out-of-state defendant is appropriate if the

7  relevant state's long-arm statute permits the assertion of jurisdiction without violating

8  federal due process." *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1376-77 (Fed.

9  Cir. 1998). "While [the Federal Circuit] defer[s] to the interpretation of a state's long-arm

10  statute given by that state's highest court, particularly whether or not the statute is

11  intended to reach the limit of federal due process, when analyzing personal jurisdiction for

12  purposes of compliance with federal due process, Federal Circuit law, rather than regional

13  circuit law, applies." *Id.* at 1377 (citations omitted).

14      **3.**      **Personal Jurisdiction over Plaintiff in Delaware is Proper under the**
15              **Delaware Long-Arm Statute**

16          Under the first step of the analysis, personal jurisdiction is proper over

17  Plaintiff in the District of Delaware under the Delaware long-arm statute sections

18  3104(c)(1) and 3104(c)(4) of the Delaware Code.[1] Plaintiff contracted with Eckerd to

19  produce a private labeled version of GasAway+TM. Exhibit 1, at ¶ 11. It is not disputed

20

21  [1] §3104(c) states

22        As to a cause of action brought by any person arising from any of the acts
      enumerated in this section, a court may exercise personal jurisdiction over
23        any nonresident, or a personal representative, who in person or through an
      agent:
24          (1) Transacts any business or performs any character of work or service in
      the State;…
25          (4) Causes tortious injury in the State or outside of the State by an act or
      omission outside the State if the person regularly does or solicits business,
26        engages in any other persistent course of conduct in the State or derives
      substantial revenue from services, or things used or consumed in the State;

27  10 Del. C. §3104 (2006).

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

that Eckerd is a well-known regional chain located in the eastern United States with numerous stores in Delaware. Exhibit 2, ¶¶ 6-7; Exhibit 6, ¶ 9. Accordingly, Plaintiff cannot claim that it did not intend for its products to be sold in this distribution chain with Delaware as a market, thus satisfying jurisdiction under §§ 3104(c).

In applying the Delaware long arm statute, the Delaware Supreme Court has stated that the long arm statute "has been broadly construed to confer jurisdiction to the maximum extent possible under the due process clause." *La Nuova D&B, S.p.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986); *Boone v. Oy Paratek Ab,* 724 A.2d 1150, 1156-57 (Del. Super. Ct. 1997). Given the broad reach of the long-arm statute, the Delaware courts have held that jurisdiction under the stream of commerce theory is proper under §3104(c). *Id.* at 1156-58.

Under this analysis, jurisdiction is proper over Plaintiff in Delaware because its actions established a distribution channel that caused its products to be sold and distributed in Delaware. Exhibit 1, at ¶ 11; *Philips Elecs. North Am. Corp v. Contec Corp.,* No. 02-123-KAJ, 2004 U.S. Dist. LEXIS 3940, at *14 (D. Del. Mar. 11, 2004) (holding that the Court had jurisdiction over defendant under §3104(c)(1) because the accused products were present in Delaware, present prior to the filing of the suit, and as a result of defendant's manufacturing the accused product for TiVo, a company that sells in Delaware).

**4.      Personal Jurisdiction over Plaintiff in Delaware is Proper under Due Process**

Personal jurisdiction under the stream of commerce theory over Plaintiff in the District of Delaware comports with due process and is proper under Federal Circuit precedent. Plaintiff is "acting in consort" with Eckerd, and when it "placed the [accused product] in the stream of commerce, [it] knew the likely destination of the products, and [its] conduct and connections with the forum state were such that [it] should reasonably have anticipated being brought into court there." *Beverly Hills Fan*, 21 F.3d at 1566. By entering into a private label agreement, Plaintiff established an ongoing relationship with

- 13 -

Eckerd, and thus could reasonably foresee that Delaware was the likely destination for its products, which is sufficient to establish personal jurisdiction over Plaintiff.

Under the Federal Circuit due process analysis, control of the distribution channel is not necessary. In particular, the choice of wording was "acting in consort" which meant "concurrence or harmony" and "does not appear to expressly state or even imply the requirement of control." *Motorola Inc. v. PC-TEL, Inc.,* 58 F. Supp.2d 349, 355 (D. Del. 1999). Thus, "by contracting with" Eckerd to supply private-label product, Plaintiff established an ongoing relationship with Eckerd and "can hardly be heard to complain that it did not know the likely destination of some of its products would include [Delaware]." *Id.* To the contrary, Plaintiff should have reasonably foreseen that Delaware was the likely destination for its products, which is sufficient to establish personal jurisdiction over Plaintiff in Delaware.

Lastly, personal jurisdiction over Plaintiff comports with the concept of "fair play and substantial justice," because Block Drug has a product that services a nation-wide market, including Delaware, and thus Block Drug has an interest in protecting its patent rights in Delaware. *See Beverly Hills Fan,* 21 F.3d at 1568.

For all the foregoing reasons, personal jurisdiction and over Plaintiff is proper in the District of Delaware. Thus, venue is also proper in Delaware.

## IV. CONCLUSION

For the foregoing reasons, this Court should dismiss this action, or alternatively should transfer this case to the District of Delaware.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1

2   DATED:  September 27, 2006              SNELL & WILMER L.L.P.

3
                                     By    s/ Sid Leach
4                                         Sid Leach
                                          SNELL & WILMER L.L.P.
5                                         One Arizona Center
                                          400 E. Van Buren
6                                         Phoenix, Arizona 85004-0001
                                          Attorneys for Block Drug Company, Inc.
7

8

9   OF COUNSEL:

10  WEIL, GOTSHAL & MANGES LLP
11  Steven D. Glazer
    David Greenbaum
12  Patricia Young
    767 Fifth Avenue
13  New York, NY 10153-0119

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 15 -

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on September 27, 2006, I electronically filed the foregoing

3   document with the Clerk of the Court using the ECF System which will send notification

4   of such filing to the following registrants:

5               Roger L. Cohen, #004409
                Email:  rlc@jaburgwilk.com
6               Michelle C. Lombino, #0162562
                Email:  mcl@jaburgwilk.com
7               JABURG & WILK, P.C.
                3200 North Central Avenue, Suite 2000
8               Phoenix, Arizona  85012
                Attorneys for Plaintiff
9

10

11

12   By s/ Sid Leach
         Sid Leach
13       SNELL & WILMER L.L.P.
         One Arizona Center
14       400 E. Van Buren
         Phoenix, Arizona 85004-0001
15       Attorneys for Block Drug Company, Inc.
         Email:  sleach@swlaw.com
16

17

18

19

20

21

22

23

24

25

26

27

28

- 16 -

# EXHIBIT 7

1 of 1 DOCUMENT

**DUSA PHARMACEUTICALS, INC., and SIRIUS LABORATORIES, INC., a wholly-owned subsidiary of DUSA PHARMACEUTICALS, INC., Plaintiffs, v. RIVER'S EDGE PHARMACEUTICALS, LLC, Defendant.**

**Civ. No. 06-1843 (SRC)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2006 U.S. Dist. LEXIS 29852*

**May 15, 2006, Filed**

**NOTICE:** [*1] NOT FOR PUBLICATION

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a patent infringement action, plaintiffs, a pharmaceutical company and a subsidiary, filed a motion for a preliminary injunction pursuant to *Fed. R. Civ. P. 65(a)* and *35 U.S.C.S. § 283*. Plaintiffs sought to enjoin defendant competitor from infringing plaintiffs' patent, which was directed to an oral pharmaceutical preparation for the treatment of inflammatory skin disorders.

**OVERVIEW:** A combination of nicotinamide in an immediate release form and zinc in a sustained release form was a required element of every claim of plaintiffs' patent. The competitor, which marketed its product as a generic substitute for plaintiff's product, contended that the patent was invalid under *35 U.S.C.S. § 102(b)* because it was anticipated by a prior art. The court held that plaintiffs met their burden of showing that the competitor's invalidity defense lacked substantial merit because (1) none of the prior art references identified by the competitor disclosed a combination of nicotinamide in an immediate release form and zinc in a sustained release form and (2) the competitor did not show how teachings from the prior art made the invention obvious within the meaning of *35 U.S.C.S. § 103(a)*. The court concluded that plaintiffs were entitled to a preliminary injunction because plaintiffs were likely to prove literal infringement of one of the claims of the patent, the competitor failed to rebut the presumption of irreparable harm, and the balance of the hardships and the public interest weighed in favor of plaintiffs.

**OUTCOME:** The court granted plaintiffs' motion for a preliminary injunction.

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Corporations*
*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > Place of Business & Residence*
[HN1] Venue in patent infringement actions is governed by *28 U.S.C.S. § 1400(b)*, which permits an infringement action to be brought in the judicial district where (1) the defendant resides or (2) where substantial acts of infringement occur and where the defendant has a regular and established place of business. Pursuant to the 1988 amendments to *28 U.S.C.S. § 1391(c)*, a corporation is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. This amendment to the general venue statute has been held to apply to *28 U.S.C.S. § 1400(b)*.

*Civil Procedure > Venue > Corporations*
[HN2] An unincorporated business entity is treated as a corporation for venue purposes.

*Patent Law > U.S. Patent & Trademark Office Proceedings > Reexaminations*
[HN3] Pursuant to *35 U.S.C.S. § 318*, a patent owner may obtain a stay of pending litigation, once an order for inter partes reexamination has been issued under *35 U.S.C.S. § 313*.

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN4] Pursuant to *35 U.S.C.S. § 283*, the district court may grant an injunction to prevent the violation of any

2006 U.S. Dist. LEXIS 29852, *

right secured by patent. The decision to grant or deny a preliminary injunction is within the discretion of the district court. To obtain this type of relief, however, a movant must demonstrate: (1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN5] Once issued, every patent is entitled to a presumption of validity. *35 U.S.C.S. § 282.* The party challenging the validity of a patent bears the burden of establishing invalidity with facts supported by clear and convincing evidence. The presumption of validity, however, does not relieve a party moving for a preliminary injunction from its burden to demonstrate a likelihood of success on the merits of all disputed issues at trial. While it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks substantial merit.

*Patent Law > Anticipation & Novelty > Elements*
[HN6] Under *35 U.S.C.S. § 102(b)*, an invention is anticipated if it was described in a printed publication in this country more than one year prior to the date of application for patent in the United States. In other words, a prior art reference anticipates a patent claim if that single reference discloses, either expressly or inherently, all limitations of the claim. The issue of anticipation is resolved by performing a comparison between the prior art reference and the asserted claims. A rejection for anticipation under § 102 requires that each and every limitation of the claimed invention be disclosed in a single prior art reference. The absence from the prior art reference of any claimed element negates anticipation.

*Patent Law > Nonobviousness > Elements & Tests > General Overview*
[HN7] Pursuant to *35 U.S.C.S. § 103*, a patent may not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *35 U.S.C.S. § 103(a).* When evaluating the obviousness or non-obviousness of a patent claim, courts look to the totality of the evidence, including: (1) the scope and content of the prior art; (2) the differences between the art

and the claims at issue; (3) the level of ordinary skill in the art; and (4) critical objective evidence of non-obviousness, such as commercial success, failure of others, copying and unexpected results. Objective considerations such as failure by others to solve the problem and copying may often be the most probative and cogent evidence of nonobviousness.

*Patent Law > Infringement Actions > Burdens of Proof*
[HN8] A patent holder bears the burden of proving infringement. Infringement analyses are traditionally performed in a two-step process. First, the patent claims are construed to ascertain their proper scope. Second, the construed claims are compared to the allegedly infringing products or processes to determine whether those products or processes fall within the scope of those claims literally or under the doctrine of equivalents. An infringer need only infringe one claim of a patent in order to be liable. However, to prove literal infringement, a plaintiff must show that the infringing device contains or "reads on" each and every limitation disclosed in a given patent claim.

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN9] Although claims must be construed to determine infringement, a court need not arrive at a final and conclusive claim construction in deciding a motion for preliminary injunction, and a court's findings and conclusions regarding claim construction are not binding at trial. In short, a court's obligation at the preliminary injunction state is only to determine the probability that infringement can be proved after a full presentation of the evidence at trial.

*Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN10] On a motion for a preliminary injunction, a patentee that shows a likelihood of success on the merits of patent validity and infringement is entitled to a presumption of irreparable harm. Because of the very nature of a patent, which provides the right to exclude, infringement of a valid patent inherently causes irreparable harm in the absence of circumstances negating that harm. However, this presumption is rebuttable. The effect of the presumption is to place the burden on the infringer to produce evidence sufficient to establish that the patentee would not be irreparably harmed by an erroneous denial of its motion for preliminary injunction. Generally, evidence that will rebut the presumption is: evidence that (1) the

2006 U.S. Dist. LEXIS 29852, *

infringer has or will soon cease the allegedly infringing activities, thus making an injunction unnecessary; (2) the patentee has already granted licenses under the patent, such that is reasonable to expect that infringement of the patent can be remedied with a royalty rather than with an injunction; or (3) the patentee unduly delayed filing suit on the infringement, thereby negating and undermining the irreparability claim.

*Civil Procedure > Remedies > Injunctions > Elements > Balance of Hardship*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN11] Before the court may award a patent holder a preliminary injunction against an accused infringer, it must balance the hardships facing both parties from the grant or denial of injunctive relief. In doing so, the magnitude of the threatened injury to the patent owner is weighed, in light of the strength of the showing of likelihood of success on the merits, against the injury to the accused infringer if the preliminary decision is in error.

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN12] Before awarding a preliminary injunction to a patent holder, the court must consider the impact of injunctive relief on the public interest. The public interest strongly favors protecting the rights secured by a valid patent.

**COUNSEL:** For DUSA PHARMACEUTICALS, INC., SIRIUS LABORATORIES, INC., A WHOLLY-OWNED SUBSIDIARY OF DUSA PHARMACEUTICALS, INC., Plaintiffs: DANIEL MATEO, REED SMITH LLP, PRINCETON, NJ; TRACY ZURZOLO FRISCH, REED SMITH LLP, PHILADELPHIA, PA.

For RIVER'S EDGE, PHARMACEUTICALS, LLCC., Defendant: DIANE STOLBACH, KRAEMER, BURNS, MYTELKA, LOVELL & KULKA, PA, SPRINGFIELD, NJ.

**JUDGES:** Hon. Stanley R. Chesler, U.S.D.J.

**OPINION BY:** Stanley R. Chesler

**OPINION: CHESLER,** District Judge

   **THIS MATTER** comes before the Court on the Motion of Plaintiffs DUSA Pharmaceuticals, Inc. ("DUSA") and Sirius Laboratories, Inc. ("Sirius II")

(jointly "DUSA") for a Preliminary Injunction pursuant to *Federal Rule of Civil Procedure 65(a)* enjoining Defendant, River's Edge, from infringement of the claims of DUSA's *U.S. Patent No. 6,979,468* (the '468 patent"). For the reasons set forth below, this Court will **GRANT** Plaintiffs' Motion.

**I. BACKGROUND**

   This action arises out of Defendant River's Edge's alleged infringement of the *'468 patent* held by DUSA. DUSA is a publicly traded pharmaceutical company incorporated in the State of New Jersey with [*2] its principal place of business in Massachusetts. (Compl. P5.) On April 21, 2006, Plaintiffs filed the Complaint in this matter alleging Defendant is infringing on one or more claims of DUSA's *'468 patent.* Simultaneously, Plaintiffs filed the instant Motion for a Preliminary Injunction enjoining River's Edge from continued infringement.

   On December 27, 2005, the *'468 patent*, entitled "Oral Composition and Method for the Treatment of Inflammatory Cutaneous Disorders" was issued to the inventor, Frank Pollard. The *'468 patent* is directed to an oral pharmaceutical preparation for the treatment of inflammatory skin disorders such as acne vulgaris and rosacea. The composition claims in the *'468 patent* comprises of nicotinamide in an immediate release form, and zinc in a sustained release form. Initially, the *'468 patent* was assigned to Sirius Laboratories, Inc., ("Sirius I"). (Compl. PP8-9.)

   Sirius I previously marketed and sold a prescription-only oral pharmaceutical product for the treatment of inflammatory skin disorders under the trademark Nicomide(R) having immediate release forms of both nicotinamide and zinc. In 2003, while the application of the *'468 patent* was pending, Sirius [*3] I released a new formulation of Nicomide(R) having an immediate release nicotinamide and a sustained release zinc as described in the *'468 patent.* (Pl. Ex. D, P9.) The reformulation of Nicomide(R) provided tangible benefits and avoided many of the negative side effects associated with other treatments. Nicomide(R) proved to be a successful oral treatment for inflammatory skin disorders and generated net revenues of approximately $ 7.3 million in 2005. (Pl. Ex. D at PP18-20; Pl. Ex. E at P12.)

   On or about March 10, 2006, in light of the success of Nicomide(R), DUSA acquired Sirius I by a merger, thus dissolving Sirius I and establishing a DUSA wholly-owned subsidiary named Sirius Laboraties, Inc. ("Sirius II"). The *'468 patent* has been assigned to DUSA and duly recorded with the United States Patent and Trademark Office. (Pl. Ex. A.1.) The reformulated Nicomide(R) product is currently marketed and sold by DUSA.

2006 U.S. Dist. LEXIS 29852, *

On or about March 17, 2006, DUSA and Sirius II, received a letter from Steven J. Hultquist of Intellectual Property Technology Law on behalf of an anonymous client. (Pl. Ex. F-1.) The March 17 letter purported to identify prior art that, Mr. Hultquist claimed, rendered the *'468* [*4] *patent* invalid, and requested that DUSA and Sirius II file a dedication to the public and disclaimer of the remaining term of the *'468 patent*. (Id.) Counsel for DUSA and Sirius II responded by letter on or about March 23, 2006 requesting that Mr. Hultquist provide a basis for questioning the validity of the *'468 patent*, and requested to communicate with Mr. Hultquist's client regarding the unidentified client's "activities or intended activities, and a potential business resolution." (Pl. Ex. F-2.) DUSA received no response to this letter.

On or about March 28, 2006, Defendant River's Edge filed a lawsuit against DUSA and Sirius II in the United States District Court for the Northen District of Georgia, asserting claims of promissory estoppel and fraud, and seeking a declaratory judgment of patent invalidity. (Id. P2, Pl. Ex. F.) In the Georgia complaint, River's Edge stated that it began marketing its product, NIC 750, on or about March 27, 2006. (Pl. Ex. F. at 7.) River's Edge has listed its NIC 750 in the National Drug Data File(R) ("NDDF"), a source consulted by physicians, pharmacists, hospitals, and clinicians to identify potential substitute equivalents of branded pharmaceuticals. [*5] (Pl. Ex. C-1.) NIC 750 is listed in the NDDF as an equivalent substitute for DUSA's prescription Nicomide(R) product. (Id.)

On or about April 21, 2006, DUSA filed the Complaint in this matter alleging patent infringement and seeking monetary damages and injunctive relief. Contemporaneously, DUSA filed the instant motion for a preliminary injunction. On May 1, 2006, River's Edge filed a Request for *Inter Partes* Reexamination of the *'468 patent* with the U.S. Patent and Trademark Office n1 . The Court held oral argument on May 5, 2006.

---

n1 On or about May 1, 2006, River's Edge also filed a separate motion to stay, dismiss or transfer this civil action (docket entry # 14). River's Edge argues, in part, that venue is improper in this district because it is a Limited Liability Company ("LLC"), and does not meet the venue requirements of *28 U.S.C. § 1400(b)*. (Def. Brief To Stay, Transfer or Dismiss 7.)

[HN1] Venue in patent infringement actions, like the case at bar, is governed by *28 U.S.C. § 1400(b)* which permits an infringement action to be brought in the judicial district where, (1) the defendant resides, or (2) where substantial acts of infringement occur and where the defendant has a regular and established place of business. *28 U.S.C. § 1400(b)*. Pursuant to the 1988 amendments to *28 U.S.C. § 1391(c)*, a corporation is "deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." This amendment to the general venue statute has been held to apply to *section 1400(b)*. See *VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1580* ("Section 1391(c) applies to all of chapter 87 of title 28, and thus to § 1400(b)").

Defendant argues that *§ 1391(c)* applies to *§ 1400(b)* only when the defendant is a corporation, and not when the defendant is an unincorporated association, like an LLC. To support this proposition Defendant relies on a footnote from VE Holding which addressed the notion that incorporating *§ 1391(c)* would render *§ 1400(b)*'s second test meaningless. The court dismissed this argument stating "§ 1400(b) applies to all defendants, not just corporate defendants, and thus the second test for venue remains operative with respect to defendants that are not corporations." *917 F.2d at 1580 n.17*. This statement, however, is *obiter dictum*. Defendant does not point to any authority recognizing this interpretation, or treating LLCs differently than corporations for purposes of venue.

The Supreme Court established in 1967 that [HN2] an unincorporated business entity is treated as a corporation for venue purposes. *Denver and Rio Grande Western Railroad Co. v. Brotherhood of Railroad Trainmen, 387 U.S. 556, 559-60, 87 S. Ct. 1746, 18 L. Ed. 2d 954 (1967)*. This holding has been followed by many federal district courts. See *MacCallum v. N.Y. Yankees P'ship, 392 F. Supp. 2d 259, 263 n.2 (D. Conn. 2005)* (applying *§ 1391(c)* to a partnership where three of the four partners were corporations); *Injection Res. Specialists v. Polaris Indus. L.P., 759 F. Supp. 1511, 1512-16 & n.9 (D. Colo. 1991)* (applying *§ 1391(c)* to a limited partnership); *Pippett v. Waterford Develop. LLC, 166 F. Supp. 2d 233, 238 (E.D. Pa. 2001)* ("An unincorporated association has no citizenship independent of its members for determining jurisdiction, but for determining venue it is treated as a corporation"). Venue, therefore, is proper in any judicial district where River's Edge resides. Under *§ 1391(c)*, venue will lie wherever River's Edge is subject to personal jurisdiction. Here, River's Edge has not contested personal jurisdiction and will, therefore, be considered a resident of New Jersey for venue purposes.

In its separate motion to dismiss, Defendant also argues that this Court should dismiss this civil action pursuant to the first-to-file rule. This Court will defer decision on Defendant's application until the Georgia district court rules on DUSA's motion to dismiss, pending before that court, and decides whether River's Edge's declaratory judgment action should be entertained. Under any circumstances, this Court would not be inclined to dismiss, even if the first-to-file rule did apply. At most, the Court would transfer this action pursuant to *28 U.S.C. § 1404(a)*. Therefore, the pendency of Defendant's motion is not a bar to the Court issuing the instant preliminary injunction.

Defendant also seeks a stay of the current action pending resolution by the PTO of River's Edge's Request for Re-Examination of the *'468 patent*. The Court is satisfied that Defendant's application for a stay should, at this point, be denied in light of the fact that Defendant's Request has not yet been granted by the USPTO. [HN3] Pursuant to *35 U.S.C. § 318*, a patent owner may obtain a stay of pending litigation, "[o]nce an order for inter partes reexamination has been *issued* under *section 313*." *35 U.S.C. § 318* (emphasis added). Therefore, this Court will deny Defendant's request for a stay as premature. See *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1424 (Fed. Cir. 1988)* (acknowledging that the district court denied a request to stay litigation where the request was filed before the USPTO had granted the reexamination).

[*6]

## II. DISCUSSION

### 1. Standard for a Preliminary Injunction

[HN4] Pursuant to *35 U.S.C. § 283*, this Court may grant an injunction to "prevent the violation of any right secured by patent." The decision to grant or deny a preliminary injunction is within the discretion of the district court. To obtain this type of relief, however, a movant must demonstrate: "(1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest." *Oakley, Inc. v. Sunglass Hut Intern'l., 316 F.3d 1331, 1338-39 (Fed. Cir. 2003)*; see *Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 879 (3d Cir. 1997)*.

### 2. DUSA's Motion for a Preliminary Injunction

#### A. Likelihood of Success on the Merits

To obtain preliminary injunctive relief, DUSA must show, in light of the burdens in place at trial, that it is likely to prove that the *'468 patent* is valid, that it is infringed by NIC 750, and that it will withstand River Edge's allegations of patent invalidity. See *Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997)*. [*7]

#### 1. Validity

[HN5] Once issued, every patent is entitled to a presumption of validity. *35 U.S.C. § 282*. The party challenging the validity of a patent bears the burden of establishing invalidity with facts supported by clear and convincing evidence. See *Loctite Corp. v. Ultraseal Ltd., 781 F.2d 861, 872 (Fed. Cir. 1985)*; *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1998)*. The presumption of validity, however, does not relieve a party moving for a preliminary injunction from its burden to demonstrate a likelihood of success on the merits of all disputed issues at trial. At the preliminary injunction stage, therefore, DUSA bears the burden "of showing a reasonable likelihood that the attack on its patent's validity would fail." *Oakley, 316 F.3d at 1339*; see *New England Braiding Co., Inc. v. A.W. Chesterton Co., 970 F.2d 878, 883 (Fed. Cir. 1992)* ("While it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks substantial merit").

#### a. Anticipation

River's Edge contends that the *'468 patent* is invalid [*8] because it was anticipated by prior art. (Def. Br. 5.) [HN6] Under *35 U.S.C. § 102(b)*, an invention is anticipated if it "was . . . described in a printed publication in this . . . country . . . more than one year prior to the date of application for patent in the United States." *35 U.S.C. § 102(b)*. In other words, a prior art reference anticipates a patent claim if that single reference discloses, either expressly or inherently, all limitations of the claim. *Finnigan Corp. v. Int'l Trade Comm'n, 180 F.3d 1354, 1356 (Fed. Cir. 1999)*. The issue of anticipation is resolved by performing a comparison between the prior art reference and the asserted claims. See *Helifix Ltd. v. Blok-Lok Ltd., 208 F.3d 1339, 1346 (Fed. Cir. 2000)*. "A rejection for anticipation under *section 102* requires that each and every limitation of the claimed invention be disclosed in a single prior art reference." *In re Paulsen, 30 F.3d 1475, 1478-79 (Fed. Cir. 1994)*. In the absence from the prior art reference of any claimed element negates anticipation. See *Kloster Speedsteel AB v. Crucible, Inc., 793 F.2d 1565, 1571 (Fed. Cir. 1986)*. [*9]

To prevail, River's Edge has the burden of proving there is a substantial question concerning whether the *'468 patent* is anticipated by a single prior art reference that disclosed each and every limitation of the claimed

invention. Thus, to prevail on the instant motion for pre-liminary injunction, DUSA must prove that River's Edge's invalidity defense of anticipation lacks substantial merit.

River's Edge contends that the *'468 patent* is antici-pated by eleven prior art n2 references: *U.S. Patent Nos.: 5,053,396* ("Blass"); 4,740,373 ("Kesselman"); *5,308,627* ("Umbdenstock"); *5,626,884* ("Lockett"); *6,299,896* ("Cooper"); *5,759,559* ("Fitzjarrell"); *4,505,896* ("Bernstein"); *4,725,609* ("Kull"); *5,989,523* ("Fitzjarrell II"); *6,248,763* ("Scivoletto"); and WIPO Patent Application Publication No. WO 01/56572 A1 ("Bland"). (Def. Br. 8-9; Hultquist Decl., Ex. A, Request for Reexamination of the *'468 patent* ("Request"), at 6-8.)

> n2 DUSA disputes whether the references Defendant identifies as prior art actually qualify as prior art under *35 U.S.C. § 102(b)*. However, for purposes of this motion only, the Court will assume that each qualify as prior art.

[*10]

The *'468 patent* contains fifteen claims. (Pl. Ex. A.) A comparison of the claims embodied in the *'468 patent* with those embodied in the eleven prior art references reveals that not one of these references contains each of the claims in the *'468 patent*. For example, claim 1 of the *'468 patent* instructs:

> An oral pharmaceutical preparation in dosage unit form adapted for administra-tion for the treatment of inflammatory skin disorders, comprising, per dosage unit at least 250 mg nicotinamide in an immediate release form, and *an amount of zinc in a sustained release form,* said amount of zinc being sufficient to provide an enhanced anti-inflammatory effect, in a vehicle pharmaceutically acceptable for oral administration.

(Pl. Ex. A.) (emphasis added). The *'468 patent* states that "zinc maybe present as any pharmaceutically acceptable zinc salt, zinc complex or zinc chelate." The specifica-tion goes on to state that while zinc oxide is a preferred zinc salt, "other zinc salts, such as zinc sulfate and zinc gluconate, zinc complexes and zinc chelates may be sub-stituted, in the sustained release form for the zinc oxide." (*'468 patent*, 3:5-7, 8-11.) Plaintiffs contend that [*11] none of the prior art patents require zinc in a sustained

release form and, therefore, cannot be said to anticipate the *'468 patent*.

Defendant contends that seven of the prior art refer-ences reveal known sustained release forms of zinc. (Re-quest, at 24-25.) A review of the seven claims reveals that each patent calls for a form of zinc or zinc com-pound which Defendant asserts is a "known sustained release form" of zinc. (Id.) For example, the Cooper pat-ent states, ". . . zinc is dosed in the form of a pharmaceu-tically acceptable zinc compound . . . acceptable zinc compounds include . . . zinc sulfate, zinc chloride, zinc oxide, and combinations thereof." (Id. at 24.) Defendant states in the "comment" column of the table that 'zinc sulfate' and 'zinc oxide' are known sustained release forms of zinc." (Id.)

Nothing in Defendant's Brief, Request, or the decla-ration of Hultquist provides any evidence that the cited patents disclose the combination of nicotinamide in an immediate release form and zinc in a sustained release form -- a required element of every claim of the *'468 patent*. The Request does not, on its face, establish an-ticipation. Defendant presents no evidence [*12] that the zinc forms listed in the prior art references are commonly known to be sustained release forms. The only evidence River's Edge submitted in support of its argument is the Hultquist declaration. Mr. Hultquist is a patent attorney and purports to be qualified as a patent *law* expert. (Hultquist Decl., at P7.) This declaration does not estab-lish that one of ordinary skill in the art would interpret the prior art to contain zinc in a sustained release form.

DUSA contends that various active ingredients can be formulated in varying ways, including to be a "sus-tained release form" or "immediate release form." (Pl. Rep. Br. 10.) To support this conclusion, Plaintiffs pre-sent the declaration of Robert O. Williams, III ("Wil-liams"), as one skilled in the art n3 . Williams submits that a person of ordinary skill in the art would know that the zincs listed in the prior patents are not known as sus-tained release forms. (Williams Decl., Ex. C, P16.) Addi-tionally, Williams opines that none of the prior art refer-ences disclose zinc in a sustained release form in combi-nation with nicotinamide in an immediate release form, as required by claim 1 of the *'468 patent*. (Id. at P15.)

> n3 Williams received a B.S. in biology from Texas A&M University in 1979, a B.S. in phar-macy from the University of Texas at Austin in 1981, and a PhD in pharmaceutics from the Uni-versity of Texas at Austin in 1986. He has exten-sive experience in pharmaceutical formulation and the use of excipients in formulating immedi-ate release and sustained release drug dosage forms and has many years experience working in

the pharmaceutical industry. (Williams Decl., Ex. C, PP3-5.)

[*13]

DUSA also relies on the prosecution history of the '468 patent to reinforce the distinction between "sustained release" as a dosage form, and a zinc salt, complex or chelate itself constituting a sustained release form. During prosecution, the PTO Examiner initially asserted that because zinc oxide "lacked sufficient solubility in physiological system [sic]" it would, by virtue of this insolubility, not be immediate release (i.e., it would be in the "sustained release form"). (Ex. C-1, Office Action, December 2, 2004, p.3.) However, the Examiner subsequently abandoned this argument and allowed the claims to issue in their present form. Plaintiffs assert that this history demonstrates two points: (1) the PTO understood the clear distinction made in the patent between zinc in a "sustained release form" and the zinc salt, complex or chelate generally; and (2) that the solubility of zinc oxide -- or any other zinc salt, complex or chelate -- did not render the zinc a "sustained release form" as that term is commonly understood by one of skill in the art. (Pl. Reply Br. 11-12.) The record before this Court does not demonstrate that every claim limitation of the '468 patent is contained [*14] in a single prior art reference and, therefore, does not raise a substantial question that the '468 patent is invalid as anticipated.

b. Obviousness

River's Edge also attacks the validity of the '468 patent by claiming that the invention was obvious in light of relevant prior art. [HN7] Pursuant to 35 U.S.C. § 103, "[a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). When evaluating the obviousness or non-obviousness of a patent claim, courts look to the totality of the evidence, including: (1) the scope and content of the prior art; (2) the differences between the art and the claims at issue; (3) the level of ordinary skill in the art; and, (4) critical objective evidence of non-obviousness, such as commercial success, failure of others, copying and unexpected results. See W.L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1553 (Fed. Cir. 1983); [*15] Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966). "Objective considerations such as failure by others to solve the problem and copying 'may often be the most probative and cogent evidence' of nonobviousness." Advanced Display Systems, Inc. v. Kent State University, 212 F.3d 1272, 1285 (quoting

Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538 (Fed. Cir. 1983).

To support a finding of non-obviousness, DUSA relies on several items of objective evidence. First, DUSA contends that the commercial success of Nicomide(R) weighs in favor of the invention being non-obvious. In 2005, Nicomide(R) sales totaled approximately $ 7.3 million. (Pl. Ex. E at P12.) Second, DUSA points to a recent publication describing an 8-week, open label study n4 evaluating the effectiveness of the invention of the '468 patent. (Pl. Br. 20.) This publication praised Nicomide(R) as providing unique advantages in treatment by avoiding many of the risks and side-effects associated with existing established forms of treatment for acne. Plaintiffs' assert that this study is persuasive evidence of industry recognition and acclaim. Lastly, Plaintiffs point to Defendant's [*16] own conduct in establishing non-obviousness. As acknowledged in the Georgia complaint, River's Edge approached Sirius I seeking a business arrangement whereby River's Edge would be permitted to "market a low-cost product containing the same active ingredients as NICOMIDE, on a profit sharing basis." (Pl. Ex. F at 4.) Plaintiffs argue that by seeking an authorized avenue to exploit the value of the invention, River's Edge's conduct must be considered a recognition of the value and non-obviousness of the '468 patent. (Pl. Br. 22.)

n4 The study is referred to as the "Nicomide(R) Improvement in Clinical Outcomes Study" ("NICOS") and was recently published in Cutaneous Medicine for the Practitioner, a supplement to the journal Cutis.

River's Edge does not challenge or refute any of the objective considerations presented by DUSA. Rather, in opposition, Defendant contends that because it was known, at the time of Pollard's invention, to use immediate release nicotinamide for treating acne and to use zinc for [*17] treating acne, it would have been obvious to one of ordinary skill in the art to combine the two into a single formulation for the treatment of acne, as recited in claims 1-9 and in method claim 16 of the '468 patent. (Def. Br. 8.) Likewise, River's Edge asserts that it was previously known to provide copper supplementation with zinc and, therefore, it would have been obvious to one of ordinary skill in the art to combine copper with the nicotinamide and zinc formulation for the treatment of acne, as recited in claims 10-15 of the '468 patent. (Id.) In support of its argument, Defendant relies on the information contained in its Request for reexamination and concludes that a review of the Request "demonstrates that all claims . . . of the '468 patent are invalid as

being . . . obvious . . . in view of the disclosures of one or more of the prior art references described" in the tables in Defendant's Request. (Def. Br. 9.) Defendant does not, however, address how the scope and content of the prior art bears on the specific elements of the *'468* claims. Similarly, River's Edge does not demonstrate, or provide the affidavit of an expert to demonstrate, how any claims or teachings from [*18] the prior art make obvious the combination of zinc in a "sustained release form" with nicotinamide in an immediate release form, as required by every claim of the *'468 patent*. The Court, therefore, finds that DUSA has met its burden by demonstrating a "reasonable likelihood that the attack on its patent's validity would fail." *Oakley, 316 F.3d at 1339.* n5

n5 The Court notes that Defendant, for the first time, raises additional arguments relating to invalidity in an unsolicited "Supplemental Memorandum" submitted to the Court after oral argument. The Court declines to consider arguments which were not properly raised in Defendant's opposition papers.

*2. Infringement*

In order to obtain a preliminary injunction, DUSA must further show that it is likely to prove infringement by River's Edge. As [HN8] the patent holder, DUSA bears the burden of proving infringement. See *Under Sea Indus., Inc. v. Dacor Corp., 833 F.2d 1551, 1557 (Fed. Cir. 1987).* Infringement analyses are traditionally [*19] performed in a two-step process. First, the patent claims are construed to ascertain their proper scope. See *N. Am. Vaccine, Inc. v. Am. Cyanamid Co., 7 F.3d 1571, 1574 (Fed. Cir. 1994); Seal-Flex, Inc. v. Athletic Track and Court Construction, 172 F.3d 836, 842 (Fed. Cir. 1999).*

Second, the construed claims are compared to the allegedly infringing products or processes to determine whether those products or processes fall within the scope of those claims literally or under the doctrine of equivalents. Id. An infringer need only infringe one claim of a patent in order to be liable. *Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1220 (Fed. Cir. 1995).* However, to prove literal infringement, a plaintiff must show that the infringing device contains or "reads on" each and every limitation disclosed in a given patent claim. *Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1211 (Fed. Cir. 1998).*

[HN9] Although claims must be construed to determine infringement, a court need not arrive at a final and conclusive claim construction in deciding a motion for preliminary injunction, see *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc., 74 F.3d 1216, 1221 (Fed. Cir. 1996),* [*20] and a court's findings and conclusions regarding claim construction are not binding at trial. See *Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F. 2d 679, 681 (Fed. Cir. 1990).* In short, a court's obligation at the preliminary injunction state is only to determine the probability that infringement can be proved after a full presentation of the evidence at trial. *Atari Games Corp. v. Nintendo of America, Inc., 897 F.2d 1572, 1575 (Fed. Cir. 1990).*

DUSA contends that River's Edge's product, NIC 750, satisfies every limitation of claim 1 of the *'468 patent*. (Pl. Br. 12.) Plaintiffs base this contention upon a comparison of the product packaging insert for NIC 750 against the limitations of claim 1 of the *'468 patent*. (Id.; Pl. Ex. C.) The following chart is taken from Plaintiffs' Brief in support of their motion for a preliminary injunction and illustrates the comparison:

| '468 PATENT CLAIM | RIVER'S EDGE'S NIC 750 PRODUCT |
|---|---|
| 1. An oral pharmaceutical preparation | "NIC 750 Tablets for oral administration are white colored tables," (Pl. Ex. C-1., NIC 750 Package Insert, Description.) |
| in dosage unit form | "Usual adult dose is one tablet taken once or twice a day or as prescribed by a physician." (Pl. Ex. C-1.) |
| adapted for administration for the treatment of patients inflammatory skin disorders, comprising, | NIC 750 is "[i]ndicated for non-pregnant with acne vulgaris, acne rosacea or other inflammatory skin disorders who are deficient in, or at risk of deficiency in, one or more of the components of NIC 750." (Pl. Ex. C-1.) |
| per dosage unit at least | "Each oral tablet provides: Nicotinamide, USP |

2006 U.S. Dist. LEXIS 29852, *

| '468 PATENT CLAIM | RIVER'S EDGE'S NIC 750 PRODUCT |
|---|---|
| 250 mg nicotinamide | 750 mg"<br>(Pl. Ex. C-1.) |
| in an immediate release form, and | "The biphasic delivery system facilitates the immediate release of 750 mg Nicotinamide,"<br>(Pl. Ex. C-1.) |
| an amount of zinc | "Each oral tablet provides:<br>. . . Zinc Oxide, USP 25 mg"<br>(Pl. Ex. C-1.) |
| in a sustained release form, | "The biphasic delivery system facilitates the immediate release of 750 mg Nicotinarnde, . . . as well as, the sustained release of 25 mg Zinc Oxide."<br>(Pl. Ex. C-1.) |
| said amount of zinc being sufficient to provide an enhanced anti-inflammatory effect, | "Zinc has been shown to inhibit the inflammatory polymorphonuclear leukocyte chemotaxis in acne patients. Zinc has also demonstrated an inhibitory effect on the lipase of the three Propionibacterium species found in human pilosebaceous follicles."<br>(Pl. Ex. C-1.) |
| in a vehicle pharmaceutically acceptable for oral administration. | "NIC 750 Tablets for oral administration are white-colored tablets,"<br>(Pl. Ex. C-1.) |

[*21]

(Pl. Br. 12-13; Pl. Ex. C.) NIC 750 meets every claim limitation of claim 1 of the '468 patent.

River's Edge's primary defense against infringement is its argument that the '468 patent is invalid and, therefore, DUSA cannot succeed on their claim for infringement because an invalid patent cannot be infringed. (Def. Br. 5.) In light of DUSA's persuasive, uncontradicted evidence, this Court finds that DUSA has shown that it is likely to prove literal infringement on claim 1.

**B. Irreparable Harm**

[HN10] On a motion for a preliminary injunction, a patentee that shows a likelihood of success on the merits of patent validity and infringement is entitled to a presumption of irreparable harm. See *PPG Indus., Inc. v. Guardian Indus. Corp., 75 F.3d 1558, 1566-67 (Fed. Cir. 1996)*. "Because of the very nature of a patent, which provides the right to exclude, . . . infringement of a valid patent *inherently* causes irreparable harm in the absence of" circumstances negating that harm. *Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 974-75 (Fed. Cir. 1996)*. Here, DUSA's refutation of each of River's Edge's validity challenges to the '468 patent and its [*22] essentially undisputed evidence of literal infringement constitute a showing of likelihood of success on the merits. Accordingly, irreparable harm to DUSA is presumed.

However, this presumption is rebuttable. The effect of the presumption is to place the burden on River's Edge "to produce evidence sufficient to establish that [DUSA] would not be irreparably harmed by an erroneous denial of its motion for preliminary injunction." *Polymer Techs., 103 F.3d at 974*. Generally, evidence that will rebut the presumption is: evidence that (1) the infringer has or will soon cease the allegedly infringing activities, thus making an injunction unnecessary; (2) the patentee has already granted licenses under the patent, such that is reasonable to expect that infringement of the patent can be remedied with a royalty rather than with an injunction; or (3) the patentee unduly delayed filing suit on the infringement, thereby negating and undermining the irreparability claim. See *Polymer Techs., 103 F.3d at 974*.

River's Edge has presented no evidence challenging any of these factors. The record before this Court is devoid of any evidence demonstrating that River's [*23] Edge will cease infringing the '468 patent, that DUSA has previously granted licenses under its patent, or that DUSA delayed in filing suit for patent infringement. Instead, again relying solely on its Request for reexamination. Defendant argues that DUSA is not entitled to the presumption of irreparable harm because the '468 patent is invalid in light of prior art. (Def. Br. 11-12.) Having already concluded that DUSA met its burden showing that River's Edge's attacks on the validity of the '468 pat-

*ent* will likely fail, the Court is unpersuaded by this argument.

To further bolster their showing of irreparable harm, DUSA has presented additional evidence demonstrating how Defendant's infringement will cause irreparable harm. DUSA contends that the entry of River's Edge's NIC 750, being marketed as a generic substitute for Nicomide(R), will cause considerable erosion of DUSA's exclusive market share. (Pl. Br. 27.) DUSA presented several reports and studies which documented the rapid and substantial decline in market share branded drugs face when generic versions enter the market. The record before this Court demonstrates that River's Edge has failed to rebut the presumption and DUSA [*24] has shown irreparable harm.

## C. Balance of the Hardships

[HN11] Before this Court may award DUSA a preliminary injunction against River's Edge, it must balance the hardships facing both parties from the grant or denial of injunctive relief. In doing so, "[t]he magnitude of the threatened injury to the patent owner is weighed, in light of the strength of the showing of likelihood of success on the merits, against the injury to the accused infringer if the preliminary decision is in error." *H.H. Robertson Co. v. U.S. Deck, Inc., 820 F.2d 384, 390 (Fed. Cir. 1987).* For DUSA, in the absence of a preliminary injunction, River's Edge will continue to infringe on its *'468 patent*, and continue to detract from DUSA's market share and to compete with DUSA in a market in which DUSA has the right to exclude.

River's Edge, in arguing that the balance of equities weigh in its favor, returns to its argument that the *'468 patent* is invalid. Defendant argues that a preliminary injunction would require River's Edge to delay bringing its "lawful product" to market. (Def. Br. 12-13.) This Court, however, has found that DUSA demonstrated a likelihood that challenges to the validity [*25] of the *'468 patent* would fail. Additionally, this Court has found

that DUSA is likely to prove that River's Edge's product NIC 750 infringes on DUSA's *'468 patent*. Therefore, any hardship River's Edge suffers is a necessary and predictable consequence of its decision to market and sell NIC 750 in light of the *'468 patent*. Accordingly, this Court finds that the balance of hardships tips in favor of DUSA.

### D. Public Interest

Lastly, [HN12] this Court must consider the impact of injunctive relief on the public interest. The public interest strongly favors protecting the rights secured by a valid patent. See *Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581 (Fed. Cir. 1983).* River's Edge does not point to any public interest that would favor denying the injunctive relief sought here. Instead, Defendant relies on its primary argument: that the *'468 patent* is invalid. Defendant, therefore argues that the public interest would not be served by the enforcement of an invalid patent. (Def. Br. 13.) Again, this Court has found that DUSA demonstrated a likelihood that challenges to the validity of the *'468 patent* would fail. Accordingly, the Court finds the public interest [*26] in protecting valid patents weighs in favor of injunctive relief in this case.

## III. CONCLUSION

DUSA has satisfied its burden by demonstrating, (1) a likelihood of success on the merits of their claim for patent infringement by River's Edge, (2) that River's Edge's attack on the validity of the *'468 patent* would likely fail, (3) that DUSA would suffer irreparable injury without injunctive relief, (4) the balance of hardships weigh in favor of DUSA, and (5) that the public interest favors granting DUSA's requested injunctive relief. Therefore, this Court will GRANT Plaintiffs' Motion for a Preliminary Injunction. An appropriate form of order will follow.

Stanley R. Chesler, U.S.D.J.

# EXHIBIT 8

## (PART I)

40-F 1 a05-14747_240f.htm 40-F

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 40-F

☐    **REGISTRATION STATEMENT PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934**

### OR

☒    **ANNUAL REPORT PURSUANT TO SECTION 13(a) OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended **May 28, 2005**
Commission File Number: 333-120787

# Le Groupe Jean Coutu (PJC) Inc.
(Exact name of Registrant as specified in its charter)

# The Jean Coutu Group (PJC) Inc.
(Translation of the Registrant's name into English)

**Quebec, Canada**
(Province or other jurisdiction of incorporation or organization)

**5912**
(Primary Standard Industrial Classification Code Number)

**N/A**
(I.R.S. Employer Identification Number)

**530 Beriault Street**
**Longueuil, Quebec, Canada, J4G 1S8, (450) 646-9760**
(Address and telephone number of Registrant's principal executive offices)

**CT Corporation System**
**111 Eighth Avenue**
**New York, New York 10011, (212) 894-8940**
(Name, address (including zip code) and telephone number (including area code) of agent for service in the United States)

Securities registered or to be registered pursuant to Section 12(b) of the Act.

N/A

Securities registered or to be registered pursuant to Section 12(g) of the Act.

N/A

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.

7⅝% Senior Notes due 2012 and 8½% Senior Subordinated Notes due 2014

For annual reports, indicate by check mark the information filed with this Form:

☒    Annual Information Form                ☒    Audited annual financial statements

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

142,252,100 Class A Subordinate Voting Shares and 119,385,000 Class B Shares, respectively, as of May 28, 2005.

Indicate by check mark whether the Registrant by filing the information contained in the Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934 (the "Exchange Act"). If "Yes" is marked, indicate the filing number assigned to the Company in connection with such Rule.

Yes ☐  No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒  No ☐

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 1. | Annual Information Form for the fiscal year ended May 28, 2005. |
| 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations for the fiscal year ended May 28, 2005. |
| 3. | Audited Consolidated Financial Statements for the fiscal year ended May 28, 2005 (including reconciliation to US GAAP at Note 25). |
| 4. | Code of Ethics of the Directors and Officers of The Jean Coutu Group (PJC) Inc. |
| 5. | Consent of Deloitte & Touche s.r.l. |
| 6. | Certification of Principal Executive Officer pursuant to Rule 13a-14(a) or 15d-14(a) of the Securities Exchange Act of 1934. |
| 7. | Certification of the Principal Financial Officer pursuant to Rule 13a-14(a) or 15d-14(a) of the Securities Exchange Act of 1934. |
| 8. | Certifications of the Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 9. | Articles of Incorporation of The Jean Coutu Group (PJC) Inc.* |
| 10. | English translation of the Articles of Incorporation of The Jean Coutu Group (PJC) Inc.* |
| 11. | By-Laws of The Jean Coutu Group (PJC) Inc., as amended.* |
| 12. | English translation of the By-Laws of The Jean Coutu Group (PJC) Inc., as amended.* |
| 13. | Indenture, by and among The Jean Coutu Group (PJC) Inc., the guarantors listed therein, and The Bank of New York, dated July 30, 2004.* |
| 14. | Supplemental Indenture, by and among The Jean Coutu Group (PJC) Inc., the guarantors listed therein, and The Bank of New York, dated July 30, 2004.* |
| 15. | Indenture, by and among The Jean Coutu Group (PJC) Inc., the guarantors listed therein, and Wells Fargo Bank, N.A., dated July 30, 2004.* |
| 16. | Supplemental Indenture, by and among The Jean Coutu Group (PJC) Inc., the guarantors listed therein, and Wells Fargo Bank, N.A., dated July 30, 2004.* |
| 17. | U.S. Senior Credit Agreement, by and among The Jean Coutu Group (PJC) Inc., The Jean Coutu Group (PJC) USA, Inc., the lenders listed therein, Merrill Lynch, Pierce Fenner & Smith Incorporated, National Bank of Canada Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc. and National Bank Financial Inc., dated July 30, 2004.* |
| 18. | First Amendment, dated December 23, 2004, to the Senior Credit Agreement, dated July 30, 2004, among The Jean Coutu Group (PJC) Inc., The Jean Coutu Group (PJC) USA, Inc., the lenders listed therein, Merrill Lynch, Pierce Fenner & Smith Incorporated, National Bank of Canada Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc. and National Bank Financial Inc. |

\* Previously filed as an exhibit to The Jean Coutu Group (PJC) Inc.'s Registration Statement on Forms F-10, S-4 and F-4 (Reg. 333-120787), filed on November 24, 2004 and incorporated herein by reference.

EX-99.1 2 a05-14747_2ex99d1.htm EX-99.1

**Exhibit 1**

**Annual Information Form for the fiscal year ended May 28, 2005.**

**THE JEAN COUTU GROUP (PJC) INC.**

**ANNUAL INFORMATION FORM**
Financial year ended May 28, 2005



August 9, 2005

## TABLE OF CONTENTS

**ITEM 1. Corporate Structure**                                                    **2**

  Name, Address and Incorporation                                         2
  Intercorporate Relationships                                            2

**ITEM 2. General Development of the Business**                                     **3**

  History and Profile                                                      3
  Principal Development and Acquisitions of the Last Three Years           3

**ITEM 3. DESCRIPTION OF ACTIVITIES**                                               **5**
  Industry                                                                 5
  Jean Coutu (Canada)                                                      7
  Jean Coutu (USA)                                                         12
  Human Resources                                                          17
  Trademarks                                                               18
  Economic and Competitive Environment                                     18
  Risks Factors                                                            18

**ITEM 4. Dividends**                                                               **18**

**ITEM 5. Capital Structure**                                                       **19**

  Class A Subordinate Voting Shares and Class B Shares                      19
  Class C Shares                                                           21
  Senior Notes                                                             21

**ITEM 6. Market for the negotiation of securities**                                **22**

  Trading Prices and Volumes                                               23

**ITEM 7. Directors and officers**                                                  **23**

  Directors                                                                23
  Officers                                                                 23

**ITEM 8. Litigation**                                                              **26**

**ITEM 9. Interest of Informed Persons and Other Persons in Material Transactions**  **26**

**ITEM 10. Trust Agent and Registrar**                                              **26**

**ITEM 11. Material Contracts**                                                      **27**

**ITEM 12. Name of experts**                                                        **29**

**ITEM 13. Audit Committee disclosure**                                             **29**

  Charter                                                                  29
  Composition of the Audit Committee                                        33
  Relevant Education and Experience                                         33
  Policies regarding services rendered by auditors                          35
  Remuneration of auditors                                                  35

**ITEM 14. Additional Information**                                                  **36**

1

Unless the context indicates otherwise, the use in this Annual Information Form of the terms *"our" and "we", the "Company", the "Jean Coutu Group"* collectively refer to The Jean Coutu Group (PJC) Inc. and barring contrary requirements or indications, to its subsidiaries.

The Annual Information Form, which follows focuses on the fiscal year of The Jean Coutu Group (PJC) Inc., ended May 28, 2005.

## Forward Looking Statements

This Annual Information Form contains certain "forward-looking statements" as defined in the *Private Securities Litigation Reform Act* of 1995. Any statement in this report not based on historical fact may be deemed a forward-looking statement. When used in this report, the words "believe", "intend", "expect", "estimate" and other similar expressions are generally intended to identify forward-looking statements. Such statements are not guarantees of the future performance of the Jean Coutu Group or its industry and involve known and unknown risks and uncertainties that may cause the outlook, the actual results or performance of the Jean Coutu Group or of its reportable segments to be materially different from any future results or performance expressed or implied by such statements. The Company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

## ITEM 1.    Corporate Structure

## Name, Address and Incorporation

The Jean Coutu Group (PJC) Inc., which has its head office at 530 Bériault Street in Longueuil, Quebec, was incorporated on June 22, 1973, under the name Farmico Services Inc. (in French, Services Farmico inc.), under Part I of the Companies Act (Quebec). On January 24, 1979, the Company obtained supplementary patent letters to modify its authorized capital stock.

On January 27, 1986, the Company was continued under Part IA of the Companies Act (Quebec) by means of a certificate of continuation. At the time of its initial public offering, the Company by-laws were modified by certificates of amendment dated August 8, 1986, and October 9, 1986, in order to:

- change the Company's name to **The Jean Coutu Group (PJC) Inc**. and, in French, **Le Groupe Jean Coutu (PJC) inc.**;

- modify the structure of authorized and issued capital stock;

- change the designation of the shares offered to Class A subordinate voting Shares.

On March 4, 1992, on September 29, 2000 and on September 25, 2002, the Company modified its statutes and proceeded, each time, to split its shares on a basis of two new shares for each existing share.

## Intercorporate Relationships

As of May 28, 2005, our only subsidiary, which represented more than 10% of our consolidated assets or more than 10% of our consolidated sales and operating revenues, was The Jean Coutu Group (PJC) USA, Inc., incorporated under the laws of Delaware on August 6, 1986. This company, which is wholly owned by us and whose head office is in Warwick, Rhode Island, specializes in retail sales through a network, which comprises 1,922 Brooks and Eckerd corporate pharmacies as of May 28, 2005, warehousing and distribution.

2

## ITEM 2.    General Development of the Business

### History and Profile

The Jean Coutu Group is one of North America's largest organizations specializing in the distribution and retailing of pharmaceutical and parapharmaceutical products.

The Company dates back to 1969, when Jean Coutu, co-founder and current Chairman of the Board, opened a first retail outlet. He introduced an innovative formula to the retail pharmaceutical and parapharmaceutical sector, featuring low prices on a wide range of products, superior customer service and extended business hours. Four years later, in 1973, the Company started up the current franchise system and became organized to act as wholesaler/distributor for the network by acquiring a first warehouse.

The "Jean Coutu" formula was quickly embraced by consumers and, in less than ten years, the network won a major share of the Quebec market. In 1982 and 1983, when the network had grown to include some 60 outlets in Quebec, it expanded into New Brunswick and Ontario.

In 1987, the Company expanded into the north-eastern United States through its Jean Coutu Group (PJC) USA, Inc. subsidiary. The Company's American network had grown to include 22 corporate pharmacies in October 1995, when The Jean Coutu Group completed its largest acquisition thus far: the purchase of 221 Brooks Drug Store pharmacies in New England. In January 2002, another acquisition added 80 pharmacies to the American network.

In July 2004, the Company completed the most important acquisition of its history with the acquisition of 1,549 Eckerd drugstores and support facilities located in 13 states of the Northeast, mid-Atlantic and Southeastern United States. Further to this acquisition, the Jean Coutu Group (PJC) Inc. became the fourth largest drugstore chain in North America. It remains the second largest in both the eastern United States and Canada.

As of May 28, 2005, the Canadian and American network comprised of 2,243 corporate and franchised outlets including 1,922 outlets operated by the Company under the names of Brooks and Eckerd, located in eighteen states and 321 franchise stores under the PJC name located in three Canadian provinces.

In its capacity as franchisor and distributor, The Jean Coutu Group provides a broad range of support services for its franchisees. It is also responsible for the purchase and warehousing of different pharmaceutical, parapharmaceutical, and other consumer products for delivery throughout its network. On May 28, 2005, the Canadian head office and warehouse employed a total of 1,125 people.

Through its subsidiary, The Jean Coutu Group (PJC) USA, Inc., The Jean Coutu Group acts as owner-operator of 1,922 Pharmacy outlets. This network is served from six regional distribution centers and a head office in Warwick, Rhode Island. The American subsidiary's pharmacies, warehouse and head office employed a total of 45,974 people on May 28, 2005.

### Principal Development and Acquisitions of the Last Three Years

#### 2002-2003

In Canada, fiscal 2002-2003 was marked by the opening of eight new pharmacies and one PJC Clinic. In addition, three outlets were relocated among which one on Ste-Catherine Street in Montreal; with its 17,000 square feet, this pharmacy is the network's largest. Finally, nineteen establishments were remodeled or enlarged to better serve the clientele.

In the United States, seventeen Brooks pharmacies were relocated and nine stores were renovated or enlarged to reflect the new prototype concept. Moreover, four new establishments opened during fiscal 2002-2003 and eight properties were purchased for future development.

3

**2003-2004**

To maintain its leadership position in the industry, the Company opened during fiscal 2003-2004 seven new stores in Quebec and two new stores in New Brunswick. Six stores were significantly revamped, seven were expanded and four more were relocated. The Company has also finalized during this fiscal year the acquisition of seven new properties and of three Pharmasave stores in Ontario.

The Company has also continued expanding its Brooks network in the United States with the opening of five new stores and the acquisition of eight new properties located in the states of Connecticut, Massachusetts, Vermont and Rhode Island. Seven Brooks stores were significantly remodeled while six other stores were relocated.

**2004-2005**

On April 4, 2004, following the signature of an agreement, TDI Consolidated Corporation ("TDI"), a wholly-owned subsidiary of J.C. Penney Corporation, Inc., which operated more than 2,800 outlets under the Eckerd Banner, agreed to sell the chain to The Jean Coutu Group (PJC) Inc. and CVS Corporation. Under this agreement, closed on July 31, 2004, the Jean Coutu Group acquired 1,549 Eckerd drugstores in 13 states(1), as follows:

| | |
|---|---:|
| Connecticut | 6 |
| Delaware | 22 |
| Georgia | 194 |
| Maryland | 20 |
| New Jersey | 147 |
| New York | 365 |
| North Carolina | 251 |
| Ohio | 1 |
| Pennsylvania | 297 |
| South Carolina | 109 |
| Tennessee | 48 |
| West Virginia | 2 |
| Virginia | 87 |
| Total | 1,549 |

The acquisition was completed at a price of US$2.375 billion, subject to post-closing adjustments. The Business Acquisition Report in compliance with Form 51-102F4, filed by the Company on August 16, 2004, is incorporated to this Annual Information Form by reference.

The purchase price, together with the repayment of existing debts totaling US$195.0 million at the date of acquisition, has been financed through:

- Debt financing consisting of secured first rank credit facilities (see "Material Contracts") of US$1.7 billion broken down as follows:

  — a five-year revolving variable-rate facility of US$350.0 million;

  — a five-year variable-rate loan facility of US$250.0 million; and

  — a seven-year variable-rate loan facility of US$1.1 billion.

---

(1) Store allocation as of June 6, 2004

4

- A US$1.2 billion senior note offering (see *"Material Contracts"*) consisting of:
  — US$350.0 million of unsecured senior notes bearing interest at 7.625% and maturing on August 1, 2012, and
  — US$850.0 million of unsecured senior subordinated notes bearing interest at 8.5% and maturing on August 1, 2014.
- The issue of 33,350,000 new Class A subordinate voting shares for gross proceeds of US$424.4 million.

Concurrently to the acquisition of Eckerd in July 2004 and its integration thereafter, the Company proceeded in the United States to the acquisition of 2 additional stores, the opening of 63 stores, the relocation of 54 stores and the closing of 28 existing stores. As of the end of fiscal 2005, the Company elected to proceed with the closing of 78 Eckerd locations. These closings are planned to take place during the 1st quarter of fiscal 2005-2006.

In Canada, 2 new stores were opened, 5 stores were relocated, while 22 stores were significantly renovated or expanded.

## ITEM 3.    DESCRIPTION OF ACTIVITIES

We exercise our pharmaceutical activities in two broad geographic areas, Eastern Canada and the Eastern United States, through corporate and franchised drugstores (under the banners of Eckerd, Brooks, PJC Jean Coutu, PJC Santé Beauté and PJC Clinique).

In Canada, franchising activities include operating a distribution center and providing services to our PJC franchised outlets. These services comprise centralized purchasing, distribution, marketing, training, human resources, management, operational consulting and information systems, as well as participation in our private label program. Our PJC franchisees own and manage their outlets and are responsible for merchandising and financing their inventory. They must provision their outlets from our distribution centre provided that the products requested are available and priced lower than other suppliers. We supply our PJC franchisees with approximately 72% of their products, including almost all prescription drugs. Although PJC retail sales are not included in our revenues, an increase or decrease in this regard will directly affect our performance as it impacts distribution centre sales and royalties.

In the U.S., we operate a network of 1,922 retail sales outlets selling pharmaceutical and other products under the Brooks and Eckerd banners, and six distribution centres.

### Industry

We operate in the large and growing North American pharmacy industry, which we believe, offers compelling industry fundamentals and favorable demographics.

***Favorable Demographics for Prescription Drug Sales Growth.***    According to IMS Health, the compounded annual growth rate for prescription drug sales through all channels in the U.S. and Canada is projected to be approximately 8.2% and 8.9% respectively, for the period 2004 through 2009. We believe that several factors will contribute to this continued growth in prescription drug sales, including increasing life expectancy, the aging "baby boom" generation, the addition of a Medicare prescription drug coverage benefit in the United States in January 2006, increasing marketing and utilization of lifestyle prescription drugs. According to the National Ambulatory Medical Care Survey, approximately 49.0% of all prescriptions written in the U.S. in 2001 were for individuals 55 years old and older. Similarly, according to IMS Health, 58.9% of all prescriptions filled in Canada in 2003 were for individuals 55 years old and older. According to the U.S. Census Bureau, in 2005 approximately 22.7% of the U.S. population, or approximately 67.5 million people, are expected to be 55 years old or older. This percentage of the total

5

U.S. population is expected to grow to 29.5%, or approximately 106.2 million people, by 2025. The Canadian population is also expected to age at an accelerated pace, with people 55 years old and older expected to represent 24.7% of the total Canadian population, or approximately 8.0 million people, by 2006 and 33.3%, or approximately 11.8 million people, by 2021, according to Statistics Canada.

*Favorable Government Regulation.*    The U.S. Medicare Prescription Drug, Improvement and Modernization Act of 2003 is expected to increase prescription drug coverage for United States Medicare beneficiaries after it comes into force, in January 2006. We believe that the addition of a Medicare prescription drug coverage benefit in the United States will increase prescription drug utilization and help sustain our industry's growth rate in the future.

*Increased Focus on Consumer Health and Wellness.*    We believe there is an increased consumer focus on prevention, general wellness, early diagnosis of medical conditions and on the purchase of self-care products, such as vitamins, analgesics, herbals and smoking-cessation products and lifestyle drugs. This is expected to continue to have a positive impact on sales of prescription drugs, over-the-counter medications, nutrition supplements and other drugstore merchandise.

*Highly Fragmented U.S. Industry.*    We believe that the U.S. pharmacy industry is fragmented with no single company holding a dominant market position. In addition, the only retail concept that has been successful in achieving and retaining a dominant market position is the chain drugstore concept. The market includes several national and regional chain drugstore operators, numerous independent pharmacies, supermarkets, mass merchandisers and mail order pharmacies. In recent years, mail order pharmacies and other channels have aggressively expanded their market position and we believe this trend is continuing. We believe this expansion of market position has primarily come at the expense of the market position of independent pharmacies. Convenience remains a primary competitive advantage for chain drugstore operators and independent pharmacies. While many supermarkets and mass merchandise stores offer pharmacy services, we believe that convenient locations, smaller store size and high level of customer service of many chain drugstores result in higher consumer utilization of chain drugstores.

*Front-End Sales Opportunity.*    We believe drugstore front-end merchandise, combined with prescription drugs, provide customers with a complete wellness solution. Front-end merchandise includes beauty, cosmetics and fragrance products, over-the-counter medications, personal care products, as well as consumable seasonal, promotional and other non-prescription products. Front-end merchandise sales typically provide higher gross margins than prescription drug sales.

We believe that the category OTC Health, which includes over-the-counter medications, has grown over the last few years due in part to the conversion of popular prescription drugs to over-the-counter medications. Also, we believe the edible and non-edible consumables categories have grown over the same period due in part to the increased number of convenient locations and wide consumables offering of many chain drugstores.

Many drugstores offer seasonal merchandise to expand front-end product assortment and further differentiate merchandise mix relative to other retail sales channels. Additionally, many chain drugstores market private label front-end merchandise, offering customers a value alternative to branded merchandise while typically providing higher gross margins than for branded products.

**Jean Coutu (Canada)**

*General*

Our PJC franchised stores have the number one market position in Quebec, the key Canadian market in which we operate. We franchise our PJC stores because, under Quebec law, only pharmacists are permitted to own a pharmacy. The PJC name is a widely recognized brand in Quebec and our Company ranked first in the most recent *Revue Commerce* survey of the most admired companies in Quebec for the fourth time in eight years.

We provide our PJC franchisee network with multiple services, including centralized purchasing, distribution, marketing, training, human resources, management, operational consulting, information systems, as well as participation in our private label program. Our franchisees pay us an average franchise royalty of approximately 4% of covered franchised store revenues, and an additional fee for other services such as human resources, information technology and loss prevention services. Our PJC franchisees own their PJC businesses independently from us and, as a result, are responsible for managing their PJC franchised stores and for funding their investments in inventory and store fixtures. While sales at our PJC franchised stores are not included in our revenues; increases or decreases in sales at these stores have a direct effect on our revenues through higher or lower warehouse sales and franchise royalties.

We believe that PJC franchised stores have a strong reputation among customers for competitive prices, fast and effective delivery of high-quality, professional pharmacy services, beauty and cosmetic product offerings, targeted and extensive seasonal product programs, photo development, private label products and convenient locations. We believe PJC is also known as a leader in delivery of new and emerging services, such as web-based digital photo processing and web-based prescription refills. Further, we believe PJC is a highly desirable and sought after franchise among pharmacists in our Canadian market area.

During fiscal 2005, our PJC franchisee network filled approximately 47.5 million prescriptions, with an average of approximately 148,000 prescriptions per store, which we believe are among the highest prescription counts for any drugstore chain in Canada. In our PJC franchisee network during that same period, prescription drugs accounted for approximately 58% of sales and front-end merchandise accounted for approximately 42% of sales.

*Store Network*

Our typical PJC franchised stores have an average size of approximately 8,000 square feet. Our PJC franchised stores are generally freestanding stores on corner locations or in strip shopping centers in high retail traffic areas. Approximately 39% of our PJC franchised stores are located adjacent to or in medical office buildings. Approximately 54% of the stores in our PJC franchisee network have been either opened, relocated, remodeled or reconfigured during the last five years.

Our PJC franchisees generally carry between 20,000 and 25,000 front-end products, including approximately 1,800 private label and exclusive brand products. PJC's private label offerings include our *Personnelle* line of beauty and cosmetic products, which we believe have developed a reputation for high quality, as well as over-the-counter medications, personal care products and other front-end products.

7

The table below sets forth the provinces in which our PJC franchised stores are located.

| Province | Number of stores as of May 28, 2005 |
|---|---|
| New Brunswick | 18 |
| Ontario | 9 |
| Quebec | 294 |
| Total stores | 321 |

The following table provides a history of our PJC franchised store openings, additions and closings since the beginning of fiscal 2001.

| | Fiscal year ended May | | | | |
|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 |
| Number of stores at beginning of period | 291 | 293 | 302 | 311 | 319 |
| Added(1) | 3 | 5 | 3 | 4 | — |
| New(2) | 2 | 11 | 8 | 5 | 2 |
| Closed or sold | 3 | 7 | 2 | 1 | — |
| Number of stores at end of period | 293 | 302 | 311 | 319 | 321 |

(1) Added stores are defined to be stores or clinics that were acquired by a franchisee and added to our drugstore chain and where all existing operations were kept at the same location.

(2) New stores are defined to be stores or clinics that were opened without buying or transferring any prescriptions from other locations.

### Franchise Operations

In Canada, under laws that vary province by province, generally only pharmacists are permitted to own a pharmacy. As a result, we maintain a franchise relationship with all of our stores. Our franchise agreement grants the pharmacist franchisee the right to operate an establishment under the PJC banner in return for the payment to us of franchise royalties and other fees. Our PJC franchisees own their PJC businesses independently from us and, as a result, are responsible for managing their PJC franchised stores and for funding their investments in inventory and store fixtures. We believe that this substantial required investment helps ensure that the interests of our franchisees are aligned with ours and also attracts more motivated entrepreneurial franchisees. We believe our franchise model is superior to those of our competitors.

*Franchise Agreement.* Under our franchise agreement, our PJC franchisees pay us an average franchise royalty of approximately 4% of covered franchised store revenues, and an additional fee for human resources, information technology and loss prevention services. The sales covered by the franchise royalty include sales of pharmacy and front-end merchandise, except postage and lottery tickets. Our PJC franchisees are required to purchase their inventory from our modern, high-capacity warehouse distribution center so long as we carry the particular item and that it is priced lower than other suppliers. The Company supplies its PJC franchisees with approximately 72% of the products stocked in PJC franchised stores, including virtually all of the prescription drugs stocked in those stores. The vast majority of the 28% of other products stocked are items we have determined not to carry in our warehouse.

Our franchisees agree to abide by standards that we believe help make PJC franchised stores a strong customer value and convenience proposition, such as maintaining operating hours seven days a week, including evening hours. In return for franchise royalties, we provide our franchisees with multiple services, including centralized purchasing, distribution, marketing, training, human resources, management, operational consulting and information systems, as well as participation in our private label

8

program. Franchisees also pay an additional fee for human resources, information technology and loss prevention services. In addition, franchisees are obligated to participate in all large-scale PJC advertising campaigns and benefit from the backing of an experienced corporate management team that has significant resources and industry expertise.

The initial term of our typical franchise agreement is five years with two five-year renewal options at either party's discretion. We have 304 PJC franchisees several of whom have franchises for multiple store locations. Among our current franchisees, 154 have been in our PJC store network for more than 10 years, including 54 who have been in the network for more than 20 years. Virtually none of our franchisees have sold their franchises or otherwise left our PJC network during the past 25 years to open a store under a competitor's banner.

*Franchisee Selection Process.* Potential franchisees undergo rigorous scrutiny and financial due diligence review before being invited to become part of the PJC franchisee network. All of our prospective franchisees are required to be licensed pharmacists in the province in which the prospective PJC franchise store is to be located. In addition to that requirement, we select franchisees based on a number of factors, including the candidate's business and pharmacy experience, management style, customer service experience and commitment to the PJC store network business strategy. After a candidate is selected as a worthwhile franchisee prospect, we perform a thorough review of the pharmacist's financial situation to ensure that he or she has adequate resources and financial skills to operate under the PJC banner. In addition, to ensure that each newly selected franchisee is prepared to operate a PJC store, we invite each new franchisee to attend more than 100 hours of business training courses on several important aspects of operating a PJC store and owning and operating a business enterprise in general. Currently, we have a substantial number of pharmacist franchisee candidates who have been through our review process and who we believe can be PJC franchisees in the future, but who are currently waiting for a franchise to become available.

### Merchandising Operations

*Pharmacy.* We believe that it is imperative that our PJC pharmacists provide high-quality and knowledgeable service and advice to customers. It is our strategy to have our PJC pharmacists become an integral part of the health care decision making process of our customers. We have developed a sophisticated, proprietary pharmacy information and workflow system designed to enable an efficient workflow process that optimizes our pharmacy services through fast prescription filling, verification of quality control, reduction in filling errors, examination of workflow data, and maximization of the availability of high demand prescription products. We believe that our pharmacy information and workflow system is critical to our goal of providing professional pharmacy services and patient care. We believe that our efforts to continually improve pharmacy services at our PJC franchised stores contribute to customer loyalty and increased customer store visits.

Each PJC pharmacy is staffed with pharmacists and drug clerks at all times. PJC pharmacist and drug clerk staffing levels are maintained in accordance with business needs to ensure accurate and timely service. Each PJC franchisee carries a complete line of both brand name and generic prescription drugs.

In order to ensure our PJC pharmacists are equipped with the latest developments in pharmacology, we established the Jean Coutu Academy. The Jean Coutu Academy offers PJC pharmacists many continuing education programs, including:

- monthly lectures pertaining to different illnesses and their treatments,

- continuing education through correspondence courses and seminars, and

- periodic publications updating current market and industry trends.

In addition, all PJC pharmacies have direct access to a prescription drug information center that answers questions or special requests concerning the use of a medication or other medical-related issues. We have also developed an in-house training program for our PJC drug clerks, which we believe is unique in our industry.

*Front-End Merchandise.* Our PJC franchised stores carry a wide variety of front-end merchandise, including over-the-counter medications, personal care products, private label products, as well as consumable, seasonal and promotional items tailored to local consumer tastes and demands for convenience and quality. Our PJC franchised stores also carry an extensive selection of high-quality beauty, cosmetics and fragrance merchandise of a type most often found in the United States in department or specialty stores. In Canada, consumers have traditionally looked to pharmacies rather than specialty or department stores for high-quality cosmetic and beauty products. We hold the exclusive rights for the sale in Canada of the *Garraud Paris* and *Jean d'Estrées Paris* lines of French beauty products and the *Crema Color from Solfine* line of Italian hair coloring. We believe that the selection and quality of such merchandise carried by our PJC franchised stores provides these stores with a competitive advantage relative to other Canadian drugstores, mass merchandisers and food retailers.

*Private Label Products.* Our PJC franchised stores carry approximately 1,800 private label products, including the exclusive cosmetic and beauty products described above. PJC's private label offerings include our *Personnelle* line of beauty and cosmetic products, which we believe have developed a reputation for high quality, as well as over-the-counter medications, personal care products and other front-end products. We intend to continue to promote and expand private label and exclusive brand merchandise offerings at our PJC franchised stores to drive sales of these products.

### Marketing and Advertising

We maintain centralized marketing and advertising programs for our PJC franchised store network. We believe that our PJC franchisees benefit from our strong, recognizable brand name, experienced and professional marketing support, and lower advertising costs resulting from the scale of our operations. We regularly consult our franchisees on product selection and hold five purchasing exhibitions annually, one of which is devoted exclusively to cosmetics.

The PJC advertising circular is our top promotional vehicle, although we participate regularly in other marketing channels, such as radio, television and local newspapers. These circulars are designed to increase sales of beauty, cosmetic and fragrance products, over-the-counter medications and private label merchandise, to satisfy local tastes and demands and to emphasize our PJC Jean Coutu brand name, the quality of our pharmacy services and our commitment to customer service. We design our marketing efforts and advertising to be targeted and straightforward to facilitate efficient and high-quality in-store execution. We encourage our franchisees to maintain strong in-stock positions for promotional merchandise featured in our circulars, which we believe, increases the effectiveness of our advertising expenditures.

Other PJC marketing initiatives include participation in the Air Miles® Reward Program. Our PJC franchised stores are the exclusive Quebec drugstore participants in the Air Miles® Reward Program. Consumers in the Air Miles® Reward Program earn reward miles in connection with product purchases at retailers in various categories that may be redeemed for over 300 different rewards including travel services, leisure and entertainment, electronics and gift certificates, including gift certificates redeemable at PJC franchised stores. The Air Miles® Reward Program promotes customer loyalty by encouraging consumers to shop at retailers that are participating sponsors in the Air Miles® Reward Program rather than all retailers as in the case of airline branded credit cards with mileage benefits. At the end of fiscal 2005, the average Air Miles® shopping cart generated 57% more sales when compared to purchases made outside the loyalty program.

10

### Purchasing and Distribution

As a warehouse supplier to our PJC franchised stores, we purchase brand name and generic (non-brand name) prescription drugs from numerous manufacturers and wholesalers. We believe that competitive sources are readily available for substantially all of the prescription drugs and front-end merchandise that we supply to our PJC franchised stores and that the loss of any one supplier would not have a material effect on our business. The largest supplier to our Canadian warehouse and distribution center operations for fiscal 2005 was Pfizer Canada, which accounted for approximately 13% of the dollar value of our Canadian warehouse and distribution center supplier volume.

In our Canadian operations, we utilize a sophisticated data warehouse to track and analyze warehouse inventory levels and selling trends at our PJC franchised stores. We believe this enables us to optimize merchandise levels and product mix in our warehouse and to aid our franchisee purchasing decisions. Approximately 72% of PJC franchised store merchandise is purchased from us and distributed by our own trucks or third party providers from our distribution center in Longueuil, Quebec. The remainder of PJC franchised store merchandise is purchased by our franchisees from third party suppliers.

### Real Estate

We have significant Canadian real estate assets. As of May 28, 2005, we owned 166 properties, including all or a portion of 78 strip malls and commercial buildings, 7 parcels of undeveloped land and 81 free-standing buildings, most of which house a PJC franchised store. We believe that PJC franchised stores attract other high-quality tenants to our properties because of the consistent retail traffic at our PJC franchised stores. We own and lease to our franchisees 130 of our PJC franchisee locations. All of these leases contain two five-year renewal options and involve fair market value rent increases. In addition, we sublet 191 store locations to other PJC franchisees under leases we have entered into directly with landlords. The leases we have entered into with landlords generally have original terms of 10 years. Our PJC leases with other landlords generally contain two five-year renewal options, and involve fair market value rent increases. We believe that our Canadian real estate assets enable us to ensure that prime locations remain under the PJC banner.

### Information Systems

Our warehouse supplier operations and the operations of our PJC franchised stores are supported by the use of modern technology, including point of sale scanners, that enables in-depth analysis of and quick decision-making with respect to store and warehouse inventory and front-end and pharmacy sales, which enhances the efficiency of our operations and those of our PJC franchisees. For example, through efficient use of information provided by our technology systems, we refine our purchasing operations on an ongoing basis and work with our suppliers to tailor our merchandising. We also work with PJC franchisees to customize their shelf space to customer preferences in an effort to increase sales volumes and gross margins. As part of our strategy to provide franchisees with the best possible information technology services, we established a subsidiary, Rx Information Centre Ltd., which is responsible for the development, installation and management of information systems for our PJC and Brooks store networks, as well as related distribution centers and administrative offices. The responsibility of this unit has been expanded to the Eckerd stores during the course of 2004-2005.

Rx Information Centre also works to ensure smooth and effective communications between us and the PJC franchised store locations. Rx Information Centre provides on-line reports and statistics regarding service as well as back office management tools. Rx Information Centre maintains a help desk with a goal to provide seven-day support to our PJC franchised stores. Rx Information Centre also works to make available to our PJC franchised stores new equipment, software updates and training assistance with a goal to act as a one-stop technology source for our PJC franchisees.

11

Rx Information Centre is also mandated to promote the ongoing automation of operations in our warehouse and distribution center facilities to optimize transportation and warehousing activities, inventory control, supply chain efficiencies, handling costs inventory movements, as well as forecasting inventory replenishment in support of our goal of just-in-time inventory distribution.

Rx Information Centre has developed a sophisticated, proprietary pharmacy information and workflow system used in all our PJC franchised stores and Brooks stores. This system is known as Rx Pro in Canada and Brooks Rx Care in the U.S. This system is designed to enable an efficient workflow process that optimizes pharmacy services through fast prescription filling, verification of quality control, reduction in filling errors, reduced chances of adverse drug interaction, examination of workflow data and maximization of the availability of high-demand prescription products. At the customer's request, this system also allows our Canadian customers to utilize any PJC store to refill prescriptions.

### Jean Coutu (USA)

#### General

Our U.S. operations began in 1987 with one store and grew primarily through acquisitions, including our acquisition of 221 Brooks stores in 1994 and 80 Osco stores in 2002. With the acquisition of the Eckerd stores in July 2004, the U.S. network comprised, as of May 28, 2005, 1,922 Brooks and Eckerd corporate-owned stores and 6 regional distribution centers.

Brooks is the second largest retail drugstore chain in New England and has a number one or two market position in 56% of the New England markets in which it operates while Eckerd holds a number one or two market position in approximately 60% of the markets in which it operates.

We believe that Brooks has a strong reputation among customers for competitive prices, fast and effective delivery of professional pharmacy services, high-quality beauty and cosmetic product offerings, targeted and extensive seasonal product programs, photo development, private label products, convenient locations and a wide selection of convenience foods and other consumables. The Brooks banner has been in use for more than 65 years, making it one of the most widely-recognized banners in the New England retail drugstore industry. In 2004, *Drug Store News* awarded Brooks the "Best Regional Chain of the Past 20 Years" in their Regional Excellence Awards.

Our Eckerd stores have significant density throughout 13 states and particularly in Georgia, New Jersey, New York, North Carolina, Pennsylvania and South Carolina. We believe that Eckerd has a strong reputation among customers for name recognition, convenience and a modern store base. The Eckerd banner, first used in 1898, is one of the longest lasting and strongest in the retail drugstore industry.

During fiscal 2005, our combined US network filled approximately 121.5 million prescriptions, with an average of approximately 64,000 prescriptions per store.

#### Store Network

Typical Brooks and Eckerd stores range in size from 10,000 to 13,500 square feet and are freestanding stores on corner locations or in strip shopping centers in high retail traffic areas. On a combined US operations basis, approximately 75% of our stores have been either opened, relocated, remodeled or reconfigured during the last five years. For the past three fiscal years, investments for the combined network have totaled more than US$500 million in the aggregate. Our stores generally carry between 18,000 and 25,000 front-end products, including approximately 1,200 to 2,000 private label products. Our stores' private label product offerings include beauty and cosmetic products, over-the-counter medications, personal care products and other front-end products.

12

The table below sets forth the states in which our Brooks and Eckerd stores are located.

| States | Number of stores as of May 28, 2005 Brooks | Eckerd |
|---|---|---|
| Connecticut | 47 | 7 |
| Delaware | | 22 |
| Georgia | | 211 |
| Maryland | | 25 |
| Maine | 6 | |
| Massachusetts | 165 | |
| New Hampshire | 38 | |
| New Jersey | | 147 |
| New York | 2 | 368 |
| North Carolina | | 259 |
| Ohio | | 1 |
| Pennsylvania | | 297 |
| Rhode Island | 46 | |
| South Carolina | | 111 |
| Tennessee | | 50 |
| Virginia | | 87 |
| Vermont | 31 | |
| West Virginia | | 2 |
| **Total stores** | **335** | **1,587** |
| **Grand Total** | | **1,922** |

The following table provides a history of our US store openings, acquisitions and closings since the beginning of fiscal 2001.

| | Fiscal year ended May | | | | |
|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 |
| Number of stores at beginning of period | 252 | 251 | 331 | 332 | 336 |
| Acquired(1) | 0 | 80 | 0 | 0 | 1,551 |
| New(2) | 5 | 4 | 4 | 5 | 63 |
| Closed or sold | 6 | 4 | 3 | 1 | 28 |
| Number of stores at end of period | 251 | 331 | 332 | 336 | 1,922 |

(1) Acquired stores are defined to be stores that were acquired and all existing operations were kept at the same location.

(2) New stores are defined to be stores that were opened without buying or transferring any prescriptions from other locations.

### Merchandising Operations

*Pharmacy.* We believe that it is imperative that our pharmacists provide high-quality and knowledgeable service and advice to customers. It is our strategy to have our pharmacists become an integral part of the health care decision making process of our customers. In our Brooks stores, we utilize the same sophisticated, proprietary pharmacy information and workflow system to ensure highly professional pharmacy services and patient care that is used in our PJC franchised stores. In our Brooks stores, we have branded this system Brooks Rx Care. During the next few years, we also intend to utilize this system in our Eckerd establishments to ensure the same highly professional services and patient care

13

that is used in our PJC and Brooks stores. We believe that our efforts to continually improve pharmacy services at our stores contribute to customer loyalty and increased customer store visits.

Each pharmacy part of our U.S. network is staffed with pharmacists, pharmacy technicians and drug clerks in accordance with business needs to ensure accurate and timely service. Each pharmacy carries a complete line of both brand name and generic prescription drugs. In the year ended May 28, 2005, approximately 44% of the prescriptions filled in our Brooks store network were for brand name drugs and approximately 56% of the prescriptions filled were for generic substitutes. Over the same period, approximately 48% of the prescriptions filled in our Eckerd store network were for brand name drugs, while approximately 52% of the prescriptions filled were for generic substitutes.

As part of our ongoing employee development program and as a way to improve customer service, we have applied for and received American Council on Pharmaceutical Education accreditation. Internally, we retain two professors from the University of Rhode Island to maintain offices in our pharmacy corporate department and two professors from the Massachusetts College of Pharmacy in two Boston area stores. We have also extended our relationship with other pharmacy schools through various programs and created the Pharmacists Speakers Bureau mostly involved in community reach initiatives, such as promoting education with hospitals and clinics.

*Front-End Merchandise.*   Our stores carry a wide variety of front-end merchandise, including beauty, cosmetic and fragrance products, over-the-counter medications, personal care products, private label products, as well as consumable, seasonal and promotional items tailored to local consumer tastes and demands for convenience and quality. As part of our strategy to differentiate our Brooks and Eckerd stores from discount stores and supermarkets with respect to front-end merchandise, we are working to enhance our reputation as a source of high-quality beauty, cosmetics and fragrance merchandise. We believe such products represent a significant opportunity for growth in front-end sales. To capitalize on this growth opportunity, Derma Skincare Centers have been opened in several of our Brooks stores and one in an Eckerd store. At the end of fiscal 2005, ten centers were in operation. These centers are stocked with high-quality skincare products including the French skincare brands *Vichy Laboratories, Avene* and *Dermablend.* These products generally carry higher margins and are priced at a premium to traditional drugstore cosmetics. Moreover, we believe we are well positioned to leverage our experience in our PJC franchised stores in merchandising high-quality beauty, cosmetics and fragrance merchandise and to incorporate the best practices used in those stores.

*Private Label Products.*   Our Brooks stores carry approximately 1,200 private label products. The Brooks private label brands include *Brooks, Harvard Square* and *Fidelity.* Eckerd stores offer approximately 2,000 private label products, mostly under the Eckerd brand name.

### Marketing and Advertising

Our Brooks advertising and promotion strategy utilizes print, circulars, as well as targeted regional radio and television ads. Circulars are our broadest form of advertising for our Brooks stores, with approximately four million distributed weekly through various channels such as newspaper and magazine inserts. These circulars are designed to increase sales of higher-margin products and to attract customers to what we refer to as the four front-end "quadrants" of our Brooks stores: convenience foods and other convenience items; health products; beauty and cosmetic items; and seasonal and promotional offerings. Further, these circulars are customized to feature beauty and cosmetic products, over-the-counter medications and private label merchandise, to satisfy local tastes and demands and to emphasize the Brooks brand name, the quality of our pharmacy services and our commitment to customer service. We design our marketing efforts and advertising to be targeted and straightforward to facilitate efficient and high-quality in-store execution. We work to maintain strong in-stock positions for promotional

merchandise featured in our circulars, which we believe, increases the effectiveness of our advertising expenditures.

Eckerd has in the past used an advertising strategy, which included newspaper advertising and coupon books, in addition to traditional weekly advertising circulars. During fiscal 2005, we made Eckerd's advertising practices more comparable to our current Brooks advertising practices by eliminating or vastly reducing coupon books and newspaper advertising and focusing on circular advertising. We also opted to de-emphasize promotions that target high-volume low-margin consumables. We believe that such consumables promotions do not significantly increase sales of other higher-margin front-end products, do not lead to repeat sales or promote customer loyalty, while at the same time they result in decreased overall operating margins.

### Purchasing and Distribution

For fiscal 2005, we purchased approximately 87% of the dollar volume of branded prescription drugs for our US network from a single supplier, McKesson Corporation. In the course of fiscal 2005, the existing agreement with McKesson was renewed and expanded into a five-year extended agreement, maintaining McKesson as the primary supplier of pharmaceutical products for the entire US network. We purchase generic (non-brand name) prescription drugs from numerous manufacturers and wholesalers. We believe that competitive sources are readily available for substantially all of the brand name and generic prescription drugs and front-end merchandise we carry in our stores and that the loss of any one supplier would not have a material effect on our business. The largest supplier of front-end merchandise for the fiscal year ended May 28, 2005, was Procter & Gamble, which accounted for approximately 8.5% of the dollar value of our front-end inventory purchases.

Purchasing for our stores is generally centralized to assure consistency and efficiency. At Brooks and Eckerd, we utilize advanced data warehouses to track and analyze stock levels and selling trends enabling us to optimize merchandise levels and mix. For the period ended May 28, 2005, approximately 82% of our front-end merchandise and 87% of prescription drugs were purchased centrally and distributed, principally by our own trucks, through our various distribution centers. The remainder of store merchandise is shipped directly to our stores or is purchased locally at the store level.

### Third-Party Payors

MEDCO accounted for approximately 14% of our pharmacy sales for the period ended May 28, 2005. No other single health plan contract or other third-party payor accounted for more than 10% of such revenues during the same period. In a typical third-party payment plan, we contract with a third-party payor (such as an insurance company, a prescription benefit management company, a governmental agency, a private employer, a health maintenance organization or other managed care provider) that agrees to pay for all or a portion of a customer's eligible prescription purchases in exchange for reduced prescription rates. State Medicaid programs may set allowable prescription dispensing fees as well as any discount that a pharmacy may apply to a drug.

For the period ended May 28, 2005, the top five third-party payors in our U.S. store network accounted for approximately 35% of pharmacy sales. Third-party payor prescriptions represented 95% of pharmacy sales and 93% of the prescriptions filled at our store network during the period ended May 28, 2005.

In the ordinary course of business, our US pharmacy operations are subject to audits by third-party payors and may be required to reimburse amounts determined to be overpayments. Any significant loss of third-party payor business, overpayment or dispute over compliance with the terms of a third party payor agreement could have a material adverse effect on our business and results of operations.

15

### Real Estate

Brooks has significant real estate assets in the markets in which it operates. Our Brooks operations comprise 335 stores and one regional distribution center. Of our 335 Brooks stores, approximately 135 are freestanding stores and approximately 88 stores have drive-up windows. Our headquarters are located in Warwick, Rhode Island. We own 102 U.S. properties, including 84 Brooks store locations, our Brooks distribution center and our Brooks corporate headquarters, and we lease the remaining 251 locations under non-cancelable leases, many of which have original terms of 10 to 15 years. In addition to minimum rental payments, which are set at competitive market rates, certain of these leases require additional payments based on sales volume, as well as reimbursement for taxes, maintenance and insurance. Our Brooks leases contain varying renewal options and involve fair market value rent increases. We believe that our Brooks real estate assets will enable us to ensure that prime locations remain under the Brooks banner.

Our Eckerd operations comprised 1,587 stores, 5 regional distribution centers, 26 local or regional offices and one building originally housing Eckerd's head office in Largo, Florida as of May 28, 2005. Of the 1,587 Eckerd stores, approximately 871 are freestanding stores and approximately 782 stores have drive-up windows. We plan to close our Largo facility during fiscal 2005-2006 and finalize the relocation and consolidation of our Eckerd headquarters with our Brooks headquarters in Warwick, Rhode Island. Our Eckerd stores, five distribution centers and 26 local or regional office locations are generally subject to non-cancelable leases with terms of 20 years. In addition to minimum rental payments, which are set at competitive market rates, certain of these leases require additional payments based on sales volume, as well as reimbursement for taxes, maintenance and insurance. Most of our Eckerd leases contain renewal options, some of which involve fair market value rent increases.

### Information Systems

Our U.S. operations are supported by the use of technology, including point of sale scanners, which enable us to perform in-depth analysis of and quick decision-making with respect to inventory and pharmacy and front-end sales, which we believe, enhances the efficiency of our operations. For example, through efficient use of information provided by our technology systems, we refine our purchasing operations and work with our suppliers to tailor our merchandising and customize our shelf space to customer preference in an effort to increase sales volume and gross margins. Our Brooks information technology systems are developed and maintained by Rx Information Centre Ltd., our subsidiary responsible for the development, installation and management of information systems for our Canadian and U.S. stores, distribution centers and administrative offices. The responsibility of this unit has been expanded to cover the Eckerd stores in the course of fiscal 2005.

We utilize in all our Brooks stores the sophisticated, proprietary pharmacy information and workflow system designed by Rx Information Centre and also used in our PJC franchised stores. In our Brooks stores, we have branded this system Brooks Rx Care. This system is designed to enable an efficient workflow process that optimizes our pharmacy services through fast prescription filling, verification of quality control, reduction in filling errors, reduced chances of adverse drug interaction, examination of workflow data and maximization of the availability of high-demand prescription products.

At the time of their acquisition, the Eckerd stores were serviced by a variety of information systems, including commercial point of sales systems. We are now in the process of reviewing the entire information platform, with an aim to standardize our U.S. information network and reduce the number of platforms from 8 to 3.

16

# EXHIBIT 8

## (PART II)

**Specialized skill and knowledge**

*Experienced Management Team with a Proven Track Record.*

Our Company was founded in Quebec in 1969 by Jean Coutu, our Chairman of the Board. François J. Coutu is the President and Chief Executive Officer of The Jean Coutu Group (PJC) Inc. and also manages our Canadian drugstore franchising and warehouse supplier business. Michel Coutu is the President and Chief Executive Officer of The Jean Coutu Group (PJC) USA, Inc. and manages our U.S. drugstore operations. Each of François J. Coutu and Michel Coutu, who are sons of founder Jean Coutu, have worked in the retail drugstore business for more than 27 years.

Our Canadian and U.S. senior management teams have developed extensive expertise in operating a chain of corporate-owned drugstores and in operating a drugstore franchisor and warehouse supplier business. The eight senior members of these teams have an average of 24 years of retail industry experience, including an average of 13 years with our Company.

Prior to the Eckerd Acquisition, we completed two significant U.S. acquisitions, adding 301 stores to our corporate-owned drugstore network, as well as several other smaller acquisitions. We believe we have consistently improved the performance of the stores we have acquired. Further, we believe that our management's experience in integrating large groups of stores into our existing network and improving the performance of acquired stores has been and will continue to be an important factor in our success.

**Human Resources**

As of May 28, 2005, The Jean Coutu Group and its subsidiaries had approximately 47,100 permanent employees: 1,125 in Canada(2) and 45,974 in the United States.

On May 28, 2005, 374 employees of the Company in Canada were unionized. These employees work at The Jean Coutu Group's distribution centre in Longueuil and are members of the Syndicat des travailleuses et travailleurs de PJC entrepôt-CSN. The current collective agreement, signed on January 18, 2003, ends on December 31, 2005.

As of May 28, 2005, the Canadian franchised outlets employed a total of 13,539 people, 36 of those employees in one outlet were unionized.

In the United States, Brooks and Eckerd operations employed approximately 45,974 persons, approximately 45,304 of whom were working in the corporate pharmacies network and distribution centers, and approximately 670 employees were working in administrative functions.

In terms of human resources management, The Jean Coutu Group favors participatory management based on communications, training, internal promotion, and quality of life in the workplace.

The Human Resources department of The Jean Coutu Group also provides franchisees with a team of professional human resources consultants whose main task is to help introduce the participatory management program and to ensure the application of uniform and equitable policies into the network.

In the area of employee training, The Jean Coutu Group, well aware of the crucial role played by the network employees in building customer loyalty, has established programs for the development of internal resources and customer service.

---

(2) This number includes corporate employees only and excludes Canadian franchised network personnel.

17

## Trademarks

The Jean Coutu Group owns or holds rights to trademarks or trade names used in conjunction with the operation of its business including, but not limited to, "Brooks" and "Brooks Rx Care" in the United States; "Personnelle", "PJC", "PJC Jean Coutu" and "PJC Clinique" in Canada; and "Rx Pro" in the provinces of Quebec and New Brunswick. As a result of the Eckerd acquisition, the Company has also acquired rights to trademarks or trade names used in conjunction with the operation of the TDI business, including, but not limited to, "Eckerd", "Ecker$_x$d" and "Genovese".

## Economic and Competitive Environment

The PJC, Brooks and Eckerd stores compete with local, regional and national companies, including other drugstore chains and banner groups, independently owned drugstores, supermarkets, mass merchandisers and discount stores. We primarily compete with national drugstore chains, such as Shoppers Drug Mart in Canada and Walgreens and CVS in the United States, but also increasingly face competition from supermarkets and mass merchandisers, such as Wal-Mart and Target, who have expanded their offerings to include pharmacy products and services. We also face increasing competition from internet-based providers, mail order pharmacies and, in the U.S., re-importation of prescription drugs. See "Risk and Uncertainties—Competition" on page 43 of the 2005 annual report of the Company, which is incorporated to this Annual Information Form by referenced.

Chain drugstores remain the main channel for prescription drug sales and have increased their share of prescription sales at the expense of the independently owned drugstores, which have difficulty competing with chain drugstores on the pricing of front-end merchandise. Another major factor for the competitiveness of chain drugstores is the convenience of chain drugstore locations. According to a 2004 *National Association of Chain Drug Stores Foundation Survey*, 68% of consumers identified convenience as the prime reason they choose a particular pharmacy.

## Risks Factors

The "Risks and Uncertainties" section of our "Management's Discussion and Analysis" on pages 43 and 45 of the of the Company's 2005 annual report is incorporated herein by reference, as supplemented from time to time in the "Risks and Uncertainties" sections of our quarterly reports to shareholders.

## ITEM 4.    Dividends

The following table provides a summary of the dividends declared and paid by the Company to all holders of Class A Subordinate Voting Shares and Class B Shares for the three most recent years.

| Fiscal year ended May 31, 2003, May 31, 2004 and May 28, 2005 CAN$ per share | |
| --- | --- |
| 2005 | 0.12 |
| 2004 | 0.12 |
| 2003 | 0.12 |

For the period ending May 27, 2006, The Jean Coutu Group intends to maintain its dividend policy, which provides for the payment to shareholders of four quarterly dividends based on financial forecasts for the current year.

The declaration, amount and date of any future dividends will continue to be considered by the Board of Directors of the Company based upon and subject to the Company's earnings and financial requirements, any covenants in its loan documentation and other conditions prevailing at the time.

**Event subsequent to May 28, 2005**

On August 2, 2005, the Board of Directors of The Jean Coutu Group declared a quarterly dividend of Can$0.03 per Class A Subordinate Voting Share and Class B Share. This dividend will be paid on September 1st, 2005 to all shareholders of the Company on record on August 18, 2005.

**ITEM 5.    Capital Structure**

Our authorized share capital consists of an unlimited number of Class A Subordinate Voting Shares without par value, an unlimited number of Class "B" Shares without par value (the "Class B Shares") and an unlimited number of Class "C" Shares without par value, issuable in one or more series (the "Class C Shares").

Further to a public offering and a private placement in the United States initiated by the Company on July 8, 2004, 33,350,000 Subscription Receipts were issued for net proceeds of US$ 424.4 million. On July 30, 2004, these Subscription Receipts were exchanged for Class A Subordinate Voting Shares of The Jean Coutu Group on a one-to-one basis.

As of May 28, 2005, 142,252,100 Class A Subordinate Voting Shares and 119,385,000 Class B Shares were issued and outstanding as fully paid. No Class C Shares are presently issued and outstanding.

The following is a summary of the material provisions concerning the various classes of shares of our authorized share capital and is subject to the complete text of the rights, privileges, conditions and restrictions attached to these shares.

**Class A Subordinate Voting Shares and Class B Shares**

*Voting rights*

The Class A Subordinate Voting Shares are entitled to one vote per share and the Class B Shares are entitled to ten votes per share.

*Change in voting rights attached to the Class B Shares*

In the event that the "Coutu Family" ceases to be the beneficial owner, directly or indirectly, of shares representing 50% or more of the votes attaching to all shares then outstanding, the Class B Shares shall thereupon confer upon their holder the right to one vote per share.

"Coutu Family" means Jean Coutu, and his descendants, born or to be born, or any one of them, as well as a body corporate, a partnership or a trust, however constituted, controlled by one or more of them.

*Issue of Class B Shares*

As long as any Class B Shares are outstanding, we shall not, at any time, unless the holders of such shares shall have given their consent by way of special resolution, issue Class A Subordinate Voting Shares unless, at the time of issue and in the manner determined by our Board of Directors, we offer to the holders of Class B Shares the right to subscribe for, pro rata the number of shares they respectively hold, an aggregate number of Class B Shares such that, if the holders of Class B Shares decided to subscribe for all of the Class B Shares that they will be entitled to subscribe for at that time, the proportion of voting rights attaching to the Class B Shares issued and outstanding immediately following such subscription in relation to all the voting rights attaching to all of the issued and outstanding shares immediately following the issue of Class A Subordinate Voting Shares shall be the same immediately following the issue of Class A Subordinate Voting Shares as immediately prior to that issue.

19

*Dividends*

The Class A Subordinate Voting Shares and Class B Shares participate equally, share for share, in any dividend which may be declared, paid or reserved for payment by us.

*Exchange privilege in the event of a Bid*

Should a Bid (as defined below) be made in respect of the Class B Shares to the holders of Class B Shares without being concurrently made upon the same terms to the holders of Class A Subordinate Voting Shares, each Class A Subordinate Voting Share will become exchangeable into one Class B Share at the holder's option in order to permit such holder to accept such bid, subject however to the acceptance of the Bid by the holders of a number of outstanding Class B Shares which entitles them, at a given date, to more than 50% of the voting rights attaching to all of the shares in our share capital carrying voting rights.

"Bid" as defined in our Articles of Amendment, means a take-over bid, a take-over bid by way of an exchange of securities or an issuer bid (as defined in the *Securities Act* (Quebec), as currently enacted or as it may be amended or reenacted thereafter) in order to purchase Class B Shares; provided, however, that a Bid does not include (i) a Bid made at the same time, price and conditions to all of the holders of Class B Shares and to all of the holders of Class A Subordinate Voting Shares, (ii) a Bid for all or any part of the Class B Shares issued and outstanding at the time of the Bid, where the purchase price for each Class B Share does not exceed 115% of the average market price obtained by averaging the closing prices of the Class A Subordinate Voting Shares during the 20 days of market activity preceding the date of the Bid, or (iii) a Bid made by one or more members of the Coutu Family, to one or more members of the Coutu Family.

The exchange privilege may be exercised until the expiry date of a Bid by providing us or our transfer agent with a written notice of intention to exercise the said exchange privilege in respect of all or any part of the Class A Subordinate Voting Shares held accompanied by the share certificates representing such shares. The exchange privilege shall be deemed to have been exercised at the date at which such written notice accompanied by the share certificates are received by us or our transfer agent; our Articles of Amendment provide for the processing of notices and share certificates, the issuance of share certificates, the exercise of voting rights, the sending of notices by our transfer agent to the holders of Class A Subordinate Voting Shares and the payment of the purchase price for the shares sold pursuant to the bid.

*Exchange privilege attached to Class B Shares*

Each Class B Share may at any time, at the holder's option, be exchanged for one Class A Subordinate Voting Share.

*Liquidation*

In the case of liquidation or dissolution of The Jean Coutu Group (PJC) Inc. or of any other distribution of our assets among our shareholders for the purposes of the winding-up of our affairs, the holders of Class A Subordinate Voting Shares and the holders of Class B Shares shall be entitled to divide equally all of our assets available for payment or distribution, on a share-for-share basis, based upon the number of shares they hold respectively, without preference or distinction.

*Rank*

Except as otherwise provided for above, each Class A Subordinate Voting Share and each Class B Share carry the same rights, are equal in all respects and must be treated by us as if they were shares of one class. The Class A Subordinate Voting Shares and the Class B Shares rank, as to dividends and reimbursement of capital in the event of liquidation or dissolution, after the Class C Shares.

*Amendment*

Our Articles of Amendment provide that certain amendments, the effect of which is to affect the rights, privileges, conditions and restrictions attached to the Class A Subordinate Voting Shares and to the Class B Shares, must be authorized by at least ¾ of the votes cast at a meeting of the holders of Class A Subordinate Voting Shares or, as the case may be, of the holders of Class B Shares, duly held for that purpose.

**Class C Shares**

The Class C Shares may be issued from time to time in one or more series and our directors may determine by way of resolution the denomination, rights, privileges, conditions and restrictions attaching to each series. The Class C Shares of each series rank equally with the Class C Shares of any other series as to dividends and reimbursement of capital in the event of liquidation or dissolution of our Company, and rank before the Class A Subordinate Voting Shares and Class B Shares as to dividends and reimbursement of capital.

*Voting rights*

The Class C Shares, as a class, are not entitled to any voting rights, save those instances where class voting rights are provided for in our Articles of Amendment.

*Liquidation*

In the event of liquidation or dissolution of The Jean Coutu Group (PJC) Inc. or any other distribution of our assets among our shareholders for the purpose of the winding-up of our affairs, the holders of Class C Shares shall be entitled to receive the paid-up capital in respect of such shares, as well as any non-cumulative dividend declared and remaining unpaid at the time of distribution or, as the case may be, any cumulative dividend accumulated and remaining unpaid, whether declared or not, but will be entitled to no further participation in our assets.

*Amendment*

Our Articles of Amendment provide that certain amendments, the effect of which is to affect the rights, privileges, conditions and restrictions attached to Class C Shares, must be authorized by at least ¾ of the votes cast at a meeting of the holders of the Class C Shares duly held for that purpose.

**Senior Notes**

The credit ratings of the Company's debt securities as at the end of its most recently completed fiscal year were as follows:

|  | Standard & Poor's Ratings Service ("S&P") | Moody's Investors Service ("Moody's") |
|---|---|---|
| Senior Unsecured Notes | B | B2 |
| Senior Unsecured Subordinated Notes | B | B3 |

The credit ratings assigned to the Company's senior unsecured notes have not changed since they were first assigned.

Credit ratings are intended to provide investors with an independent measure of the credit quality of an issue of securities and are indicators of the likelihood of payment and of the capacity and willingness of a company to meet its financial commitment on an obligation in accordance with the terms of the

21

obligation. A description of the rating categories of each of the rating agencies described above is set out below.

Credit ratings are not recommendations to purchase, hold or sell securities and do not address the market price or suitability of a specific security for a particular investor. Credit ratings may not reflect the potential impact of all risks on the value of securities. In addition, real or anticipated changes in the Company's credit ratings will generally affect the market value of the debt. The foregoing ratings may be revised or withdrawn at any time by the rating agency if in its judgment circumstances warrant.

*Standard & Poor's Rating Services*

An obligor rated 'B' (the 6th highest category out of 10) is vulnerable but currently has the capacity to meet its financial commitments. Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meet its financial commitments. The Company's ratings reflect its very high lease-adjusted leverage resulting from the acquisition; its integration risk associated with the Eckerd stores; and the challenge to enhance their profitability, particularly in the front-end; and somewhat constrained liquidity. These factors are partially offset by management's track record of successful drugstores integration in both the U.S. and Canada, the scale of the Eckerd acquisition, which allow the Company to become the fourth-largest drugstore chain operator in North America, and favorable long-term dynamics industry.

*Moody's Investors Service*

According to Moody's ratings, obligations rated B are considered speculative and are subject to high credit risk. The modifier 2 indicates a mid-range ranking; and the modifier 3 indicates a ranking in the lower end of that generic-rating category. A "B" rating is the 6th highest category out of 10.

The B2 rating on the senior notes considers that this debt is guaranteed by the Company's operating subsidiaries on a senior basis. This senior class of debt will be contractually subordinated to the bank loan. The B3 rating on the senior subordinated notes considers that this debt is also guaranteed by the Company's operating subsidiaries on a senior subordinated basis. However, this subordinated class of debt will be contractually subordinated to significant amounts of more senior obligations. Constraining the ratings are the management challenges in tripling the Company's size, the operational challenges at restoring Eckerd, and the weak post-transaction debt protection measures. The strong core business at the Jean Coutu and Brooks stores, the track record of successfully integrating several small acquisitions, and Moody's belief that the Company will quickly achieve some of the projected post-merger synergies benefit the ratings.

**ITEM 6.    Market for the negotiation of securities**

Class A subordinate voting shares of The Jean Coutu Group are traded on the Toronto Stock Exchange under the PJC.SV.A symbol.

In order to clarify the nature of the securities traded on its exchange and to standardize their classification, the Toronto Stock Exchange has changed the symbols of the shares with non-conventional voting structures. In this context, the stock symbol of the Class A Subordinate Voting Shares of The Jean Coutu Group has been changed to include an additional two-character voting structure indicator "SV". All other characteristics of the shares, including CUSIP numbers, remained unchanged.

22

**Trading Prices and Volumes**

The information below pertaining to prices is stated in Canadian dollars and per share.

| Month | High | Low | Volume |
|-------|------|-----|--------|
| June 2004 | 19.23 | 17.75 | 4,100,097 |
| July 2004 | 18.80 | 16.98 | 11,463,226 |
| August 2004 | 18.95 | 16.30 | 11,438,470 |
| September 2004 | 17.69 | 15.98 | 10,023,838 |
| October 2004 | 16.90 | 14.66 | 12,960,387 |
| November 2004 | 17.98 | 16.00 | 9,459,746 |
| December 2004 | 18.00 | 16.27 | 5,351,451 |
| January 2005 | 17.69 | 15.90 | 10,050,824 |
| February 2005 | 19.48 | 17.51 | 8,899,623 |
| March 2005 | 21.39 | 18.22 | 8,484,736 |
| April 2005 | 19.16 | 17.55 | 11,550,270 |
| May 2005(1) | 19.87 | 18.01 | 7,927,875 |
| **Total** | | | **111,710,543** |

(1) For the period ended May 28, 2005

As part of its financing of the Eckerd acquisition, the Company has offered to qualified institutional buyers and others US$1.2 billion of senior notes consisting of (1) US$350.0 million of unsecured senior notes bearing interest at 7.625% and maturing on August 1, 2012, and US$850.0 million of unsecured senior subordinated notes bearing interest at 8.5% and maturing on August 1, 2014. For more information see "Material Contracts—Trust Indentures" on page 30.

**ITEM 7.    Directors and officers**

**Directors**

The names, principal occupations and places of residence of the Directors of The Jean Coutu Group, the number of Class A subordinate voting Shares and Class B Shares directly or indirectly owned by them as of July 26, 2005 as well as any information pertaining to bankruptcies and similar procedures are detailed on pages 7 to 10 of the Management Proxy Circular, and are incorporated herein by reference.

**Officers**

The names, places of residence, and principal occupations of the past five years of the Officers of The Jean Coutu Group and its subsidiaries appear in the following table. The information is accurate as of May 28, 2005.

| Name, place of residence | Occupation(1) |
|--------------------------|---------------|
| ***THE JEAN COUTU GROUP (PJC) INC.*** | |
| **Jean Coutu**<br>Montreal, Quebec | Chairman of the Board |
| **François J. Coutu**<br>Montreal, Quebec | President and Chief Executive Officer |
| **Andre Belzile**<br>Drummondville, Quebec | Senior Vice President, Finance and Corporate Affairs |

23

| | |
|---|---|
| **Michel Boucher**<br>Longueuil, Quebec | Chief Information Officer |
| **Denis Courcy**<br>Laval, Quebec | Vice President, Human Resources and Legal Affairs |
| **Louis Coutu**<br>Montreal, Quebec | Vice President, Commercial Policies |
| **Alphonse Galluccio**<br>Montreal, Quebec | Vice President, Internal Audit |
| **Yvon Goyer**<br>Lachenaie, Quebec | Vice President, Services and Promotions |
| **Kim Lachapelle**<br>Montreal-West, Quebec | Corporate Secretary |
| **Alain Lafortune**<br>St-Sauveur, Quebec | Senior Vice President, Purchasing and Marketing |
| **Richard Mayrand**<br>Montreal, Quebec | Vice President, Pharmacy and Public Affairs |
| **Johanne Meloche**<br>Laval, Quebec | Vice President, Cosmetics, Exclusive Brands and Beauty Programs |
| **Normand Messier**<br>Longueuil, Quebec | Senior Vice President, Network Exploitation |
| **Jean-Pierre Normandin**<br>Varennes, Quebec | Vice President, Distribution Centre |
| **Marcel A. Raymond**<br>Lorraine, Quebec | Vice President, Control and Treasury |

***THE JEAN COUTU GROUP (PJC) USA INC.***

| | |
|---|---|
| **Michel Coutu**<br>Providence, Rhode Island | President and Chief Executive Officer |
| **Tim Burger**<br>Alison Park, Pennsylvania | Group Vice President |
| **Enzo Cerra**<br>Palm Harbor, Florida | Group Vice President |
| **Barbara Donellan**<br>Franklin, Massachusetts | Vice President, Information Systems |
| **Felise Feingold**<br>Boston, Massachusetts | Vice President and General Counsel |
| **Walter Gommermann**<br>Wakefield, Rhode Island | Vice President, Distribution |
| **C. Daniel Haron**<br>Warwick, Rhode Island | Vice President, Pharmacy and Professional Affairs |

24

| | |
|---|---|
| **Robert Hureau**<br>East Greenwich, Massachusetts | Vice President, Corporate Controller |
| **Donald Kinney**<br>Franklin, Massachusetts | Group Vice President |
| **Daniel Miller**<br>Palm Harbor, Florida | Vice President, Pharmacy Operations |
| **David A. Morocco**<br>Newton, Massachusetts | Executive Vice President, Marketing and Logistics |
| **Curt Neel**<br>Belleair, Florida | Senior Vice President, Distribution and Logistics |
| **Howard Nobleman**<br>Saunderstown, Rhode Island | Vice President, Acquisition and Real Estate Logistics |
| **Douglas Palmacci**<br>Pembroke, Massachusetts | Vice President, Advertising and Merchandising |
| **Allan Patrick**<br>Palm Harbor, Florida | Group Vice President |
| **Bud Pelkey**<br>Exeter, Florida | Vice President, Loss Prevention |
| **Robert Pouliot**<br>North Kingstown, Rhode Island | Senior Vice President, Purchasing |
| **Ernie Richardsen**<br>Pittsburgh, Pennsylvania | Vice President Pharmacy Category Management |
| **Kenneth Robinson**<br>Smithfield, Rhode Island | Vice President, Managed Care |
| **Anthony Sadler**<br>West Greenwich, Rhode Island | Vice President, Operations Services |
| **Peter Schmitz**<br>Newport, Rhode Island | Vice President, Real Estate |
| **Kenneth Spader**<br>Cumberland, Rhode Island | Vice President, Construction, Facilities, Engineering and Store Planning |
| **William Z. Welsh Jr.**<br>East Greenwich, Rhode Island | Executive Vice President and Chief Operating Officer |
| **Randy Wyrofsky**<br>North Providence, Rhode Island | Executive Vice President and Chief Financial Officer |

(1) For the past five years, all Officers of the Company and the American Subsidiary have occupied the positions given above or other management positions within the Company and/or Eckerd and affiliated companies, except for Andre Belzile who prior to May 10, 2004 acted as Vice President and Chief Finance Officer of Cascades Inc., Alphonse Galluccio who prior to August 26, 2002 was acting as Principal Director of Samson Bélair / Deloitte & Touche, Normand Messier, who left in 1995 to join Groupe Cadieux as a Vice President and joined the Company again in 2001, Kim Lachapelle who,

25

prior to joining the Company in August 2004, was Legal Counsel and Corporate Secretary of Pebercan Inc.,   Marcel A. Raymond, who, prior to joining the Company in November 2004, was acting as Vice President, Finances of Labatt Breweries Ltd., Robert Hureau who, prior to joining the Company, in September 2004, was the Corporate Controller of Ocean Spray Cranberries, Inc., Felise Feingold who, prior to January 2005, was an associate at McDermott Will and Emery and Douglas Palmacci who, prior to June 2005 occupied the following positions: Director of Advertising of Herald News from March 2001 to August 2003 and Vice President, Advertising of the Colibri Group from September 2003 to June 2004.

As of May 28, 2005, the Directors and Officers of the Company beneficially, as a group, owned, directly or indirectly, or exercised control over 4.02% of Class A subordinate voting Shares and 100% of Class B Shares.

## ITEM 8.    Litigation

There are various legal proceedings and claims pending against us, most of which are with respect to Eckerd, that are common to our operations. While it is not feasible to predict or determine the ultimate outcome of these matters, it is the opinion of management that these suits will not result in monetary damages not covered by insurance that in the aggregate would be material and adverse to our business or operations.

We are covered by insurance policies that carry deductibles. At this time, we believe that we are adequately covered through the combination of insurance policies and self-insurance. Future losses which exceed insurance policy limits or, under adverse interpretations if any, are excluded from coverage would have to be paid out of general corporate funds.

In connection with the Eckerd acquisition, J.C. Penney has agreed to indemnify us for, among other things, damages arising out of or relating to pre-closing noncompliance with the Eckerd five-year corporate integrity agreement with the Department of Health & Human Services—Office of the Inspector General, taxes and environmental liabilities relating to legal noncompliance during periods prior to the closing date, existing labor practices claims, any breach of any of its covenants under the stock purchase agreement for the Eckerd Acquisition and for any funding liabilities with respect to benefit plans maintained for TDI employees.

Also, J.C. Penney has agreed to indemnify us up to a maximum of $350.0 million against damages attributable to breaches of certain representations and warranties made by it in the stock purchase agreement, subject to negotiated deductible thresholds.

## ITEM 9.    Interest of Informed Persons and Other Persons in Material Transactions

The interest of informed persons and other persons involved in material transactions are described on page 20 of the Management Proxy Circular dated July 26, 2005, and this information is incorporated herein by reference.

## ITEM 10.   Trust Agent and Registrar

The transfer agent and registrar for the shares of the Company is National Bank Trust Company, 1100 University Street, Suite 900, Montreal, Quebec H3B 4L8. Registrar offices are located in Toronto, Calgary and Vancouver.

26

## ITEM 11.  Material Contracts

### Senior Secured Credit Facilities

In connection with the acquisition of Eckerd and as of July 30, 2004, the Company entered into senior secured credit agreements ("senior secured credit facilities") with certain senior lenders.

Our senior secured credit facilities provide for senior secured financing of up to approximately US$1.7 billion, consisting of:

- A US$350.0 million revolving credit facility maturing in July 2009. The revolving credit facility can be used as (1) a Canadian and U.S. swingline loan subfacilities and (2) a Canadian and U.S. letter of credit subfacilities, not exceeding US $180.0 million.

- A US$250.0 million term loan A facility maturing in July 2009.

- A US$1.1 billion term loan B facility maturing in July 2011.

All borrowings under our senior secured credit facilities are subject to the satisfaction of customary conditions, including absence of a default and accuracy of representations and warranties.

### Interest and fees

The interest rates per annum applicable to revolving and term loans under our senior secured credit facilities are, at our option (1) in the case of U.S. dollar denominated loans, equal to either the U.S. base rate (defined as the higher of the prime rate and the federal funds rate plus 0.5%), or an adjusted eurodollar rate and (2) in the case of Canadian dollar denominated loans, equal to the Canadian prime rate (defined as the higher of the Canadian dollar reference rate and the Canadian dollar offered rate for bankers acceptances plus 1% per annum), in each case plus an applicable margin. The applicable margin for the term loan B facility for Eurodollar loans is 2.25% and the applicable margin for U.S. base rate loans is 1.25%. The applicable margin for the term loan A facility and the revolving facility for Eurodollar loans is 2.5% and for U.S. base rate loans and for Canadian prime rate loans is 1.5%.

### Amortization of term loans

The term loan A facility is payable in quarterly installments, subject to certain exceptions in the first and last years of the facility, at a rate of 5% in our first fiscal year, 15% in our second fiscal year, 20% in our third fiscal year, 25% in our fourth fiscal year and 35% thereafter. The term loan B facility is payable at a rate of 1% per annum in equal quarterly installments during the first six years thereof, with the balance payable in equal quarterly installments during the seventh year thereof.

### Prepayments

Subject to exceptions, our senior secured credit facilities require mandatory prepayments of the loans from issuances of equity, excess cash flows and issuances of debt and require us to make a mandatory offer to prepay the loans from asset dispositions and casualty proceeds, in such amounts as to be determined prior to the closing of the Eckerd Acquisition. Proceeds required to prepay the loans will be applied pro rata to the remaining scheduled amortization payments of the term loans, and then to any outstanding revolving loans (without permanent reduction of the corresponding commitments). Prior to the fifth anniversary of the closing, all mandatory prepayments (subject to certain exceptions resulting from asset sales and casualty proceeds) and scheduled repayments of the term loan B facility are limited in aggregate amount to 25% of the original principal amount of the term loan B facility (with a catch-up payment following the fifth anniversary of the closing date). Any prepayment that would exceed the limit described above is held in a collateral account pending disbursement to the lenders following the fifth anniversary of the closing. In addition, the term loan B lenders may elect to decline any mandatory prepayment, which

27

will then be allocated first, to the term loan A facility and second, if and when the term loan A facility are paid in full, back to the term loan B facility. Voluntary prepayments of loans under our senior secured credit facilities and voluntary reductions of revolving loan commitments are permitted, in whole or in part, in minimum amounts as set forth in the credit agreement.

**Collateral and guarantees**

Our senior secured credit facilities are guaranteed by us and all of our current and future subsidiaries that can provide a full and unconditional guarantee, and are secured by a first priority security interest in substantially all of our and their existing and future assets, and a first priority pledge of the capital stock of the guarantor subsidiaries, as well as capital stock of and intercompany senior notes issued by our non-guarantor subsidiaries, if any, subject to certain exceptions agreed upon with our lenders and local law requirements.

**Certain covenants and other matters**

Our senior secured credit facilities require that we comply on a quarterly basis with certain financial covenants, including a maximum leverage ratio test and minimum fixed charge coverage ratio test. In addition, our senior secured credit facilities include negative covenants, subject to certain exceptions, that restrict or limit our ability and the ability of our subsidiaries to, among other things, incur, assume or permit to exist additional indebtedness or guaranty obligations, incur liens or agree to negative pledges in other agreements, engage in sale and leaseback transactions, make capital expenditures, make loans and investments, declare dividends, make payments or redeem or repurchase capital stock, engage in mergers, acquisitions and other business combinations, prepay, redeem or purchase certain indebtedness including the senior notes, amend or otherwise alter the terms of our organizational documents and our indebtedness including the senior notes, sell assets or engage in receivables securitization, form subsidiaries outside the United States and Canada, transact with affiliates, and alter the business that we conduct.

Our senior secured credit facilities contain certain customary representations and warranties, affirmative covenants and events of default, including payment defaults, breach of representations and warranties, covenant defaults, cross-defaults to certain indebtedness and other material agreements, certain events of bankruptcy, U.S., Canadian or other employee benefit plans, material judgments, actual or asserted failure of any guaranty or security document supporting our senior secured credit facilities to be in full force and effect and change of control. If such an event of default occurs, the lenders under our senior secured credit facilities are entitled to take various actions, including an increase in interest rates, the acceleration of amounts due under our senior secured credit facilities and all actions permitted to be taken by a secured creditor.

**Trust Indentures**

As part of its financing of the Eckerd acquisition, the Company has offered to qualified institutional buyers and others US$1.2 billion of senior notes (the "Senior Notes") consisting of (1) US$350.0 million of unsecured senior notes bearing interest at 7.625% and maturing on August 1, 2012, and US$850.0 million of unsecured senior subordinated notes bearing interest at 8.5% and maturing on August 1, 2014. The unsecured senior notes bearing interest at 7.625% are governed by a Trust Indenture with The Bank of New York, as Trustee and the unsecured senior subordinated notes bearing interest at 8.5% are governed by a Trust Indenture with Well Fargo Bank N.A. as Trustee (collectively "the Indentures"). Both Indentures are dated July 30, 2004. The terms of the Senior Notes include those stated in the Indentures and those made part of the Indentures by reference to the Trust Indenture Act of 1939, as amended.

28

The Senior Notes are subordinated to the Company's senior indebtedness. The Senior Notes are guaranteed by the parent company and each subsidiaries on a senior subordinated basis. Each guarantee is unsecured and subordinated to senior indebtedness of the guarantor.

The Indentures governing the senior notes contain covenants that, among other things, limit our ability and the ability of our subsidiaries to incur additional indebtedness, pay dividends on, redeem or repurchase our capital stock, make investments, engage in transactions with affiliates, create certain liens, sell assets, in the case of our subsidiaries, guarantee indebtedness, issue or sell subsidiary preferred stock, create restrictions on the ability of restricted subsidiaries to pay dividends, enter into sale and leaseback transactions, create unrestricted subsidiaries, and consolidate, merge or transfer all or substantially all of our assets and the assets of our subsidiaries on a consolidated basis.

These covenants under each of the Indentures are subject to important exceptions and qualifications.

## ITEM 12.  Name of experts

The consolidated financial statements of the Company for the year ended May 28, 2005 have been audited by Deloitte & Touche, L.L.P., independent registered chartered accountants.

In the context of the Eckerd acquisition, the services of KPMG L.L.P. independent registered chartered accountants have been used for the purpose of auditing the carve out special purpose financial statements of the acquired assets.

## ITEM 13.  Audit Committee disclosure

**Charter**

1. **Composition**

    1) The Audit Committee shall consist of at least three (3) members and a maximum of seven (7) members.

    2) Each of the members of the Audit Committee shall be a director of the Company.

    3) Each member of the Audit Committee shall be independent.

    4) Each member of the Audit Committee shall be financially literate.

2. **Election of members.** The members, as well as the president of the Audit Committee, are elected by the Directors of the Company during the first meeting of the Board of Directors immediately following the general shareholders meeting of the Company.

3. **Terms of mandate.** The mandate of a member of the Audit Committee begins at the date of the meeting of the Board of Directors during which he is elected to this position and expires at the date of the first meeting of the Board of Directors during which his successor is duly elected or appointed, unless the member is replaced before the end of the term by resolution of the Board of Directors.

4. **Death, incapacity or resignation of a member.** In the event that the Board of Directors must fill a Audit Committee vacancy resulting from the death, the incapacity or the resignation of a member, the member of the Audit Committee appointed to fill the Audit Committee vacancy is dispensed from the application of paragraphs 3) and 4) of article 1 for a period ending at the latest of the two following dates:

    a) The next annual shareholders meeting of the Company, or

    b) six (6) months after the event leading to the vacancy.

29

The present article shall apply whenever the Board of Directors of the Company has reason to believe that this exemption could significantly reduce the capacity of the Audit Committee to act independently and to comply with other regulatory requirements.

5. **Meeting of the Committee.** The Audit Committee is required to meet at least four (4) times a year in the place, and at the date and time determined by the secretary after consultation with the president and the members of the Audit Committee. A member of the Audit Committee can request the holding of an extraordinary meeting at any time by sending the secretary a notice to this effect.

6. **Invitation to attend.** A notice with the time, date and object of any meeting of the Audit Committee shall be sent by any mode of transmission permitted by law or communicated by telephone to each member and to the auditors of the Company at least two (2) days before the date of the meeting.

7. **Conference call.** The members of the Audit Committee may participate to a meeting via means allowing all the said participants to communicate between themselves, more specifically by conference call.

8. **Quorum.** The quorum of the Audit Committee consists in the majority of members attending the meeting.

9. **President.** The meeting of the Audit Committee is presided by a member of the Audit Committee appointed by the Board of Directors and in his absence by a member chosen among the members then attending any given meeting.

10. **Procedure.** Audit Committee meeting procedures are the same as those in effect during Board of Director meetings.

11. **Majority required.** The questions debated during an Audit Committee meeting are decided by the majority of votes cast.

12. **Remuneration.** The members of the Audit Committee receive in compensation for their services on the said committee the remuneration determined via a resolution of the Board of Directors of the Company.

13. **Powers.** The Audit Committee has the following powers:

    a) to communicate directly with or to meet privately with any manager or employee of the Company, as well as its internal or external auditors;

    b) to hire independent attorneys or other counselors it deems necessary to exercise its functions;

    c) to determine and pay the fees of the counselors it employs.

14. **Mandate.** The preparation and the presentation of the financial statements of the Company, their accuracy, as well as the efficiency of the internal audit are the responsibility of management. Management is also responsible for maintaining adequate internal control and procedures, as well as for the implementation of appropriate policies and standards regarding accounting and presentation of financial statements. The external auditors are responsible for the audit of annual financial statements in accordance to generally accepted accounting principles.

The Audit Committee is created to review on a continuous basis the pertinence and the efficiency of these activities and to assist the Board of Directors to oversee the accuracy of the financial statements of the Company, of the pertinence and the efficiency of internal controls, of the independence of external auditors, and of compliance by the Company to legal and regulatory requirements.

The Audit Committee must review its mandate each year.

30

The Audit Committee's mandate extends to the Company, its divisions and subsidiaries and is described more particularly as follows:

**14.1** *Responsibilities in respect to financial disclosure and financial reports*

- Each quarter, the Audit Committee reviews the financial statements as well as the management discussion and analysis of the Company before its approval by the Board of Directors;

- It ensures that the Company complies with regulatory standards relative to the preparation and the disclosure of financial statements and the management report.

- It inquires about changes to accounting policies having a material impact on the presentation of financial statements.

- It reviews and makes sure that all claims or lawsuits, which may have a material impact on the finances of the Company, are correctly recorded in the financial statements.

- It ensures that the financial statements of the Company are accurate, reliable and honest.

- It evaluates the decisions taken by management or by the auditors relative to the presentation of financial statements.

- It reviews the press releases concerning the annual and quarterly releases of financial results of the Company before their approval by the Board of Directors.

**14.2** *Relationship with external auditors*

- The Audit Committee recommends to the Board of Directors the appointment of the external auditors as well as their fees, and reviews their employment perquisites, as well as other services they may be called upon to provide to the Company and the circumstances which may justify and warrant a change of external auditors, which report directly to this committee;

- It oversees the work of the external auditor employed to deliver an audit report or render other audit, review or attestation services to the Company, including the resolution of disagreements between management and the external auditor concerning financial information;

- It discusses and reviews the competence, independence and objectivity of the external auditors and of the partner of the external audit firm in charge of the mission with the Company, as well as the rotation of the partner in charge or of the other partners involved on the engagement team;

- It reviews the mandate and the external audit program, the letter of recommendation which follows the annual audit and the corresponding follow-ups, the major changes to accounting policies, the main value judgements at the basis of the financial statements and how they are drafted;

- It preapproves all non-audit services that the external auditor of the Company or those of its subsidiaries must render to the Company or to its subsidiaries within the context of the *Control Procedure Relative to the Employment of Auditors*;

- It may contact the external auditors directly at any time;

- It meets management and the external auditors separately at least once a year and more often, as necessary.

31

- It questions external auditors regarding their relationship with the management of the Company, as well as the difficulties encountered during their audit mandate, as the case may be.

**14.3  *Responsibilities concerning the internal audit***

- The Audit Committee meets the vice president, internal audit, as well as the management of the Company, to discuss the efficiency of internal controls  implemented by the Company, as well as the measures taken to rectify any major weakness or failure discovered;

- It reviews the mandate and the internal audit programs, the resources granted to the function and the follow-ups made in accordance to the recommendations of the vice president, internal audit;

- It reviews the statements of the vice president, internal audit concerning the efficiency of the internal controls of the Company with regard to the audit work performed;

**14.4  *Responsibilities concerning internal controls***

- The Audit Committee supervises the presentation by management of information concerning internal controls.

- It requires that management implements appropriate internal and disclosure controls of financial information extracted or derived from the financial statements of the Company for the benefit of the public;

- It reviews, evaluates and approves periodically such controls;

- It verifies all investments and operations likely to impact negatively the sound financial situation of the Company when it is brought to its attention by the auditor(s) or an executive;

- It oversees the implementation of procedures concerning the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters;

- It oversees the implementation of procedures concerning the confidential, anonymous submission by employees of the issuer, including its divisions and subsidiaries, of concerns regarding questionable accounting or auditing matters.

**14.5  *Review of transactions between tied persons***

The Audit Committee reviews management's report on related-parties transactions during the year.

**14.6  *Responsibilities concerning oversight organizations***

- The Audit Committee reviews all important reports received from regulatory instances.

- The Audit Committee reviews the evaluation and the statements of management relative to compliance to particular regulatory requirements, as well as to the plans of management aiming to remedy any failure discovered.

- It ensures that the recommendations presented by regulatory bodies are implemented and then monitored.

32

      Lastly, the Audit Committee reviews all other financial matters that it deems fit or that the Board of the Directors decides to bring forward to its attention.

15. **Report.** The Audit Committee reports about its activities to the Board of Directors verbally during a meeting of the Board of Directors following an Audit Committee meeting and by submitting a meeting report at the next meeting of the Board of Directors.

**Composition of the Audit Committee**

      The audit committee is presently formed of six independent directors, i.e. Mr. L. Denis Desautels, chairman of the committee and Mrs. Lise Bastarache, Mr. Marcel Dutil, Mrs. Claire Léger, Mr. Pierre Legault and Mr. Dennis Wood.

**Relevant Education and Experience**

      The following section names each member of the audit committee as well as his relevant education and experience regarding the execution of his responsibilities as a member of the said committee.

      ***L. Denis Desautels.*** Mr. Desautels is executive-in-residence at the School of Management of the University of Ottawa. He has been a chartered accountant since 1966. He has practiced as a certified public accountant, auditor and one of the senior partners of the firm Ernst & Young LLP (formerly Clarkson Gordon) from 1964 to 1991. In 1991, Mr. Desautels was appointed Auditor General of Canada, position that he held till 2001. In this capacity, he was notably responsible for the auditing of financial statements of the Government of Canada, the governments of the Territories and several crown corporations. He is presently a member of audit committees of four listed companies and two non-profit organizations. He is the chair of three of these committees, which provides him with a first-hand opportunity to appreciate the role and the functioning of an audit committee.

      Over the course of his career, Mr. Desautels has acquired competence in the audit of major public and private companies and by way of consequence, he is quite familiar with generally accepted accounting principles. He is able to understand financial statements of a complexity generally presenting accounting problems comparable to those that could be found in the financial statements of The Jean Coutu Group (PJC) Inc. In addition, his experience as external auditor during the last thirty-seven (37) years has allowed him to acquire a solid understanding of internal controls and of the process leading to the preparation of financial statements.

      ***Lise Bastarache.*** Mrs. Bastarache was, until January 2005, Regional Vice President, Private Banking Quebec for RBC Financial Group, where she has also served as Analyst in Commercial Markets and Deputy Chief Economist during the previous five years. Mrs. Bastarache holds a Bachelors degree and a Master's degree in Economics from the University of Quebec in Montreal as well as the course requirements of a PhD in Economics from McGill University. As Analyst in Commercial Markets of RBC Royal Bank, Mrs. Bastarache has analyzed the financial statements of many large corporations that presented accounting problems generally comparable in scope and complexity to those found in the financial statements of The Jean Coutu Group (PJC) Inc.

      In addition, as Vice President of RBC Private Banking, Mrs. Bastarache was ultimately responsible for the internal controls and of the preparation of the income statements of her division. Since January 2005, Mrs. Bastarache continues to act as member of various boards of directors and committees.

      ***Marcel Dutil.*** Mr. Dutil is Chairman of the board of directors and Chief Executive Officer of the Canam Group inc., company that he created in 1973 following the acquisition of Les Aciers Canam Inc. As Chairman of the board of directors and Chief Executive Officer of the Canam Group Inc. and as director of several public companies since 1974, such as Border Trust, National Bank of Canada, Transcontinental inc., Québec Téléphone and others, Mr. Dutil has acquired a good understanding of generally accepted

33

accounting principles in Canada and has regularly been called upon to analyze and evaluate financial statements presenting accounting problems generally comparable to those that could reasonably be expected to be found in the financial statements of The Jean Coutu Group (PJC) Inc. He has acted as a member of several audit committees for some twenty years, as those of Québec Téléphone, Maax, and National Bank of Canada (for a period of one year).

*Claire Léger.* Mrs. Léger is currently a member of the board of directors of the St-Hubert Group Inc. She holds a Bachelor's degree in Commerce (1966) as well as a Master's degree in business administration (1986). Her university degrees and her work experience as manager interested in the evolution of accounting standards, have allowed her to acquire a solid understanding of generally accepted accounting principles in Canada. Her career as manager and owner of St-Hubert Group Inc., has required that she analyze and evaluate financial statements of a complexity at least comparable to those of The Jean Coutu Group (PJC) Inc. She has acquired a thorough understanding of internal controls and of the process leading to the drawing up of financial statements, as well as to the role and functioning of audit committees such as those of Quebecor Inc., St-Hubert Group Inc. and The Jean Coutu Group (PJC) Inc.

*Pierre Legault.* Mr. Legault is currently President and Chief Executive Officer of the Dermatology division of Sanofi-Aventis. Before occupying this position, Mr. Legault was Chief Financial Officer of Marion Messel Dow (Canada), of Hoescht Marion Roussel (Canada and in the United States), of Aventis (Europe with worldwide responsibilities) and of Sanofi-Aventis (North America). In addition, Mr. Legault acted as external auditor for the firm PriceWaterhouseCoopers and internal auditor for Sidbec Dosco and Domtar. He was also division controller for Domtar. He is a chartered accountant who earned a bachelor's degree at Les Hautes Études Commerciales (HEC MONTRÉAL) and a MBA at McGill University.

Within the context of the different responsibilities described above, Mr. Legault gained a good understanding of the generally recognized accounting principles in Canada and in the United States. His responsibilities required that he regularly analyze and evaluate the financial statements of a breadth and complexity at least comparable to those of The Jean Coutu Group (PJC) Inc. Mr. Legault also acquired a thorough understanding of internal controls and procedures for financial reporting within the context of his university training (CA, BAA and MBA), his functions at PriceWaterhouseCoopers and his responsibilities as chief financial officer at Sanofi Aventis. In addition, he was in charge of the compliance project of Sanofi-Aventis relative to the compliance to requirements of the Sarbanes-Oxley Act.

*Dennis Wood.* Mr. Wood is currently President and Chairman of Les Placements Dennis Wood Inc., a company constituted in 1973 to support his different entrepreneurial ventures. Through this company, Mr. Wood, since 1973, has been actively involved in the acquisition, the sale and the exchange of some seventy-five different companies, ranging in value from a few million and few billion dollars.

As President and Chief Executive Officer at C-MAC Industries Inc. and through his active involvement in the financial management of this company, Mr. Wood has acquired a deep understanding of the generally accepted accounting principles in Canada, the United States and Europe, as well as a good understanding of internal controls and a good understanding of the process surrounding the preparation of financial statements. Following the sale of C-MAC Industries Inc. to Solectron Corporation, Mr. Wood was asked to sit on the audit committee of the latter company, position that he occupied from 2001 to 2004.

Mr. Wood's many years of experience as a businessman, board member and audit committee member (the like of Les industries C-MAC Inc. et MAAX Inc.) have exposed him to financial statements of a complexity at least comparable to those of The Jean Coutu Group (PJC) Inc.

For 25 years, Mr. Wood sat on different Canadian and American audit committees, e.g. those of Les Industries C-MAC Inc., National Bank Trust Inc., the Montreal Metropolitan Symphony Orchestra and Solectron Corporation, in which capacity he was able to appreciate the role and the functioning of an audit

34

committee. Over the years, he was also a member of the board of directors of Transat A.T. Inc., Victhom Human Bionics Inc., Groupe Bocenor Inc., Evolved Digital Systems Inc. National Bank of Canada, National Bank Trust, Sherbrooke Trust Company and MAAX Inc.

## Policies regarding services rendered by auditors

The audit committee has adopted a policy concerning the scope of the services rendered by the external auditors, which policy is in force since the 1st quarter of fiscal 2005. The policy requires the Audit Committee to pre-approve all audit and non audit services, subject to the *de minimis* exception. This policy forbids the Company from engaging auditors to provide certain non-audit services to the Company and its subsidiaries, including bookkeeping or other services related to accounting records or financial statements, financial information systems design and implementation, appraisal or valuation services, actuary services, internal audit services, investment banking services, management functions or human resources functions, legal services and expert services not associated to the audit function. The policy allows, in particular circumstances, the Company to engage the services of auditors to provide non-audit services, other than the prohibited services, only when the audit committee specifically approves these services.

All audit and non-audit services provided by the Company's independent auditors for the fiscal year ended May 28, 2005 were pre-approved by the Company's Audit Committee.

A copy of the policy concerning the scope of the services rendered by external auditors may be obtained free of charge upon request to the Corporate Secretary of the Company, at the head office of the Company located at 530 rue Bériault, Longueuil, Québec, J4G 1S8.

## Remuneration of auditors

The following table presents by category the fees billed by the external auditors of the firm Deloitte & Touche L.L.P. for the fiscal year ended May 28, 2005 and May 31, 2004.

| Category of fees | 2005 Can $ | 2004 Can $ |
|---|---|---|
| Audit fees | 4,700,939 | 697,221 |
| Audit-Related Fees | 338,076 | 8,000 |
| Tax Fees | 1,986,270 | 157,020 |
| Other fees | 1,340,940 | 127,165 |
| **Total** | **8,366,225** | **989,406** |

"**Audit Fees**" include the aggregate fees billed by Deloitte & Touche L.L.P. for the audit of annual consolidated financial statements and other audits and regulatory filings.

"**Audit-Related Fees**" include the aggregate fees billed by Deloitte & Touche L.L.P. for assurance and other related services that are reasonably related to the performance of the audit or review of the financial statements and are not reported under "Audit Fees", notably the audit of the retirement plan, the consultation relative to the accounting and financial disclosure standards.

"**Tax Fees**" include the aggregate fees billed by Deloitte & Touche L.L.P. for professional services rendered for tax compliance, tax advice as well as consultation and tax planning services in view of the preparation of income tax returns of the Company, of capital and sales taxes.

"**All Other Fees**" include the aggregate fees billed by Deloitte & Touche L.L.P. for all other services other than those presented in the categories of Audit fees, Audit-related fees and tax fees, notably the consultation services related to the due diligence process for the purpose of acquisitions.

**ITEM 14.  Additional Information**

Further financial and corporate information is available on Internet at *www.sedar.com* or *www.jeancoutu.com.*

In addition, the Company shall provide to any person, upon request to the Corporate Secretary of the Company:

(a)  when the securities of the Company are in the course of a distribution pursuant to a short form prospectus or a preliminary short form prospectus has been filed in respect of a distribution of its securities :

  i.  one copy of the Company's annual information form, together with one copy of any document, or the pertinent pages of any document, incorporated by reference in the annual information form,

  ii.  one copy of the comparative financial statements of the Company for its most recently completed financial year together with the accompanying report of the auditor and one copy of any interim financial statements of the Company subsequent to the financial statements for its most recently completed financial year,

  iii.  one copy of the management proxy circular of the Company in respect of its most recent annual meeting of shareholders that involved the election of directors, and

  iv.  one copy of any other documents that are incorporated by reference into the preliminary short form prospectus or the short form prospectus and are not required to be provided under I to III above; or at any other time, one copy of any of may require the payment of a reasonable the documents referred to in I, II and III above, provided that the Company.

(b)  at any other time, one copy of any documents referred to in i, ii and iii above, provided the Company may require the payment of a reasonable fee if the per son requiring the information is not a securities' holder of the Company.

Additional information, including officers' and directors' remuneration and loans granted to them, if any, principal shareholders of the Company, stock options and the interest of insiders in material transactions, if any, is contained in the Management Proxy Circular dated August 2, 2005, which was prepared for the 2005 Annual Meeting of Shareholders. Other financial information is included in the audited consolidated financial statements and the notes thereto for the fiscal year ended May 28, 2005 as well as Management's Discussion and Analysis thereon. All such additional information relating to the Company is available on SEDAR at www.sedar.com.

The foregoing documents may be obtained by contacting the Corporate Secretary at the head office of the Company, located at 530, Bériault Street, Longueuil, Quebec, J4G 1S8.

36

# EXHIBIT 9

# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

**222 DELAWARE AVENUE**

P. O. BOX 1150

**WILMINGTON, DELAWARE 19899**

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

October 2, 2006

Roger L. Cohen, Esquire
JABURG & WILK, P.C.
3200 N. Central Ave., Ste. 2000
Phoenix, AZ  85012

<u>VIA FEDERAL EXPRESS</u>

Re:    *Block Drug Company, Inc. v. Sedona Laboratories, Inc., et al.,*
        <u>C.A. No. 06-350-KAJ (D. Del.)</u>

Dear Roger:

Thank you for agreeing to accept service in the above matter on behalf of Nutri-Health Supplements, LLC.  A copy of the First Amended Complaint is enclosed.  If you have any questions, or if there is anything further that you require, please don't hesitate to let me know.

Very truly yours,

John G. Day

JGD/nml
Enclosure
173777.1

cc:    David S. Eagle, Esquire (by hand; w/enc.)
        David Greenbaum, Esquire (by electronic mail; w/o enc.)