## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

Block Drug Company, Inc.,        :
        :
        Plaintiff,     :
        :    CIVIL ACTION
     v.        :    NO. 06-350-KAJ
        :
Sedona Laboratories, Inc. and      :
Nutri-Health Supplements, LLC     :
d/b/a Sedona Laboratories,       :
        :
        Defendants.   :
        :

## REPLY BRIEF OF
## DEFENDANT NUTRI-HEALTH SUPPLEMENTS, LLC
## IN SUPPORT OF ITS MOTION TO DISMISS
## OR, ALTERNATIVELY, TO TRANSFER VENUE

KLEHR, HARRISON, HARVEY, BRANZBURG
& ELLERS LLP
David S. Eagle (DE Bar #3387)
Patrick A. Costello (DE Bar #4535)
919 Market Street, Suite 1000
Wilmington, DE 19801
Telephone (302) 426-1189
*deagle@klehr.com*
*pcostello@klehr.com*
Attorneys for Nutri-Health Supplements, LLC

*Of Counsel:*

Roger L. Cohen
Michelle C. Lombino
Thomas A. Connelly
JABURG & WILK, P.C.
3200 N. Central Avenue, Suite 2000
Phoenix, AZ 85018
Telephone (602) 248-1000

Dated: October 16, 2006

**Table of Contents**

I.      INTRODUCTION ....................................................................................................1

II.     ADDITIONAL RELEVANT FACTS ....................................................................3

III.    PLAINTIFF MISAPPLIES FEDERAL CIRCUIT LAW AND CONCEDES THAT
        IT IS PROCEEDING ONLY ON A THEORY OF SPECIFIC JURISDICTION ..............3

IV.     SPECIFIC PERSONAL JURISDICTION OVER NHS, UNDER THE STREAM
        OF COMMERCE THEORY, DOES NOT EXIST IN DELAWARE................................7

        A.      Personal Jurisdiction Does Not Exist Under Delaware's Long Arm Statute...........8

        B.      The Exercise of Personal Jurisdiction Would Violate Due Process. ....................11

V.      PENDING LEGISLATION SHOWS CONGRESS' INTENT THAT 28 U.S.C. §
        1391(c) IS NOT TO CONTROL OR INFORM THE SPECIFIC PATENT VENUE
        AND JURISDICTION STATUTE, 28 U.S.C. § 1400(b)...................................16

VI.     CONCLUSION....................................................................................................19

DEL1 64831-2

## Table of Authorities

**Cases**

*3D Sys., Inc. v. Aarotech Labs., Inc.*,
   160 F.3d 1373 (Fed. Cir. 1998).................................................................... 4, 5, 8

*Akro Corp. v. Luker*,
   45 F.3d 1541 (Fed.Cir.1995)........................................................................ 4

*Am. Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.*,
   1999 WL 615175 (D.Del. Aug. 3, 1999) ...................................................... 7

*Asahi Metal Indus. Co. v. Superior Court*,
   480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)........................... 1, 6, 8, 15

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*,
   21 F.3d 1558 (Fed. Cir. 1994)........................................................ 4, 11, 14, 15

*Boone v. Oy Partek Ab*,
   724 A.2d 1150 (Del Super. Ct. 1997) ................................................ 6, 7, 9, 10

*Burger King v. Rudzewicz*,
   471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)...................................... 8

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*,
   293 F.Supp.2d 423  (D.Del. 2003)............................................................... 5, 9

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*,
   395 F.3d 1315, 1320 & n.5 (Fed. Cir. 2005) ................................... 4, 5, 6, 8, 14

*Cybersell, Inc. v. Cybersell, Inc.*,
   130 F.3d 414 (9th Cir.1997) ........................................................................ 11

*Davlyn Mfg. Co., Inc. v. H&M Auto Parts, Inc.*,
   414 F.Supp.2d 523 (E.D. Pa. 2005) ................................................ 4, 7, 13, 14, 15

*E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates*,
   197 F.R.D. 112 (D.Del. 2000) ...................................................................... 7

*Fireman's Fund Ins. Co. v. National Bank of Coops.*,
   103 F.3d 888 (9th Cir.1996) ........................................................................ 4

*Fourco Glass Co. v. Transmirra Prod. Corp.*, 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 404 (1957)
   .................................................................................................... 2, 17, 19

*Hanson v. Denckla*,
   357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)................................. 8

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)............................................. 8

*LaNuova D&B, S.p.A. v. Bowe Co., Inc.*,
   513 A.2d 764 (Del. 1986) ........................................................................... 9

iii

*Merck & Co. v. Barr Labs., Inc.,*
    179 F.Supp.2d 368 (D.Del. 2002) ................................................................. 5, 6

*Motorola Inc. v. PC-TEL, Inc.,*
    58 F.Supp.2d 349 (D.Del. 1999) ......................................................... 11, 12, 13

*Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc.,*
    685 A.2d 724 (Del Super. Ct. 1996) ............................................................. 7, 9

*Siemens Aktiengesellschaft v. LG Semicon Co., Ltd.,*
    69 F.Supp.2d 622, 626 (D.Del. 1999) ................................................................ 9

*Telcordia Techs., Inc. v. Alcatel S.A.,*
    2005 WL 1268061 (D.Del. May 27, 2005) ....................................... 7, 8, 11, 13

*Toys "R" Us, Inc. v. Step Two, S.A.,*
    318 F.3d 446 (3d Cir. 2003) ............................................................................ 11

*Up-Right, Inc. v. Aluminum Safety Prods., Inc.,*
    165 F.Supp. 742 (D.Minn. 1988) ..................................................................... 18

*Vibber v. U.S. Rubber Co.,*
    255 F.Supp. 47  (S.D.N.Y. 1966) .................................................................... 18

*Vons Cos., Inc. v. Seabest Foods, Inc.,*
    14 Cal.4th 434, 58 Cal.Rptr.2d 899, 926 P.2d 1085 (Cal.1996) ........................ 4

*World-Wide Volkswagon Corp. v. Woodson,*
    444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) ................................ 8

**Statutes**

10 DEL. C. §  3104(c)(1) ....................................................... 2, 5, 6, 7, 8, 9, 10

10 DEL. C. § 3104 ............................................................................................. 5

10 DEL. C. § 3104(c)(4) .................................................................................. 5, 6

28 U.S.C. § 1391(c) .......................................................... 1, 2, 16, 17, 18, 19, 20

28 U.S.C. § 1400(b) .......................................................... 1, 2, 16, 17, 18, 19, 20

CAL.CIV.PROC.CODE §  410.10 (West 1997) ................................................... 4

**Rules**

Federal Rules of Civil Procedure 12(b)(2) ....................................................... 7

## I.    INTRODUCTION

Defendant Nutri-Health Supplements, LLC d/b/a Sedona Laboratories ("NHS") respectfully submits this Reply Brief in support of its Motion To Dismiss Or, Alternatively, To Transfer Venue ("Motion") and in reply to Plaintiff Block Drug Company, Inc.'s Answering Memorandum of Law In Opposition To Defendant's Motion To Dismiss Or, Alternatively, To Transfer Venue ("Response").

Neither the law, nor the facts of this case as applied to the law, are as clear and straightforward as Plaintiff so blissfully (and incorrectly) asserts in its Response.  Neither the Federal or Third Circuits, nor the Delaware Supreme Court, has determined which of the disparate stream of commerce theories set out by Justices O'Connor and Brennan in *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), should be adopted for asserting personal jurisdiction over non-resident defendants in patent infringement cases (or other stream of commerce cases).  As a result, the courts of this District are without clear and controlling precedent.  Plaintiff fails to acknowledge this uncertain state of the law (or chooses to ignore it).  (*See* Sections III and IV below.)

Regardless, Plaintiff's Response fails to establish that it has met its burden of proof showing that personal jurisdiction and venue are proper in this District for this patent infringement action.  Plaintiff's argument that 28 U.S.C. § 1391(c) has completely supplanted 28 U.S.C. § 1400(b) for purposes of venue overstates the present state of the law, which again, as to the stream of commerce theory advocated by Plaintiff, remains unsettled.  Moreover, the Federal Circuit case law primarily relied upon by Plaintiff is demonstrably in conflict with traditional and current Congressional intent regarding jurisdiction and venue for patent infringement actions.

Furthermore, applying the personal jurisdiction analysis advocated by Plaintiff to the current action shows that NHS is not subject to the personal jurisdiction of this Court because (i) the Delaware long-arm statute does not reach NHS since NHS is not alleged (and has not, in fact) engaged in any act in Delaware as required by 10 DEL. C. § 3104(c)(1), and (ii) the exercise of personal jurisdiction over NHS would not comport with traditional notions of fair play and substantial justice since NHS has not purposefully availed itself of the benefits of conducting business in Delaware, and simply by contracting to sell a private-label version of its product to Eckerd (which is not a Delaware corporation and does hot have its principal place of business in Delaware) could not have reasonably anticipated being haled into court in Delaware. (*See* Section IV below.)

Indeed, this Court would be on the emerging forefront of the law, ironically, by harkening back to the straightforward and clear-cut analysis for determining jurisdiction in patent infringement cases embodied in the traditional analysis of 28 U.S.C. § 1400(b) set out in cases such as *Fourco Glass Co. v. Transmirra Prod. Corp.*, 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 404 (1957) and its progeny. There is legislation currently pending which clearly demonstrates Congress' intention, as discussed in Section V below, that 28 U.S.C. § 1391(c) is not to be read into the patent venue statute; and that in such cases, jurisdiction is not intended to reach to the hinterlands under the general venue statute, but rather, is to be more straightforward and easily determined.

For these reasons, as more fully discussed below, as well as for the reasons asserted in the Motion, the Complaint ought to be dismissed as to NHS, or, alternatively, this matter ought to be transferred to the United States District Court for the District of Arizona—a proper and intended forum.

2

## II.     ADDITIONAL RELEVANT FACTS

The following additional facts are relevant and will be useful to the Court's proper analysis of the issue here.  On or about September 1, 2006, NHS sent letters to three representatives of Eckerd, informing them that, due to this lawsuit, NHS was stopping the manufacture and sale of the Eckerd private-labeled product at issue in this case.  (Declaration of Thomas A. Connelly ("Connelly Decl.") ¶ 3, attached hereto and incorporated herein.)  Those letters were sent to David Morocco, Executive Vice President-Marketing, Patrick Kenney, Purchasing, and Savana Genereux, Purchasing Assistant, all at an address in Warwick, Rhode Island, by first-class U.S. mail and by email.  (*Id.*)  The last shipments of the Eckerd private-labeled product were sent to Eckerd warehouses in July, 2006.  (*Id.* ¶ 4.)  NHS does not receive any royalty payments from Eckerd based on sales of the private-labeled product.  (*Id.* ¶ 5.)  NHS has no control or input with Eckerd as to which Eckerd retail outlets actually receive the Eckerd private-labeled product after that product is shipped to the Eckerd warehouses.  (*Id.* ¶ 6.)  The parties have not entered into a principal/agent relationship, and Eckerd is not an agent of NHS. (*Id.* ¶ 7.)  NHS reserves the right to approve private labels with all of its private-label customers (not just Eckerd) to review their accuracy as to any information regarding ingredients and dosage, and that they otherwise comply with all applicable federal and state labeling laws and regulations.  (*Id.* ¶ 8.)

## III.     PLAINTIFF MISAPPLIES FEDERAL CIRCUIT LAW AND CONCEDES THAT IT IS PROCEEDING ONLY ON A THEORY OF SPECIFIC JURISDICTION

In setting out its erroneous argument that personal jurisdiction over NHS exists in this case, Plaintiff asserts that "the Federal Circuit's three-part test for determining jurisdiction" is

3

properly applied in this case. (Resp. § II at 7.) Several things must be noted from Plaintiff's reliance on this test.

First, the Federal Circuit's three-part test is directed at determining "specific" jurisdiction, not both "general" and "specific" jurisdiction as Plaintiff's characterization of the test as one "for determining jurisdiction" implies. *See 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1378 (Fed. Cir. 1998) ("In [Akro Corp. v. Luker, 45 F.3d 1541, 1545-46 (Fed.Cir.1995)] we outlined a three-prong minimum contacts test for determining if *specific jurisdiction* existed") (emphasis added); *Davlyn Mfg. Co., Inc. v. H&M Auto Parts, Inc.*, 414 F.Supp.2d 523, 528 (E.D. Pa. 2005) ("The Federal Circuit has established a three-prong test for determining whether the exercise of *specific jurisdiction* is consistent with due process.") (emphasis added). Also, the *3D Sys., Inc.* decision, relied upon by Plaintiff, originated from the Central District of California, a state where the California Supreme Court has held that its long arm statute reaches the limits of federal due process; *3D Sys., Inc.*, 160 F.3d at 1377 (citing CAL.CIV.PROC.CODE § 410.10 (West 1997); *Fireman's Fund Ins. Co. v. National Bank of Coops.,* 103 F.3d 888, 893 (9th Cir.1996); and *Vons Cos., Inc. v. Seabest Foods, Inc.,* 14 Cal.4th 434, 444, 58 Cal.Rptr.2d 899, 926 P.2d 1085, 1091 (Cal.1996)); a result that is in contrast to Delaware where the Federal Circuit has recently noted that "it is not clear … whether the Delaware long arm statute extends to the full extent that the due process clause would permit."[1] *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1320 & n.5 (Fed. Cir. 2005) (hereinafter referred to as "*Chi Mei II*").

---

[1] Likewise, *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994), also heavily relied upon by Plaintiff, stems from a district court in Virginia, a state whose long arm statute has been held to be co-extensive with the limits of federal due process. *Id.* at 1569 n.23. For that reason, and others discussed elsewhere, *Beverly Hills Fan Co.* is inapposite.

4

Plaintiff's reliance on the three-prong test and the *3D Sys., Inc.* decision make it clear that

Plaintiff is relying on specific jurisdiction, rather than general jurisdiction. Although, in its

Complaint and Response, Plaintiff has generally asserted sections 3104(c)(1) and 3104(c)(4) of

the Delaware long arm statute as grounds for exercising personal jurisdiction over NHS[2]; the

Complaint is devoid of any allegations that NHS "regularly solicits or does business" in

Delaware, "engages in any other persistent course of conduct in the State," or "derives

substantial revenue from services, or things used or consumed" in Delaware, as would be

necessary under section 3104(c)(4). Moreover, it is widely recognized that section 3104(c)(1) is

a specific jurisdiction statute, and section 3104(c)(4) is a general jurisdiction statute.

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 293 F.Supp.2d 423, 427,

429 (D.Del. 2003) (hereinafter referred to as "*Chi Mei I*"), *vacated on other grounds by Chi Mei

II*, 395 F.3d at 1316.

Finally, lest there be any doubt that Plaintiff is proceeding on only a theory of specific

jurisdiction, and not on a theory of general jurisdiction, the Response states in a footnote:

> The case upon which Defendant primarily relies, *Merck & Co. v.
> Barr Labs., Inc.*, 179 F.Supp.2d 368 (D.Del. 2002), is inapposite to
> this action because the parties in *Merck* conceded that specific
> jurisdiction was not available. *Id.* at 371. Unlike *Merck*, <u>the
> infringing conduct in this case directly arises from Defendant's
> actions that placed the infringing product in Delaware.</u>

---

[2] Section § 3104(c) in Title 10 of the Delaware Code is this State's long arm statute and states:
   As to a cause of action brought by any person arising from any of the acts
   enumerated in this section, a court may exercise personal jurisdiction over any
   nonresident, or a personal representative, who in person or through an agent:
   (1) Transacts any business or performs any character of work or service in the
       State; ...
   (4) Causes tortious injury in the State or outside of the State by an act or
       omission outside the State if the person regularly does or solicits business,
       engages in any other persistent course of conduct in the State or derives
       substantial revenue from services, or things used or consumed in the State;
       ...
10 DEL. C. § 3104(c) (2006).

5

(Resp. § II.A., n.3 at 9) (underline added). In other words, Plaintiff is not basing its claims upon any "continuous and systematic contacts" of NHS's with Delaware, but from specific acts of NHS (i.e., contracting with Eckerd and approving the private label) that caused its product to reach Delaware. *See Merck & Co.*, 179 F.Supp.2d at 371 (defining specific and general jurisdiction). And *Merck* indeed is a general jurisdiction case. *See Merck & Co.*, 179 F.Supp.2d at 371 ("the Court will only consider the facts under a general jurisdiction analysis."). Furthermore, the *Merck* Court was construing § 3104(c)(4) of the Delaware long arm statute in a stream of commerce setting; *Merck & Co.*, 179 F.Supp.2d at 372-74; which section Plaintiff now concedes, by force of its arguments, no longer applies here.

Consequently, since Plaintiff now implicitly concedes that it is proceeding only on a theory of specific jurisdiction under section 3104(c)(1) of the Delaware Code, the ensuing analysis in Section IV below, will take Plaintiff at its word that an analysis of general jurisdiction under section 3104(c)(4) is inapposite and focus only on the stream of commerce theory as applied under section 3104(c)(1) of the Delaware long arm statute.[3] *But see Boone v. Oy Partek Ab*, 724 A.2d 1150, 1155-59 (Del Super. Ct. 1997) (where, despite finding that § 3104(c)(1) did not confer jurisdiction in that case under a stream of commerce theory, the Court found that the defendant, through its "exclusive distributor" and for other reasons, had a sufficiently "general presence" within the State to confer general jurisdiction under § 3104(c)(4) and thereby

---

[3] *Chi Mei II* contains an informative discussion of the stream of commerce theory as it relates to personal jurisdiction under the Delaware long arm statute and due process analysis. *See, generally, Chi Mei II*, 395 F.3d at 1319-23. As to its application to the long arm statute, the Court stated that the scope of the theory under Delaware law "is not clear, and the issue has yet to be directly addressed by the Delaware Supreme Court." *Id*. at 1320. The Court noted that "it is not clear 1) whether proof of an 'intent or purpose to serve the Delaware market' is required, and 2) whether the Delaware long arm statute extends to the full extent that the due process clause would permit." *Id*. In regard to the due process analysis under the stream of commerce theory, the Court noted that "Delaware law is unclear as to whether the proper interpretation of the long arm statute accords with Justice O'Connor's or Justice Brennan's view as expressed in *Asahi*." *Id*. at 1322. The Court ultimately remanded the case to the district court for jurisdictional discovery to be conducted. *Id*. at 1322 and 1324. Plaintiff has not sought jurisdictional discovery here.

6

implicate the transactional elements of § 3104(c)(1). The facts of *Boone* distinguish it from this case.).

Applying the correct personal jurisdiction analysis, in accord with the Delaware long arm statute, Delaware case law construing that statute, and federal due process, it is clear that Plaintiff has not met its burden to show that this Court's exercise of personal jurisdiction over NHS is proper and that this case must be dismissed against NHS.

## IV.    SPECIFIC PERSONAL JURISDICTION OVER NHS, UNDER THE STREAM OF COMMERCE THEORY, DOES NOT EXIST IN DELAWARE

To start, Plaintiff bears the burden of establishing that this Court has jurisdiction. *Am. Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.*, 1999 WL 615175, at *1-2 (D.Del. Aug. 3, 1999). To meet its burden, Plaintiff must make a *prima facie* showing that Delaware's long arm statute confers jurisdiction. *Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724 (Del Super. Ct. 1996) (hereinafter "*Outokumpu*"). "In deciding a motion to dismiss for lack of personal jurisdiction, the Court need not treat the plaintiff's allegations as true, but may consider affidavits and weigh any other relevant evidence in making the jurisdictional determination." *Davlyn Mfg. Co., Inc.*, 414 F.Supp.2d at 528. "Rule 12(b)(2) of the Federal Rules of Civil Procedure requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant." *Telcordia Techs., Inc. v. Alcatel S.A.*, 2005 WL 1268061, at *1 (D.Del. May 27, 2005) (hereinafter "*Alcatel*") (quoting *E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates*, 197 F.R.D. 112, 119 (D.Del. 2000)). As shown below, this Court lacks personal jurisdiction over NHS.

To establish personal jurisdiction over NHS, a non-resident corporate defendant in this patent infringement action, Plaintiff must show *both* that jurisdiction exists under the Delaware

7

long-arm statute, and that the exercise of jurisdiction would be consistent with the requirements

of constitutional due process. *E.g.*, *Chi Mei II*, 395 F.3d at 1319; *Alcatel*, 2005 WL 1268061 at

*1. Contrary to Plaintiff's argument, this Court must "defer to the interpretation of a state's long-

arm statute given by that state's highest court"—Federal Circuit law does not control that

interpretation, as Plaintiff's own case acknowledges. *3D Sys., Inc.*, 160 F.3d at 1377. If the

state's long arm statue applies, then under the due process analysis, Plaintiff must still show the

existence of minimum contacts between NHS and Delaware "such that the maintenance of the

suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v.

Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Specifically, Plaintiff must

show that NHS "purposefully availed" itself of the privilege of conducting business within

Delaware. *Burger King v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)

(quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); *see also

Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92

(1987). Contacts that are either "random," fortuitous," "attenuated" or that result from the

"unilateral activity" of others, are not sufficient. *Burger King*, 471 U.S. at 475 & n. 17. Rather,

the quantum and quality of the contacts must be such that NHS "should reasonably anticipate

being haled into court" in Delaware. *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286,

297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

## A.    Personal Jurisdiction Does Not Exist Under Delaware's Long Arm Statute.

The section of the Delaware long arm statute relied upon by Plaintiff here, section

3104(c)(1), states:

> As to a cause of action brought by any person arising from any of
> the acts enumerated in this section, a court may exercise personal
> jurisdiction over any nonresident, or a personal representative, who
> in person or through an agent: (1) Transacts any business of
> performs any character of work or service in the State ....

8

10 DEL. C. § 3104(c)(1).  Section 3104(c)(1) is a specific jurisdiction provision.  *Outokumpu*,

685 A.2d at 729; *Boone v. Oy Partek AB*, 724 A.2d 1150, 1155 (Del. Super. Ct. 1997); *Chi Mei I*,

293 F.Supp.2d at 427.  Consequently, this section requires some act on the part of NHS that

occurred in Delaware and out of which Plaintiff's claims arise.  *Outokumpu*, 685 A.2d at 729;

*Boone*, 724 A.2d at 1156; *see also Siemens Aktiengesellschaft v. LG Semicon Co., Ltd.*, 69

F.Supp.2d 622, 626 (D.Del. 1999) (hereinafter "*Siemens*") (section 3104(c)(1) "require[s] that

some action by the defendant occur within Delaware").  Where a manufacturer has no general

presence in Delaware, the mere transfer of ownership of goods to a third party outside Delaware

is not an act deemed to have occurred in Delaware.  *LaNuova D&B, S.p.A. v. Bowe Co., Inc.*, 513

A.2d 764, 768 (Del. 1986); *Siemens*, 69 F.Supp.2d at 626.

Here, there is no question that NHS does not have a general presence in Delaware, and

Plaintiff has conceded as much.  The only allegations relevant to this District's jurisdiction are

that NHS "manufactured and distributed to Eckerd a private-label-branded version" of the

allegedly infringing product, which Eckerd then sells to Delaware consumers; and that NHS had

approval over the private label used by Eckerd.[4]  (Compl. ¶ 7.)  NHS does not deny any of that.

However, the sales from NHS to Eckerd occurred in Arizona.  Title to the goods passed to

Eckerd either in Arizona, or in Florida, Georgia, New York, North Carolina, Pennsylvania or

Texas, where they were shipped to Eckerd's warehouses.  Furthermore, NHS was not a party to

any sales transaction between Eckerd and its retail customers in Delaware.  Eckerd, not NHS,

---

[4] The Complaint also alleges that NHS's "GasAway+" product was sold to "purchasers throughout the United States" by way of its website at www.sedonalabs.com.  (Compl. ¶ 8.)  Plaintiff is apparently no longer pursuing those allegations as a basis for jurisdiction since the alleged website sales are not discussed as a basis for jurisdiction in Plaintiff's answering brief.  This is understandable since the GasAway+ product cannot be purchased over the Internet at that website.  Therefore, the only allegedly infringing product sales being set forth as a basis for personal jurisdiction are those of the Eckerd private-label-branded version of NHS's product.

9

conducted those sales transactions.  NHS did not receive any particular benefit from those

Delaware sales, such as a royalty.

Moreover, NHS retained approval over the labels used by Eckerd to ensure that those

labels did not misrepresent the product in any way, and to ensure that they complied with all

applicable federal and state labeling laws and regulations.  That fact does not constitute any sort

of act on the part of NHS that occurred in Delaware.  Any such review and approval, if in fact

such occurred, would have occurred in Arizona, at NHS's place of business.  Moreover, the

labels themselves do not refer to NHS or "Sedona Labs" in any way.  Rather, the only reference

to any company made on the label is, "Distributed by: Eckerd Drug Company, Clearwater, FL

33758."

Plaintiff argues that NHS "intend[ed] for its products to be sold by Eckerd in its

distribution chain, with Delaware within the intended regional market."  (Resp. § II.A. at 8.)

However, that is not the inquiry to be made under section 3104(c)(1).  Rather, the proper inquiry

must focus on whether or not NHS committed some act in Delaware out of which the claims

arise.  For instance, in *Boone*, a case relied upon by Plaintiff, the Delaware Superior Court found

that § 3104(c)(1) was not satisfied, even though the defendant had placed its product into the

stream of commerce, intending to target the entire country, and that product eventually landed

and caused harm in Delaware.  *Boone*, 724 A.2d at 1156.  The Court held that "[b]ecause [the

defendant] passed title to [its exclusive distributor] in Helsinki it did not act in this State as

required by [section 3104(c)(1)]."  *Id.*  The result must be the same here.

Finally, judging by its Response, where the issue is not addressed, Plaintiff has

abandoned any assertion or argument that jurisdiction is proper in this District based on NHS's

10

website. Plaintiff's decision is a sound one. As noted in the Motion, the allegedly infringing

product cannot be purchased from the NHS website as alleged in the Complaint. That website is

a passive one, for informational purposes only, and thus, does not give rise to personal

jurisdiction. *See Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 419-20 (9th Cir. 1997)

("essentially passive" web site was insufficient to establish purposeful availment for purposes of

due process). "Rather, there must be evidence that the defendant 'purposefully availed' itself of

conduct activity in the forum, knowingly interacting with residents of the forum state via its

website." *Alcatel*, 2005 WL 1268061 at *7, (quoting *Toys "R" Us, Inc. v. Step Two, S.A.*, 318

F.3d 446, 454 (3d Cir. 2003)). Here, Plaintiff has not met its burden of showing that NHS's

website reached, or was intended to reach, customers in Delaware for the conduct of any

infringing activity.

### B.     The Exercise of Personal Jurisdiction Would Violate Due Process.

Plaintiff argues that due process is satisfied here because NHS is "acting in consort" with

Eckerd. (Resp. § II.B. at 9.) Plaintiff provides no analysis on how that is (nor are there any such

allegations in the Complaint), except to parrot conclusory language from *Beverly Hills Fan*. (*See*

*id*.) That is not enough for Plaintiff to meet its burden.

This Court, in another case relied upon by Plaintiff, has construed the term "acting in

consort" to mean "acting in concurrence and harmony." *Motorola Inc. v. PC-TEL, Inc.*, 58

F.Supp.2d 349, 355 (D.Del. 1999) (Judge Sleet). There, in the due process analysis, Judge Sleet

found that the defendant, AltoCom, Inc., "consorted" with its licensees and sublicensees (its

customers) by "acting in concurrence or harmony" in many varied and substantial ways that do

not exist here. *Id*. at 353-56. For instance, AltoCom licensed a product (a "softmodem") that

was integrated into the many products of its customers (large global companies like Compaq,

Phillips, Samsung, Sharp and Sony), which necessarily required a certain level of cooperation in

11

the manufacturing process; even when integrated, AltoCom's products maintained their own

identity and were identified to the end-user by a legend that appeared on the end-user's computer

screen identifying the modem as an "AltoCom software modem"; the AltoCom products were an

"integral part" of the sales activities of its multi-national customers; Delaware residents and end-

users accessed AltoCom's website to either purchase products or download software related to

those products; and, before shipping its product, AltoCom required its customers to execute

licensing agreements which provided for royalties based on the number products ultimately

activated by end-users. *Id.* at 354-55 & n.7.  Regarding the licensing agreement, Judge Sleet

noted,

> By its very terms, terms drafted by AltoCom, none of that which is
> contemplated by this business arrangement can be accomplished
> without the concurrence, without there being harmony, that is,
> without all parties from the beginning to the end of the distribution
> network acting in consort to place products containing integrated
> AltoCom software into the stream of commerce.

*Id.* at 355.  Judge Sleet also noted that, "[t]hese facts clearly distinguish AltoCom from the

defendant that finds itself subject to jurisdiction merely because it decided to do business with a

company that does business nationwide." *Id.* at 354, n.7.

   Such a situation is a far cry from that which exists here.  NHS, a manufacturer and seller,

finds itself being haled into court in Delaware "merely because it decided to do business with

[Eckerd]."  Eckerd contracted with NHS merely to provide a private-label version of NHS's own

product.  That product was not integrated into any other Eckerd product, or designed by Eckerd,

thereby requiring significant engineering and production cooperation between the companies as

in *Motorola*.  And it can hardly be said that NHS's product is an "integral part" of Eckerd's sales

activities when, by Plaintiff's own count, Eckerd (a drug store that carries between 18,000 and

25,000 front-end products, including approximately 1,200 to 2,000 private label products, (Resp.,

12

Exhibit 8 [SEC Form 40-F, Ex. 1 – Annual Information Form] at 12)) is currently carrying an average of four (4) bottles of the allegedly infringing private-labeled product on the shelves of its Delaware stores.[5]  (*See* Resp., Declaration of Tiffany Geyer Lydon ¶¶ 2-4.)

Moreover, NHS had no input or control over Eckerd's marketing or sales activities regarding the Eckerd private-labeled product.  NHS had no say over which Eckerd stores received the private-labeled product, or how many units each store received.  Surely, those decisions are driven by Eckerd's own internal marketing analysis.  When NHS informed Eckerd that it was stopping shipment of the private-labeled product because of the allegations made by Plaintiff, Eckerd did nothing, and chose to keep the units they had already received on the shelves—a decision NHS could neither influence, nor control.  The allegedly infringing product cannot be purchased from the www.sedonalabs.com website.  Nor does the Eckerd private label identify NHS as the manufacturer; rather, it only identifies "Eckerd Drug Company, Clearwater, FL 33758" as the distributor.

Clearly, under the *Motorola* definition of "acting in consort," NHS is not doing so with Eckerd.  Thus, under the case law advocated by Plaintiff, the exercise of jurisdiction in this case would not comport with the requirements of due process.  The absence of due process here is also consistent with Judge Sleets' recent analysis and holding in *Alcatel*, where this Court denied jurisdiction over a non-resident defendant under a stream of commerce theory in a patent infringement lawsuit.  *See, generally, Alcatel*, 2005 WL 1268061.  An even more analogous recent decision is that reached in *Davlyn Mfg. Co., Inc. v. H&M Auto Parts, Inc.*, 414 F.Supp.2d 523 (E.D.Pa. 2005).

---

[5] NHS shipped a total of 10,002 units of the Eckerd private-labeled product to Eckerd between January 2006 and July 2006, for an average of 6.45 units per store (10,002 units; 1549 Eckerd stores in the U.S.).  (*See* King Decl. ¶ 5; *see also* Resp., Ex. 8 at 4.)  On average, therefore, there were 142 units that made their way into Delaware (22 Eckerd stores in Delaware * 6.5 units/store), less than 1.5% of the total number of units sold to Eckerd.

In *Davlyn*, the plaintiff, a Pennsylvania corporation, was the assignee of three patents for oven door gaskets used to seal conventional home ovens. *Id*. at 525. The defendants had manufactured on their behalf an oven gasket for use in home ovens, which they sold to Electrolux Home Products, the maker of "Frigidaire" brand appliances and the Sears' "Kenmore" brand. *Id*. at 525-26 & 528. The plaintiff brought suit for patent infringement claiming that the defendants purposefully directed their activities at the forum by placing the oven gaskets in the stream of commerce via a nationwide distributor of home appliances, which were then sold through established channels of distribution throughout the United States, including in the forum State. *Id*. at 528. The defendants sought dismissal for lack of personal jurisdiction claiming that they never purposefully directed the sale of oven gaskets at the forum; that they had no offices, employees, agents, or customers in the forum; that they were not corporations or residents of the forum and had no business contacts there; and that they had "no control, nor knowledge except in a general sense" of the final destination of the allegedly infringing products. *Id*. at 528-29.

In its due process analysis, the Court recognized that both the Federal and Third Circuits have "declined to adopt a position as to whether mere placement of a product in the stream of commerce and awareness of its potential destination will subject a defendant to jurisdiction in a forum state." *Id*. at 530 & n1. (Delaware has also not adopted a position on that question. *See Chi Mei II*, 395 F.3d at 1320, 1322 and n.7.) The Court went on to distinguish *Beverly Hills Fan*, a case relied upon by Plaintiff here, by noting the salient facts in *Beverly Hills Fan* (that the fans were shipped directly into the forum by the defendant, they clearly identified the defendant as the source of the product, and they were accompanied by a warranty that the defendant would honor) and then setting out the contrasting, salient facts in its case:

14

> In the instant case, Plaintiff has presented no evidence of
> additional conduct or contacts which would indicate that [the
> defendant] purposefully directed it activities at the forum state of
> Pennsylvania. While [defendant] admits to a "general" awareness
> that its oven gaskets may be incorporated into ovens sold in
> various states, including Pennsylvania, it has no control over
> whether the gaskets end up in Pennsylvania as opposed to any
> other state, and has taken no purposeful steps to ensure that it reaps
> the benefits of Pennsylvania business. [The defendant] does not
> ship its products to Pennsylvania. ... Electrolux/Frigidare does not
> market or advertise [the defendant's] oven gaskets, let alone
> identify them by name, as in *Beverly Hills Fan Co.*, .... Plaintiff
> has offered no evidence to suggest that consumers purchasing
> Frigidaire ovens are aware that the oven's heat-sealing gaskets
> were originally sold by a Texas corporation.

*Davlyn*. at 530. From those facts, and other facts analogous to this case, the Court concluded

that the exercise of personal jurisdiction would violate due process. *Id*. at 531. The Court stated:

> Despite the absence of clear guidance from either the Federal or
> Third Circuits, this Court must take a position with respect to the
> resolution of the instant action. Accordingly, we find that a
> defendant does not "purposefully direct" his activities at a forum
> state merely by selling a component part to a nationwide
> distributor of home appliances with the awareness that appliances
> containing the defendant's product may ultimately be sold in the
> forum state. In keeping with the stream of commerce theory
> proposed by Justice O'Connor in *Asahi*, there must be some
> additional evidence of the defendant's purpose and intent to serve
> the forum state, such as state-specific marketing or design, the
> provision of customer support services, or an exclusive contractual
> relationship with a distributor in the forum state. The Supreme
> Court has held that "foreseeability alone" is not a sufficient
> benchmark for personal jurisdiction under the Due Process Clause,
> and we believe that adoption of the broad minimum contacts test
> enunciated by Justice Brennan in *Asahi* would run afoul of this
> prescription.

*Id*. (citations omitted).

The same analysis clearly applies to the salient facts here. NHS has not "purposefully

directed" any of its activities at Delaware. It has no offices here, no registered agents, is not

registered to do business in Delaware. It ships no allegedly infringing product directly into

15

Delaware. While it may be generally aware that Eckerd has retail outlets in Delaware, it has no control whether or not Eckerd actually places the private-labeled product on the shelves of its Delaware stores. NHS has no exclusive distribution agreement with Eckerd or any other company, nor is NHS the only company that provides Eckerd with private-labeled products. Eckerd does not market or advertise the GasAway+ product, nor does it identify NHS as the manufacturer of its private-labeled product. There are no allegations or evidence that consumers purchasing the Eckerd private-labeled product are aware that NHS manufactured it. NHS has not marketed its product to Delaware consumers. The only allegations here are that NHS sold to Eckerd a private-label-brand of the allegedly infringing product and that Eckerd then sold it in Delaware. Such contacts are too attenuated, random, fortuitous, and depend on the unilateral activity of Eckerd. As such, it would offend traditional notions of fair play and substantial justice to hale NHS into court in Delaware on that basis.

## V.    PENDING LEGISLATION SHOWS CONGRESS' INTENT THAT 28 U.S.C. § 1391(c) IS NOT TO CONTROL OR INFORM THE SPECIFIC PATENT VENUE AND JURISDICTION STATUTE, 28 U.S.C. § 1400(b)

While it is undeniable that the Federal Circuit enlarged the scope of venue for patent infringement proceedings by reading 28 U.S.C. § 1391(c) into the patent infringement venue statute, 28 U.S.C. § 1400(b); *see VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1578 (Fed. Cir. 1990) ("On its face, § 1391(c) clearly applies to § 1400(b), and thus redefines the meaning of the term 'resides' in that section."); it is far less clear that the holding of *VE Holding Corp.* will continue to have vitality in light of legislation currently pending in both chambers of Congress; *see* Patent Reform Act of 2006, S. 3818, 109th Cong. § 8 (2006) (attached hereto as Exhibit "1"), and Patents Depend on Quality Act of 2006, H.R. 5096, 109th Cong. § 7 (2006) (attached hereto as Exhibit "2"). The pending legislation severely undercuts

16

the reasoning of the federal circuit court, particularly those portions of the *VE Holding Corp.* decision where the court *sub silencio* overrules long-established Supreme Court precedent, such as *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957), and its progeny. That legislation also calls into question the conclusions reached by the Federal Circuit regarding Congress' intention as to venue for corporate defendants in patent infringement actions in enacting the 1988 modifications to the general venue statute.

In deciding *VE Holding Corp.*, the Federal Circuit emphasized that the legislative history for the 1988 modification to § 1391(c)[6] did not contain a clear expression of Congressional intention regarding the effect, if any, the modification was intended to have upon § 1400(b). Finding no clear expression of Congressional intent, the Court engaged in a lengthy exercise wherein it attempted to sleuth that intention. The Court ultimately concluded that "Congress' intention is simply not known," *VE Holding Corp.*, 917 F.2d at 1581, and that "Congress has not given any indication of whether it intended to change the scope of venue under § 1400(b)," *Id.* Nevertheless, the Court held that the "plain language" of § 1391(c) did exactly that—changed the scope of venue under § 1400(b) by subjecting corporations to jurisdiction and venue in patent infringement actions in any judicial district where the corporation is subject to personal jurisdiction under the general venue statute. *Id.* at 1583. In so holding, the Court set aside decades of Supreme Court precedent and side-stepped several established rules of statutory construction (including the widely accepted rule that specific statutes are not controlled or nullified by general statutes) to support its conclusion that Congress intended for the new language of § 1391(c) to be read into § 1400(b) and, therefore, greatly enlarge the jurisdictional

---

[6] Section 1391(c) was amended as part of the Judicial Improvements and Access to Justice Act, Pub. L. No. 100-702, tit. X, § 1013(a), 102 Stat. 4642, 4669 (1988).

17

and venue scope of § 1400(b).[7]  As discussed above, the *VE Holding Corp* decision has resulted

in a patchwork of uncertain and hard-to-define analyses of patent infringement jurisdiction,

particularly in this District and the Third Circuit.  The *VE Holding Corp.* Court also ignored

completely Congress' long-standing intention that the forum in patent infringement actions

should be one reasonably convenient to the defendant.  *Up-Right, Inc. v. Aluminum Safety*

*Prods., Inc.*, 165 F.Supp. 742, 744 (D.Minn. 1988); *see also Vibber v. U.S. Rubber Co.*, 255

F.Supp. 47, 49 (S.D.N.Y. 1966) (certainty and restrictiveness are objectives of venue statute

governing patent infringement actions).

Congress has now weighed in on the issue and, in currently pending legislation, clearly

expressed its intention that jurisdiction and venue for patent infringement actions involving

corporate defendants are *not* co-extensive with the general venue statute.  The Patent Reform Act

of 2006 (the "Act"), introduced in the Senate on August 3, 2006, contains a section titled "Venue

and Jurisdiction."  *See* Patent Reform Act of 2006, § 8.  The Act makes the following change to

28 U.S.C. § 1400(b):

> (a) Venue for Patent Cases. – <u>Section 1400 of title 28, United States Code</u>, is amended by striking subsection (b) and inserting the following:
>
> '(b) Any civil action arising under any Act of Congress relating to patents, other than an action for declaratory judgment or an action seeking review of a decision of the Patent Trial and Appeal Board under chapter 13 of title 35, may be brought only –
>
> > '(1) in the judicial district where either party resides; or

---

[7] Contrary to Plaintiff's argument that § 1391(c) is the "proper venue statute for a corporate defendant in a patent infringement action[,]" (Resp. § I at 5), *VE Holding Corp.* itself recognizes that "§ 1391(c) only operates to define a term in § 1400(b)—it neither alone governs patent venue nor establishes a patent venue rule separate and apart from that provided under § 1400(b)." *VE Holding Corp.*, 917 F.2d at 1580.

18

'(2) in the judicial district where the defendant has
committed acts of infringement and has a regular and
established place of business.

'(c) *Notwithstanding section 1391(c) of this title*, for purposes of
venue under subsection (b), a corporation shall be deemed to reside
in the judicial district in which the corporation has its principal
place of business or in the State in which the corporation is
incorporated.'

*Id*. (emphasis added).  The Act leaves no doubt that § 1391(c) does not inform the venue and

jurisdictional analysis for patent infringement actions involving corporate defendants.  The Act is

clear—*section 1391(c) does not apply to patent infringement actions*.  Rather, the specific patent

venue statute, § 1400(b), continues to apply to those actions in essentially the same manner as it

did prior to the 1988 amendment to § 1391(c).  Under the Act, jurisdiction and venue would be

proper in either: (i) the state in which either party has its principal place of business or is

incorporated (here, Arizona, New Jersey or Pennsylvania); or (ii) where the defendant has

committed an act of infringement *and* has a regular and established place of business (here,

Arizona).  Moreover, passage of the Act would reinforce that *Fourco* and its progeny are still

good law and control the determination of jurisdiction and venue for patent infringement actions

involving corporate defendants.

## VI.    CONCLUSION

NHS is not subject to personal jurisdiction or venue in this District since, as shown in

NHS's Motion and not contradicted in Plaintiff's Response, neither party resides in Delaware

since neither is incorporated in Delaware (NHS is an Arizona entity; Plaintiff is a New Jersey

corporation); and NHS does not have a regular and established place of business in Delaware.

Even if this Court applies a § 1391(c) personal jurisdiction analysis, as Plaintiff advocates and as

19

demonstrated in Section IV above, the result is the same—this Court lacks personal jurisdiction over NHS and venue here is improper.

This Court should not be lulled into the incorrect and misleading advocacy of Plaintiff in its zealousness to litigate this patent infringement matter in this District—a jurisdiction that truly has no connection to any of the parties. Plaintiff is a New Jersey corporation with its principal place of business in Pennsylvania. NHS is an Arizona entity with its principal place of business in Arizona. The other Defendant, Sedona Labs, Inc., is also an Arizona corporation with its principal place of business in Arizona. The only connection to this District (as tenuous as it is) is that Eckerd Drug Company, not a party here, has stores in Delaware that carry a private-label-brand of NHS's allegedly infringing product, whose labels do not even identify NHS as the maker of the product. Delaware consumers are unaware of the existence of NHS in relation to those few bottles of the private-labeled product on the shelves in Delaware. NHS has not "acted in consort" with Eckerd to bring the allegedly infringing product into Delaware. NHS has never directed any activities at Delaware, it has never "purposefully availed" itself of the privilege of doing business in Delaware, or of the protections of Delaware's laws. It has never taken any steps by which it could reasonably have anticipated being haled into Delaware's courts. NHS is not within the reach of Delaware's long arm statute, and to make it litigate in this forum would violate constitutional due process and offend traditional notions of fair play and substantial justice. For these reasons, this Court ought to dismiss the Complaint as to NHS; or, alternatively, transfer this matter to the District of Arizona where a Declaratory Action involving NHS and Plaintiff, and essentially the same issues, is pending, and where such an action is proper under both 28 U.S.C. § 1391(c) and 28 U.S.C. § 1400(b).[8]

---

[8] Plaintiff, Block Drug Co., has filed a motion to dismiss the Declaratory Action in Arizona. However, that motion is based on the "first-filed" rule. Plaintiff does not challenge that Court's exercise of personal jurisdiction.

20

Dated: October 16, 2006

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP


_/s/ Patrick A. Costello_

Of Counsel:

David S. Eagle (Bar No. 3387)
Patrick A. Costello (Bar No. 4535)

Roger L. Cohen
Michelle C. Lombino
Thomas A. Connelly
3200 N. Central Avenue, Suite 2000
Phoenix, AZ 85018
Telephone (602) 248-1000

919 Market Street, Suite 1000
Wilmington, DE 19801
(302) 426-1189 (phone)
(302) 426-9193 (fax)
deagle@klehr.com
pcostello@klehr.com
_Attorneys for Defendant Nutri-Health_
_Supplements, LLC, d/b/a Sedona_
_Laboratories_

# EXHIBIT 1

II

109TH CONGRESS
2D SESSION

# S. 3818

To amend title 35, United States Code, to provide for patent reform.

---

## IN THE SENATE OF THE UNITED STATES

AUGUST 3, 2006

Mr. HATCH (for himself and Mr. LEAHY) introduced the following bill; which was read twice and referred to the Committee on the Judiciary

---

# A BILL

To amend title 35, United States Code, to provide for patent reform.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4        (a) SHORT TITLE.—This Act may be cited as the

5  ''Patent Reform Act of 2006''.

6        (b) TABLE OF CONTENTS.—The table of contents of

7  this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Reference to title 35, United States Code.
Sec. 3. Right of the first inventor to file.
Sec. 4. Inventor's oath or declaration.
Sec. 5. Remedies for infringement and affirmative defenses thereto.
Sec. 6. Post-grant procedures.
Sec. 7. Submissions by third parties and other quality enhancements.
Sec. 8. Venue and jurisdiction.

2

Sec. 9. Other statutory and conforming amendments.
Sec. 10. Effective date.

1  **SEC. 2. REFERENCE TO TITLE 35, UNITED STATES CODE.**

2      Whenever in this Act a section or other provision is

3  amended or repealed, that amendment or repeal shall be

4  considered to be made to that section or other provision

5  of title 35, United States Code.

6  **SEC. 3. RIGHT OF THE FIRST INVENTOR TO FILE.**

7      (a) DEFINITIONS.—Section 100 is amended by add-

8  ing at the end the following:

9      "(f) The term 'inventor' means the individual or, if

10 a joint invention, the individuals collectively who invented

11 or discovered the subject matter of the invention.

12     "(g) The terms 'joint inventor' and 'coinventor' mean

13 any 1 of the individuals who invented or discovered the

14 subject matter of a joint invention.

15     "(h) The 'effective filing date of a claimed invention'

16 is—

17         "(1) the filing date of the patent or the applica-

18     tion for patent containing the claim to the invention;

19     or

20         "(2) if the patent or application for patent is

21     entitled to a right of priority of any other applica-

22     tion under section 119, 365(a), or 365(b) or to the

23     benefit of an earlier filing date in the United States

24     under section 120, 121, or 365(c), the filing date of

•S 3818 IS

3

1    the earliest such application in which the claimed in-
2    vention is disclosed in the manner provided by the
3    first paragraph of section 112.

4        "(i) The term 'claimed invention' means the subject
5    matter defined by a claim in a patent or an application
6    for a patent.

7        "(j) The term 'joint invention' means an invention
8    resulting from the collaboration of inventive endeavors of
9    2 or more persons working toward the same end and pro-
10   ducing an invention by their collective efforts.".

11       (b) CONDITIONS FOR PATENTABILITY.—

12           (1) IN GENERAL.—Section 102 is amended to
13       read as follows:

14   **"§ 102. Conditions for patentability; novelty**

15       "(a) NOVELTY; PRIOR ART.—A patent for a claimed
16   invention may not be obtained if—

17           "(1) the claimed invention was patented, de-
18       scribed in a printed publication, or otherwise pub-
19       licly known—

20               "(A) more than 1 year before the effective
21           filing date of the claimed invention; or

22               "(B) 1 year or less before the effective fil-
23           ing date of the claimed invention, if the inven-
24           tion was patented or described in a printed pub-
25           lication or otherwise publicly known before the

4

1       invention thereof by the applicant for a patent;

2       or

3       "(2) the claimed invention was described in a

4       patent issued under section 151, or in an application

5       for patent published or deemed published under sec-

6       tion 122(b), in which the patent or application, as

7       the case may be, names another inventor and was

8       effectively filed before the effective filing date of the

9       claimed invention.

10      "(b) LIMITATION ON PRIOR ART.—

11      "(1) DERIVATION AND COMMON ASSIGNMENT

12      EXCEPTIONS.—Subject matter that would otherwise

13      qualify as prior art only under subsection (a)(2)

14      shall not be prior art to a claimed invention if—

15      "(A) the subject matter was obtained di-

16      rectly or indirectly from the inventor or a joint

17      inventor; or

18      "(B) the subject matter and the claimed

19      invention were, not later than the effective fil-

20      ing date of the claimed invention, owned by the

21      same person or subject to an obligation of as-

22      signment to the same person.

23      "(2) GRACE PERIOD.—Subject matter disclosed

24      in the prior art less than 1 year before the effective

25      filing date of the claimed invention shall not pre-

5

1   clude the patenting of a claimed invention under
2   subsection (a) or section 103 if the claimed inven-
3   tion was made prior to the date the subject matter
4   becomes prior art pursuant to section 102(b), if the
5   subject matter disclosed was obtained directly or in-
6   directly from an inventor of the claimed subject mat-
7   ter or the applicant.

8   "(3) PATENTS AND PUBLISHED APPLICATIONS
9   EFFECTIVELY FILED.—A patent or application for
10  patent is effectively filed under subsection (a)(2)
11  with respect to any subject matter described in the
12  patent or application—

13       "(A) as of the filing date of the patent or
14       the application for patent; or

15       "(B) if the patent or application for patent
16       is entitled to claim a right of priority under sec-
17       tion 119, 365(a), or 365(b) or to claim the ben-
18       efit of an earlier filing date under section 120,
19       121, or 365(c), based upon 1 or more prior
20       filed applications for patent, as of the filing
21       date of the earliest such application that de-
22       scribes the subject matter.".

23       (2) CONFORMING AMENDMENT.—The item re-
24  lating to section 102 in the table of sections for
25  chapter 10 is amended to read as follows:

"102. Conditions for patentability; novelty.".

•S 3818 IS

6

1    (c) CONDITIONS FOR PATENTABILITY; NONOBVIOUS

2  SUBJECT MATTER.—Section 103 is amended—

3        (1) in subsection (a)—

4            (A) by striking "A patent may not be ob-

5           tained through the invention" and inserting "A

6           patent for the claimed invention may not be ob-

7           tained through the claimed invention";

8            (B) by striking "sought to be patented"

9           and inserting "of the claimed invention"; and

10          (C) by striking "at the time the invention

11         was made" and inserting "before the effective

12         filing date of the claimed invention";

13      (2) by striking subsection (b) and redesignating

14  subsection (c) as subsection (b);

15      (3) by amending subsection (b)(1), as so redes-

16  ignated, to read as follows:

17  "(d)(1) Subject matter developed by another person,

18  which is disqualified as prior art under section 102(b),

19  shall not preclude patentability under this section if the

20  subject matter and the claimed invention were owned by

21  the same person, or subject to an obligation of assignment

22  to the same person, on or before the effective filing date

23  of the claimed invention."; and

24        (4) in subsection (b)(2)(A), as so redesignated,

25      by striking "the date the claimed invention was

7

1    made" and inserting "the effective filing date of the

2    claimed invention".

3    (d) REPEAL OF REQUIREMENTS FOR INVENTIONS

4  MADE ABROAD.—Section 104, and the item relating to

5  that section in the table of sections for chapter 10, are

6  repealed.

7    (e) REPEAL OF STATUTORY INVENTION REGISTRA-

8  TION.—

9      (1) IN GENERAL.—Section 157, and the item

10     relating to that section in the table of sections for

11     chapter 14, are repealed.

12     (2) REMOVAL OF CROSS REFERENCES.—Section

13     111(b)(8) is amended by striking "sections 115,

14     131, 135, and 157" and inserting "sections 131 and

15     135".

16    (f) EARLIER FILING DATE FOR INVENTOR AND

17  JOINT INVENTOR.—Section 120 is amended by striking

18  "which is filed by an inventor or inventors named" and

19  inserting "which names an inventor or joint inventor".

20    (g) CONFORMING AMENDMENTS.—

21     (1) RIGHT OF PRIORITY.—Section 172 is

22     amended by striking "and the time specified in sec-

23     tion 102(d)".

24     (2) LIMITATION ON REMEDIES.—Section

25     287(c)(4) is amended by striking "the earliest effec-

8

1 tive filing date of which is prior to" and inserting

2 "which has an effective filing date before".

3     (3) INTERNATIONAL APPLICATION DESIG-

4 NATING THE UNITED STATES: EFFECT.—Section

5 363 is amended by striking "except as otherwise

6 provided in section 102(e) of this title".

7     (4) PUBLICATION OF INTERNATIONAL APPLICA-

8 TION: EFFECT.—Section 374 is amended by striking

9 "sections 102(e) and 154(d)" and inserting "section

10 154(d)".

11     (5) PATENT ISSUED ON INTERNATIONAL APPLI-

12 CATION: EFFECT.—The second sentence of section

13 375(a) is amended by striking "Subject to section

14 102(e) of this title, such" and inserting "Such".

15     (6) LIMIT ON RIGHT OF PRIORITY.—Section

16 119(a) is amended by striking "; but no patent shall

17 be granted" and all that follows through "one year

18 prior to such filing".

19     (7) INVENTIONS MADE WITH FEDERAL ASSIST-

20 ANCE.—Section 202(c) is amended—

21         (A) in paragraph (2)—

22             (i) by striking "publication, on sale,

23             or public use," and all that follows through

24             "obtained in the United States" and in-

25             serting "the 1-year period referred to in

9

1       section 102(a) would end before the end of

2       such 2-year period"; and

3               (ii) by striking "the statutory" and

4               inserting "the 1-year"; and

5           (B) in paragraph (3), by striking "any

6           statutory bar date that may occur under this

7           title due to publication, on sale, or public use"

8           and inserting "the expiration of the 1-year pe-

9           riod referred to in section 102(a)".

10      (h) REPEAL OF INTERFERING PATENT REMEDIES.—

11  Section 291, and the item relating to that section in the

12  table of sections for chapter 29, are repealed.

13      (i) ACTION FOR CLAIM TO PATENT ON DERIVED IN-

14  VENTION.—Section 135(a) is amended to read as follows:

15      "(a) DISPUTE OVER RIGHT TO PATENT.—

16          "(1) INSTITUTION OF INVENTOR'S RIGHTS CON-

17          TEST.—An applicant may request initiation of a der-

18          ivation proceeding to determine the right of the ap-

19          plicant to a patent by filing a request which sets

20          forth with particularity the basis for finding that an

21          earlier applicant derived the claimed invention and

22          without authorization filed an application claiming

23          such invention. Any such request shall be made

24          within 12 months of the date of first publication of

25          an application containing a claim that is the same

10

1     or is substantially the same as the claimed invention,

2     under oath and supported by substantial evidence.

3     Whenever patents or applications for patent naming

4     different individuals as the inventor are determined

5     by the Director to interfere because of a dispute over

6     the right to patent under section 101, the Director

7     shall institute an inventor's rights contest for the

8     purpose of determining which applicant is entitled to

9     a patent.

10         "(2) REQUIREMENTS.—No proceeding shall be

11     commenced under this subsection unless the party

12     requesting the proceeding has filed an application

13     that—

14             "(A) was filed not later than 18 months

15         after the effective filing date of the application

16         or patent deemed to interfere with the subse-

17         quent application or patent; and

18             "(B) did not, within 1 year of the earliest

19         effective filing date of the application, contain a

20         claim that is the same or substantially the same

21         as the invention claimed in the earlier filed ap-

22         plication;

23         "(3) DETERMINATION BY PATENT TRIAL AND

24     APPEAL BOARD.—In any proceeding under this sub-

25     section, the Patent Trial and Appeal Board—

11

1          "(A) shall determine the question of the
2      right to patent;

3          "(B) in appropriate circumstances, may
4      correct the naming of the inventor in any appli-
5      cation or patent at issue; and

6          "(C) shall issue a final decision on the
7      right to patent.

8      "(4) DERIVATIVE PROCEEDING.—The Board
9   may defer action on a request to initiate a derivation
10  proceeding until 3 months after the date on which
11  the Director issues a patent to the applicant that
12  filed the earlier application.

13     "(5) EFFECT OF FINAL DECISION.—The final
14  decision of the Patent Trials and Appeal Board, if
15  adverse to the claim of an applicant, shall constitute
16  the final refusal by the Patent and Trademark Of-
17  fice on the claims involved. The Director may issue
18  a patent to an applicant who is judged to have the
19  right to patent. The final decision of the Board, if
20  adverse to a patentee, shall, if no appeal or other re-
21  view of the decision has been or can be taken or had,
22  constitute cancellation of the claims involved in the
23  patent, and notice of such cancellation shall be en-
24  dorsed on copies of the patent distributed after such
25  cancellation by the Patent and Trademark Office.".

12

1    (j) PATENT TRIAL AND APPEAL BOARD.—

2        (1) ELIMINATION OF REFERENCES TO INTER-

3    FERENCES.—

4            (A) Sections 6, 41, 134, 141, 145, 146,

5        154, 305, and 314 are each amended by strik-

6        ing "Board of Patent Appeals" each place it

7        appears and inserting "Patent Trial and Appeal

8        Board".

9            (B) Sections 135, 141, 146, and 154 are

10        each amended by striking "interference" each

11        place it appears and inserting "inventor's rights

12        contest".

13            (C) The item relating to section 146 in the

14        table of sections for chapter 13 is amended to

15        read as follows:

"146. Civil action in case of inventor's rights contest.".

16        (2) TECHNICAL AND CONFORMING AMEND-

17    MENTS.—Section 135(c) is amended—

18            (A) by striking "(c) Any" and inserting

19        "(c)(1) Any";

20            (B) in the second paragraph, by striking

21        "The Director" and inserting "(2) The Direc-

22        tor"; and

23            (C) in the third paragraph, by striking

24        "Any discretionary" and inserting "(3) Any dis-

25        cretionary".

13

1 SEC. 4. INVENTOR'S OATH OR DECLARATION.

2     (a) INVENTOR'S OATH OR DECLARATION.—

3         (1) IN GENERAL.—Section 115 is amended to

4     read as follows:

5 "§ 115. Inventor's oath or declaration

6     "(a) NAMING THE INVENTOR; INVENTOR'S OATH OR

7 DECLARATION.—An application for patent that is filed

8 under section 111(a), that commences the national stage

9 under section 363, or that is filed by an inventor for an

10 invention for which an application has previously been

11 filed under this title by that inventor shall include, or be

12 amended to include, the name of the inventor of any

13 claimed invention in the application. Except as otherwise

14 provided in this section, an individual who is the inventor

15 or a joint inventor of a claimed invention in an application

16 for patent shall execute an oath or declaration in connec-

17 tion with the application.

18     "(b) REQUIRED STATEMENTS.—An oath or declara-

19 tion under subsection (a) shall contain statements that—

20         "(1) the application was made or was author-

21     ized to be made by the affiant or declarant; and

22         "(2) such individual believes himself or herself

23     to be the original inventor or an original joint inven-

24     tor of a claimed invention in the application.

25     "(c) ADDITIONAL REQUIREMENTS.—The Director

26 may specify additional information relating to the inventor

14

1 and the invention that is required to be included in an

2 oath or declaration under subsection (a).

3     "(d) SUBSTITUTE STATEMENT.—

4         "(1) IN GENERAL.—In lieu of executing an oath

5         or declaration under subsection (a), the applicant for

6         patent may provide a substitute statement under the

7         circumstances described in paragraph (2) and such

8         additional circumstances that the Director may

9         specify by regulation.

10         "(2) PERMITTED CIRCUMSTANCES.—A sub-

11         stitute statement under paragraph (1) shall be per-

12         mitted with respect to any individual who, at the

13         time the substitute statement is filed—

14             "(A) is deceased;

15             "(B) is under legal incapacity;

16             "(C) is under an obligation to assign the

17             invention, but has refused to make the oath or

18             declaration required under subsection (a); or

19             "(D) cannot be found or reached after dili-

20             gent effort.

21         "(3) CONTENTS.—A substitute statement under

22         this subsection shall—

23             "(A) identify the individual with respect to

24             whom the statement applies;

15

1          "(B) set forth the circumstances rep-
2     resenting the permitted basis for the filing of
3     the substitute statement in lieu of the oath or
4     declaration under subsection (a); and

5          "(C) contain any additional information,
6     including any showing, required by the Direc-
7     tor.

8     "(e) MAKING REQUIRED STATEMENTS IN ASSIGN-
9  MENT OF RECORD.—An individual who is under an obliga-
10 tion of assignment of an application for patent may in-
11 clude the required statements under subsections (b) and
12 (c) in the assignment executed by the individual, in lieu
13 of filing such statements separately.

14    "(f) TIME FOR FILING.—A notice of allowance under
15 section 151 may be provided to an applicant for patent
16 only if the applicant for patent has filed each required
17 oath or declaration under subsection (a) or has filed a sub-
18 stitute statement under subsection (d) or recorded an as-
19 signment meeting the requirements of subsection (e).

20    "(g) EARLIER-FILED APPLICATION CONTAINING RE-
21 QUIRED STATEMENTS OR SUBSTITUTE STATEMENT.—
22 The requirements under this section shall not apply to an
23 individual with respect to an application for patent in
24 which the individual is named as the inventor or a joint

16

1   inventor and that claims the benefit under section 120 or

2   365(c) of the filing of an earlier-filed application, if—

3         "(1) an oath or declaration meeting the require-

4       ments of subsection (a) was executed by the indi-

5       vidual and was filed in connection with the earlier-

6       filed application;

7         "(2) a substitute statement meeting the re-

8       quirements of subsection (d) was filed in the earlier

9       filed application with respect to the individual; or

10      "(3) an assignment meeting the requirements

11      of subsection (e) was executed with respect to the

12      earlier-filed application by the individual and was re-

13      corded in connection with the earlier-filed applica-

14      tion.

15   "(h) SUPPLEMENTAL AND CORRECTED STATE-

16 MENTS; FILING ADDITIONAL STATEMENTS.—

17      "(1) IN GENERAL.—A statement made under

18      this section may be withdrawn, replaced, or other-

19      wise corrected at any time. If a change is made in

20      the naming of the inventor requiring the filing of 1

21      or more additional statements under this section, the

22      Director shall establish regulations under which such

23      additional statements may be filed.

24      "(2) SUPPLEMENTAL STATEMENTS NOT RE-

25      QUIRED.—If an individual has executed an oath or

•S 3818 IS

17

1     declaration under subsection (a) or an assignment

2     meeting the requirements of subsection (e) with re-

3     spect to an application for patent, no supplemental

4     oath or declaration or further substitute statement

5     shall thereafter be required in connection with the

6     application for patent or any patent issuing thereon.

7         "(3) SAVINGS CLAUSE.—No patent shall be in-

8     valid or unenforceable based upon the failure to

9     comply with a requirement under this section if the

10     failure is remedied as provided under paragraph

11     (1).".

12         (2) RELATIONSHIP TO DIVISIONAL APPLICA-

13     TIONS.—Section 121 is amended by striking "If a

14     divisional application" and all that follows through

15     "inventor.".

16         (3) CONFORMING AMENDMENT.—The item re-

17     lating to section 115 in the table of sections for

18     chapter 10 is amended to read as follows:

"115. Inventor's oath or declaration.".

19     (b) FILING BY OTHER THAN INVENTOR.—Section

20 118 is amended to read as follows:

21 **"§ 118. Filing by other than inventor**

22     "A person to whom the inventor has assigned or is

23 under an obligation to assign the invention may make an

24 application for patent. A person who otherwise shows suf-

25 ficient proprietary interest in the matter may make an ap-

18

1   plication for patent on behalf of and as agent for the in-
2   ventor on proof of the pertinent facts and a showing that
3   such action is appropriate to preserve the rights of the
4   parties. If the Director grants a patent on an application
5   filed under this section by a person other than the inven-
6   tor, the patent shall be granted to the real party in inter-
7   est and upon such notice to the inventor as the Director
8   considers to be sufficient.".

9       (c) SPECIFICATION.—Section 112 is amended—

10          (1) in the first paragraph by striking "The
11      specification" and inserting "(a) IN GENERAL.—The
12      specification";

13          (2) in the second paragraph—

14              (A) by striking "The specifications" and
15          inserting "(b) CONCLUSION.—The specifica-
16          tions"; and

17              (B) by striking "applicant regards as his
18          invention" and inserting "inventor or a joint in-
19          ventor regards as the invention";

20          (3) in the third paragraph, by striking "A
21      claim" and inserting "(c) FORM.—A claim";

22          (4) in the fourth paragraph, by striking "Sub-
23      ject to the following paragraph," and inserting "(d)
24      REFERENCE IN DEPENDENT FORMS.—Subject to
25      subsection (e),";

19

1    (5) in the fifth paragraph, by striking "A

2  claim" and inserting "(e) REFERENCE IN MULTIPLE

3  DEPENDENT FORM.—A claim"; and

4    (6) in the last paragraph, by striking "An ele-

5  ment" and inserting "(f) ELEMENT IN CLAIM FOR

6  A COMBINATION.—An element".

7 **SEC. 5. REMEDIES FOR INFRINGEMENT AND AFFIRMATIVE**

8    **DEFENSES THERETO.**

9 (a) DAMAGES.—Section 284 is amended by—

10   (1) in the first paragraph—

11    (A) by striking "Upon" and inserting "(a)

12   AWARD OF DAMAGES.—(1) Upon"; and

13    (B) by adding at the end the following:

14   "(2) In determining a reasonable royalty con-

15  sideration shall be given to—

16    "(A) the economic value that should be at-

17   tributed to the novel and non-obvious feature or

18   features of the invention, as distinguished from

19   the economic value attributable to other fea-

20   tures, improvements added by the infringer,

21   and the business risks the infringer undertook

22   in commercialization;

23    "(B) the terms of non-exclusive market-

24   place licensing of the invention; and

•S 3818 IS

20

1           "(C) other relevant factors in applicable

2         law.";

3      (2) by amending the second paragraph to read

4   as follows:

5   "(b) WILLFUL INFRINGEMENT.—

6      "(1) INCREASED DAMAGES.—A court that has

7   determined that the infringer has willfully infringed

8   a patent or patents may increase the damages up to

9   3 times the amount of damages found or assessed

10  under subsection (a), except that increased damages

11  under this paragraph shall not apply to provisional

12  rights under section 154(d).

13     "(2) PERMITTED GROUNDS FOR WILLFUL-

14  NESS.—A court may find that an infringer has will-

15  fully infringed a patent only if the patent owner pre-

16  sents clear and convincing evidence that—

17       "(A) the infringer, having received ade-

18      quate written notice from the patentee, after a

19      reasonable opportunity to investigate, thereafter

20     performed 1 or more of the alleged acts of in-

21     fringement;

22       "(B) the infringer intentionally copied the

23     patented invention with knowledge that it was

24     patented; or

•S 3818 IS

21

1            "(C) after having been found by a court to
2        have infringed that patent, the infringer en-
3        gaged in conduct that was not colorably dif-
4        ferent from the conduct previously found to
5        have infringed the patent, and which resulted in
6        a separate finding of infringement of the same
7        patent.
8      "(3) WRITTEN NOTICE.—For purposes of para-
9 graph (2), written notice shall be adequate only if
10 such notice—
11        "(A) alleges acts of infringement in a man-
12        ner sufficient to give the infringer an objectively
13        reasonable apprehension of suit on such patent,
14        and
15        "(B) identifies with particularity each
16        claim of the patent, each product or process
17        that the patent owner alleges infringes the pat-
18        ent, and the relationship of such product or
19        process to such claim, the infringer.
20      "(4) LIMITATIONS ON WILLFULNESS.—
21        "(A) IN GENERAL.—A court shall not find
22        that an infringer has willfully infringed a patent
23        under paragraph (2) for any period of time dur-
24        ing which the infringer had an informed good
25        faith belief that the patent was invalid or unen-

22

1   forceable, or would not be infringed by the con-
2   duct later shown to constitute infringement of
3   the patent.
4       "(B) INFORMED GOOD FAITH BELIEF.—
5   For purposes of this paragraph, an informed
6   good faith belief may be established by—
7           "(i) reasonable reliance on advice of
8       counsel;
9           "(ii)  evidence  that  the  infringer
10      sought to modify its conduct to avoid in-
11      fringement once it had discovered the pat-
12      ent; or
13          "(iii) other evidence a court may find
14      sufficient to establish such good faith be-
15      lief.
16      "(C) EVIDENCE.—The decision of the in-
17  fringer not to present evidence of advice of
18  counsel shall have no relevance to a determina-
19  tion of willful infringement under paragraph
20  (2).
21      "(5) LIMITATION ON PLEADING.—Before the
22  date on which a determination has been made that
23  the patent in suit is not invalid, is enforceable, and
24  has been infringed by the infringer, a patentee may
25  not plead, and a court may not determine, that an

23

1    infringer has willfully infringed the patent. The

2    court's determination of an infringer's willfulness

3    shall be made without a jury."; and

4        (3) in the third paragraph, by striking "The

5    court" and inserting "(c) EXPERT TESTIMONY.—

6    The court".

7    (b) ATTORNEY'S FEES.—Section 285 is amended to

8 read:

9    "(a) The court shall award, to a prevailing party, fees

10 and other expenses incurred by that party in connection

11 with that proceeding, unless the court finds that the posi-

12 tion of the nonprevailing party or parties was substantially

13 justified or that special circumstances make an award un-

14 just.".

15    (c) UNENFORCEABILITY.—Section 282 of title 35,

16 United States Code, is amended—

17        (1) by inserting "(a) IN GENERAL.—" before

18    "A patent shall be presumed valid."; and

19        (2) by adding at the end the following:

20    "(b) UNENFORCEABILITY.—

21        "(1) PERMITTED GROUNDS FOR UNENFORCE-

22    ABILITY.—A court may find that a patent is unen-

23    forceable only if the patent owner presents clear and

24    convincing evidence that, with respect to the patent

24

1    at issue the patentee, or a patentee's agent, or privy

2    before issuance of the patent—

3              "(A) failed to disclose material informa-

4           tion, or submitted false material information or

5           statements; and

6              "(B) did so with an intent to mislead or

7           deceive the United States Patent and Trade-

8           mark Office.

9       "(2) LIMITATIONS ON UNENFORCEABILITY.—A

10    court shall not find that a patent in unenforceable

11    under paragraph (1) if—

12              "(A) the patentee, agent, or privy had an

13           informed good faith belief that the specific in-

14           formation that was not disclosed was not mate-

15           rial;

16              "(B) the patentee had no actual or con-

17           structive knowledge of the misconduct of an

18           agent or privy, exercised due care in selecting

19           and supervising such agent or privy, and rea-

20           sonably relied on counsel in obtaining the pat-

21           ent;

22              "(C) establishes good faith by other evi-

23           dence a court may find sufficient; or

25

1           "(D) the court has not determined 1 or

2           more claims in the patent at issue in the action

3           to be invalid.

4         "(3) LIMITATION ON PLEADING.—Before the

5 date on which a determination has been made that

6 the patent in suit is not invalid in whole and has

7 been infringed by the infringer, a defendant may not

8 plead, and a court may not determine, that the pat-

9 ent in question is unenforceable.".

10 (d) DEFENSE TO INFRINGEMENT BASED ON EAR-

11 LIER INVENTOR.—Section 273 of title 35, United States

12 Code, is amended—

13         (1) in subsection (a)—

14           (A) in paragraph (1)—

15              (i) by striking "of a method"; and

16              (ii) by striking "review period;" and

17           inserting "review period; and";

18           (B) in paragraph (2)(B), by striking the

19           semicolon at the end and inserting a period;

20           and

21           (C) by striking paragraphs (3) and (4);

22         (2) in subsection (b)—

23           (A) in paragraph (1)—

24              (i) by striking "for a method"; and

26

1      (ii) by striking "at least 1 year before

2      the effective filing date of such patent,

3      and" and all that follows through the pe-

4      riod and inserting "and commercially used,

5      or made substantial preparations for com-

6      mercial use of, the subject matter before

7      the effective filing date of the claimed in-

8      vention.";

9   (B) in paragraph (2)—

10      (i) by striking "The sale or other dis-

11      position of a useful end result produced by

12      a patented method" and inserting "The

13      sale or other disposition of subject matter

14      that qualifies for the defense set forth in

15      this section"; and

16      (ii) by striking "a defense under this

17      section with respect to that useful end re-

18      sult" and inserting "such defense"; and

19   (C) in paragraph (3)—

20      (i) by striking subparagraph (A); and

21      (ii) by redesignating subparagraphs

22      (B) and (C) as subparagraphs (A) and

23      (B), respectively;

24   (3) in paragraph (7), by striking "of the pat-

25   ent" and inserting "of the claimed invention"; and

27

1      (4) by amending the heading to read as follows:

2  **"§ 273. Special defenses to and exemptions from in-**

3         **fringement".**

4      (e) TABLE OF SECTIONS.—The item related to sec-

5  tion 273 in the table of sections for chapter 28 is amended

6  to read as follows:

"Sec. 273. Special defenses to and exemptions from infringement.".

7      (f) EFFECT OF EXTRATERRITORIAL INFRINGE-

8  MENT.—Section 271(f) is repealed.

9  **SEC. 6. POST-GRANT PROCEDURES.**

10     (a) POST-GRANT OPPOSITION PROCEDURES.—

11        (1) IN GENERAL.—Chapter 31 is amended to

12     read as follows:

13  **"CHAPTER 31—POST-GRANT REVIEW**

14              **PROCEEDINGS**

"Sec.
"311. Petition for post-grant review.
"312. Timing of petition.
"313. Submission of petition.
"314. Prohibited filings.
"315. Conduct of post-grant review proceedings.
"316. Proof and evidentiary standards.
"317. Showing of sufficient grounds; institution of post-grant review pro-
        ceedings.
"318. Amendment of the patent.
"319. Decision of the Patent Trial and Appeal Board.
"320. Effect of decision.
"321. Relationship to other pending proceedings.
"322. Effect of decisions rendered in civil action on future post-grant review
        proceedings.
"323. Effect of final decision on future proceedings.

15  **"§ 311. Petition for post-grant review**

16      "Any person who is not the patent owner may file

17  a petition for cancellation seeking to institute a post-grant

28

1 review proceeding before the Patent Trial and Appeal
2 Board to cancel as unpatentable any claim of a patent on
3 any ground which might be raised under section 282(a)
4 (2) and (3) (relating to invalidity of the patent or any
5 claim).

6 **"§ 312. Timing of petition**

7    "A post-grant review proceeding may be instituted
8 only if the petition for cancellation is filed by a cancella-
9 tion petitioner—

10        "(1) not later than 12 months after the date
11    the patent was issued or reissued; or

12        "(2) who establishes a substantial reason to be-
13    lieve that the continued existence of the challenged
14    claim causes or is likely to cause the petitioner sig-
15    nificant economic harm.

16 **"§ 313. Submission of petition**

17    "The petition for cancellation shall—

18        "(1) be accompanied by payment of the post-
19    grant review fee set forth in subsection 41(a);

20        "(2) identify the cancellation petitioner; and

21        "(3) set forth in writing the basis for the can-
22    cellation, identifying each claim challenged and pro-
23    viding such information as the Director may require
24    by regulation.

29

1  **"§ 314. Prohibited filings**

2  "No post-grant review proceeding shall be insti-

3  tuted—

4  "(1) under subsection (a) of section 312 if the

5  petition for cancellation identifies the same cancella-

6  tion petitioner and the same patent as a previous pe-

7  tition for cancellation filed under subsection (a) of

8  section 312; or

9  "(2) under subsection (b) of section 312 if the

10  petition for cancellation identifies the same cancella-

11  tion petitioner and the same patent as a previous pe-

12  tition for cancellation filed under subsection (b) of

13  section 312.

14  **"§ 315. Conduct of post-grant review proceedings**

15  "(a) IN GENERAL.—The Director shall—

16  "(1) establish regulations, in accordance with

17  section 2(b)(2), to govern post-grant review pro-

18  ceedings and their relationship to other proceedings;

19  "(2) prescribe regulations setting forth the

20  standards for showings of substantial reason to be-

21  lieve and significant economic harm under section

22  312(b) and sufficient grounds in section 317; and

23  "(3) prescribe regulations setting forth proce-

24  dures for discovery of relevant evidence, including

25  that such discovery shall be limited to evidence di-

26  rectly related to factual assertions advanced by ei-

30

1    ther party in the proceeding, and the procedures for

2    obtaining such evidence shall be consistent with the

3    purpose and nature of the proceeding.

4        "(b)   POST-GRANT   REGULATIONS.—Regulations

5    under subsection (a)(1)—

6            "(1) shall be designed to result in a final deci-

7        sion on a petition for cancellation within 12 months

8        of the institution of the post-grant review pro-

9        ceeding;

10           "(2) shall provide for discovery upon order of

11       the Board;

12           "(3) may prescribe sanctions for abuse of dis-

13       covery or abuse of process to the extent authorized

14       in United States district courts by rule 11 and rule

15       37 of the Federal Rules of Civil Procedure;

16           "(4) may provide for protective orders gov-

17       erning the exchange and submission of confidential

18       information; and

19           "(5) shall ensure that any information sub-

20       mitted by the patent owner in support of any

21       amendment entered under section 318 shall be made

22       available to the public as part of the prosecution his-

23       tory of the patent.

24       "(c) CONSIDERATIONS.—In prescribing regulations

25   under this section, the Director shall take into consider-

31

1  ation the effect on the economy, the integrity of the patent

2  system, and the efficient administration of the Office.

3  **"§ 316. Proof and evidentiary standards**

4      "(a) IN GENERAL.—The presumption of validity set

5  forth in section 282 shall not apply in a challenge to any

6  patent claim under this chapter.

7      "(b) BURDEN OF PROOF.—The party advancing a

8  proposition under this chapter shall have the burden of

9  proving that proposition.

10  **"§ 317. Showing of sufficient grounds; institution of**

11              **post-grant review proceedings**

12      "Within such time as may be prescribed by regula-

13  tion, the cancellation petitioner shall file any information

14  known  to  it  that  supports  its  allegation  of  the

15  unpatentability of any challenged claim. The Patent Trial

16  and Appeal Board shall not institute a post-grant review

17  proceeding unless it determines that the information pre-

18  sented provides sufficient grounds to proceed. If the Pat-

19  ent Trial and Appeal Board does not institute a post-grant

20  review proceeding under this section then the cancellation

21  petitioner may not assert the same grounds against the

22  same claims in any other proceeding within the Office.

23  **"§ 318. Amendment of the patent**

24      "(a) IN GENERAL.—In response to a challenge in a

25  petition for cancellation, the patent owner may file 1 mo-

32

1 tion to amend the patent in 1 or more of the following
2 ways:

3         "(1) Cancel any challenged patent claim.

4         "(2) For each challenged claim, propose a sub-
5     stitute claim that includes all the limitations of the
6     challenged claim.

7         "(3) Amend the patent drawings or otherwise
8     amend the patent other than the claims.

9     "(b) ADDITIONAL MOTIONS.—Additional motions to
10 amend may be permitted only for good cause shown.

11     "(c) SCOPE OF CLAIMS.—No amendment shall en-
12 large the scope of the claims of the patent. No amendment
13 shall introduce new matter.

14 **"§ 319. Decision of the Patent Trial and Appeal Board**

15     "If the post-grant review proceeding is instituted
16 under section 317 and not dismissed under section 320
17 or subsection (b) of section 323, the Patent Trial and Ap-
18 peal Board shall issue a final decision with respect to pat-
19 entability of any patent claim challenged and any new
20 claim added under this section 318.

21 **"§ 320. Effect of decision**

22     "(a) IN GENERAL.—Where a final decision of the
23 Patent Trial and Appeal Board is issued under section
24 319 and the time for appeal has expired or any appeal
25 proceeding has terminated, the Director shall issue and

33

1  publish a certificate canceling any claim of the patent fi-
2  nally determined to be unpatentable and incorporating in
3  the patent by operation of the certificate any new claim
4  determined to be patentable.

5       "(b) NEW CLAIMS.—Any new claim held to be pat-
6  entable and incorporated into a patent in a post-grant re-
7  view proceeding shall have the same effect as that speci-
8  fied in section 252 for reissued patents on the right of
9  any person who made, purchased, offered to sell, or used
10 within the United States, or imported into the United
11 States, anything patented by such new claim, or who made
12 substantial preparations therefore, prior to issuance of a
13 certificate under the provisions of subsection (a) of this
14 section.

15 **"§ 321. Relationship to other pending proceedings**

16      "Notwithstanding subsection 135(a), sections 251
17 and 252, and chapter 30, the Director may determine the
18 manner in which any reexamination proceeding, reissue
19 proceeding, interference proceeding, or post-grant review
20 proceeding that is pending during a post-grant review pro-
21 ceeding, may proceed, including providing for stay, trans-
22 fer, consolidation, or termination of such proceedings.

34

1  **"§ 322. Effect of decisions rendered in civil action on**
2         **future post-grant review proceedings**

3      "If a final decision has been entered against a party

4  in a civil action arising in whole or in part under section

5  1338 of title 28 establishing that the party has not sus-

6  tained its burden of proving the invalidity of any patent

7  claim—

8          "(1) that party to the civil action and the

9      privies of that party may not thereafter request a

10     post-grant review proceeding on such patent claim

11     on the basis of any grounds, under the provisions of

12     section 311, which that party or the privies of that

13     party raised or could have raised in such civil action;

14     and

15         "(2) the Office may not thereafter maintain a

16     post-grant review proceeding previously requested by

17     that party or the privies of that party on the basis

18     of such grounds.

19 **"§ 323. Effect of final decision on future proceedings**

20     "(a) IN GENERAL.—If a final decision under section

21 319 is favorable to the patentability of any original or new

22 claim of the patent, the cancellation petitioner may not

23 thereafter, based on any ground which the cancellation pe-

24 titioner raised during the post-grant review proceeding—

25         "(1) request or pursue a reexamination of such

26     claims;

35

1         "(2) request or pursue an interference of such

2     claims;

3         "(3) request or pursue a post-grant review pro-

4     ceeding of such claims; or

5         "(4) assert the invalidity of any such claims, in

6     any civil action arising in whole or in part under sec-

7     tion 1338 of title 28.

8     "(b) EXTENSION OF PROHIBITION.—If the final deci-

9 sion is the result of a petition for cancellation under sec-

10 tion 312(b), the prohibition under this section shall extend

11 to any ground which the cancellation petitioner raised or

12 could have raised during the post-grant review pro-

13 ceeding.".

14     (b) TECHNICAL AND CONFORMING AMENDMENT.—

15 The table of chapters is amended to read as follows:

    "31. Post-grant review proceedings.".

## SEC. 7. SUBMISSIONS BY THIRD PARTIES AND OTHER QUALITY ENHANCEMENTS.

18     (a) PUBLICATION.—Section 122(b)(2) is amended—

19         (1) by striking subparagraph (B); and

20         (2) in subparagraph (A)—

21             (A) by striking "(A) An application" and

22         inserting "An application"; and

23             (B) by redesignating clauses (i) through

24         (iv) as subparagraphs (A) through (D), respec-

25     tively.

36

1    (b) REEXAMINATION.—Subsection 303(a) is amended

2  to read as follows:

3    "(a) Within 3 months following the filing of a request

4  for reexamination under the provisions of section 302, by

5  the owner of the patent, the Director shall determine

6  whether a substantial new question of patentability affect-

7  ing any claim of the patent concerned is raised by the re-

8  quest, with or without consideration of other patents or

9  printed publications. On his own initiative, and at any

10  time, the Director may determine whether a substantial

11  new question of patentability is raised by patents and pub-

12  lications discovered by him, cited under the provisions of

13  section 301, or cited by any person other than the owner

14  of the patent under the provisions of section 302 or section

15  311. The existence of a substantial new question of pat-

16  entability is not precluded by the fact that a patent or

17  printed publication was previously cited by or to the Office

18  or considered by the Office.".

19    (c) PREISSUANCE SUBMISSIONS BY THIRD PAR-

20  TIES.—Section 122 is amended by adding at the end the

21  following:

22    "(e) PREISSUANCE SUBMISSIONS BY THIRD PAR-

23  TIES.—

24      "(1) IN GENERAL.—Any person may submit for

25      consideration and inclusion in the record of a patent

37

1    application, any patent, published patent application,

2    or other publication of potential relevance to the ex-

3    amination of the application, if such submission is

4    made in writing before the earlier of—

5         "(A) the date a notice of allowance under

6         section 151 is mailed in the application for pat-

7         ent; or

8         "(B) either—

9              "(i) 6 months after the date on which

10             the application for patent is published

11             under section 122; or

12             "(ii) the date of the first rejection

13             under section 132 of any claim by the ex-

14             aminer during the examination of the ap-

15             plication for patent, whichever occurs later.

16    "(2) OTHER REQUIREMENTS.—Any submission

17    under paragraph (1) shall—

18         "(A) set forth a concise description of the

19         asserted relevance of each submitted document;

20         "(B) be accompanied by such fee as the

21         Director may prescribe; and

22         "(C) include a statement by the submitter

23         affirming that the submission was made in

24         compliance with this section.".

38

1    (d) EFFECTIVE DATES.—Notwithstanding any other

2 provision of law, sections 311 through 318 of title 35,

3 United States Code, as amended by this Act, shall apply

4 to any patent that issues from an original application filed

5 on any date.

6 **SEC. 8. VENUE AND JURISDICTION.**

7    (a) VENUE FOR PATENT CASES.—Section 1400 of

8 title 28, United States Code, is amended by striking sub-

9 section (b) and inserting the following:

10    "(b) Any civil action arising under any Act of Con-

11 gress relating to patents, other than an action for declara-

12 tory judgment or an action seeking review of a decision

13 of the Patent Trial and Appeal Board under chapter 13

14 of title 35, may be brought only—

15       "(1) in the judicial district where either party

16    resides; or

17       "(2) in the judicial district where the defendant

18    has committed acts of infringement and has a reg-

19    ular and established place of business.

20    "(c) Notwithstanding section 1391(c) of this title, for

21 purposes of venue under subsection (b), a corporation

22 shall be deemed to reside in the judicial district in which

23 the corporation has its principal place of business or in

24 the State in which the corporation is incorporated.".

39

1       (b) INTERLOCUTORY APPEALS.—Subsection (c)(2) of

2   section 1292 of title 28, United States Code, is amended

3   by adding at the end:

4           "(3) of an appeal from an interlocutory order

5       or decree determining construction of claims in a

6       civil action for patent infringement under section

7       271 of title 35.

8               "(A) Application for an appeal hereunder

9           shall be made to the court within 10 days after

10          entry of the order or decree.

11              "(B) Proceedings in the district court shall

12          be stayed during pendency of the appeal.".

13  **SEC. 9. OTHER STATUTORY AND CONFORMING AMEND-**

14          **MENTS.**

15      (a) FEES.—Section 41(a) of title 35, United States

16  Code is amended—

17          (1) by redesignating paragraphs (8), (9), (10),

18      (11), (12), (13), (14), and (15) as paragraphs (10),

19      (11), (12), (13), (14), (15), (16), and (17) respec-

20      tively; and

21          (2) by inserting after paragraph (7) the fol-

22      lowing:

23          "(8) On filing a petition for cancellation under

24      subsection (a) of section 312, a fee established by

40

1    the Director to recover ½ the estimated average cost

2    to the Office of a post-grant review proceeding.

3         "(9) On filing a petition for cancellation under

4    subsection (b) of section 312, a fee established by

5    the Director to recover the estimated average cost to

6    the Office of a post-grant review proceeding.".

7       (b) DEFINITIONS.—Section 100 (as amended by this

8 Act) is further amended—

9         (1) in subsection (e), by striking "or inter

10    partes reexamination under section 311";

11         (2) by inserting the following:

12    "(k) The term 'cancellation petitioner' means the real

13 party in interest requesting cancellation of any claim of

14 a patent under chapter 31 of this title and the privies of

15 the real party in interest.".

16       (c) PATENT TRIAL AND APPEAL BOARD.—

17         (1) Section 6 is amended to read as follows:

18 **"§ 6. Patent Trial and Appeal Board**

19    "(a) ESTABLISHMENT AND COMPOSITION.—There

20 shall be in the Office a Patent Trial and Appeal Board.

21 The Director, the Deputy Director, the Commissioner for

22 Patents, the Commissioner for Trademarks, and the ad-

23 ministrative patent judges shall constitute the Patent

24 Trial and Appeal Board. The administrative patent judges

25 shall be persons of competent legal knowledge and sci-

41

1 entific ability who are appointed by the Director. Any ref-

2 erence in any Federal law, Executive order, rule, regula-

3 tion, or delegation of authority, or any document of or

4 pertaining to the Board of Patent Appeals and Inter-

5 ferences is deemed to refer to the Patent Trial and Appeal

6 Board.

7     "(b) DUTIES.—The Patent Trial and Appeal Board

8 shall, on written appeal of an applicant, review adverse

9 decisions of examiners upon application for patents; shall,

10 on written appeal of a patent owner, review adverse deci-

11 sions of examiners upon patents in reexamination pro-

12 ceedings under chapter 30; shall determine priority and

13 patentability of invention in inventor's rights contests de-

14 clared under subsection 135(a); and shall preside over

15 post-grant review proceedings under chapter 31. Each ap-

16 peal, inventor's rights contest, and post-grant review pro-

17 ceeding shall be heard by at least 3 members of the Patent

18 Trial and Appeal Board, who shall be designated by the

19 Director. Only the Patent Trial and Appeal Board may

20 grant rehearings.".

21     (2) Title 35, United States Code, is amended by

22     striking "Board of Patent Appeals" each place it ap-

23     pears and inserting in its place "Patent Trial and

24     Appeal Board".

42

1    (d) AUTHORITY OF PANELS OF ADMINISTRATIVE
2 PATENT JUDGES.—Section 6 (as amended by this section)
3 is further amended by adding at the end the following:
4    "(c) ADDITIONAL RESPONSIBILITIES OF ADMINIS-
5 TRATIVE PATENT JUDGES.—Panels of administrative pat-
6 ent judges, once assigned by the Director, shall have the
7 responsibilities under chapter 32 in connection with post-
8 grant opposition proceedings.".
9    (e) RULEMAKING AUTHORITY.—Section 3(a) is
10 amended by adding at the end the following:
11        "(5) RULEMAKING AUTHORITY.—In addition to
12    the authority conferred by other provisions of this
13    title, the Director may promulgate such rules, regu-
14    lations, and orders as the Director determines ap-
15    propriate to carry out the provisions of this title or
16    any other law applicable to the United States Patent
17    and Trademark Office or that the Director deter-
18    mines necessary to govern the operation and organi-
19    zation of the Office.".
20    (f) REEXAMINATION.—
21        (1) Section 304 is amended by striking the final
22    3 sentences.
23        (2) Section 305 is amended by striking, in the
24    first sentence, "and reply" and also striking "have"
25    and inserting "has" in its place.

43

1       (3) Section 315(c) is amended by striking "or

2    could have raised".

3       (4) Section 4607 of the Intellectual Property

4    and Communications Omnibus Reform Act of 1999,

5    as enacted by section 1000(a)(9) of Public Law

6    106–113, is repealed.

7   (g) APPEAL TO THE COURT OF APPEALS FOR THE

8 FEDERAL CIRCUIT.—

9       (1) IN GENERAL.—Section 141 is amended to

10    read as follows:

11 **"§ 141. Appeal to the Court of Appeals for the Federal**

12            **Circuit**

13   "(a) EXAMINATIONS.—An applicant dissatisfied with

14 the final decision in an appeal to the Patent Trial and

15 Appeal Board under section 134 may appeal the decision

16 to the United States Court of Appeals for the Federal Cir-

17 cuit. By filing such an appeal, the applicant waives his

18 right to proceed under section 145.

19   "(b) REEXAMINATIONS.—A patent owner in any re-

20 examination proceeding who is dissatisfied with the final

21 decision in an appeal to the Patent Trial and Appeal

22 Board under section 134 may appeal the decision to the

23 United States Court of Appeals for the Federal Circuit.

24   "(c) INVENTOR'S RIGHTS CONTEST.—A party to an

25 inventor's rights contest dissatisfied with the final decision

44

1 of the Patent Trial and Appeal Board on the interference

2 may appeal the decision to the United States Court of Ap-

3 peals for the Federal Circuit.

4     "(d) POST-GRANT REVIEW.—A party to a post-grant

5 review proceeding dissatisfied with the final decision of the

6 Patent Trial and Appeal Board under section 319 may

7 appeal the decision only to the United States Court of Ap-

8 peals for the Federal Circuit. Any decision of the Patent

9 Trial and Appeal Board under subsection 312(b) or sec-

10 tion 317 shall be final and nonappealable. A decision by

11 the Board under section 320 not to issue a final decision

12 under subsection 319 as a result of settlement shall also

13 be final and nonappealable.".

14         (2)    CERTAIN    APPEALS.—Subsection

15         1295(a)(4)(A) of title 28, United States Code, is

16         amended to read as follows:

17             "(A) the Patent Trial and Appeal Board of

18             the United States Patent and Trademark Office

19             with respect to patent applications, reexamina-

20             tions, and inventor's rights contests, at the in-

21             stance of an applicant for a patent or any party

22             to a patent interference, reexamination, or post-

23             grant review proceeding, and any such appeal

24             shall waive any right of such applicant or party

45

1        to proceed under section 145 or 146 of title
2        35;".
**3  SEC. 10. EFFECTIVE DATE.**
4        Except as otherwise provided in this Act, the provi-
5  sions of this Act shall take effect 12 months after the date
6  of enactment of this Act and shall apply to any patent
7  issued on or after that effective date.

○

# EXHIBIT 2

I

109TH CONGRESS
2D SESSION

# H. R. 5096

To amend title 35, United States Code, to modify certain procedures relating
to patents.

_____

## IN THE HOUSE OF REPRESENTATIVES

APRIL 5, 2006

Mr. BERMAN (for himself and Mr. BOUCHER) introduced the following bill;
which was referred to the Committee on the Judiciary

_____

# A BILL

To amend title 35, United States Code, to modify certain
procedures relating to patents.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "Patents Depend on

5    Quality Act of 2006" or "PDQ Act".

6    **SEC. 2. OPPOSITION PROCEDURES.**

7    (a) IN GENERAL.—Title 35, United States Code, is

8    amended by inserting after chapter 31 the following new

9    chapter:

2

1    **"CHAPTER 32—POST-GRANT OPPOSITION**

2                      **PROCEDURES**

"Sec.
" 321. Right to oppose patent; opposition request.
" 322. Real party in interest.
" 323. Timing of opposition request.
" 324. Limits on scope of validity issues raised.
" 325. Institution of the opposition proceeding.
" 326. Patent owner response.
" 327. Amendment of claims.
" 328. Discovery and sanctions.
" 329. Supplemental submissions.
" 330. Hearing and briefs.
" 331. Written decision.
" 332. Burden of proof and evidence.
" 333. Reconsideration.
" 334. Appeal.
" 335. Certificate.
" 336. Estoppel.
" 337. Duration of opposition.
" 338. Settlement.
" 339. Intervening rights.
" 340. Relationship with reexamination proceedings.

3    **"§ 321. Right to oppose patent; opposition request**

4        "(a) FILING OF OPPOSITION.—A person may request

5    that the grant or reissue of a patent be reconsidered by

6    the Patent and Trademark Office by filing an opposition

7    seeking to invalidate 1 or more claims in the patent. The

8    Director shall establish, by regulation, fees to be paid by

9    the person filing the opposition (in this chapter referred

10   to as the 'opposer'). Copies of patents and printed publica-

11   tions to be relied upon in support of the request must be

12   filed with the request. If an opposer relies on other factual

13   evidence or on expert opinions in support of the opposi-

14   tion, such evidence and opinions must be filed with the

3

1 request through one or more accompanying affidavits or
2 declarations.

3       "(b) COPIES PROVIDED TO PATENT OWNER.—Copies
4 of any documents filed under subsection (a) must be pro-
5 vided to the patent owner or, if applicable, the designated
6 representative of the patent owner, at the time of filing
7 under subsection (a), except that if a request is made that
8 the identity of a real party in interest be kept separate
9 pursuant to section 322(b), then the identity of the real
10 party in interest may be redacted from the copies pro-
11 vided.

12      "(c) FILE AVAILABLE TO THE PUBLIC.—The file of
13 any opposition proceeding shall be made available to the
14 public, except as provided in section 322.

15 **"§ 322. Real party in interest**

16      "(a) IDENTIFICATION.—The person making a request
17 under section 321 shall identify in writing each real party
18 in interest, and the opposition pursuant to the request
19 shall proceed in the name of the real party in interest.

20      "(b) IDENTITY KEPT SEPARATE UPON REQUEST.—

21          "(1) IN GENERAL.—Subject to paragraph (2),
22      if requested by the opposer, the identity of a real
23      party in interest shall be kept separate from the file
24      of the opposition and made available only to Govern-
25      ment agencies upon written request, or to any per-

4

1    son upon a showing of good cause. If the identity of

2    a real party in interest is kept separate from the file

3    under this paragraph, then the opposition shall pro-

4    ceed in the name of the individual filing the request

5    as the representative of the real party in interest.

6        "(2) EXCEPTION.—No request under paragraph

7    (1) to keep the identity of a real party in interest

8    separate from the file of the opposition may be made

9    or maintained if the opposer relies upon factual evi-

10    dence or expert opinions in the form of affidavits or

11    declarations during the opposition proceeding or if

12    the opposer exercises the right to appeal under sec-

13    tion 141.

14  **"§ 323. Timing of opposition request**

15    "A person may not make an opposition request under

16  section 321 later than 9 months after the grant of the

17  patent or issuance of the reissue patent, as the case may

18  be, or later than 6 months after receiving notice from the

19  patent holder alleging infringement of the patent, except

20  that, if the patent owner consents in writing, an opposition

21  request may be filed anytime during the period of enforce-

22  ability of the patent. A court having jurisdiction over an

23  issue of validity of a patent may not require the patent

24  owner to consent to such a request.

5

1 **"§ 324. Limits on scope of validity issues raised**

2     "An opposition request under section 321 must iden-

3 tify with particularity the claims that are alleged to be

4 invalid and, as to each claim, 1 or more issues of invalidity

5 on which the opposition is based. The issues of invalidity

6 that may be considered during the opposition proceeding

7 are double patenting and any of the requirements for pat-

8 entability set forth in sections 101, 102, 103, and 112,

9 and the fourth paragraph of section 251, except for—

10     "(1) any requirement contained in the first

11     paragraph of section 112 relating to disclosing the

12     best mode; and

13     "(2) any issue arising under subsection (c), (f),

14     or (g) of section 102.

15 **"§ 325. Institution of the opposition proceeding**

16     "(a) DISMISSAL; INSTITUTION.—

17     "(1) DISMISSAL.—The Director may dismiss an

18     opposition request that the Director determines

19     lacks substantial merit. The determination by the

20     Director to dismiss an opposition request shall not

21     be appealable. The dismissal of an opposition re-

22     quest shall not be admissible in any civil action re-

23     lated to the patent against which a dismissed re-

24     quest was filed.

25     "(2) INSTITUTION.—If the Director receives 1

26     or more requests that meet the requirements of sec-

6

1    tion 321 regarding the same patent by the Director

2    and are not dismissed under paragraph (1), an op-

3    position proceeding shall be promptly instituted pur-

4    suant to the request or requests, but not before a

5    period of 9 months has elapsed since the date on

6    which the patent was granted.

7       "(3) CONSOLIDATED PROCEEDING.—If an op-

8    position proceeding is instituted based upon more

9    than 1 opposition request, the opposition shall pro-

10    ceed as a single consolidated proceeding, unless later

11    divided under subsection (c).

12    "(b) PARTIES.—The parties to an opposition pro-

13  ceeding under this section shall be the patent owner and

14  each opposer whose request meets the requirements of sec-

15  tion 321 and has not been dismissed under subsection

16  (a)(1).

17    "(c) DECISION BY PANEL.—The Director shall as-

18  sign the opposition proceeding to a panel of three adminis-

19  trative patent judges (in this chapter referred to as the

20  'panel'). The panel shall decide the questions of patent-

21  ability raised in each opposition request for which an oppo-

22  sition proceeding has been instituted. The decision shall

23  be based upon the prosecution record that was the basis

24  for the grant of the patent and the additional submissions

25  by the parties to the opposition proceeding authorized

7

1 under this chapter. The panel may, in appropriate cases,

2 divide the opposition into separate proceedings if the oppo-

3 sition involves multiple opposition requests by different

4 parties.

5 **"§ 326. Patent owner response**

6      "After the Director has instituted an opposition pro-

7 ceeding under section 325, the patent owner shall have

8 the right to file, within the time period set by the panel,

9 a response to each opposition request that is the subject

10 of the proceeding. The patent owner, in responding to an

11 opposition request, shall file with the response, through

12 affidavits or declarations, any additional factual evidence

13 and expert opinions on which the patent owner relies in

14 support of the response.

15 **"§ 327. Amendment of claims**

16      "The patent owner is entitled to request amendment

17 of any claims that are the subject of an opposition pro-

18 ceeding under this chapter, including by the addition of

19 new claims. The patent owner shall file any such request

20 for amendment with the patent owner's response to an op-

21 position request under section 326. The panel may permit

22 further requests for amendment of the claims only upon

23 good cause shown by the patent owner. No amendment

24 enlarging the scope of the claims of the patent shall be

25 permitted in the opposition proceeding.

8

1 **"§ 328. Discovery and sanctions**

2     "(a) DISCOVERY.—After an opposition proceeding is

3 instituted under this chapter, the patent owner shall have

4 the right to depose each person submitting an affidavit

5 or declaration on behalf of any opposer, and each opposer

6 shall have the right to depose each person submitting an

7 affidavit or declaration on behalf of the patent owner.

8 Such depositions shall be limited to cross-examination on

9 matters relevant to the affidavit or declaration. No other

10 discovery shall be permitted unless the panel determines

11 that additional discovery is required in the interest of jus-

12 tice. The panel shall determine the schedule for the taking

13 of discovery under this subsection.

14     "(b) SANCTIONS.—If any party to an opposition pro-

15 ceeding fails to properly respond to any discovery under

16 subsection (a), the panel may draw appropriate adverse

17 inferences and take other action permitted by statute,

18 rule, or regulation.

19 **"§ 329. Supplemental submissions**

20     "The panel may permit one or more supplemental

21 submissions to be made by any party to an opposition pro-

22 ceeding under this chapter, subject to the rights and limi-

23 tations on discovery under section 328.

24 **"§ 330. Hearing and briefs**

25     "Any party to an opposition proceeding under this

26 chapter may request an oral hearing within the time set

9

1  by the panel. If a hearing is requested or the panel deter-

2  mines sua sponte that a hearing is needed, the panel shall

3  set a time for the hearing. The panel may permit the par-

4  tied to file briefs for the hearing, and shall permit cross-

5  examination of all affiants and declarants in the hearing,

6  either before the panel or by deposition taken under sec-

7  tion 328.

8  **"§ 331. Written decision**

9      "The panel shall issue a written decision on each

10  issue of patentability with respect to each claim that is

11  the subject of an opposition proceeding under this chapter.

12  The written decision shall consist of findings of fact and

13  conclusions of law. The written decision shall become a

14  final determination of the Office on the issues raised in

15  the opposition unless a party to the opposition files a re-

16  quest for reconsideration and modification of the written

17  decision within a period set by the panel, which shall not

18  be less than two weeks from the date of the written deci-

19  sion.

20  **"§ 332. Burden of proof and evidence**

21      "(a) BURDEN OF PROOF.—The opposer in an opposi-

22  tion proceeding under this chapter shall have the burden

23  to prove the invalidity of a claim by a preponderance of

24  the evidence. The determination of invalidity shall be

10

1 based upon the broadest reasonable construction of the
2 claim.

3     "(b) EVIDENCE.—The Federal Rules of Evidence
4 shall apply to the opposition proceeding, except to the ex-
5 tent inconsistent with any provision of this chapter.

6 **"§ 333. Reconsideration**

7     "If a request is filed for reconsideration of the written
8 decision in an opposition proceeding under this chapter,
9 the panel may authorize a party to the proceeding who
10 did not file such a request to file a response to the request
11 for reconsideration. Following any reconsideration, the
12 panel shall either deny the request for modification of the
13 written decision or grant the request and issue a modified
14 written decision, which shall constitute the final deter-
15 mination of the Office on the issues raised in the opposi-
16 tion proceeding.

17 **"§ 334. Appeal**

18     "A party dissatisfied with the final determination of
19 the panel in an opposition proceeding under this chapter
20 may appeal the determination under sections 141 through
21 144. Any party to the opposition proceeding shall have the
22 right to be a party to the appeal.

23 **"§ 335. Certificate**

24     "When a decision of a panel in an opposition pro-
25 ceeding under the chapter has become final under section

11

1 331, 333, or 334, as the case may be, the Director shall

2 issue and publish a certificate in accordance with the deci-

3 sion, canceling any claim of the patent determined to be

4 unpatentable, and shall incorporate into the patent any

5 new or amended claims determined to be patentable. The

6 issuance of the certificate shall terminate the opposition

7 proceeding.

8 **"§ 336. Estoppel**

9     "(a) ESTOPPEL.—

10         "(1) IN GENERAL.—Subject to paragraph (2),

11         after a certificate has been issued under section 335

12         in accordance with the decision of the panel in an

13         opposition proceeding, the determination with re-

14         spect to an issue of invalidity raised by an opposer

15         shall bar that opposer from raising, in any subse-

16         quent proceeding involving that opposer under this

17         title, any issue of fact or law actually decided and

18         necessary to the determination of that issue.

19         "(2) EXCEPTION.—If an opposer in an opposi-

20         tion proceeding demonstrates, in a subsequent pro-

21         ceeding referred to in paragraph (1), that there is

22         additional factual evidence that is material to an

23         issue of fact actually decided in the opposition pro-

24         ceeding, and necessary to the final determination in

25         the opposition proceeding, that could not reasonably

12

1     have been discovered or presented in the opposition
2     proceeding by that opposer, the opposer may raise,
3     in that subsequent proceeding, that issue of fact and
4     any determined issue of law for which the issue of
5     fact was necessary.

6     "(b) EXPANDED DEFINITION OF OPPOSER.—For
7 purposes of this section, the term 'opposer' includes the
8 person making the request under section 321, any real
9 party in interest, and their successors in interest.

10     "(c) NEW PARTY-IN-INTEREST.—If a proceeding
11 arising by reason of additional factual evidence raised
12 under subsection (a)(2) involves a real party in interest
13 not identified to the patent owner under section 322, the
14 real party in interest shall notify the Director and the pat-
15 ent owner of that fact and of the proceeding, within 30
16 days after receiving notice that the proceeding has been
17 filed.

18 **"§ 337. Duration of opposition**

19     "The determination of a panel in an opposition pro-
20 ceeding under this chapter, including any determinations
21 pursuant to a request for reconsideration under section
22 133, shall be issued not later than 1 year after the date
23 on which the opposition proceeding is instituted under sec-
24 tion 325. Upon good cause shown, the Director may ex-
25 tend the 1-year period by not more than 6 months.

13

1    **"§ 338. Settlement**

2    "(a) IN GENERAL.—An opposition proceeding under

3    this chapter shall be terminated with respect to any op-

4    poser upon the joint request of the opposer and the patent

5    owner, unless the panel has issued a written decision

6    under section 331 before the request for termination is

7    filed. If the opposition is terminated with respect to an

8    opposer under this section, no estoppel under section 336

9    shall apply to that opposer with respect to an issue of inva-

10    lidity raised in the opposition proceeding. The written de-

11    cision under section 331 shall thereafter be issued only

12    with respect to issues of invalidity raised by opposers that

13    remain in the opposition proceeding.

14    "(b) AGREEMENTS IN WRITING.—Any agreement or

15    understanding between the patent owner and an opposer,

16    including any collateral agreements referred to therein,

17    that is made in connection with or in contemplation of

18    the termination of an opposition proceeding under sub-

19    section (a) shall be in writing. The opposition with respect

20    to the parties to the agreement or understanding shall not

21    be terminated until a true copy of the agreement or under-

22    standing, including any such collateral agreements, has

23    been filed in the Patent and Trademark Office. If any

24    party filing such an agreement or understanding requests,

25    the agreement or understanding shall be kept separate

26    from the file of the opposition, and shall be made available

14

1  only to Government agencies on written request, or to any
2  person on a showing of good cause.

3      "(c) DISCRETIONARY ACTIONS REVIEWABLE.—Any
4  discretionary action of the Director under subsection (b)
5  shall be reviewable under chapter 7 of title 5.

6  **"§ 339. Intervening rights**

7      "Any proposed amended or new claim determined to
8  be patentable and incorporated into a patent following an
9  opposition proceeding under this chapter shall have the
10  same effect as that specified in section 252 of this title
11  for reissued patents on the right of any person who made,
12  purchased, or used within the United States, or imported
13  into the United States, anything patented by such pro-
14  posed amended or new claim, or who made substantial
15  preparation therefor, before the certificate issued under
16  section 335 with respect to that amended or new claim.

17  **"§ 340. Relationship with reexamination proceedings**

18      "(a) ESTOPPEL.—A patent for which an opposition
19  proceeding has been instituted under this chapter may not
20  thereafter be made the subject of a request under section
21  302 or 311 for reexamination, by the same opposer or on
22  behalf of the same real party in interest, on the same
23  claim and on the same issue that was the basis of the
24  opposition proceeding.

15

1    "(b) STAYING OF OTHER PROCEEDINGS.—[If, after

2  an opposition proceeding has been instituted under this

3  chapter, a request for reexamination under section 302 or

4  section 311 is made by or on behalf of a person other than

5  the opposer or the same real party in interest, such reex-

6  amination shall be stayed during the pendency of any op-

7  position proceeding under this chapter.]".

8    (b) CLERICAL AMENDMENT.—The table of chapters

9  for part III of title 35, United States Code, is amended

10  by adding at the end the following:

**"32. Opposition Procedures** ........................................................... **321.".**

11  **SEC. 3. PUBLICATION OF PATENT APPLICATIONS.**

12    Section 122 of title 35, United States Code, is

13  amended—

14        (1) in subsection (b)(2)—

15            (A) by striking subparagraph (B); and

16            (B) in subparagraph (A)—

17                (i) by striking "(A) An application"

18            and inserting "An application"; and

19                (ii) by redesignating clauses (i)

20            through (iv) as subparagraphs (A) through

21            (D), respectively; and

22        (2) by striking subsection (c) and redesignating

23      subsection (d) as subsection (c).

16

1 **SEC. 4. SUBMISSIONS BY THIRD PARTIES.**

2      Section 131 of title 35, United States Code, is

3 amended—

4           (1) by striking ''The Director'' and inserting

5      ''(a) IN GENERAL.—The Director''; and

6           (2) by adding at the end the following:

7      ''(b) THIRD PARTY SUBMISSIONS.—Any party shall

8 have the opportunity to submit for consideration and for

9 inclusion in the record, prior art (including, but not lim-

10 ited to, evidence of knowledge or use, or public use or sale,

11 under section 102), to determine whether the invention

12 was known or used, or was in public use, or on sale, under

13 section 102 or would have been obvious under section 103.

14 The Director shall consider such submissions if the re-

15 quest—

16           ''(1) is made in writing not later than—

17                ''(A) 6 months after the date on which the

18           patent application is published under section

19           122, or

20                ''(B) before the date on which a notice of

21           allowance is mailed under section 151 for a pat-

22           ent on the invention,

23      whichever occurs first;

24           ''(2) is accompanied by the payment of a fee es-

25           tablished by the Director under section 41 for third

26           party submissions;

17

1    "(3) sets forth the teaching and applicability of
2    each reference and the basis on which the submis-
3    sion is offered; and

4    "(4) includes a sworn declaration attesting to
5    the relevance and accuracy of the submissions.

6  Information submitted under this subsection shall be con-
7  sidered during the examination of the patent application.".

8  **SEC. 5. INTER PARTES REEXAMINATION.**

9    (a) ESTOPPEL PROVISION.—Section 315(c) of title
10  35, United States Code, is amended by striking "or could
11  have raised".

12    (b) FINAL DECISION.—Section 317(b) of title 35,
13  United States Code, is amended—

14    (1) in the heading, by striking "FINAL DECI-
15    SION" and inserting "DISTRICT COURT DECISION";
16    and

17    (2) in the first sentence, by striking "final deci-
18    sion" and inserting "decision of a district court".

19    (c)    APPLICABILITY.—Notwithstanding    section
20  4608(a) of the Intellectual Property and Communications
21  Reform Act of 1999, as enacted by section 1000(a)(9) of
22  Public Law 106–113 (41 U.S.C. note), sections 311
23  through 318 of title 35, United States Code, as amended
24  by this section, shall apply to any patent that issues from

18

1  an original application filed before, on, or after November
2  29, 1999.

3  SEC. 6. WILLFUL INFRINGEMENT.

4        Section 284 of title 35, United States Code, is
5  amended—

6              (1) in the first paragraph, by striking "Upon"
7        and inserting "(a) AWARD OF DAMAGES.—Upon";
8        and

9              (2) by amending the second paragraph to read
10       as follows:

11  "(b) WILLFUL INFRINGEMENT.—

12        "(1) INCREASED DAMAGES.—A court that has
13        determined that the infringer has willfully infringed
14        a patent or patents may increase the damages up to
15        three times the amount of damages found or as-
16        sessed under subsection (a), except that increased
17        damages under this paragraph shall not apply to
18        provisional rights under section 154(d) of this title.

19        "(2) PERMITTED GROUNDS FOR WILLFUL-
20        NESS.—A court may find that an infringer has will-
21        fully infringed a patent only if the patent owner pre-
22        sents clear and convincing evidence that—

23              "(A) after receiving written notice from
24              the patentee—

19

1          "(i) alleging acts of infringement in a

2     manner sufficient to give the infringer an

3     objectively reasonable apprehension of suit

4     on such patent, and

5          "(ii) identifying with particularity

6     each claim of the patent, each product or

7     process that the patent owner alleges in-

8     fringes the patent, and the relationship of

9     such product or process to such claim,

10    the infringer, after a reasonable opportunity to

11    investigate, thereafter performed one or more of

12    the alleged acts of infringement;

13        "(B) the infringer intentionally copied the

14    patented invention with knowledge that it was

15    patented; or

16        "(C) after having been found by a court to

17    have infringed that patent, the infringer en-

18    gaged in conduct that was not colorably dif-

19    ferent from the conduct previously found to

20    have infringed the patent, and which resulted in

21    a separate finding of infringement of the same

22    patent.

23        "(3) LIMITATIONS ON WILLFULNESS.—(A) A

24    court shall not find that an infringer has willfully in-

25    fringed a patent under paragraph (2) for any period

20

1   of time during which the infringer had an informed
2   good faith belief that the patent was invalid or unen-
3   forceable, or would not be infringed by the conduct
4   later shown to constitute infringement of the patent.
5       "(B) An informed good faith belief within the
6   meaning of subparagraph (A) may be established by
7   reasonable reliance on advice of counsel.
8       "(C) The decision of the infringer not to
9   present evidence of advice of counsel shall have no
10  relevance to a determination of willful infringement
11  under paragraph (2).
12      "(4) LIMITATION ON PLEADING.—Before the
13  date on which a determination has been made that
14  the patent in suit is not invalid, is enforceable, and
15  has been infringed by the infringer, a patentee may
16  not plead, and a court may not determine, that an
17  infringer has willfully infringed the patent. The
18  court's determination of an infringer's willfulness
19  shall be made without a jury."; and
20      (3) in the third paragraph, by striking "The
21  court" and inserting "(c) EXPERT TESTIMONY.—
22  The court".

21

1 **SEC. 7. VENUE.**

2    Section 1400 of title 28, United States Code, is

3 amended by adding at the end the following new sub-

4 section:

5    "(c) A court shall grant a motion to transfer an ac-

6 tion to a judicial district or division in which the action

7 could have been brought if—

8        "(1) such judicial district or division is a more

9    appropriate forum for the action, including any judi-

10    cial district or division where a party to the action

11    has substantial evidence or witnesses;

12        "(2) the action was not brought in a district or

13    division—

14            "(A) in which the patentee resides or

15        maintains its principal place of business;

16            "(B) in which an accused infringer main-

17        tains its principal place of business; or

18            "(C) in the State in which an accused in-

19        fringer, if a domestic corporation, is incor-

20        porated;

21        "(3) at the time the action was brought, neither

22    the patentee nor an accused infringer had substan-

23    tial evidence or witnesses in the judicial district in

24    which the action was brought; and

25        "(4) the action has not been previously trans-

26    ferred under this subsection.

22

1     "(d) For purposes of subsection (c), the use or sale

2   of allegedly infringing subject matter in a judicial district

3   shall not, by itself, establish the existence of substantial

4   evidence or witnesses in such a judicial district.".

**5   SEC. 8. INJUNCTION.**

6     Section 283 of title 35, United States Code, is

7   amended by adding at the end the following: "In deter-

8   mining equity, the court shall consider the fairness of the

9   remedy in light of all the facts and the relevant interest

10  of the parties associated with the invention. Unless an in-

11  junction is entered pursuant to a nonappealable judgment

12  of infringement, a court shall stay the injunction pending

13  an appeal upon an affirmative showing that the stay would

14  not result in irreparable harm to the owner of the patent

15  and that the balance of hardships from the stay does not

16  favor the owner of the patent.".

○

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

Block Drug Company, Inc.,                    :
                                             :
            Plaintiff,                       :
                                             :      CIVIL ACTION
      v.                                     :      NO. 06-350-KAJ
                                             :
Sedona Laboratories, Inc. and                :
Nutri-Health Supplements, LLC                :
d/b/a Sedona Laboratories,                   :
                                             :
            Defendants.                      :
                                             :

----------------------------------------------------

## DECLARATION OF THOMAS A. CONNELLY

I, Thomas A. Connelly, declare as follows:

     1.       I am an attorney with the law firm Jaburg & Wilk, P.C., and am licensed to practice in the State of Arizona and am a member of the bar of that Court. I am an attorney for Defendant Nutri-Health Supplements, LLC d/b/a Sedona Labs ("NHS"). I am competent to and would testify to the facts stated in this Declaration, all of which facts are known by me to be true.

     2.       Ms. Tracy King is the President of NHS, and has provided this firm with certain business records of NHS.

     3.       As recorded in the contemporaneous records of NHS, on or about September 1, 2006, Ms. King authorized letters to three representatives of Eckerd, informing them that, due to this pending lawsuit, NHS was stopping the manufacture and sale of the Eckerd private-labeled food-enzyme product at issue in this case. Those letters were sent to David Morocco, Executive Vice President-Marketing, Patrick Kenney, Purchasing, and Savana Genereux, Purchasing Assistant, all at an address in Warwick, Rhode Island, by first-class U.S. mail and by email. True and accurate copies of those letters are collected and attached hereto as **Exhibit "A"**.

4.     As recorded in the contemporaneous records of NHS, the last shipments of the Eckerd private-labeled product were sent to Eckerd warehouses in July, 2006.

5.     As recorded in the contemporaneous records of NHS, for the period of January 1, 2006 through July 31, 2006, NHS shipped a total of 10,002 units of the Eckerd private-labeled product to Eckerd. The payment terms were on a per unit basis, and not a royalty basis.

6.     As recorded in the contemporaneous records of NHS, NHS has no control or input with Eckerd as to which Eckerd retail outlets actually receive the Eckerd private-labeled product after we ship that product to the Eckerd warehouses.

7.     NHS has not entered into an agency relationship with Eckerd, and Eckerd is not an agent of NHS.

8.     NHS reserves the right to approve private labels with all of its private-label customers (not just Eckerd) to review their accuracy as to any information regarding ingredients and dosage, and that they otherwise comply with all applicable federal and state labeling laws and regulations.

9.     A true and correct copy of the actual Eckerd private-label is attached hereto as **Exhibit "B"**.

10.     As recorded in the contemporaneous records of NHS, part of its January 2006 purchase of the assets of Sedona Laboratories, Inc., NHS included the website at www.sedonalabs.com, which at this time remains essentially the same as it was at the time of the asset purchase.

I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of October 2006 in Phoenix, Arizona.

Thomas A. Connelly

# Exhibit "A"

(To Declaration of Thomas A. Connelly)

September 1, 2006

Eckerd/Brooks
David Morocco
Executive Vice President, Marketing
50 service Avenue
Warwick, RI 02886

     Re: Alpha-Galactosidase Supplement

Dear Madam or Sir:

     We are grateful for the trust that you have placed in Nutri-Health Supplements, Inc. d/b/a Sedona Laboratories ("Sedona Labs") by selecting Sedona Labs to supply you with a private label alpha-galactosidase supplement to aid in the relief of gas in humans. In keeping with our relationship, we are writing to inform you of claims alleged by Block Drug Company Inc. ("Block") with respect to Sedona Labs's alpha-galactosidase supplement, and the steps Sedona Labs is taking to address those claims.

     Block recently commenced a civil action in the United States District Court for the District of Delaware captioned *Block Drug Company, Inc. v. Sedona Laboratories, Inc*, civil case number 06-350-KAJ, alleging that Sedona Labs's manufacture and sale of a food-enzyme dietary supplement containing the enzyme alpha-galactosidase (the "Product") unlawfully infringes on Block's U.S. Patent No. 6,344,196 ("the '196 Patent"). Sedona Labs vehemently disputes Block's allegations, and has itself filed a declaratory judgment action against Block in the United States District Court for the District of Arizona captioned *Nutri-Health Supplements, L.L.C. d/b/a Sedona Laboratories v. Block Drug Company, Inc.*, civil case number 3:06-cv-1673 DGC, seeking declaratory judgment that the Product does not infringe the '196 Patent, and that the '196 Patent is invalid, void and unenforceable.

     While Sedona Labs strongly believes in its position, it also has an obligation to minimize the risks posed to both itself and its customers by Block's claims. Accordingly, under the duress of Block's false claims, and with much reluctance, Sedona Labs has no choice but to cease manufacture and sale of the Product until such time as its disputes with Block are adjudicated. Sedona Labs regrets being forced to such action and does so not as an admission of any kind but solely to shield itself and its customers from exposure. Should you have any questions, please contact our counsel, Michelle Lombino, at 602-248-1027.

                  Very truly yours,

                  NUTRI-HEALTH SUPPLEMENTS, L.L.C.

                  Tracy King, President

September 1, 2006

Eckerd/Brooks
Patrick Kenney
Purchasing
50 service Avenue
Warwick, RI 02886

      Re:  Alpha-Galactosidase Supplement

Dear Madam or Sir:

      We are grateful for the trust that you have placed in Nutri-Health Supplements, Inc. d/b/a Sedona Laboratories ("Sedona Labs") by selecting Sedona Labs to supply you with a private label alpha-galactosidase supplement to aid in the relief of gas in humans.  In keeping with our relationship, we are writing to inform you of claims alleged by Block Drug Company Inc. ("Block") with respect to Sedona Labs's alpha-galactosidase supplement, and the steps Sedona Labs is taking to address those claims.

      Block recently commenced a civil action in the United States District Court for the District of Delaware captioned *Block Drug Company, Inc. v. Sedona Laboratories, Inc,* civil case number 06-350-KAJ, alleging that Sedona Labs's manufacture and sale of a food-enzyme dietary supplement containing the enzyme alpha-galactosidase (the "Product") unlawfully infringes on Block's U.S. Patent No. 6,344,196 ("the '196 Patent").  Sedona Labs vehemently disputes Block's allegations, and has itself filed a declaratory judgment action against Block in the United States District Court for the District of Arizona captioned *Nutri-Health Supplements, L.L.C. d/b/a Sedona Laboratories v. Block Drug Company, Inc.,* civil case number 3:06-cv-1673 DGC, seeking declaratory judgment that the Product does not infringe the '196 Patent, and that the '196 Patent is invalid, void and unenforceable.

      While Sedona Labs strongly believes in its position, it also has an obligation to minimize the risks posed to both itself and its customers by Block's claims.  Accordingly, under the duress of Block's false claims, and with much reluctance, Sedona Labs has no choice but to cease manufacture and sale of the Product until such time as its disputes with Block are adjudicated. Sedona Labs regrets being forced to such action and does so not as an admission of any kind but solely to shield itself and its customers from exposure.  Should you have any questions, please contact our counsel, Michelle Lombino, at 602-248-1027.

      Very truly yours,

      NUTRI-HEALTH SUPPLEMENTS, L.L.C.

      Tracy King, President

September 1, 2006

Eckerd/Brooks
Savanna Genereux
Purchasing Assistant
50 service Avenue
Warwick, RI 02886

      Re:  Alpha-Galactosidase Supplement

Dear Madam or Sir:

      We are grateful for the trust that you have placed in Nutri-Health Supplements, Inc. d/b/a Sedona Laboratories ("Sedona Labs") by selecting Sedona Labs to supply you with a private label alpha-galactosidase supplement to aid in the relief of gas in humans. In keeping with our relationship, we are writing to inform you of claims alleged by Block Drug Company Inc. ("Block") with respect to Sedona Labs's alpha-galactosidase supplement, and the steps Sedona Labs is taking to address those claims.

      Block recently commenced a civil action in the United States District Court for the District of Delaware captioned *Block Drug Company, Inc. v. Sedona Laboratories, Inc,* civil case number 06-350-KAJ, alleging that Sedona Labs's manufacture and sale of a food-enzyme dietary supplement containing the enzyme alpha-galactosidase (the "Product") unlawfully infringes on Block's U.S. Patent No. 6,344,196 ("the '196 Patent"). Sedona Labs vehemently disputes Block's allegations, and has itself filed a declaratory judgment action against Block in the United States District Court for the District of Arizona captioned *Nutri-Health Supplements, L.L.C. d/b/a Sedona Laboratories v. Block Drug Company, Inc.,* civil case number 3:06-cv-1673 DGC, seeking declaratory judgment that the Product does not infringe the '196 Patent, and that the '196 Patent is invalid, void and unenforceable.

      While Sedona Labs strongly believes in its position, it also has an obligation to minimize the risks posed to both itself and its customers by Block's claims. Accordingly, under the duress of Block's false claims, and with much reluctance, Sedona Labs has no choice but to cease manufacture and sale of the Product until such time as its disputes with Block are adjudicated. Sedona Labs regrets being forced to such action and does so not as an admission of any kind but solely to shield itself and its customers from exposure. Should you have any questions, please contact our counsel, Michelle Lombino, at 602-248-1027.

                  Very truly yours,

                  NUTRI-HEALTH SUPPLEMENTS, L.L.C.

                  Tracy King, President

# Exhibit "B"

(To Declaration of Thomas A. Connelly)

A Proprietary Enzyme Bl...
Containing Alpha
ECKERD    Galactosida...
Dietary Supple...
An Aid to Diges...
food·enzym...
100 CAPSULES



**Supplement Facts**
Serving Size: 1 Tablet
Servings Per Container: 100
Amount Per Tablet    %DV

alpha-galactosidase
Amylase        150 GALU *
(derived from Aspergillus niger)
Invertase        140 SU *
Hemicellulase
Beta-glucanase
Protease
* Daily value not established

Other Ingredients: Rice Starch,
Gelatin Capsule
Storage: Keep at or below room
temperature. Avoid heat.

DISTRIBUTED BY:
XXXXO DRUG COMPANY
CLEARWATER, FL 33758

**Directions:** 1 capsule per serving of gassy food, at the beginning of the meal. A typical meal consists of 2 to 3 servings of food. For best results you may have to adjust the number of capsules according to the number of servings of problem foods that you eat.

**Allergy Note:** This product is made from a safe, foodgrade mold, however if a rare sensitivity occurs, with allergy type symptoms, discontinue use.

**Consult your doctor** if you are Galactosemic.

**DO NOT USE IF PRINTED SEAL UNDER CAP IS TORN OR MISSING**

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Block Drug Company, Inc., | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 06-350-KAJ |
| | : | |
| Sedona Laboratories, Inc. and | : | |
| Nutri-Health Supplements, LLC | : | |
| d/b/a Sedona Laboratories, | : | |
| | : | |
| Defendants. | : | |

## UNREPORTED DECISIONS CITED IN THE
## REPLY BRIEF OF DEFENDANT
## NUTRI-HEALTH SUPPLEMENTS, LLC
## IN SUPPORT OF ITS MOTION TO DISMISS
## OR, ALTERNATIVELY, TO TRANSFER VENUE

KLEHR, HARRISON, HARVEY, BRANZBURG
& ELLERS LLP
David S. Eagle (DE Bar #3387)
Patrick A. Costello (DE Bar #4535)
919 Market Street, Suite 1000
Wilmington, DE 19801
Telephone (302) 426-1189
*deagle@klehr.com*
*pcostello@klehr.com*
Attorneys for Nutri-Health Supplements, LLC

*Of Counsel:*

Roger L. Cohen
Michelle C. Lombino
Thomas A. Connelly
JABURG & WILK, P.C.
3200 N. Central Avenue, Suite 2000
Phoenix, AZ 85018
Telephone (602) 248-1000

Dated: October 16, 2006

DEL1 64834-1

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
AMERICAN BIO MEDICA CORPORATION,
Plaintiff,
v.
PENINSULA DRUG ANALYSIS CO., INC.; James
T. Ramsey; Phamatech, Inc .; Dipro Diagnostic
Products, Inc.; Dipro Diagnostic Products of North
America, Inc., Defendants.
**No. Civ.A. 99-218-SLR.**

Aug. 3, 1999.

Daniel F. Wolcott, Jr., Gregory A. Inskip, and Joanne
Ceballos, of Potter, Anderson & Corroon LLP,
Wilmington, Delaware, and Charles Michael Tobin,
of Hopkins & Sutter, Washington, D.C., for plaintiff.
Matthew B. Lehr, and Maryellen Noreika, of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware,
and Edward W. Moore, of Dallas, Texas, for
defendants Peninsula Drug Analysis Co., Inc.; James
T. Ramsey; DiPro Diagnostic Products, Inc.; and
DiPro Diagnostic Products of North America, Inc.,
Doreen L. Costa, Neil P. Sirota, and Steven R.
Gustavson, of Baker & Botts, L.L.P., New York,
New York, of counsel.
Kevin W. Goldstein, of Ratner & Prestia,
Wilmington, Delaware, for defendant Phamatech,
Inc., Steele N. Gillaspey, of Gillaspey, Harms &
Associates, San Diego, California, of counsel.

MEMORANDUM OPINION
ROBINSON, J.

I. INTRODUCTION

*1 Pending before the court are motions to dismiss or
transfer v enue filed by defendants Dipro Diagnostic
Products of North America, Inc. ("Dipro"),
Phamatech, Inc. ("Phamatech"), and Peninsula Drug
Analysis Co., Inc. and James T. Ramsey ("Peninsula"
and "Ramsey," respectively). (D.I. 17, 25 and 49)
Plaintiff American Bio Medica Corporation
("ABMC") opposes said motions. ABMC owns the
rights to U.S. Design Patent No. D404812, which
patent issued on January 26, 1999. ABMC is a New
York corporation engaged in the manufacture,
worldwide distribution and sale of the Rapid Drug

Screen, a product covered by the patent at issue.
According to ABMC, when the Rapid Drug Screen
was developed in 1995, it was the first vertical, hands
free test for the detection of the presence of drug
residue in urine. Until February 1999, ABMC
purchased test strips from defendant Phamatech for
incorporation into the Rapid Drug Screen. ABMC
alleges that Phamatech initiated production of its own
vertical test kit (Quick Screen) in 1998 or earlier,
using proprietary information it acquired by reason of
its supply relationship with ABMC.

Defendant Phamatech is a California corporation.
According to ABMC, Phamatech distributes Quick
Screen through the auspices of defendants Peninsula
and Ramsey, among others. Defendant Dipro is a
Delaware corporation that, according to ABMC,
acquires directly or indirectly from Phamatech an
accused product called Rapid Response and
distributes that product through Peninsula and
Ramsey, among others. Peninsula is a Virginia
corporation and R amsey is the sole stockholder and
an employee of Peninsula.

Plaintiff ABMC initiated this lawsuit on April 7,
1999 against defendants for design patent
infringement, violation of the Lanham Act, and other
acts of unfair competition. A day later, on April 8,
1999, Phamatech filed suit in the United States
District Court for the Southern District of California
seeking a declaratory judgment that ABMC's design
patent is i nvalid, and joining other federal and s tate
claims essentially mirroring the claims and operative
facts at issue. By decision issued June 21, 1999,
Judge Keep of the Southern District of California
found that the California court could exercise specific
personal jurisdiction over ABMC; however, applying
the "first-filed" rule, she stayed the California case
pending disposition of the instant motions.

II. FACTS

The facts are essentially undisputed. Prior to the
filing of the complaint, none of the accused products
had b een s old t o a D elaware r esident. I n t he f all o f
1998, defendant Peninsula did ship an order of
ABMC's Rapid Drug Screen to a Delaware resident,
Pace Electric of New Castle, Delaware. Sometime
thereafter and prior to January 1999, Peninsula
stopped handling ABMC's product. In January 1999,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

defendant Ramsey and a third party met with a representative of Pace to discuss a possible business relationship for the sale and distribution of the Phamatech/Dipro product, Rapid Response, in Delaware. These discussions took place in Hawaii and Maryland. Although there are averments of record indicating that some agreement was reached (D.I.32), it is the court's understanding that no actual sales or movement of defendants' products occurred in Delaware prior to the filing of the complaint.

**\*2** Prior to April 1999, Peninsula sent direct mail postcards to Delaware as part of a mass mailing to potential customers in more than 20 states.[FN1] Both Ramsey and Phamatech maintain national Internet websites that can be accessed from Delaware. It is the court's understanding that these websites include promotional material about the allegedly infringing products, including information on ordering and shipping; however, orders cannot be consummated directly through the websites.

> FN1. Approximately 60 out of a total of 6,000 postcards were directed to Delaware residents. No responses are recorded.

### III. DISCUSSION

### A. Personal Jurisdiction

ABMC, as plaintiff, bears the burden of establishing that this court may exercise personal jurisdiction over defendants. When personal jurisdiction is contested without the benefit of discovery, the plaintiff need only establish a *prima facie* case with the record viewed in the light most favorable to the plaintiff. *See Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F.Supp. 1458, 1462 (D.Del.1991); Computer People, Inc. v. Best Int'l Group, Inc.,* No. Civ. A. 16648, 1999 WL 288119, at \*4 & n. 5 (Del. Ch. Apr 27, 1999). There is no question but that this court can exercise personal jurisdiction over defendant Dipro, a Delaware corporation. The focus of the following discussion, therefore, is whether the exercise of personal jurisdiction over the remaining defendants comports with the law of the Federal Circuit.[FN2]

> FN2. According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional

circuit in which the case arose," is applicable. *Akro Corp. v. Luker,* 45 F.3d 1541, 1543 (Fed.Cir.1995).

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a suit for "lack of jurisdiction over the person." According to the United States Supreme Court,

before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 104 (1987). The principle pronounced above is traditionally described in this court as a two-step analysis. The court will determine, first, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendants' rights to due process.

Rule 4(e)(1) of the Federal Rules of Civil Procedure states that service of a summons may be effected "pursuant to the law of the state in which the district court is located." The Delaware long-arm statute, 10 Del. C. § 3104(c), has been construed "broadly ... to confer jurisdiction to the maximum extent possible under the due process clause." *LaNuova D & B S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). As noted by this court in *Intel Corp. v. Silicon Storage Tech., Inc.,* 20 F.Supp.2d 690, 694 (D.Del.1998), "[t]he Delaware Supreme Court has not determined that § 3104(c) is coextensive with federal due process, nor does it substitute federal due process analysis for state long-arm analysis." *Accord Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* 611 A.2d 476, 480-81 (Del.1992); *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods. Inc.,* Civ. A. No. 12036, 1991 WL 129174, at \*3 (Del. Ch. July 10, 1991); *Ramada Inns v. Drinkhall,* No. Civ. A. 83C-AU-56, 1984 WL 247023, at \*2 (Del.Super. May 17, 1984). Therefore, the court must determine that the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendants' constitutional rights to due process.[FN3]

> FN3. The Federal Circuit has instructed that, "in interpreting the meaning of state long-arm statutes, we ... defer to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." *Graphic Controls Corp. v. Utah Med. Prods., Inc.,* 149 F.3d 1382, 1386 (Fed.Cir.1998). Thus, in *Luker,* the Federal Circuit's analysis followed that of the Sixth Circuit's holding in *R.L. Lipton Distrib. Co. v. Dribeck Importers, Inc.,* 811 F.2d 967 (6th Cir.1987): " 'This Ohio [long-arm] statute has been construed to extend to the outer limits of due process, and thus an Ohio personal jurisdiction analysis becomes an examination of constitutional limitations." ' *Luker,* 45 F.3d at 1544 (quoting *Dribeck,* 811 F.2d at 969). By contrast, as noted above, the Delaware state courts do not collapse the long-arm inquiry into the due process inquiry and neither shall this court.

**\*3** Delaware's long-arm statute provides:
(c) As to a cause of action brought by a person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-resident, or his personal representative, who in person or through an agent:
(1) Transacts any business or performs any character of work or service in the State;
(2) Contracts to supply services or things in this State;
(3) Causes tortious injury in the State by an act or omission in this State;
(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State....

Del.Code Ann. tit. 10, § 3104(c)(1)-(4).

As explained by the Delaware Supreme Court in *LaNuova,*
[t]he conduct embraced in subsections (1) and (2), the transaction of business or performance of work and contracting to supply services or things in the State, may supply the jurisdictional basis for suit only with respect to claims which have a nexus to the designated conduct. Where personal jurisdiction is asserted on a transactional basis, even a single transaction is sufficient if the claim has its origin in the asserted transaction.

Similarly, where the claim is one for tortious injury under subsection (c)(3),
a single "act or omission" in the State in which the injury was caused will suffice. Such a claim may also be viewed as transactional.

*LaNuova,* 513 A.2d at 768. Therefore, in order to establish transactional or specific jurisdiction, plaintiff must demonstrate not only that an act or acts occurred in Delaware but also that its causes of action arise from those act or acts. According to relevant caselaw, plaintiff also must demonstrate that the act or acts occurring in Delaware actually constitute "transacting business" in Delaware, i.e., that defendants "purposefully avail[ed themselves] of the privileges and benefits of Delaware law." *Computer People, Inc.,* 1999 WL 288119, at [*]8; *see also Thorn EMI N. Am. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993) (stating that the designated conduct "must be directed at residents of the State of Delaware and the protection of its laws"). With this requirement in mind, courts have concluded that "[m]ere solicitation does not arise to transacting business, nor does the isolated shipment of goods into Delaware." *Id.* (citing *Moore v. Little Giant Indus., Inc.,* 513 F.Supp. 1043, 1047 (D.Del.1981); *Waters v. Deutz Corp.,* 460 A.2d 1332, 1335 (Del.Super.1983). The distinction between isolated business activities and those giving rise to personal jurisdiction has been explained on the basis of whether the conduct is "part of a general business plan ... to solicit business in Delaware and deliver products to customers in Delaware." *Thorn EMI,* 821 F.Supp. at 274.

**\*4** Plaintiff alleges in its complaint seven causes of action, including unlawful use of the trademarks and service marks of the Rapid Drug Screen in violation of the Lanham Act and common and state law trademark rights; violation of the design patent "by making, using and/or selling the ABMC design ..."; and engaging in unfair competition and deceptive trade practices. (D.I.1) Although the products at issue have not been made, used, or sold in Delaware, plaintiff asserts that, "[t]hrough offers and extensive planning to sell the infringing product in Delaware, defendants have engaged in a course of conduct that readily meets the nexus requirements of sections 3104(c)(1), (2), and (3)." (D.I. 57 at 7-8)

The record demonstrates that defendants Peninsula and Ramsey have offered to sell [FN4] allegedly infringing products to Delaware residents through what appears to be a concerted marketing effort. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

marketing effort includes national advertisements accessible to Delaware residents (the internet website), out-of-state sales negotiations with a Delaware resident,[FN5] and the mailing of promotional materials to Delaware residents. Given the history of these defendants' relationship with plaintiff, the record adequately demonstrates that these activities are directed at Delaware residents, constitute "transacting business," and are sufficiently related to plaintiff's causes of action to satisfy the requirements of 10 Del. C. § 3104(c)(1). [FN6] Cf. Computer People, Inc., 1999 WL 288119, at *8.[FN7]

FN4. Plaintiff did not specifically allege such in its complaint; however, 35 U.S.C. § 271(a) reads "whoever without authority makes, uses, offers to sell, or sells any patented invention ... infringes the patent." (Emphasis added)

FN5. The out-of-state sales negotiations with Pace Electric are viewed in tandem with defendants' other conduct as evidence of a general business plan directed at Delaware residents and the protection of its laws.

FN6. As noted, the court is satisfied that the activities described above are "part of a general business plan" and not isolated, unrelated events. In the past, this court has demanded as well proof that the activities have had a "tangible effect" in Delaware. See, e.g., Intel Corp., 20 F.Supp. at 696 ("... SST's solicitations in Delaware [have not] been shown to have had any tangible effect on Intel's sales here."). Sales are lost generally because of the sale of competing products. Given the fact that liability under 35 U.S.C. § 271(a) can now rest on mere "offers to sell," the court is reluctant to require proof of actual sales and is not sure what other "tangible effect" is contemplated. Therefore, the court will not require evidence of "tangible effects" in this case.

FN7. Although the court noted that, "as a general matter telephone calls and an e-mail [to a Delaware resident] do not, in and of themselves, automatically constitute 'transacting business' within Delaware sufficient to invoke jurisdiction under § 3104(c)(1)," the court looked at the specific factual context and held that these contacts

were insufficient because they could not be a basis for the plaintiff's causes of action.

The court further finds that the exercise of personal jurisdiction over these defendants comports with federal due process considerations. The Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945), held that

due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintainance of the suit does not offend "traditional notions of fair play and substantial justice."

Id. at 316 (citation omitted). The Court in Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985), added the further requirement that the minimum contacts be "purposeful" contacts, noting that "even a single act can support jurisdiction" so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation." Id. at 475 n. 18. Therefore, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id. at 477. In Luker, the Federal Circuit suggested a three-prong jurisdictional analysis: 1) has the defendant purposefully directed its activities at residents of the forum?; 2) do the claims arise out of or relate to those activities?; 3) is the assertion of personal jurisdiction reasonable and fair? See Luker, 45 F.3d at 1545-46. The court has already answered the first two inquiries in the affirmative and has not discovered in the record any compelling evidence which suggests that the exercise of personal jurisdiction over these defendants would be unreasonable.

*5 The court concludes otherwise with respect to defendant Phamatech. The conduct attributed to Phamatech includes the following: 1) Phamatech manufactures allegedly infringing products; 2) Phamatech arranges for the distribution of its product through defendants Peninsula and Ramsey; and 3) Phamatech advertises its product through an Internet website accessible to Delaware residents. As noted previously, however, there had been no actual sales of infringing product in Delaware prior to the filing of the complaint. Neither is there evidence relating Phamatech to Peninsula and Ramsey's marketing efforts directed at Delaware residents. Although plaintiff asserts that "Phamatech intentionally established a chain of distribution that it knew, or reasonably could have foreseen, had a termination

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

point in Delaware" (D.I. 62 at 11), the record does not demonstrate the existence of ongoing commercial relationships with retailers and customers in Delaware.

The facts of record are distinguishable, therefore, from the facts in *Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564 (Fed.Cir.1994)*, cited by plaintiff. In that case, the court concluded that the alleged infringers were placing accused products into the chain of commerce, which included shipping products into the forum for sale to customers through an intermediary. Because the commercial relationship with the intermediary was ongoing and the accused products in fact had been shipped into the forum, the court found the defendant amenable to the exercise of personal jurisdiction: "From these ongoing relationships, it can be presumed that the distribution channel formed by defendants and [the intermediary] was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was [the forum]." *Royal Sovereign, 21 F.3d at 1564*. Instantly, there is no evidence demonstrating that Phamatech directed Peninsula and Ramsey's sales efforts at Delaware residents; there certainly is no evidence of any ongoing commercial relationships between Phamatech, Peninsula/Ramsey, and Delaware residents. The final conduct designated is Phamatech's Internet website. Assuming for purposes of this motion that a website with product information constitutes an "offer to sell," in the absence of evidence that Delaware residents actually accessed this website, the court declines to find that Phamatech transacted business in Delaware, consistent with 10 Del. C. § 3104(c)(1) and (3).[FN8]

> FN8. Plaintiff does not assert general jurisdiction under § 3104(c)(4).

## B. Venue

Generally, in reviewing a motion for transfer of venue, this court gives great deference to a plaintiff's choice of forum and only transfers venue if the defendants truly are regional (as opposed to national) in character. Motions to transfer venue are granted as well if there is a related case which has been filed first or otherwise is the more appropriate vehicle to litigate the issues between the parties. Given the court's conclusion that it cannot exercise personal jurisdiction over defendant Phamatech, the manufacturer of the accused products, transfer of this case to the Southern District of California is

warranted.

## IV. CONCLUSION

**\*6** For the reasons stated, defendants' motions to dismiss are granted in part and denied in part. Defendants' motions to transfer venue are granted.

An appropriate order shall issue.

D.Del.,1999.
American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:99CV00218 (Docket) (Apr. 07, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Telcordia Technologies, Inc. v. Alcatel
S.A.D.Del.,2005.Only the Westlaw citation is
currently available.
United States District Court,D. Delaware.
TELCORDIA TECHNOLOGIES, INC., Plaintiff,
v.
ALCATEL S.A. and Alcatel USA, Inc., Defendants.
**No. Civ.A. 04-874 GMS.**

May 27, 2005.

Steven J. Balick, John G. Day, Ashby & Geddes,
Wilmington, DE, for Plaintiff.
Josy W. Ingersoll, Young, Conaway, Stargatt &
Taylor, Kevin M. Baird, Connolly Bove Lodge &
Hutz, Wilmington, DE, for Defendants.

*MEMORANDUM*
SLEET, J.

### I. INTRODUCTION

*1 On July 16, 2004, the plaintiff, Telcordia
Technologies, Inc. ("Telcordia"), filed this patent
infringement action against Alcatel S.A. ("Alcatel
S.A.") and Alcatel USA, Inc. ("Alcatel USA").
Presently before the court is Alcatel S.A.'s motion to
dismiss for lack of personal jurisdiction. For the
following reasons, the court will grant the motion.

### II. BACKGROUND

Alcatel S.A. is a French corporation with its principal
place of business in Paris, France. Alcatel S.A. is the
parent company of Alcatel USA, a Delaware
corporation with its principal place of business in
Plano, Texas. (D.I. 18 Ex. 2 ¶ ¶ 2-3.) It is a holding
company that does not manufacture, sell, advertise,
offer to sell, trade or import any goods or services in
the United States or anywhere in the world. (*Id.* ¶ ¶
3-5.) It does not maintain any offices or other
facilities in Delaware or the United States. (*Id.* ¶ 7.)
It neither owns nor leases any real property in
Delaware or the United States, but it does own
United States patents. (*Id.* ¶ 8.) Alcatel S.A. does not
maintain any bank accounts in Delaware and has
never contracted to supply services or things in

Delaware or the United States. (*Id.* ¶ ¶ 9-10.)

Telcordia, a Delaware Corporation with its principal
place of business in Piscataway, New Jersey, is the
assignee and owner of the patent-in-suit, U.S. Patent
No. 4,893,306 (the " '306 patent").[FN1] The '306 patent
relates to a method and apparatus for multiplexing
circuit and packet traffic. The patent discloses a data
transmission technique, or Dynamic Time Division
Multiplexing ("DTDM"), that is compatible with the
digital circuit transmission format, as well as the
packet transmission format, thereby providing "a
flexible migration strategy between present circuit
networks and future broadband packet networks."
(U.S. Patent No. 4,893,306 Abstract.) The complaint
alleges that Alcatel S.A. and Alcatel USA have
infringed, induced infringement of, and/or
contributorily infringed one or more claims of the
'306 patent by making, using, offering for sale,
selling and/or importing into the United States
communication network products embodying the
patented invention. (D.I. 1 ¶ ¶ 13-14.)

> FN1. The '306 patent was issued on January
> 9, 1990 and assigned to Bell
> Communications Research, Inc.
> ("Bellcore"), which became Telcordia in
> 1999.

### III. STANDARD OF REVIEW

Alcatel S.A. moves to dismiss the complaint for lack
of personal jurisdiction over the defendant. "Rule
12(b)(2) of the Federal Rules of Civil Procedure
requires a court to dismiss a case when the court
lacks personal jurisdiction over the defendant[ ]." *E.I.
DuPont de Nemours & Co. v. Rhodia Fiber & Resin
Intermediates,* 197 F.R.D. 112, 119 (D.Del.2000). In
determining whether personal jurisdiction exists,
courts engage in a two step analysis. First, the court
must decide whether jurisdiction is authorized by the
long-arm statute of the state in which the court sits.
*Transportes Aeros de Angola v. Ronair, Inc.,* 544
F.Supp. 864-65 (D.Del.1982). If jurisdiction is proper
per the long-arm statute, the court must then
determine whether exercising jurisdiction comports
with the requirements of the Due Process Clause of
the Fourteenth Amendment. *Id.* (noting, however,
"intent of the legislature to exercise jurisdiction over
non-residents whenever feasible"); *Compaq*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

*Computer Corp. v. Packard Bell Elec., Inc.,* 948 F.Supp. 338, 342 (D.Del.1996) (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted). Specifically, Telcordia must show that Alcatel S.A. "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); *see also Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Unless the contacts are continuous and systematic, they must be related to the present cause of action. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414-15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

**\*2** In determining the jurisdictional question, the court must accept as true the allegations in the complaint. *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.,* 542 F.Supp. 53, 55 (D.Del.1982). However, Telcordia, the plaintiff, bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over Alcatel S.A. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F.Supp.2d 268, 270-71 (D.Del.2001). To meet this burden, Telcordia must adduce facts which " 'establish with reasonable particularity' " that jurisdiction over Alcatel S.A. exists. *Id.* (quoting *Joint Stock Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 193 (D.Del.1996)).

### IV. DISCUSSION

#### A. Delaware's Long-Arm Statute

The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, Del.Code Ann. tit. 10 § 3104, warrant the exercise of jurisdiction over Alcatel S.A. Alcatel S.A. contends that the court has no basis to assert jurisdiction, while Telcordia maintains that the conduct of Alcatel S.A. satisfies the requirements of subsections (c)(1) and (c)(3) of the long-arm statute.

Under subsection (c)(1), the court may exercise

jurisdiction over a nonresident or agent of a nonresident who "transacts any business or performs any character of work or service in the State." Del.Code Ann. tit. 10 § 3104(c)(1). Subsection (c)(3) gives the court the authority to exercise jurisdiction over a nonresident or agent of a nonresident who "causes tortious injury in the State by an act or omission in this State." Del.Code Ann. tit. 10 § 3104(c)(3). Delaware courts construe the long-arm statute broadly so as to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state." *Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156-57 (Del.Super.1997). The Delaware Supreme Court has interpreted subsections (c)(1) and (c)(3) as specific jurisdiction provisions that require a "nexus" between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. *See LaNuova D & B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). In order to meet the requirements of subsections (c)(1) and (c)(3), Alcatel S.A.'s actions must be directed at residents of Delaware and the protection of Delaware laws. *Thorn EMI N. Am. Inc. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993).

Telcordia asserts that the court should exercise jurisdiction under § 3104(c)(1) and/or (c)(3) because Alcatel S.A.'s contacts with Delaware are attributable to its subsidiary, Alcatel USA, under the principles of agency.[FN2] The principles of agency allow a court to establish jurisdiction over the parent based upon its jurisdiction over a subsidiary. Under the agency theory, "the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." *C.R. Bard Inc. v. Guidant Corp.,* 997 F.Supp. 556, 559 (D.Del.1998) (citing *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989)). Thus, the agency theory "examines the degree of control which the parent exercises over the subsidiary." *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1463 (D.Del.1991). The factors relevant to the court's examination include: (1) "the extent of overlap of officers and directors"; (2) "methods of financing"; (3) "the division of responsibility for day-to-day management"; and (4) "the process by which each corporation obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant." *Id.* If the court determines that an agency relationship exists, it may attribute certain actions of the subsidiary, Alcatel USA, to the parent corporation, Alcatel S.A., in assessing whether

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Telcordia has satisfied the requirements of the long-arm statute. *See id.* However, the mere existence of an agency relationship is not sufficient to confer jurisdiction. The court must still apply the Delaware long-arm statute. *See id.* at 1455 ("[A] finding of agency does not render the long-arm statute inapplicable, but simply implicates its 'or through an agent' provision.")

> FN2. Delaware law provides two theories that allow a court to exercise jurisdiction over a parent corporation based on its jurisdiction over a subsidiary: the alter ego theory and the agency theory. *Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F.Supp. 1458, 1463 (D.Del.1991).* Under the alter ego theory, the party showing jurisdiction must show fraud or inequity in the use of the corporate form for a court to "pierce the corporate veil," or attribute the actions of a subsidiary to the parent corporation. *Id.; see Mobile Oil Corp. v. Linear Films, Inc., 718 F.Supp. 260, 266 (D.Del.1989).* Telcordia has neither asserted the existence of any fraud in the corporate structure of Alcatel S.A. and Alcatel USA nor introduced evidence that would support a finding of fraud. Accordingly, the court will not address this jurisdictional theory.

**\*3** Telcordia contends that Alcatel S.A. should be subject to jurisdiction under the agency theory because "Alcatel S.A. and Alcatel USA are closely knit together, effectively operating as one." (D.I. 20, at 10.) Telcordia alleges the following to support its contention of an agency theory of jurisdiction: (1) Alcatel S.A. makes it abundantly clear that the United States market is very important to it and raises funds in the United States; (2) it owns patents, *i.e.* property, in the United States; (3) it fails to distinguish among its multinational subsidiaries-that is, it consolidates descriptions of its activities with those of its subsidiaries; (4) it chose to incorporate Alcatel USA in Delaware; (5) its Senior Vice President, Mike Quigley ("Quigley") is the CEO of Alcatel USA; and (6) its website solicits requests for information concerning its products, including allegedly infringing products from Delaware residents. (*Id.* at 3-5, 10.) Telcordia further contends that, "at the very least," Alcatel USA has offered to sell in Delaware products accused of infringing the '306 patent and, therefore, transacts business in the state. In addition, because Alcatel USA committed these acts as Alcatel S.A.'s agent, they are attributable

to Alcatel S.A. (D.I. 20, at 10.)

Before the court can determine whether it should attribute Alcatel USA's alleged acts in Delaware to Alcatel S.A., it must determine whether an agency relationship exists between the two corporations. As previously stated, in order to make this determination, the court must consider the extent of overlap of officers and directors between Alcatel USA and Alcatel S.A., the methods of financing with respect to the two corporations, the division of responsibility for day-to-day management between the two, and the process by which each corporation obtains its business. After having considered these factors, the court concludes that Telcordia has not carried its burden. As to the first factor, Telcordia points to one overlap in officers between the two corporations: Quigley is Senior Executive Vice President of Alcatel S.A. and CEO of Alcatel USA. According to Alcatel S.A., there is a second overlap between the two corporations: its President and COO, Philippe Germond, is a member of the Board of Directors of Alcatel USA. (D.I. 23, at 3; D.I. 22 ¶ 6.) This minor overlap, however, is not dispositive, as "it is entirely appropriate for directors of a parent corporation to serve as directors of a subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods, 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)* (citations omitted) (noting that it is "well established principle ... that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership"). As such, this factor does not weigh in favor of a finding of agency.

**\*4** Likewise, the remaining factors do not weigh in favor of applying the agency theory in the present case. First, Alcatel S.A. is merely a holding company that does not manufacture, sell, or advertise in the United States, or anywhere in the world. (D.I. 18 ¶ ¶ 3-5.) Thus, this is not a case in which Alcatel S.A. manufactures a product and uses an independent distributor to sell its product. *Cf. C.R. Bard, 997 F.Supp. at 561.* In addition, Alcatel USA maintains its own executive team, which is responsible for the day-to-day management of Alcatel USA, and no employee of Alcatel S.A. is a member of the executive team of Alcatel USA. (D.I. 22 ¶ 5.) It also maintains its own financial statements, separate from those kept by Alcatel S.A. (D.I. 22 ¶ 10.) Alcatel USA files a consolidated United States federal income tax return that is separate from tax returns filed by Alcatel S.A. (*Id.* ¶ 12.) Alcatel USA

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

finances its day-to-day activities through funds generated from its business activities, including the manufacture, marketing and distribution of the accused infringing products. (*See id.* ¶ 13.) Accordingly, the court finds that while there is a minor overlap of officers and directors between the parent and subsidiary, Telcordia has not produced sufficient evidence for the court to conclude that the specific combination of agency factors militates in favor of a finding that Alcatel USA was acting as Alcatel S.A.'s agent. Thus, sections (c)(1) and (c)(3) do not warrant the exercise of jurisdiction over Alcatel S.A.[FN3]

> FN3. The court need not address whether jurisdiction in Delaware comports with the requirements of the Due Process Clause because it has no statutory authority under the Delaware long-arm statute to exercise jurisdiction over Alcatel S.A.

### B. Federal Rule of Civil Procedure 4(k)(2)

Telcordia next asserts that, even if the Delaware long-arm statute does not apply in the present case, the court should not grant Alcatel S.A.'s motion to dismiss because it has the authority to exercise personal jurisdiction over Alcatel S.A. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure. Rule 4(k)(2) provides:
If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. P. 4(k)(2). In order to establish jurisdiction pursuant to Rule 4(k)(2), (1) Telcordia's claim must arise under federal law; (2) Alcatel S.A. must lack sufficient contacts with any state to subject it to personal jurisdiction; and (3) Alcatel S.A. must have sufficient contacts with the United States as a whole to satisfy due process. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254, 258-59 (3d Cir.2000). Telcordia contends that all three requirements of Rule 4(k)(2) are satisfied. The court disagrees.

First, the parties do not dispute, nor could they, that Telcordia's claims arise under federal law. The complaint alleges that Alcatel S.A. has infringed, induced infringement of, and/or contributorily

infringed the '306 patent. Patents and the protection of patent rights are the subject of Title 35 of the United States Code. 35 U.S.C. § 271 specifically provides the elements of patent infringement. Additionally, 28 U.S.C. § 1338 gives district courts original jurisdiction over patent actions. A patent infringement action, therefore, is one that arises under federal law. Telcordia has thus satisfied the first requirement of Rule 4(k)(2).

**\*5** Having found that the first requirement of Rule 4(k)(2) is satisfied, the court next must determine whether Alcatel S.A. is not subject to jurisdiction in any state. *See United States v. Offshore Marine Ltd.,* 179 F.R.D. 156, 160 (D.Vi.1998); *Revak v. Locatum A.B.,* No. Civ. A. 03-4822, 2005 WL 1017771, at \*2 (E.D.Pa. Apr.28, 2005). As a preliminary matter, the court must determine whether Telcordia or Alcatel S.A. bears the burden of proving that Alcatel S.A. is not subject to the jurisdiction of any state. In *Offshore Marine Ltd.,* the United States District Court for the District of the Virgin Islands noted that "[t]he question [of] which party bears the burden of proving ... that the defendant is not subject to jurisdiction in any state appears to be an issue of first impression in this Court and in this Circuit, probably because it is generally the plaintiff's duty to allege and prove personal jurisdiction." *Offshore Marine Ltd.,* 179 F.R.D. at 160. Indeed, it appears that the Third Circuit has not yet addressed whether the plaintiff or defendant bears the burden of proving that the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, or what is known as the negation requirement. *See Base Metal Trading Ltd. v. OJSC "Novokuzetsky Aluminum Factory",* 47 Fed. Appx. 73, 75 (3d Cir.2002) (unpublished) (determining that negation issues need not be reached because the Due Process requirement of Rule 4(k)(2) was not satisfied). [FN4] Various district courts of the Third Circuit, however, have addressed the negation requirement and concluded that the plaintiff bears the burden of demonstrating that the defendant is not subject to jurisdiction in any state. *See Offshore Marine Ltd.,* 179 F.R.D. at 160 ("Accordingly to survive a motion to dismiss for want of personal jurisdiction, the plaintiff bears the burden to prove that [the defendant] is not otherwise subject to service of process in any state."); *see also Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.,* 293 F.Supp.2d 423, 430 (D.Del.2003), *vacated on other grounds by* 395 F.3d 1315 (Fed.Cir.2005) (issue abandoned on appeal) ("Plaintiffs must also demonstrate that defendant is 'not subject to the jurisdiction of *any* state' under Rule 4(k)(2). Therefore, Rule 4(k)(2) "provides 'a

Not Reported in F.Supp.2d                                                                                                           Page 5
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

narrow exception which may subject an alien defendant to a federal court's jurisdiction." ') The court agrees with the Third Circuit district courts that have addressed the negation requirement and concludes that Telcordia bears the burden of demonstrating that Alcatel S.A. is not subject to jurisdiction in any state.

> FN4. Likewise, it appears that the Federal Circuit has not had occasion to address the negation issue.

Here, Telcordia addresses the negation requirement only by asserting that, based on the information provided by Alcatel S.A. in its opening brief and the publicly available information regarding Alcatel S.A., an analysis of whether any other state has personal jurisdiction over Alcatel S.A. would not be "significantly different" from the analysis regarding Alcatel S.A.'s personal jurisdiction under the Delaware long-arm statute. (D.I. 20, at 13.) According to Telcordia, if the court cannot exercise jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute then Rule 4(k)(2) applies. (Id.) The court is not persuaded by this argument, however, and concludes that Telcordia's conclusory statement does not support a finding that Alcatel S.A. lacks sufficient contacts with any state to subject it to personal jurisdiction. Thus, Telcordia has not satisfied the second requirement of Rule 4(k)(2).

*6 Even assuming Telcordia was able to show that Alcatel S.A. was not subject to jurisdiction in any other state, it cannot satisfy the third requirement of Rule 4(k)(2) because the record evidence demonstrates that Alcatel S.A. lacks sufficient contacts with the United States as a whole to satisfy due process. The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "ha[s] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of justice and fair play.' ' See International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citations omitted). In order for the court to find that Alcatel S.A. has "minimum contacts" with the United States, Telcordia must demonstrate either specific or general personal jurisdiction. Helicopteros Nacionales de Columbia v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The court can assert specific jurisdiction over a nonresident defendant that has "purposefully directed his activities at residents of the

forum and the litigation results from alleged injuries that 'arise out of or related to' those activities." Burger King, 471 U.S. at 472 (citations omitted). The court can assert general jurisdiction over a defendant when its contacts with the forum, regardless of their relation to the litigation, are "continuous and systematic." Helicopteros Nacionales, 466 U.S. at 416. The court will address the reasons it cannot exercise specific or general jurisdiction over Alcatel S.A. in turn.

When determining whether a defendant's contacts give rise to specific jurisdiction, "[i]t is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum ... thus invoking the benefits and protections of its laws." BP Chems., 229 F.3d at 259 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 475, 100 S.Ct. 559, 62 L.Ed.2d 490). In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 580, 62 L.Ed.2d 490 (1980). Thus, a court usually must determine the character of the defendant's activity in the forum, and whether the plaintiff's claim arises out of or has a substantial connection with that activity. See Burger King, 471 U.S. at 475-76. In the present case, however, the court need not make this determination because Telcordia bases its argument on the specific jurisdiction subsections of the Delaware long-arm statute which, as discussed in Section IV.A., supra, do not warrant the exercise of jurisdiction over Alcatel S.A. because Alcatel USA is not its United States agent.

The court also concludes that Alcatel S.A.'s contacts with the United States that are unrelated to the present litigation are not "continuous and systematic" so as to give rise to general jurisdiction. Telcordia contends that general jurisdiction exists because there is "ample evidence of Alcatel S.A.'s contacts with the United States." (D.I. 20, at 12.) According to Telcordia, this evidence includes the following: (1) Alcatel S.A. is listed on the New York Stock Exchange; (2) Alcatel S.A. owns property in the United States, specifically hundreds of patents; (3) Alcatel S.A.'s website fails to distinguish among its multinational subsidiaries and uses its name in the name of its subsidiaries; (4) Alcatel S.A.'s website describes its worldwide activities, including its activities in the United States, but never discloses that its United States activities are performed by one of its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 6
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

subsidiaries; and (5) Alcatel S.A. incorporated its subsidiary, Alcatel USA in Delaware. The court does not find the evidence sufficient to support Telcordia's assertion.

**\*7** First, as previously discussed, Alcatel S.A. is a French holding company that does not make, sell, export or import any products into the United States. Alcatel S.A. does not maintain any offices in the United States, or lease or own any real property in the United States. It does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. Alcatel S.A.'s employees also all reside outside of the United States.

Moreover, while Alcatel S.A. is listed on the New York Stock Exchange as an American Depository Receipt ("ADR"), this factor alone does not justify the exercise of jurisdiction. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 330 (S.D.N.Y.2003); *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir.2001) ("[T]he Court is not persuaded that Congress intended for the courts to assert jurisdiction under Rule 4(k)(2) whenever a corporation lists its stock on a United States exchange."). Likewise, "[o]wnership of a United States patent, without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state besides the District of Columbia." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,* No. C-95-3577 DLJ, 1996 WL 467293, at \*6 n. 5 (N.D.Cal. July 24, 1996) (citing 35 U.S.C. § 293). Furthermore, incorporating a subsidiary in the United States does not give rise to jurisdiction unless the litigation is related to the act of incorporation and, here, it is not related. *See Applied Biosystems,* 772 F.Supp. at 1468. Additionally, "the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conduct activity in the forum, knowingly interacting with residents of the forum state via its web site." *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 454 (3d Cir.2003). Here, Telcordia has not adduced evidence to support a finding that Alcatel S.A.'s web site was intended to reach customers in Delaware, or any other state in the United States.[FN5]

> FN5. Telcordia asserts that there can be "no question that Alcatel S.A.'s website solicits requests for information concerning its products (including allegedly infringing

products) from Delaware residents, pointing to a "website page concerning the possible purchase of Alcatel products" with Delaware chosen as the potential buyer's state. (D.I. 20, at 5; Ex. 11.) Telcordia misses the point, however, as the record does not support any documented sales to persons in Delaware (or any other state in the United States). Nor does it support any interaction between Alcatel S.A. and Delaware residents, as the web site page, in Telcordia's own words, demonstrates only the *possible* purchase of Alcatel products.

The court also disagrees with Telcordia's assertion that Alcatel's website "never discloses that its U.S. activities are performed by some entity (or entities) other than Alcatel S.A." (D.I. 20, at 4.) First, when one enters the Alcatel website and clicks on "United States" as its country/region the web address changes from "www.alcatel.com" to "www.usa.alcatel.com." Further, when one clicks on the "About Alcatel" dropdown menu and selects "Alcatel in the U.S.A.," he or she is provided with information regarding Alcatel USA, including its business locations. Moreover, the web page states "[i]t is the policy of *Alcatel USA* to satisfy the expectation of our customers." www.usa.alcatel .com/company/ausa_info.jhtml (last visited May 23, 2005) (emphasis added). Thus, the Alcatel web site does distinguish Alcatel S.A. from Alcatel USA. This fact does not support the exercise of jurisdiction over Alcatel S.A. Accordingly, Alcatel S.A.'s alleged contacts with the United States do not provide a basis for the court to conclude that it has a "continuous and systematic" presence in the United States.

**\*8** Nor does the combination of Alcatel S.A.'s alleged contacts with the United States provide the court with a sufficient basis to conclude that the requirements for general jurisdiction are met. *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254 (3d Cir.2000) is instructive on this point. In *BP Chemicals,* the Third Circuit found that a foreign defendant did not have sufficient contacts with the United States as a whole to justify the exercise of Rule 4(k)(2) jurisdiction, even though the defendant exported its products to the United States, held a small ownership interest in a Delaware corporation, and entered into contracts requiring its personnel to travel to the United States for training. *Id.* at 263. The Court of Appeals also found that the cumulative effect of the defendants contacts did not meet the requirements for general jurisdiction. In the present case, Alcatel S.A.'s alleged contacts fall short of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

those alleged by the plaintiff in *BP Chemicals*. As such, the court finds that there is no basis for exercising Rule 4(k)(2) jurisdiction over Alcatel S.A.

### C. Jurisdictional Discovery

Lastly, Telcordia asserts that if the court does not conclude that Alcatel S.A. "is subject to personal jurisdiction under the *Delaware long-arm statute,*" it should p ermit l imited j urisdictional d iscovery r ather than granting Alcatel S.A.'s motion to dismiss. (D.I. 20, at 11) (emphasis added). Telcordia asserts that its claims against Alcatel S.A. are not clearly frivolous, and that discovery is necessary due to the "limited publicly available information" that it has gathered without discovery. (D.I. 20, at 11.) Telcordia further asserts that the case will not be delayed as a result of any discovery on the personal jurisdiction issue.

Conversly, Alcatel S.A. contends that Telcordia's claims against it are clearly frivolous, because Telcordia has not carried its burden of making "a *prima facie* showing that Alcatel S.A. is subject to personal jurisdiction in Delaware." (D.I. 23, at 17.) In addition, Alcatel S.A. contends that it "strains belief that P laintiff ( 1 ) d id n ot k now e ntities i n the Alcatel Family to sue, and (2) that Alcatel S.A. was not one of them." (*Id.* at 17 .) According to Alcatel S.A., Telcordia has had prior business interactions with Alcatel entities regarding the patent-in-suit, as well as other communications technology. (*Id.* at 2.) Alcatel S.A. further contends that Telcordia is "arguably the most knowledgeable company in the telecommunications field with respect to what products are sold by the various players in the market." (*Id.* at 1.) Thus, it "is hard to believe that it [Telcordia] does not k now e xactly w ho the relevant players in the market are." (*Id.*) Lastly, Alcatel S.A. contends that Telcordia is engaging in a fishing expedition, noting that the United States Supreme Court has held that courts should "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." (*Id* at 18-19 (citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern Dist. Iowa*, 482 U.S. 522, 546, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987)). The court is persuaded by Alcatel S.A.'s argument.

**\*9** "Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.' " *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir.2003) (internal citations omitted). Thus, resolution of Telcordia's request "begins with the presumption in favor of allowing discovery to establish personal jurisdiction." *Hansen v. Neumueller GmbH,* 163 F.R.D. 471, 474 (D.Del. Oct.5, 1995). However, "[t]he court must be satisfied that there is some indication that this particular defendant is amenable to suit in this forum." *Id.* at 475. For example, "a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery." *Id.* at 476. Likewise, "a mere unsupported allegation that [a] defendant 'transacts business' in an area is 'clearly frivolous.' " *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir.1997); *see B.L. Poe v. Babcock Int'l,* 662 F.Supp. 4, 7 (M.D.Pa. Mar.14, 1985) ("Since plaintiff h as m et defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction."). Rather, "there must be *some* competent evidence to demonstrate that personal jurisdiction over [a] defendant might exist before allowing discovery to proceed." *Hansen,* 163 F.R.D. at 475. Furthermore, "[w]hen the lack of personal jurisdiction is clear, ... further discovery serves no purpose and should be denied." *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.,* 62 Fed. Appx. 322, 338 (Fed.Cir.2003) (unpublished).

Here, as previously discussed in Section IV.A., *supra,* the record evidence regarding Telcordia's agency theory of specific jurisdiction is insufficient to support the conclusion that Alcatel USA was acting as Alcatel S.A.'s agent. In addition, Telcordia did not assert that the court c ould exercise personal jurisdiction over Alcatel S.A. based on the general jurisdiction subsection of the Delaware long-arm statute. For these reasons, the court believes it is clear that it may not exercise personal jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute. Thus, further discovery would not be worthwhile. In other words, granting Telcordia's request for jurisdictional discovery would amount to allowing it to conduct a fishing expedition in order to form a basis for jurisdiction. The court, therefore, will deny Telcordia's request for jurisdictional discovery.

*ORDER*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:
1. Alcatel S.A.'s Motion to Dismiss for Lack of Personal Jurisdiction (D.I.17) is GRANTED.
2. Telcordia's request for jurisdictional discovery is DENIED.


D.Del.,2005.
Telcordia Technologies, Inc. v. Alcatel S.A.
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1182445 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s Second Notice of 30(b)(6) Deposition (Mar. 30, 2006) Original Image of this Document (PDF)
• 2006 WL 1182446 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s Third Notice of 30(b)(6) Deposition (Mar. 30, 2006) Original Image of this Document (PDF)
• 2006 WL 1182444 (Trial Pleading) Telcordia's Answering Claim Construction Brief Addressing Telcordia's '633 Patent and Alcatel's '052 Patent (Mar. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 1204461 (Trial Pleading) Alcatel's Answering Claim Construction Brief for U.S. Patent No. 6,247,052 (Mar. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 1182443 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s First Notice of 30(b)(6) Deposition (Mar. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 1182441 (Trial Pleading) Alcatel's Opening Claim Construction Brief for U.S. Patent Nos. 6,247,052 and Re. 36.633 (Mar. 3, 2006) Original Image of this Document (PDF)
• 2006 WL 1182442 (Trial Pleading) Telcordia's Opening Claim Construction Brief (Mar. 3, 2006) Original Image of this Document (PDF)
• 2005 WL 3666806 (Trial Motion, Memorandum and Affidavit) Telcordia's Reply Brief in Support of its Motion to Dismiss Or, in the Alternative, to Sever and Stay Alcatel Usa, Inc.'s Patent Infringement Counterclaim (Nov. 1, 2005) Original Image of this Document (PDF)
• 2005 WL 2867944 (Trial Pleading) Telcordia's Reply to Alcatel USA, Inc.'s Amended Counterclaims and Demand for Jury Trial (Sep. 29,
2005) Original Image of this Document (PDF)
• 2005 WL 2867947 (Trial Motion, Memorandum and Affidavit) Telcordia's Motion to Dismiss, or in the Alternative, to Sever and Stay Alcatel USA, Inc.'s Patent Infringement Counterclaim (Sep. 29, 2005) Original Image of this Document (PDF)
• 2005 WL 2385505 (Trial Pleading) Alcatel Usa's Answer and Counterclaims to Plaintiff's First Amended Complaint and Demand for Jury Trial (Aug. 10, 2005) Original Image of this Document (PDF)
• 1:04cv00874 (Docket) (Jul. 16, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Patrick A. Costello, hereby certify that on October 16, 2006, I caused a copy of the

foregoing *Reply Brief of Defendant Nutri-Health Supplements, LLC In Support Of Its Motion To*

*Dismiss, Or Alternatively, To Transfer Venue* along with the accompanying *Exhibits (1 and 2),*

*Declaration of Thomas A. Connelly* and *Unreported Decisions* to be served on the following

counsel of record and in the manner indicated:

### VIA ELECTRONIC FILING

Steven J. Balick, Esq.
John G. Day, Esq.
Tiffany Geyer Lydon, Esq.
Ashby & Geddes
222 Delaware Ave., 17th Floor
P.O. Box 1150
Wilmington, DE 19899


John W. Shaw, Esq.
Young, Conaway, Stargatt & Taylor LLP
1000 West Street, 17th Floor
Wilmington, DE 19801


*/s/ Patrick A. Costello*
Patrick A. Costello (DE Bar No. 4535)