IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BLOCK DRUG COMPANY, INC.,⁣ )
)
    Plaintiff,    )
)
    v.     )    C.A. No. 06-350-***(MPT)
)
SEDONA LABORATORIES, INC., and )
NUTRI-HEALTH SUPPLEMENTS, LLC )
d/b/a SEDONA LABORATORIES, )
)
    Defendants.    )
)

## OPENING BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION TO AMEND ITS FIRST AMENDED COMPLAINT

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

Steven D. Glazer
David Greenbaum
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
212-310-8000

Dated: February 28, 2007

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................1

II.   ARGUMENT ....................................................................................2

      A.  Courts Routinely Recognize And Impose Personal Liability On
          Corporate Officers For Acts Of Patent Infringement ...............................2

      B.  None of the Defendants Will Be Prejudiced If Block Drug Is
          Allowed to Proceed Against The Individual Defendants For
          Personal Liability ......................................................................5

      C.  Block Drug Should Be Allowed To Proceed Against Messrs.
          Alan Lemisch, Kwan Sung Jin, Fred Auzenne and
          Ms. Tracy King Personally Because NHS And SLI May
          Not Have Sufficient Assets To Satisfy A Judgment ........................6

III.  CONCLUSION...................................................................7

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page (s)**

*Bechtel v. Robinson,*
    *886 F.2d (3d Cir. 1989)* ................................................................ 5

*Dole v. Arco Chemical Co.,*
    *921 F.2d 484 (3d Cir. 1990)* ........................................................ 8

*Foman v. Davis,*
    371 U.S. 178, 182 (1962) ............................................................. 9

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,*
    806 F.2d 1565 (Fed. Cir. 1986) .................................................. 2

*Symbol Technologies, Inc. v. Metrologic Instruments, Inc.,*
    771 F.Supp. 1390, 1401-04 (D.N.J. 1991) ............................... 2

**STATUTES**

35 U.S.C. § 271 ............................................................................... 2

35 U.S.C. § 271(a) ......................................................................... 2

35 U.S.C. § 271(b) ......................................................................... 2

35 U.S.C. § 271(c) ......................................................................... 2

Plaintiff Block Drug Company, Inc. ("Block Drug") respectfully submits this memorandum of law in support of its Motion to Amend its First Amended Complaint.

## I.

## INTRODUCTION

Pursuant to Federal Circuit precedent that clearly establishes that officers of corporations can be found personally liable for patent infringement under 35 U.S.C. §271, Block Drug seeks to amend its First Amended Complaint to add claims of patent infringement against Mr. Fred Auzenne, Chief Executive Officer of defendant, Nutri-Health Supplements, LLC, d/b/a Sedona Laboratories ("NHS"); Ms. Tracy King, President of NHS; Mr. Alan Lemisch, President of defendant, Sedona Laboratories, Inc. ("SLI"); and Mr. Kwan Sung Jin, officer of SLI.

Based on evidence recently provided in discovery by both SLI and NHS in response to Block Drug's first sets of interrogatories and document requests, Block Drug now has a sufficient basis under Fed. R. Civ. P. 11 to amend its First Amended Complaint to pursue claims against Messrs. Alan Lemisch, Kwan Sung Jin, Fred Auzenne and Ms. Tracy King for patent infringement.  Significantly, there is no prejudice to these individuals by adding them as defendants at this time.  Pursuant to the November 1, 2006, Scheduling Order, Block Drug has timely filed its Motion to Amend its First Amended Complaint, fact discovery in this case is open until November 16, 2007, and written discovery has only recently begun.  And, insofar as the proposed patent infringement claims against Messrs. Alan Lemisch, Kwan Sung Jin, Fred Auzenne and Ms. Tracy King mirror the claims that are already pending against NHS and SLI – and neither raise new issues of law, nor introduce new issues of fact not already known to NHS and SLI – there is no prejudice to any of the defendants.

## II.

## ARGUMENT

**A.    Courts Routinely Recognize And Impose Personal Liability On Corporate Officers For Acts Of Patent Infringement**

Federal Circuit precedent clearly establishes that officers of corporations can be found personally liable for patent infringement under 35 U.S.C. §271. See, e.g., Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1579 (Fed. Cir. 1986) ("The cases are legion in which courts have recognized and imposed personal liability on corporate officers for participating in, inducing, and approving acts of patent infringement."); Symbol Technologies, Inc. v. Metrologic Instruments, Inc., 771 F.Supp. 1390, 1401-04 (D.N.J. 1991). For example, with respect to direct patent infringement, the Patent Act reads in relevant part, "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." 35 U.S.C. §271(a). This language is interpreted by the courts to allow findings of infringement against corporate officers as well as individuals and corporations. Symbol Technologies, 771 F. Supp. at 1402 ("Even with respect to officers of corporations, it is hornbook law that there is no need to pierce the corporate veil in order to find personal liability."). The same is true for inducing infringement under 35 U.S.C. §271(b) and contributory infringement under 35 U.S.C. §271(c).

Block Drug's First Amended Complaint alleges direct infringement, inducement, and contributory infringement under 35 U.S.C. §271(a)-(c), and Block Drug's Second Amended Complaint seeks to add these same claims against Messrs. Alan Lemisch, Kwan Sung Jin, Fred Auzenne and Ms. Tracy King personally. In general, the stated rationale in Orthokinetics and Symbol Technologies for imposing such personal liability is that patent infringement is a tort. Orthokinetics, 806 F.2d at 1579; Symbol Technologies, 771 F. Supp. at 1402. And officers of

corporations are "personally liable for tortious conduct of the corporation if they personally took part in the commission of the tort or specifically directed other officers, agents, or employees of the corporation to commit the tortious act." Orthokinetics, 806 F.2d at 1579; see also 3A W. Fletcher, Cyclopedia of the Law of Private Corporations, § 1135 at 267 (1986 & Supp. 1990) (cases cited).

The courts in both Orthokinetics and Symbol Technologies found that the presidents and certain corporate officers of the defendant corporations were personally liable for patent infringement. The significant facts upon which the courts relied included evidence that the defendant presidents and corporate officers were (1) the sole owners who most directly benefited from any financial success associated with the sale of the infringing products, and (2) personally responsible for the manufacture and production of the infringing products, and solicited potential customers. Orthokinetics, 806 F.2d at 1579; Symbol Technologies, 771 F. Supp. at 1402-04.

Based on evidence recently provided in discovery by both SLI and NHS in response to Block Drug's first sets of interrogatories and document requests, Block Drug now has a sufficient basis under Fed. R. Civ. P. 11 to amend its First Amended Complaint to pursue claims against Messrs. Alan Lemisch, Kwan Sung Jin, Fred Auzenne and Ms. Tracy King for patent infringement under 35 U.S.C. §271(a)-(c), consistent with the application of law and the facts of Orthokinetics and Symbol Technologies.

This newly discovered evidence includes documents produced by NHS that show that Mr. Auzenne and Ms. King were personally responsible for the manufacture and production of the infringing products, and solicited potential customers. See Exhibit 1, NHS-0000085, NHS-0000126, NHS-0000163-67.

3

This new evidence also includes documents produced by SLI that show that Mr. Lemisch and Mr. Jin were the sole owners who most directly benefited from any financial success associated with the sale of the infringing products. According to the Business Assets Purchase Agreement, Mr. Lemisch and Mr. Jin were the sole shareholders of SLI. See Exhibit 2, SDI00010-35. Various communications and documents produced by Defendants also show that Mr. Lemisch and Mr. Jin were personally responsible for and involved in the manufacture and production of the infringing products. See Exhibit 2, SDI00036; see also Exhibit 3 [SLI's Supplemental Privilege Log], Items 1, 4 and 6-9; Exhibit 4 [SLI's Initial Disclosures], pp. 1-2; Exhibit 1, NHS-000066-70.

Furthermore, SLI's Responses to Block Drug's First Set of Interrogatories show that Mr. Jin and SLI were aware of the patents on Beano® when they developed their product. First, in response to Block Drug's Interrogatory No. 6, SLI stated:

> SLI also received general information regarding Block Drug's patent for its Beano product from National Enzyme, Inc. That information was the form of an e-mail which will be produced in response to the request for production of documents Block Drug propounded to SLI.

Exhibit 5, p. 13; see also Exhibit 2, SDI00036. Second, in response to Block Drug's Interrogatory No. 7, SLI stated:

> Kwan Jin of SLI was contacted by Renee Norton of National Enzyme who was already a supplier of raw materials used in other SLI products. He asked if they could formulate a product that would serve the same function as Beano but not infringe on any of its rights including patent rights.

Exhibit 5, p. 14.

Clearly, this preliminary evidence is analogous to the relevant facts upon which the Orthokinetics and Symbol Technologies courts relied to find the presidents of the defendant corporations personally liable for patent infringement.

4

**B.     None of the Defendants Will Be Prejudiced If Block Drug Is Allowed to Proceed Against the Individual Defendants For Personal Liability**

Fed. R. Civ. P. 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." And the Third Circuit has "shown a strong liberality" in allowing amendments under Rule 15(a). See Bechtel v. Robinson, 886 F.2d 644, 652 (3d Cir. 1989). "This approach ensures that a particular claim will be decided on the merits rather than on technicalities." Dole v. Arco Chemical Co., 921 F.2d 484, 487 (3d Cir. 1990). Additionally, the Supreme Court has stated that:

> In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be 'freely given.'

Foman v. Davis, 371 U.S. 178, 182 (1962). Furthermore, the Third Circuit has interpreted the factors listed in Foman to emphasize that "prejudice to the non-moving party is the touchstone for the denial of [an] amendment." Bechtel, 886 F.2d at 652. And "the non-moving party must do more than merely claim prejudice; it must show that it [would be] unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have [otherwise] offered." Id.

This case is still in the very early stages of discovery. Written discovery has just recently begun, and the defendants will be unable to identify any undue prejudice or delay, bad faith or dilatory motive on the part of Block Drug. Additionally, insofar as the proposed patent infringement claims against Messrs. Alan Lemisch, Kwan Sung Jin, Fred Auzenne and Ms. Tracy King mirror the claims that are already pending against NHS and SLI – and neither raise new issues of law, nor introduce new issues of fact not already known to NHS and SLI – there is no prejudice to any of the defendants. Moreover, if the individual defendants are added to the

5

case at this time, they will certainly have a full and fair opportunity to respond to the patent infringement claims against them. Furthermore, to the extent that Messrs. Alan Lemisch, Kwan Sung Jin, Fred Auzenne and Ms. Tracy King have already been managing this litigation on behalf of NHS and SLI, including being involved in the discovery to date, there surely would not be any prejudice if each proposed individual defendant were now expressly added to the Second Amended Complaint. For example, Mr. Auzenne has previously provided declarations in support of NHS's Motion to Dismiss filed in Delaware. See Exhibit 6. Ms. King has been involved in acquiring an opinion of counsel after the commencement of the litigation. Exhibit 3, [SLI's Supplemental Privilege Log], Item 11. And Mr. Jin provided the verification for SLI's Responses to First Set of Interrogatories. Exhibit 5, p. 17.

## C. Block Drug Should Be Allowed to Proceed Against Messrs. Alan Lemisch, Kwan Sung Jin, Fred Auzenne and Ms. Tracy King Personally Because NHS and SLI May Not Have Sufficient Assets To Satisfy A Judgment

Block Drug intends to have its damages experts evaluate SLI's and NHS's financial status and the expected damages awards, but, based on the limited evidence received to date, it appears that SLI and NHS may have insufficient retained capital to satisfy any significant future judgment. Accordingly, Block Drug wishes to proceed against Messrs. Alan Lemisch, Kwan Sung Jin, Fred Auzenne and Ms. Tracy King personally to ensure that it can collect any future damage award, in addition to permanently enjoining the infringing conduct.

## III.

## CONCLUSION

For the above reasons, Block Drug respectfully requests a ruling that it may amend its First Amended Complaint to add a claim of patent infringement against Messrs. Alan Lemisch, Kwan Sung Jin, Fred Auzenne and Ms. Tracy King.

ASHBY & GEDDES

*/s/ Steven J. Balick*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*

Of Counsel:

Steven D. Glazer
David Greenbaum
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
212-310-8000

Dated:  February 28, 2007

# EXHIBIT 1

## Susan, Sedona Labs

| | |
|---|---|
| **From:** | <JAngus1967@aol.com> |
| **To:** | <APEXAWD@aol.com>; <alan@sedonalabs.com>; <operations@sedonalabs.com>; <susan@sedonalabs.com>; <linda@sedonalabs.com> |
| **Sent:** | Tuesday, May 10, 2005 9:25 AM |
| **Subject:** | Pvt Label Food Enzyme Update |

In the past two weeks we have had the following activity:

* Sent samples to Wodika - Devine Broker for KMart presentation.
* Brokers samples sent for presentation to Long's Drug Stores in California.
* Order anticipated for Raley's (140 stores in California). Item approved.
* Art work and samples and Certificate of Insurance sent to Save Mart ( 120 California stores). Item has been approved. Save Mart to use same Pvt Label (Today's Health) as Raley's. "SELECT"
* Samples and USA Drug labels sent to buyer for final approval. Over 500 stores in Midwest.
* Meijer second order will not come in until June. Initial order we shipped has not been placed at store level - plan -o-gram for stores was backdated to May.
* Lactozyme pricing finalized with Will Nest. Will be requesting samples be sent out to selected broker and accounts in May and June.
* Brooks Pharmacy (750 stores) parent company of Eckerd has requested labels and samples. They are now reviewing their Pvt Label category. We should get in. Susan Hook working on labels, etc..

Please make sure Will, Kwan and Alan are copied on this.

Thanks,

Jim Angus

---

No virus found in this incoming message.
Checked by AVG Anti-Virus.
Version: 7.0.308 / Virus Database: 266.11.7 - Release Date: 5/9/2005

9/8/04
Kevan

For
Will

# National Sales Manager
# Marketing Plan
## 9/1/04 to 3/31/05 – 7 Months (Sell In)
## 1/1/05 to 12/31/05 – Sales Objectives

## MASS ACCOUNTS (Private Label Only)
*Food Enzyme (Beano)
*LactoZyme (Lactaid)

**Current Accounts:** Eckerd

**Accounts Presented To Date:** CVS 03/04
Winn-Dixie 08/04

**23 Accounts To Be Presented now through March 05 with Daymon Worldwide (Pvt. Label Broker):**

| | |
|---|---|
| American Sales (Ahold USA) | Ralph's / Food 4 Less |
| Fred Meyer (Kroger Division) | Rite Aid |
| Fry's (Kroger Division) | Shaws |
| Giant Eagle | Shopko |
| Harris Teeter | Spartan |
| HEB | Stater Brothers |
| Hy Vee | Supervalu |
| Kmart | Topco |
| Kroger Co. | Wegmans |
| Marsh Supermarkets | Weis Markets |
| Meijer | Pathmark |
| Raley's | |

**10 Accounts Direct now through March 05:**

Albertsons
Walgreens
Wal-Mart
Safeway
Publix
Long's Drug
Brooks
Fleming
CDMA
Target

NHS-000067

**Broker:  Daymon Worldwide**

**Shows/Associations:  PLMA (private Label Manufacturing Association)**
**Cost:  $1,000 Yearly Membership / $2,000 10x10 Booth**

**2005 Mass Retailer Sales Objectives:**

- **By 3/31/05 - 8 to 16 of 36 listed/targeted Accounts carrying a minimum of one item.**
- **By 3/31/05 – 20,000 stores carrying a minimum of one item**
- **$75.00 per store in sales minimum over a 12-month period**
- **$1,500,000 over a 12 month period – 4/1/05 to 3/31/06**
- **$1,125,000 over a 12 month period – 1/1/05 to 12/31/05**

# NATURAL PRODUCT DISTRIBUTORS

**Current Distributors:  7**

Tree of Life SE
Tree of Life MW
Tree of Life NE
Select Nutrition (East / West)
All Natural Distributors
Super Natural Distributors
Nature's Best

**Targeted Minimum New Distributors by 3/31/04:  7 = 14 Total**

Tree of Life SW
Tree of Life NW
UNFI East
Rainbow (UNFI Central)
Mountain Peoples Warehouse (UNFI West)
Palko Distributors
Independence Distributors

**NP Distributors Sales Objectives:**

|         | YTD thru August | Total Year        |
|---------|-----------------|-------------------|
| 2003    | $40,189         | $71,818           |
| 2004    | $64,042         | $120,000 Forecast |
| $ +/-   | + $33,853       | +$48,182  Forecast |
| %chg    | + 59.4%         | + 67.1%  Forecast |

**NP Distributors Advertising Year Contract Costs 2004:**

NHS-000068

- Five Distributors @ $1,800 (3 Ads / 1 Catalog)  Total  $9,000
- One Distributor @ $3,600 (3 Ads @ $1,200 ea)  Total   3,600
- One Distributor @ $800 (4 Ads @ $200 ea)      Total     800

                             Total 2004            $13,400
                             % of Sales Objective     11.2%

**2005 NP Distributors Sales Objectives:**

- **Minimum of 14 Distributors**
- **2005 Sales Objective = $250,000 / = 108% vs. 2004**
- **Advertising spend vs. sales = $25,000 / -10% of sales**

## NATURAL PRODUCT CHAIN ACCOUNTS

**21 Chain Accounts / None are currently sold:**

| | |
|---|---|
| Akin's Natural Food Markets | GNC Corporate |
| AZ Health Foods | Hi Health |
| Basha's Natural Choice | Henry's |
| Bread & Circus | Mollie Stone Markets |
| Boney's | PCC Natural Markets |
| Bristol Farms | Sprouts Farmers Markets |
| Chamberlin's (Akin's) | Seattle Super Supplements |
| Discount Sport Nutrition | Trader Joe's |
| Earth Fare | Wildoats Markets |
| Freshfields | Whole Foods Markets |
| Gelson's | |

**2005 NP Chain Accounts Sales Objective:**

- **Distribution in a minimum of 10 of 21 Accounts by 3/31/04**
- **150 stores @ $1,500 per year sales**
- **2005 Sales Objective = $225,000**
- **Advertising spend vs. sales = $22,500 / -10% of sales**

## 2005 TOTAL RESPONSIBILITY SALES OBJECTIVES

| | | |
|---|---|---|
| Mass Retailers (Pvt.Label) | | $1,125,000 |
| NP Distributors | | 250,000 |
| NP Chain Accounts | | 225,000 |
| | Total | $1,600,000 |

NHS-000069

<u>Main Identity (OPSMNGR)</u>

| | |
|---|---|
| From: | <JAngus1967@aol.com> |
| To: | <APEXAWD@aol.com>; <operations@sedonalabs.com> |
| Sent: | Wednesday, April 20, 2005 8:33 AM |
| Subject: | Private Label |

Hi Alan, Kwan, Will -
Update on Sedona Labs Private Label.

**Food Enzyme**
**The following presentations have been made to where we are awaiting possible orders:**

**1.Brooks (580 stores) - Answer in May**
**2.Rite Aid (4,500) - Answer in June**
**3.Winn Dixie (1,500) - Still developing PL section to carry - we will go in when they establish the section - hoping for back half of 2005.**
**4.Pathmark (200) - Answer in May**
**5.Raley's (160)  - Waiting for opening order / within next two weeks.**
**6.Super D Drugs (500) - Susan developing label - they will purchase - first order expected 4 to 6 weeks after they approve label.**
**7.Family Brands (Wholesaler) - Answer in June**

**The following is were samples have been sent to the respective Broker and appointments to present will be made over the next 60 days:**

**KMart - (2000)**
**Walgreens - (4,500)**
**Osco/Albertsons - (3,500)**
**Topco - Buying PL group supplies + 5,000 stores**
**Weis Markets (200)**
**Hy-Vee (250)**
**Shaw's (200)**

**There will be more accounts to follow with presentations.**

**On the LactoZyme I have discussed pricing with Will Nest and he agrees we could offer PL pricing of $4.25 to $5.00 for a 60ct bottle.  I am preparing a forecast on possible sales over a 12 month period to help in establish product availability, etc.**

**Regards,**

**Jim Angus**

4/20/2005

**Tracy King**

| | |
|---|---|
| **From:** | JAngus1967@aol.com |
| **Sent:** | Monday, February 13, 2006 9:38 AM |
| **To:** | tracy@sedonalabs.com |
| **Subject:** | CVS FORECAST |

HI TRACY AND FRED -

FOR THE PURPOSE OF EVALUATING THE COST ANALYSIS TO DO A CARDED PRODUCT FOR CVS ON OUR <u>FOOD ENZYME</u>.  BELOW IS MY BEST GUESS IN FORECASTED SALES (MINIMUM) OVER A 12 MONTH PERIOD. YOU CAN SEE IT IS HUGE. I FEEL 3 SALES PER STORE PER MONTH IS A CONSERVATIVE #.

| | |
|---|---|
| #STORES: | 5,000 |
| SALES PER MONTH PER STORE: | 3 |
| SALES PER MONTH /  CHAIN | 15,000 |
| SALES PER YEAR / CHAIN | 180,000 |
| CVS COST: | $3.00 |
| TOTAL SALES / CHAIN | $540,000 |

LET ME KNOW WHAT YOU THINK.  IT WOULD BE GREAT TO RE START THE CVS ENGINE.

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.375 / Virus Database: 267.15.6/258 - Release Date: 2/13/2006

6/22/2006

NHS-000085

**Tracy King**

**From:** JAngus1967@aol.com
**Sent:** Monday, March 20, 2006 9:08 PM
**To:** tracy@sedonalabs.com
**Subject:** Re: Topco    *Eckerd*

Hi Tracy -
All is well with Eckerd. The buyer called me on it -- I never saw a letter - is there
one? Sorry I did not notify you and Fred about by discussion with the buyer -- next
time you will contacted ASAP. It all started with the was rep from Beano stating to
the buyer at Brooks that why were they are carrying a private label?? - and that
they had forced the previous private label to discontinue. I discussed this the
buyer and he was ok with it too. He knows we have the same ingredient as Beano
but also 2 additional enzymes which make us a better product as well as a
**different product**. This is why they cannot come to us with a lawyers, etc. This
has already been looked into by Sedona Labs lawyers when we started with our
Beano private
label. The buyer is ok with it he just wanted me to be aware of the reps
comments. If there is a letter this is the first time I am hearing this???
I will call you tomorrow.
Again my apologies for not communicating this directly to you.
On another note I am in contact with Topco and they are going to buy us. More
later.

Regards, Jim Angus

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.385 / Virus Database: 268.2.6/287 - Release Date: 3/21/2006

NHS-000126

**Tracy King**

| | |
|---|---|
| **From:** | JAngus1967@aol.com |
| **Sent:** | Wednesday, March 22, 2006 8:58 PM |
| **To:** | tracy@sedonalabs.com |
| **Subject:** | Fwd: TH Food Enzyme Save Mart |
| **Attachments:** | TH Food Enzyme Save Mart (1.71 KB) |

Hi Tracy -
This is good news. Save Mart +100 store chain out of Modesto, CA will be adding
our Food Enzyme to their product assortment.
Price: $3.00
Forecast 12 months = $18,000 / 6,000 units

More later,

Jim Angus

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.385 / Virus Database: 268.3.0/290 - Release Date: 3/23/2006

6/22/2006

**Tracy King**

| | |
|---|---|
| **From:** | JAngus1967@aol.com |
| **Sent:** | Wednesday, March 22, 2006 8:58 PM |
| **To:** | tracy@sedonalabs.com |
| **Subject:** | Fwd: TH Food Enzyme Save Mart |
| **Attachments:** | TH Food Enzyme Save Mart (1.71 KB) |

Hi Tracy -
This is good news.  Save Mart +100 store chain out of Modesto, CA will be adding
our Food Enzyme to their product assortment.
Price:  $3.00
Forecast 12 months = $18,000 / 6,000 units

More later,

Jim Angus

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.385 / Virus Database: 268.3.0/290 - Release Date: 3/23/2006

6/22/2006

NHS-000164

**Tracy King**

| | |
|---|---|
| **From:** | JAngus1967@aol.com |
| **Sent:** | Monday, May 22, 2006 6:54 AM |
| **To:** | DHAWK209@aol.com |
| **Cc:** | linda@sedonalabs.com; tracy@sedonalabs.com |
| **Subject:** | Initial Order from Save Mart |

Hi Dennis -
What is the status on the initial order from Save Mart on our private label food
enzyme? You were looking at a May order.

Thanks,

Jim Angus
Sedona Labs

NHS-000165

**Tracy King**

| | |
|---|---|
| **From:** | JAngus1967@aol.com |
| **Sent:** | Wednesday, March 22, 2006 8:56 AM |
| **To:** | tracy@sedonalabs.com |
| **Subject:** | Topco Forecast |

Hi Tracy -
Below is my best mid (conservative)forecast for Topco. It is based on the first 12
months with distribution. Topco supplies a number of US Mass Market Retailers.
The actual store count is 7,805. I am using 1.5 units per store per month and a %
of the stores coming on board every 3 month period to calculate this forecast.

First 3 months (250 stores plus 2 x for warehouse distribution)
Second 3 months (250 + 500 stores = 750)
Third 3 months (750 + 1,000 stores = 1,750)
Fourth 3 months (1,750 + 1,000 stores = 2,750)

| Period | Units | $$ |
|---|---|---|
| Mo's 1-3 | 2,250 | 6,750 |
| Mo's 4-6 | 3,375 | 10,125 |
| Mo's 7-9 | 7,875 | 23,625 |
| Mo's 10-12 | 12,375 | 37,125 |
| | | |
| Total | 25,875 | $77,625 |

After year one I believe we can see a steady increase from this account representing
equal to 30% in year 2 and 20% in year 3.

Tracy, again these are conservative estimates based on Topco retailer participation
with distribution and sales.

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.385 / Virus Database: 268.3.0/290 - Release Date: 3/23/2006

6/22/2006

**Tracy King**

**From:** JAngus1967@aol.com
**Sent:** Thursday, March 16, 2006 8:08 AM
**To:** tracy@sedonalabs.com
**Subject:** Topco

Hi Tracy -
It looks real good for us going into Topco on our private Label Food Enzyme. Topco is the largest private label company distributor in the US - they supply over 15,000 stores with their Topco label. In a short time we should get their art work for the label, etc. Well keep you posted.
Brooks is going to proceed and buy our Food Enzyme for the Brooks stores. I talked with the buyer and they have delayed their plan o gram in this section to June. More at that time.

All the best,

Jim Angus

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.385 / Virus Database: 268.2.5/284 - Release Date: 3/17/2006

6/22/2006

# EXHIBIT 2

06/08/2006  09:35   6029236290              WCI BROKERS                        PAGE  02/27

# BUSINESS ASSETS PURCHASE AGREEMENT

**OFFER TO PURCHASE**: FRED AUZENNE or his nominee, (hereinafter referred to as BUYER), hereby offers to purchase from SEDONA LABORATORIES, INC., an Arizona corporation ("Sedona Labs"); SEDONA LEASING, LLC, an Arizona limited liability company ("Sedona Leasing"); SOUTHWEST HEALTH FOOD SUPPLEMENTS, LLC, Arizona limited liability company ("Southwest Health", together with Sedona Labs and Sedona Leasing, each a "Seller", collectively "Sellers") and Alan Lemisch and Kwan Jin, being all of the shareholders of Sedona Labs and all of the members of Sedona Leasing and Southwest Health. (the "Sellers"), (hereinafter referred to as SELLER), certain assets of the businesses known as SEDONA LABORATORIES, SEDONA LEASING, SOUTHWEST HEALTH FOOD and dba NUTRI-HEALTH, located at 218 Justin Drive, Cottonwood, Arizona 86326, (hereinafter referred to as the ASSETS), under the following terms and conditions and the terms and conditions of the attached "Commercial Real Estate Purchase Agreement".

**PURCHASE PRICE**:  The total purchase price offered is the sum of eight million dollars ($8,000,000.00) plus certain inventory, pre-paid items and the new Encapsulator payable as follows:

$  100,000.00   by an earnest money deposit received herewith in the form of a personal check payable to Westland Title Agency of Arizona.

$7,100,000.00   by a cashier's check or wire transfer payable on or before Closing to Westland Title Agency of Arizona.

$  800,000.00   by a Promissory Note made in favor of Seller, payable in twelve (12) equal consecutive monthly payments of sixty nine thousand two hundred twenty-one dollars and forty cents ($69,221.40), or more, including interest at seven percent (7%) per annum on the unpaid balance until paid in full. Any payment made late by Maker shall result in

1

Page Read

SDI00010

06/08/2006  09:35    6029236200    WCI BROKERS    PAGE  03/27

a fifty dollar ($50.00) per day late fee being due and payable to the Note Holder in addition to each such late payment. The first payment shall be due and payable sixty (60) days from the close of sale.

**DEED OF TRUST TO SECURE SELLER'S PROMISSORY NOTE:** At the close of this sale Buyer and Seller shall enter into and execute a Deed of Trust granting Seller a lien against all Real Estate included in this sale, as described in the "Purchase Price Allocation" and in the Real Estate Purchase Agreement, until the Promissory Note owed to Seller hereunder has been paid in full.

**PRE-PAID MAILING EXPENSES:** Buyer shall purchase from Seller all pre-paid postage on hand and all pre-paid direct mail costs related to pending mailings not yet mailed as of closing.

**INVENTORY OF GOODS PURCHASE:** It is agreed that the on-hand inventory of marketable goods at Seller's cost at closing shall be approximately four hundred thousand dollars ($400,000.00). Buyer and Seller shall meet and take a physical, itemized inventory prior to the closing. Seller may sell and restock inventory items in the normal course of business. Buyer shall purchase additionally all inventory exceeding two hundred thousand dollars ($200,000.00) at closing in addition to the two hundred thousand dollars ($200,000.00) of inventory listed in the "Purchase Price Allocation".

**CLOSING DATE:** The closing of this transaction shall occur on or before November 30th, 2005, unless otherwise extended by mutual written Agreement of Buyer and Seller.


Page Read

2

**PURCHASE PRICE ALLOCATION:**  The total purchase price subject to any adjustments hereinafter provided for shall be allocated to the various assets purchased as follows:

| | |
|---|---|
| EQUIPMENT & FIXTURES | $  750,000.00 |
| INVENTORY | $  200,000.00 |
| COVENANTS NOT TO COMPETE | $  150,000.00 |
| GOODWILL | $1,900,000.00 |
| PRODUCT NAMES/FORMULAS | $1,400,000.00 |
| CUSTOMER BASE/MAILING LISTS | $1,440,000.00 |
| REAL ESTATE | $2,000,000.00 |

**ALL LISTED ASSET PRICE:**        **$8,000,000.00**

**CONTINGENCY REGARDING BOOKS AND RECORDS EXAMINATION:** Buyer's obligation to complete this purchase is contingent upon Buyer's satisfaction with an examination of Seller's Books and Records. Upon acceptance of this offer Buyer and Buyer's agents shall be given access to all such business records for examination at Seller's offices. Buyer shall provide Seller with a written list of all items Buyer wishes to examine within five (5) days following Seller's signed acceptance of this offer. Buyer shall have thirty (30) days after receiving access to all records to complete such examination. If Buyer is not satisfied with results of the examination Buyer may cancel this Agreement by giving notice, in writing, to Seller and the escrow company on or before 6:00 P.M. of the thirtieth (30th) day following Buyer's receipt of access to all Books and Records. In such event Buyer will be entitled to an immediate return of the earnest money check. If no cancellation notice is timely received this contingency will thereafter be deemed satisfied.

**EARNEST MONEY:**  Buyer instructs Broker to hold Buyer's earnest money check for deposit with the Escrow Agent until signed acceptance of this contract by Seller is obtained and satisfaction of the Books and Records contingency is obtained and if not obtained to promptly return the check to Buyer.

Page Read

3

SDI00012

**BUYER'S ACKNOWLEDGEMENT:** Buyer acknowledges that Buyer will competently and thoroughly investigate to Buyer's satisfaction all material aspects of the business assets purchased including applicable licenses, zoning, permits, FDA rules, operating capital needs, credit, competition, warranties, financial history, and other items Buyer and Buyer's agents consider to be of importance. Buyer has reviewed Seller's financial statements received and will rely upon Buyer's judgment and decision in entering into and consummating this purchase. Buyer acknowledges that Seller cannot guarantee future profits of the business under Buyer's future ownership, management and/or control.

**ADVERTISING LIABILITY ASSUMPTIONS:** Buyer agrees to assume and pay all future obligations for advertising contracts and Agreements that are presently in force regarding the operation of the business assets including, but not limited to, all yellow page contracts and any other advertising contracts. These assumptions shall be effective at the close of escrow. All such contracts shall be provided to Buyer during the Books and Records Examination period.

**UCC-I AND PROPERTY TITLE SEARCH:** The Escrow agent is hereby instructed to obtain a lien and judgment search and title search upon opening of escrow and to promptly report the results of such search to the parties. Seller shall cure any defects or liens disclosed by such search at or prior to closing.



Page Read

4

SDI00013

06/08/2006  09:35   6029236200          WCI BROKERS                    PAGE  06/27

**FINANCIAL INFORMATION:**  Seller warrants that all financial information
in the documents by reference incorporated herein is true and correct
and is a fair and accurate presentation of the results of the operations
of the Company for the years 2002, 2003, 2004, and 2005 through July
31st, 2005. Such documents include but are not limited to the Broker's
Agreement, Broker's Questionnaire, Owner's Cash Flows, Financial
Statements, Federal Income Tax Returns and Broker's Confidential
Business Opportunity form.

**CONDITION AND INSPECTION OF EQUIPMENT:**  All equipment included in this
sale is purchased on an "as is" basis without warranty of
merchantability or fitness for any particular purpose, however, at the
closing of this sale, all such equipment shall be in good working
condition, or Seller, at Seller's sole expense, and at Buyer's option,
shall promptly repair or cause to be repaired any equipment which is not
in good working condition. Broker has not made an appraisal of the
equipment. The price of all equipment was determined through
negotiations between Buyer and Seller.  Buyer shall inspect all
equipment purchased prior to closing to assure each item exists and is
in working condition to Buyer's satisfaction.

**COVENANTS NOT TO COMPETE:**  Seller, and KWAN SUNG JIN AND ALAN LEMISCH,
jointly and individually, promise and agree that they shall not and will
not, for a period of five (5) consecutive years from the close of this
sale, within the United States of America or in any country in the world
where Buyer is selling Nutri-Health products during the restricted
term,, directly or indirectly, engage in the health food supplement
business, nor aid or assist anyone else, except Buyer to do so, nor have
any interest, directly or indirectly in such a business. In the event
the Company is resold by Buyer, the Covenantors shall continue to abide
by the terms of this "Covenant Not to Compete" for the period of the
covenant, as if any subsequent Buyer was the Buyer


Page Read

5

SDI00014

06/08/2006  09:35    6029236290                WCI BROKERS                    PAGE  07/27

herein. If Buyer defaults in the timely payments of monies owed Seller, the Covenantors shall have the right to disregard their obligations under this covenant unless such default is promptly cured.

**LITIGATION:**  Seller represents and warrants that there is no action, lawsuit, proceeding, arbitration, or investigation pending, or to the knowledge of Seller, threatened against or affecting the Company, nor business interests of the Company in any court or before any federal, state or other governmental agency which would materially adversely affect the Company.

**FAMILIARIZATION:**  Seller, through KWAN SUNG JIN AND ALAN LEMISCH, without pay, shall familiarize and acquaint Buyer with all material aspects of the Company from the close of this sale for a period of twelve (12) months including attending trade shows, customer and supplier introductions and all material aspects of each of the Sellers activities, the first ninety (90) days shall be consistent with Kwan Sung Jin and Alan Lemisch's present work schedules. They shall thereafter familiarize Buyer through telephone consultation as reasonably needed for a period of nine (9) months. If Kwan Sung Jin and/or Alan Lemisch attend any trade shows or other meetings with suppliers or customers where travel and/or lodging expenses are incurred Buyer shall pay all such costs.

**RIGHT OF OFFSET:**  Buyer considers the **"FAMILIARIZATION"** to be provided to be essential and of utmost importance to Buyer. It is therefore agreed that should Kwan Sung Jin or Alan Lemisch fail to reasonably provide the familiarization services set forth herein Buyer shall be relieved from Buyer's obligations to pay Seller the eight hundred thousand ($800,000.00) dollars being carried back. Such right of offset shall be allowed only if Buyer should prevail in the arbitration(s) of Buyer's claims made in arbitration that Kwan Sung Jin or Alan Lemisch failed to reasonably provide the familiarization required under this agreement.

Page Read

SDI00015

06/08/2006  09:35    6029236090              WCI BROKERS                          PAGE  08/27

**INDEMNIFICATION:**  Seller does hereby indemnify Buyer and shall hold and save Buyer harmless from and against all debts, claims, actions, causes of action, losses, damages, and attorney fees, now existing or that may hereafter arise from or grow out of Seller's past operation and ownership of the Company except for advertising, and any other liabilities being assumed by Buyer hereunder.

**LIABILITIES WARRANTY:**  Seller warrants that all outstanding liabilities of the Company shall be paid in full on or before close of this sale and that Buyer shall receive possession and control of the Business and Real Estate free and clear of any other liens or encumbrances.

**BILL OF SALE:**  Seller shall deliver to Buyer, at closing of the sale, a Bill of Sale for all the assets, equipment and fixtures included in this sale for which Seller warrants that Seller has good and marketable title, free and clear of all liens or encumbrances.

**ACCOUNTS RECEIVABLE AND PAYABLE:**  All accounts receivable and payable accruing to the close of this transaction shall remain the property of and the responsibility of Seller.  Immediately from and after the closing of this transaction, all subsequent receivables and payables shall be the property and responsibility of Buyer.

**COMPANY PREMISES:**  Until possession is given to Buyer, Seller agrees to maintain the company premises, including applicable heating, cooling, plumbing and electrical systems, built-in fixtures, together with all other equipment and assets included in this sale, in normal working order, and to maintain and leave the premises in a clean, orderly condition.

**LOSSES OR DAMAGES:**  In the event there is any loss or damage to the Company premises, or any of the improvements, systems, equipment or other assets included in this sale, at any time prior to the closing of

7

SDI00016

Page Read

this sale, such risk of loss shall be solely upon Seller. Immediately from and after the closing of this sale, all risk of loss or damage shall be upon Buyer.

**BUSINESS RECORDS:**  At the close of this sale, Seller shall deliver to Buyer copies of the prior vendors, suppliers and customer accounts and records, product formulas, mailing lists and any other documents pertinent to the general operation of the Company, which Seller may have. Such records shall include copies of those documents reasonably necessary for Buyer to conduct business with suppliers and customers of the Company.

**ESCROW AGENT:**  In order to facilitate closing of this sale, an Escrow Agent mutually acceptable to Seller and Buyer shall be employed to receive, deposit and distribute funds for the parties, prepare and obtain the execution of escrow instructions, see to the execution and distribution of appropriate documents evidencing the terms and conditions of this sale by and between the respective parties and see to the proper closing of sale, recordation of documents and distribution of funds. Buyer and Seller appoint Westland Title Company, located at 7720 N. 16th Street, Suite #300, Phoenix, Arizona 85020, as Escrow Agent for this sale and each agrees to pay one-half (1/2) of the Escrow Agents fees and expenses.

**COLLECTION AGENT:**  The Escrow Agent designated herein shall also act as a Collection Agent on the Promissory Note owed to Seller and shall make disbursements therefrom in accordance with the terms of this Business Assets Purchase Agreement. Buyer and Seller hereby agree to each pay one-half (1/2) of the Collection Agent's fees when due.

**PERMITS AND CERTIFICATES:**  Seller hereby warrants that any and all permits and certificates, and FDA compliances, as may be necessary to continue the operation of the Company, as in the past, shall be current and valid as of the closing and can be renewed at no expense to Buyer

Page Read

8

SDI00017

06/08/2006  09:35    6029236200         WCI BROKERS                    PAGE  10/27

other than the normal fees.  Any expenses to bring the premises to
necessary operating standards shall be paid by the Seller including FDA
or Health Department requirements, if any.

**TENANT LEASES:**  All leases with tenants occupying any portion of the
Real Estate Purchased shall be transferred to Buyer at closing.

**POSSESSION:**  Possession, together with the keys to the business
premises, shall be delivered to Buyer at the time of closing of this
transaction.

**PRORATIONS:**  Buyer and Seller shall prorate to the day of closing,
outside of escrow, and to pay when due their proportionate share of the
general business expenses including the monthly rental income of the
Real Estate, salaries, utility bills, the current years personal and
Real property taxes and any work and/or sales in process. All revenues
received from normal business operations on the day of closing shall
belong to the party paying the expenses for that day.

### GENERAL PROVISIONS

**TIME:**  Time is declared to be of the essence under this Agreement.

**ENTIRE AGREEMENT:**  No other representations, promises or Agreements have
been made between the parties other than as expressly herein set forth.
Neither Buyer, Seller, nor Broker and its agents, shall be, nor are they
bound by, any alleged understandings, Agreements, promises,
representations, covenants or stipulations, which are not set forth
herein.  This Business Assets Purchase Agreement constitutes the entire
contract of the parties hereunder, and cannot be modified except in
writing signed by each of the parties hereto.



Page Read

9

SDI00018

06/08/2006  09:35    6029236200    WCI BROKERS    PAGE  11/27

**BINDING EFFECT:**  This Agreement shall bind and inure to the benefit of the successors, assigns, personal representatives, heirs, and legatees of the parties hereto. Upon execution by all parties, this Agreement shall be binding and fully enforceable.

**BUYER'S DEFAULT:**  If all contingencies herein are satisfied and thereafter Buyer fails to pay the balance necessary to close this sale and to complete the purchase as herein provided, within five (5) days following a written demand to do so, Seller may enforce this Agreement by a suit for specific performance, by an action for damages for Buyer's breach of contract including, but not limited to, full recourse and recovery of Seller's loss of bargain and consequent damages, Seller's liability for Broker's commissions, reasonable attorney's fees incurred, court costs, and all other costs and expenses incurred, or Seller may commence any other action available at law or in equity for the recovery of any other relief available to Seller.

**SELLER'S DEFAULT:** If Buyer tenders full performance of all Buyer's obligations at the time set for the Closing, including the payment of the required sums necessary to close the transaction, and Seller fails or refuses to deliver of all assets as described herein, Buyer may bring an action for specific performance and/or a lawsuit for related damages against Seller.

**CHOICE OF LAW:**  This Agreement shall be governed by and construed under the laws of the State of Arizona, with venue in the County of Maricopa.

**RESOLUTIONS:**  Buyer and Seller shall, at the closing of this sale, deliver to the Escrow Agent duly signed resolutions authorizing the appropriate officers to complete the transaction described herein. The resolutions shall be prepared by the escrow company and shall be signed at closing. The resolutions shall be prepared by the escrow agent.

Page Read

10

SDI00019

**ATTORNEYS FEES AND COSTS:**  Should Buyer, Seller, Broker, or its agents, file an action to enforce any right or rights arising under this Business Assets Purchase Agreement, the party or parties prevailing in such action shall be entitled to recover reasonable attorney's fees and all costs and expenses incurred incidental to the successful prosecution or defense of any such action.

**SEVERABILITY:**  In the event that any of the provisions, or portions thereof, of this Agreement is held to be unenforceable or invalid by any court of competent jurisdiction, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected thereby.

**NOTICES:**  All notices, as may be required by this Agreement, shall be hand delivered or sent by certified mail to the respective parties at the addresses set forth herein.  The place of notice may be modified by notification of such modification through certified mail to the other party.

**PARAGRAPH HEADINGS:**  The various paragraph headings are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any section thereof.

**ARBITRATION:**  After the transaction closes, in the event of any dispute arising between and/or among Buyer, Seller and/or Broker, or its agents, with respect to or arising from any of the transactions set forth in this Agreement, including but not limited to, disputes relating to representations, warranties, covenants, contract construction, jurisdiction, or payment obligations, it is agreed that the matter shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association then prevailing except that actions limited to injunctive relief only are reserved unto the courts.

**BUSINESS INFORMATION PROVIDED BY BROKER:**  It is hereby acknowledged that

Page Read

11

SDI00020

the information recorded on the Broker's Agreement, Questionnaire, and any Financial Forms or Statements by reference incorporated herein, and any further oral or written information provided to Buyer by Broker was provided to Broker by Seller. BROKER HAS NOT CONDUCTED ANY INDEPENDENT INVESTIGATION OF THE COMPANY OR THE INFORMATION PROVIDED BY SELLER NOR HAS BROKER INDEPENDENTLY INVESTIGATED THE FINANCIAL CONDITION OR BUSINESS ACUMEN OF BUYER.

**BUSINESS NAMES AND TELEPHONE NUMBERS:** Seller hereby grants Buyer, effective with the closing of this sale, any and all rights held by Seller in the business names, " SEDONA LABORATORIES, SEDONA LEASING, SOUTHWEST HEALTH FOOD SUPPLEMENTS" and all present and past product names as manufactured or sold by Seller, and related telephone numbers and hereby waives any rights thereto, and shall not, after the closing, make use of said names or telephone numbers, directly or indirectly. Seller shall change all formal company business names within thirty (30) days following closing.

Buyer's offer to purchase is open for Seller's signed acceptance on or before 6:00 PM, Monday, September 19th, 2005.

Buyer and Seller acknowledge fully reading, understanding, and receiving a copy of this Agreement, and previously receiving a copy of each of the following documents: the WCI Brokers Confidential Business Opportunity Form; the Broker's Agreement; the Broker's Agreement Questionnaire; the "Non-Disclosure" Agreement signed by Buyer; Owner's Cash Flow Reports; Business Profit and Loss Statements for the periods 2002, 2003, 2004, 2005 through July; Federal Income Tax Returns for 2002, 2003 and 2004; and a list of the equipment included in this purchase. All the above documents are incorporated herein by this reference.

This offer is made, dated and signed by Buyer this 12th day of



Page Read

12

SDI00021

September, 2005.


**BUYER:**



X ~~_signature_~~
(By: Fred Auzenne

7641 N. Via Del Paraiso
Scottsdale, Arizona 85258

(602) 622-1750



13

Page Read

**SELLER'S ACCEPTANCE:**  Seller accepts the foregoing offer and agrees to sell the above-described business on the terms and conditions offered. For value received, Seller further agrees to pay SOUTHWEST BUSINESS SERVICES, INC., dba WCI BROKERS, (who served as Seller's Broker only in this transaction), a commission in the amount as set forth in a separate Agreement between Broker and Seller.

Dated, Signed and Accepted this _18th_ day of September, 2005, at the hour of _9:00_ o'clock P.M.

**SELLER:**

X _____
By: Alan Lemisch, as President
and as a member and individually
regarding his obligations under
the Covenant Not to Compete and
to Familiarize Buyers.

X _____
By: Kwan Sung Jin, as an
officer and as a member and
individually regarding his
obligations under the Covenant
Not to Compete and to
Familiarize Buyers.

218 Justin Drive
Cottonwood, Arizona 86326
(602) 509-1042 Cell

218 Justin Drive
Cottonwood, Arizona 86326
 (602) 316-5033 Cell


**BROKER:    WCI BROKERS**

_____
By: Charles J. Tanko, President

4835 E. Cactus Road
Suite #110
Scottsdale, Arizona 85254
(602) 923-6300 Office
(602) 923-6200 Fax

WORD/MY DOCUMENTS/CONTRACTS/BUS ASSET PURCH-SINGULAR

14

Page Read

SDI00023

06/08/2006   09:35     6029236200                WCI BROKERS                          PAGE   25/27

11/07/2005   10:01     480    :531              ALAN LEMISCH                        PAGE   01/01
11/04/2005   11:56     6029236200               WCI BROKERS                         PAGE   02/02

# FIRST AMENDMENT TO THE
## BUSINESS ASSETS PURCHASE AGREEMENT
### SEDONA LABORATORIES, SEDONA LEASING, SOUTHWEST HEALTH FOOD
### and dba NUTRI-HEALTH

*COPY*

The undersigned entered into a Business Assets Purchase Agreement for the purchase of certain assets of the business known as "SEDONA LABORATORIES, SEDONA LEASING, SOUTHWEST HEALTH FOOD and dba NUTRI-HEALTH", on September 18th, 2005.  They hereby amend that Agreement as follows:

The Real Property appraisal has been received by the parties and they have in good faith negotiated certain modifications.

The price of the Real Estate portion is reduced to one million eight hundred thousand dollars ($1,800,000.00) and the total price is therefore reduced two hundred thousand dollars ($200,000.00). The amount of inventory included in the sale is increased fifty thousand dollars ($50,000.00).

All other terms and conditions remain as stated in the Agreement.

So agreed this 3rd day of November, 2005.

**BUYER:**

X _____
(By: Fred Auzenne

7641 N. Via Del Paraiso
Scottsdale, Arizona 85258
(602) 622-1750

**SELLER:**

X _____
By: Alan Lemisch, as President and as a
member.

218 Justin Drive
Cottonwood, Arizona 86326
(602) 509-1042 Cell

X _____
By: Kwan Sung Jin, as an officer and as a
member.

218 Justin Drive
Cottonwood, Arizona 86326
(602) 316-5033 Cell

WORDMY DOCUMENTS\CONTRACTS\AMENDMENT FORM

SDI00024

06/08/2006  09:35   6029236290                WCI BROKERS                        PAGE  26/27

# SECOND AMENDMENT TO THE
## BUSINESS ASSETS PURCHASE AGREEMENT
### SEDONA LABORATORIES, SEDONA LEASING, SOUTHWEST HEALTH FOOD
### and dba NUTRI-HEALTH

The undersigned entered into a Business Assets Purchase Agreement for the purchase of certain assets of the businesses known as "SEDONA LABORATORIES, SEDONA LEASING, SOUTHWEST HEALTH FOOD and dba NUTRI-HEALTH", on September 18, 2005. They hereby amend that Agreement as follows:

The closing date is hereby amended to on or before January _1ST, 2006_
All documents shall be prepared and sighed during December, 2005 with closing to occur January 1, 2006.

All other terms and conditions remain as stated in the Agreement as previously amended.

So agreed this 1st day of December, 2005.

**BUYER:**

X _____
By: Fred Auzenne

9236 East Desert Village Drive
Scottsdale, Arizona 85255
(602) 622-1750

**SELLER:**

X _____            _____
By: Alan Lemisch, as President and as a          By: Kwan Sung Jin, as an officer and as a
member.                                          member.

218 Justin Drive                                 218 Justin Drive
Cottonwood, Arizona 86326                        Cottonwood, Arizona 86326
(602) 509-1042 Cell                              (602) 316-5033 Cell

SDI00025

06/08/2006  09:35   6029236200                  WCI BROKERS                    PAGE  27/27
  7/14/2005  16:11    49    531                 ALAN LEMISC                    PAGE  01/01
 12/14/2005  16:11   6029236200                 WCI BROKERS                    PAGE  02/02

# THIRD AMENDMENT TO THE
# BUSINESS ASSETS PURCHASE AGREEMENT
## SEDONA LABORATORIES, SEDONA LEASING, SOUTHWEST HEALTH FOOD
## and dba NUTRI-HEALTH

The undersigned entered into a Business Assets Purchase Agreement for the purchase of certain assets of the businesses known as "SEDONA LABORATORIES, SEDONA LEASING, SOUTHWEST HEALTH FOOD and dba NUTRI-HEALTH", on September 18, 2005.  They hereby amend that Agreement as follows:

Buyer and Seller acknowledge that all contingencies have been satisfied.  Each are prepared and ready to proceed with the closing as scheduled.  Buyer has formed two Arizona companies known as NUTRI-HEALTH SUPPLEMENTS, L.L.C., which shall be the Buyer of the Assets and NUTRI-HEALTH REAL ESTATE, L.L.C., shall be the Buyer of the real property.  Buyer hereby assigns all Buyers purchase rights to said companies and Buyer shall personally guarantee "Buyers" obligations to Seller.

The escrow company, Westland Title, is hereby instructed to prepare the closing documents accordingly.

All other terms and conditions remain as stated in the Agreement as previously amended.

So agreed this 14th day of December 2005.

BUYER:                                          BUYER: NUTRI-HEALTH SUPPLEMENTS,
                                                L.L.C.

X _____                     X _____
By: Fred Auzenne,                               By: Fred Auzenne, Managing Member
9236 East Desert Village Drive                  9236 East Desert Village Drive
Scottsdale, Arizona 85255                       Scottsdale, Arizona 85255
(602) 622-1750                                  (602) 622-1750

BUYER:  NUTRI-HEALTH REAL ESTATE, L.L.C.

X _____
By: Fred Auzenne,
9236 East Desert Village Drive
Scottsdale, Arizona 85255
(602) 622-1750

SELLER:

X _____                     X _____
By: Alan Lemisch, as President and as a         By: Kwan Sung Jin, as an officer and as a
member.                                         member.
218 Justin Drive                                218 Justin Drive
Cottonwood, Arizona 86326                       Cottonwood, Arizona 86326
(602) 509-1042 Cell                             (602) 316-5033 Cell



**COMMERCIAL REAL ESTATE PURCHASE CONTRACT**
**("CONTRACT")**

PAGE 1

THE PRINTED PORTION OF THIS CONTRACT HAS BEEN APPROVED BY THE ARIZONA ASSOCIATION OF REALTORS®. THIS IS INTENDED TO BE A BINDING CONTRACT. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION OR THE TAX CONSEQUENCES THEREOF. IF YOU DESIRE LEGAL, TAX OR OTHER PROFESSIONAL ADVICE, CONSULT YOUR ATTORNEY, TAX ADVISOR OR PROFESSIONAL CONSULTANT.

**RECEIPT**

1. Offer Received From: ("Buyer") *FRED AUZENNE — (OR NOMINEE)*
2. Agency Confirmation: Broker named on Line 18 is the agent of (check one):
3. ☐ the Buyer exclusively; or  ☐ the Seller exclusively; or  ☐ both the Buyer and Seller
4. Amount of Earnest Money: *INCLUDED IN THE BUSINESS AGREEMENTS*
5. All earnest money shall be deposited into a federally insured account acceptable to Buyer and Seller and any
6. interest earned thereon shall also be included as earnest money ("Earnest Money"). Buyer agrees that, if Buyer breaches this
7. Contract, Earnest Money is subject to forfeiture. If any check for Earnest Money is dishonored for any reason, Seller may, at
8. Seller's option, immediately cancel this Contract pursuant to lines 309-313. Unless otherwise provided herein, all Earnest Money
9. is considered to be part of the Purchase Price for the Property described below.
10. Earnest Money shall be: *(check one)*
11.  ☐ Delivered by Buyer to Escrow Company upon mutual execution of this Contract.
12.  ☒ Held by Broker until mutual execution. Upon mutual execution, Broker shall promptly deposit the Earnest Money
13.  with the Escrow Company to which the check is payable. If the check is payable to Broker, Broker shall deposit the check in
14.  Broker's trust account or endorse the check without recourse and deposit it with a duly licensed Escrow Company.
15. Form of Earnest Money: ☒ Personal Check  ☐ Other: _____
16. Deposited with: ☐ Broker's Trust Account  ☒ Escrow Company
17. Offer Received By: *CHARLES J TRANKO* _____  _____
    (PRINT SALESPERSON'S NAME AND AGENT CODE)   (SALESPERSON'S SIGNATURE)   (MO/DA/YR)
18. *WCI BROKERS* _____  _____ (collectively "Broker")
    (PRINT NAME OF FIRM)    (OFFICE CODE)

**PROPERTY AND PURCHASE PRICE**

19. Property Description and Offer: Buyer agrees to purchase and Seller agrees to sell the following real property:
20. Property Address: *218 JUSTIN DRIVE*
21. City: *COTTONWOOD* _____ County: *YAVAPAI* _____ AZ. Zip Code: *86326*
22. Assessors Parcel #: _____
23. Legal description: *439 W MINGUS, 211 JENNIFER, 218 JENNIFER ALL*
24. *WITH ZIP CODE 86326 — IN COTTONWOOD, ARIZONA*
25. _____
26. which includes, at no additional cost to Buyer, all fixtures and improvements thereon, as well as the following items, if any, owned by
27. Seller and presently located on or in the real property: electrical distribution systems (power panels, ducting, conduits, disconnects),
28. lighting fixtures, computer wiring, telephone distribution systems (lines, jacks and connections), heating, ventilation and air conditioning
29. equipment, evaporative coolers, air lines, carpets, window coverings, wall coverings, security and fire detection systems/alarms, and
30. _____
31. _____
32. (collectively the "Property). All fixtures and improvements shall be free of liens and encumbrances unless otherwise specified.
33. Leased Equipment NOT Included: *N/A*
34. Personal Property Included: _____
35. Personal property shall be transferred in AS-IS CONDITION, FREE AND CLEAR OF ANY LIENS AND ENCUMBRANCES, and SELLER
36. MAKES NO WARRANTY of any kind, expressed or implied (including, without limitation, ANY WARRANTY OF MERCHANTABILITY).
37. Addenda Incorporated: ☒ Schedule of personal property  ☐ Lead-Based Paint Disclosure  ☐ Other: _____
38. $ *2,000,000.00* Full Purchase Price, paid as outlined below. Buyer acknowledges that failure to have funds deposited as
39.  required to close escrow on the date specified herein shall constitute a material breach of Contract.
40. $ _____ Earnest Money *INCLUDED WITH BUSINESS PURCHASE AGREEMENT*
41. $ _____ Additional Earnest Money *AS ATTACHED SHEET*
42. $ _____
43. _____
44. _____

Initials: _____ / _____              ©AAR Form CPC 5/03 K        Initials: _____ / _____
        SELLER / SELLER                                                  BUYER / BUYER

                              PAGE 1 of 9

SDI00027

PAGE 2

45. **Escrow:** This Contract shall be u     as escrow instructions. The Escrow Company     .loyed by the parties to carry out the terms of
46. this Contract shall be: _WESTLAND TITLE COMPANY_ _BRENDA BAIRD_
    (ESCROW COMPANY)                    (CONTACT PERSON)
47. _7720 N 16 ST, SUITE 300, PHOENIX ESCRO_ _602-749-7080_
    (ADDRESS)                    (TELEPHONE)
48. _602-674-0864_ _BBAIRD @ WESTLANDTITLEAZ.COM_
    (FAX)                    (E-MAIL)
49. **Opening of Escrow:** The term "Opening of Escrow" shall mean the date when a fully executed Contract and the Earnest Money have
50. been delivered to Escrow Company. Escrow Company shall immediately notify Buyer, Seller and Broker(s) in writing of the date of
51. Opening of Escrow.

52. **Close of Escrow:** Seller and Buyer shall comply with all terms and conditions of this Contract and Close Escrow
53. _NOVEMBER 30, 2005_
54. but in no event later than _EXTENDED DATE_. Any other closing date requires the written mutual agreement of Seller and Buyer.
    (MO/DA/YR)
55. Seller and Buyer hereby agree that the Close of Escrow shall be defined as recordation of the deed and any other documents required
56. to complete the transaction. The parties expressly agree that the failure of any party to comply with the terms and conditions of this
57. Contract by the scheduled Close of Escrow shall constitute a material breach of this Contract.

58. **Possession and Keys:** Possession and occupancy of the Property shall be delivered to Buyer **at Close of Escrow,**
59. **or** ☐ _____, subject to the rights of tenants under existing leases. Seller shall provide keys and/or means to operate
60. all locks, mailboxes, security system/alarms, access to all common area facilities and _____
61. _____

**DUE DILIGENCE AND INSPECTIONS**

62. **Due Diligence:** Buyer's due diligence and inspection period shall be thirty (30) days  or ☐ _____ days after Opening of Escrow
63. ("Due Diligence Period"). During the Due Diligence Period, Buyer shall satisfy itself with respect to the physical condition of the
64. Property, the condition of title to the Property and as to the feasibility and suitability of the Property for Buyer's intended
65. purpose. REFER TO LINES 65-85 FOR IMPORTANT TERMS.
66. **Buyer Disapproval:** If prior to the expiration of the Due Diligence Period or as otherwise provided herein, Buyer, in Buyer's sole
67. discretion, disapproves of the Property, Buyer shall:
68. (a) immediately cancel this Contract pursuant to Lines 309-313 without further written consent of the parties, in which event all
69. Earnest Money shall be returned to Buyer; or
70. (b) deliver to the Seller written notice of the items disapproved and provide Seller an opportunity to correct the items.
71. If Buyer elects option (b), Seller shall respond in writing within five (5) days or ☐ _____ days after delivery to Seller of Buyer's
72. notice of items disapproved. If Seller is unwilling or unable to agree to correct any of the items disapproved by Buyer, including mak-
73. ing any repairs in a workmanlike manner, Buyer may either:
74. (a) cancel this Contract within five (5) days after receipt of Seller's response or after expiration of the time period for Seller's
75. response, whichever occurs first, in which case all Earnest Money shall be returned to Buyer; or
76. (b) proceed with the transaction, in which case Seller is not obligated to correct those items Seller has not agreed to correct
77. in writing.
78. If Buyer cancels this Contract, Buyer shall return all documents provided by the Seller and provide Seller with copies of all reports or
79. studies generated by Buyer, provided, however, that Buyer shall not be required to deliver any such report or study if the written
80. contract that Buyer entered into with the consultant who prepared such report or study specifically forbids the dissemination of the
81. report or study to others.
82. **BUYER'S FAILURE TO GIVE WRITTEN NOTICE OF CANCELLATION OF THIS CONTRACT OR DISAPPROVAL OF ITEMS**
83. **WITHIN THE SPECIFIED TIME PERIODS SHALL CONCLUSIVELY BE DEEMED BUYER'S ELECTION TO PROCEED WITH**
84. **THE TRANSACTION WITHOUT CORRECTION OF ANY DISAPPROVED ITEMS THAT SELLER HAS NOT AGREED IN**
85. **WRITING TO CORRECT.**
86. **Inspections:** During the Due Diligence Period, Buyer shall have the right, at Buyer's expense, to select an inspector(s), and to
87. make economic, environmental and physical "inspections" (including tests, surveys, and other studies) of the Property, including
88. but not limited to square footage, wood infestation, roof, designated flood hazard areas, structural, plumbing (such as galvanized
89. or polybutylene pipes), sewer/septic, well, heating, air conditioning, electrical and mechanical systems, built-in appliances, soil,
90. foundation, pool/spa and related equipment, cost of compliance with swimming pool regulations, possible environmental hazards
91. (such as asbestos, formaldehyde, radon gas, lead-based paint, fuel or chemical storage tanks, methamphetamine, LSD, ecstasy,
92. hazardous waste, other substances, materials or products, and/or location in a federal or state Superfund area), water damage,
93. mold, conditions conducive to mold, geologic conditions, location of property lines, water/utility use restrictions and fees for
94. services such as garbage, water/utility or fire protection, sign usage, zoning regulations, variances, use permits, and compliance
95. with Americans with Disabilities Act. If the presence of sex offenders in the vicinity of the Property or the occurrence of a disease,
96. natural death, suicide, homicide or other crime on or in the vicinity of the Property is a material matter to the Buyer, it must be
97. investigated by the Buyer during the Due Diligence Period.
98. **Square Footage:** BUYER IS AWARE THAT ANY REFERENCE TO THE SQUARE FOOTAGE (OR NET ACREAGE) OF THE
99. REAL PROPERTY (LAND) OR IMPROVEMENTS THEREON IS APPROXIMATE. IF SQUARE FOOTAGE (OR NET ACREAGE)
100. IS A MATERIAL MATTER TO THE BUYER, IT MUST BE VERIFIED BY BUYER DURING THE DUE DILIGENCE PERIOD.

Initials: ___/___     Initials: ___/___
SELLER    SELLER                    BUYER    BUYER

©AAR Form CPC 5/03 K

SDI00028

PAGE 3

101. **Wood Infestation Inspection:** I. ...URRENT OR PAST WOOD INFESTATION (...CH AS TERMITES) IS A MATERIAL MAT-
102. TER TO THE BUYER, IT MUST BE INVESTIGATED DURING THE DUE DILIGENCE PERIOD. If the lender requires an updated
103. Wood Infestation Report, it shall be performed at Buyer's expense. If wood infestation is disclosed in any Wood Infestation Report,
104. REFER TO LINES 66-85 FOR IMPORTANT TERMS.

105. **Flood Hazard:** If the Property is situated in an area identified as having any special flood hazards by any governmental entity
106. including, but not limited to, being designated as a special flood hazard area by the Federal Emergency Management Agency
107. (FEMA), the Buyer's lender may require the purchase of flood hazard insurance at the Close of Escrow or some future date.
108. Special flood hazards may affect the ability to encumber or improve the Property now or at some future date. Flood hazard desig-
109. nation of the Property or cost of flood hazard insurance shall be determined by Buyer during the Due Diligence Period.

110. **Survey:** A survey ☒ shall be performed ☐ is waived by the Buyer.

111. If a survey is to be performed, Buyer shall have the survey completed by a licensed surveyor in accordance with the Arizona State
112. Board of Technical Registration's "Arizona Land Boundary Survey Minimum Standards" and review the receipt of results of survey
113. or map during the Due Diligence Period.

114. Cost of the survey shall be paid by: ☐ Seller   ☐ Buyer   ☐ Other: *PER BUYER & SELLER INSTRUCTIONS*

115. Surveyor's instructions are:    ☒  A boundary survey and survey plat showing the corners either verified or monumentation.

116.                                ☐  A survey certified by a licensed surveyor, acceptable to Buyer and the Title Company, in sufficient
117.                                    detail for issuance of an American Land Title Association ("ALTA") Owner's Policy of Title
118.                                    Insurance showing all boundary, encroachment or survey exceptions and all improvements, utility lines
119.                                    and easements on the Property or within five (5) feet thereof.

120.                                ☐  Other survey terms: _____
121.                                   _____

122. **Buyer's Responsibility Regarding Inspections:** Buyer shall keep the Property free and clear of liens, shall indemnify and hold
123. Seller harmless from all liability, claims, demands, damages, and costs and shall repair all damages arising from the inspections.

124. **Final Walkthrough:** The Seller grants Buyer and any representative of Buyer reasonable access to conduct a final walkthrough of the
125. Property for the purpose of satisfying Buyer that any repairs agreed to by the Seller have been completed and, further, that the Property
126. is in substantially the same condition as on the date of the mutual execution of the Contract. Seller shall make the Property available for
127. the final walkthrough. If Buyer does not conduct such walkthrough, Buyer specifically releases Seller and Broker(s) of any liability.

128. **Seller's Responsibility Regarding Inspections and Final Walkthrough:** Seller shall make the Property available for all inspec-
129. tions during the Due Diligence Period and final walkthrough. Seller understands that the inspections and final walkthrough require
130. that all utilities be on and the Seller is responsible for providing same at Seller's expense.

131. **Sanitation and Waste Disposal Systems:** Buyer is aware and Seller warrants that the Property is on a:
132. ☐ sewer system ☐ septic system ☐ alternative system  *TO BE DETERMINED*

133. **Seller's Obligations Regarding On-Site Wastewater Treatment Facility (conventional septic or alternative system)**
134. **("Facility"):** If such a Facility has been installed on the Property, Seller shall deliver to Buyer copies of Facility permits and any
135. other Facility documents of record within five (5) days after Opening of Escrow. During Due Diligence Period, any Facility on the
136. Property shall be inspected as required by law at: ☐ Buyer's expense ☐ Seller's expense by an inspector recognized by the
137. applicable governmental authority. Seller shall deliver to Escrow Company, at Seller's expense, any certification and/or
138. documentation required. Escrow Company is instructed to file any transfer form(s) with applicable county authority. Buyer shall
139. pay any Facility transfer fees.

140. **Seller's Obligations Regarding Wells:** If any well is located on the Property, Seller shall deliver to Escrow Company, before Close of
141. Escrow, a copy of the Arizona Department of Water Resources ("ADWR") "Registration of Existing Wells." Escrow Company is hereby
142. instructed to send to the ADWR a "Change of Well Information." Seller does not warrant the gallons per minute as reflected on the ADWR
143. certification of registration. Buyer may verify gallons per minute during Due Diligence Period through a certified flow test.

144. **Changes During Escrow:** Seller shall immediately notify Buyer in writing: (i) of any changes in the disclosures made herein, in the Seller Property
145. Disclosure Statement, or otherwise; (ii) if Seller modifies any existing lease or other agreement affecting the Property; or (iii) if Seller enters into
146. any new leases, rental agreements, service contracts or other agreements affecting the Property. Buyer shall be allowed five (5) days after receipt
147. of such notice to provide written notice to Seller of any items disapproved. REFER TO LINES 66-85 FOR IMPORTANT TERMS.

## DISCLOSURES

148. **Seller Property Disclosure Statement ("SPDS"):**

149. (a) ☐ Buyer has received, read, and approved the SPDS.

150. (b) ☐ Buyer waives review and approval of the SPDS.   (BUYER'S INITIALS REQUIRED TO WAIVE SPDS ___*JTU*___ )
                                                                                          BUYER       BUYER

151. (c) ☒ Seller shall deliver the SPDS to Buyer within ~~five~~ (5) days after Opening of Escrow.
          *FIFTEEN DAYS ( 15 )*

SDI00029

06/08/2006   09:35    6029236280                    WCI BROKERS                    PAGE   19/27

PAGE 4

152. Additional Seller Disclosures and information: Seller shall provide to Buyer the following disclosures and information pertinent
153. to the Property in writing within five (5) days or _____ days after Opening of Escrow: (1) any information known to Seller that may adversely
154. effect the Buyer's use of the Property, (2) any known pending special assessments, association fees, claims, or litigation, (3) copies of covenants,
155. conditions, and restrictions, articles of incorporation; by-laws; other governing documents; and any other documents required by law, (4) financial
156. statements, copies of current rent rolls, lists of current deposits, personal property lists, copies of leases, rental agreements, service contracts, (5) a
157. copy of the most recent survey, if available, and (6) any and all other agreements, documents, studies, or reports relating to the Property in Seller's
158. possession or control provided, however, that Seller shall not be required to deliver any report or study if the written contract that Seller entered into
159. with the consultant who prepared such report or study specifically forbids the dissemination of the report to others. The Buyer shall provide written
160. notice to Seller prior to the expiration of the Due Diligence Period of any items disapproved. REFER TO LINES 66-85 FOR IMPORTANT TERMS.
161. Seller shall deliver all original documents and estoppel certificates executed by all tenants to Buyer at Close of Escrow.

162. No Seller or Tenant Bankruptcy, Probate or Insolvency Proceedings. Seller has no notice or knowledge that any tenant on the
163. Property is the subject of a bankruptcy, probate or insolvency proceeding. Further, Seller is not the subject of a bankruptcy, insolvency
164. or probate proceeding.

165. Seller's Notice of Violations: Seller represents that Seller has no knowledge of any notice of violations of City, County, State, or
166. Federal building, zoning, fire, or health laws, codes, statutes, ordinances, regulations, or rules filed or issued regarding the
167. Property. If Seller receives notice of violations of any of the aforementioned prior to Close of Escrow, Seller shall immediately
168. notify Buyer in writing. Buyer shall have five (5) days after receipt of such notice to provide written notice to Seller of any items
169. disapproved. REFER TO LINES 66-85 FOR IMPORTANT TERMS.

170. DISCLOSURES FOR PROPERTY USED FOR RESIDENTIAL PURPOSES

171. (If Property is not used for residential purposes, GO TO LINE 194.)

172. Notice to Buyer of Swimming Pool Barrier Regulations (Initials Required): The State of Arizona has swimming pool barrier regulations that
173. are outlined in the Arizona Department of Health Services Private Pool Safety Notice. The county or municipality in which the Property is locat-
174. ed may have different swimming pool barrier regulations than the state. During the Due Diligence Period, Buyer agrees to investigate all applic-
175. able state, county, and municipal swimming pool barrier regulations and, unless disapproved prior to the expiration of the Due Diligence Period,
176. agrees to comply with and pay all costs of compliance with said regulations. BUYER'S INITIALS ACKNOWLEDGE 1) EXISTENCE OF
177. SWIMMING POOL BARRIER REGULATIONS and 2) If this Property contains a swimming pool, RECEIPT OF THE ARIZONA
178. DEPARTMENT OF HEALTH SERVICES APPROVED PRIVATE POOL SAFETY NOTICE AS REQUIRED BY A.R.S. §36-1681 (E).
179.                                    (BUYER'S INITIALS REQUIRED)

                                                                    _____    _____
                                                                       BUYER          BUYER

180. Lead-Based Paint Disclosure (Initials Required): If the Property was built prior to 1978, Seller shall: (1) notify the Buyer of any
181. known lead-based paint or lead-based paint hazards in or on the Property; (2) provide the Buyer with any lead-based paint risk
182. assessments or inspections of the Property in the Seller's possession; (3) provide the Buyer with the Disclosure of Information on
183. Lead-based Paint and Lead-Based Paint Hazards, and any reports, records, pamphlets, and/or other materials referenced therein,
184. including the pamphlet "Protect Your Family from Lead in Your Home" (collectively "Lead-Based Paint Information").
185. ☐ Lead-Based Paint Information was provided prior to Contract acceptance and Buyer acknowledges the opportunity to conduct lead-
186. based paint risk assessments or inspections during Due Diligence Period.
187. ☒ Seller shall provide the Lead-Based Paint Information to Buyer within five (5) days after Opening of Escrow. Buyer may within
188. ten (10) days or ☐ _____ days after receipt of the Lead-Based Paint Information conduct or obtain a risk assessment or
189. inspection of the Property for the presence of lead-based paint or lead based-paint hazards ("Assessment Period"). Buyer may
190. within five (5) days after receipt of the Lead-Based Paint Information or five (5) days after expiration of the Assessment Period
191. cancel this Contract in Buyer's sole discretion by delivering written notice of cancellation to Seller pursuant to Lines 309-313.

192. Prior to 1978: If Property was constructed prior to 1978, BUYER'S INITIALS REQUIRED    _____    _____
                                                                                              BUYER          BUYER

193. 1978 or Later: If Property was constructed in 1978 or later, BUYER'S INITIALS REQUIRED  _____    _____
                                                                                              BUYER          BUYER

194. IF THIS IS AN ALL CASH SALE, GO TO LINE 209.


FINANCING

195. (If financing is to be other than new financing, see attached addendum.)

196. This sale ☐ is  ☒ is not contingent upon Buyer obtaining a satisfactory financing commitment within Financing
197. Commitment Contingency Period. (If sale is not contingent on a financing commitment, go to line 209.)

198. Financing Commitment Contingency Period: If the sale is contingent upon Buyer obtaining a satisfactory financing commitment, Buyer
199. shall have thirty (30) days or ☐ _____ days after the Opening of Escrow ("Financing Commitment Contingency Period") to obtain a financing
200. commitment satisfactory to Buyer in Buyer's sole discretion, for a loan to purchase the Property or Buyer may cancel this Contract pursuant to
201. Lines 309-313 and receive a refund of the Earnest Money. PRIOR TO THE EXPIRATION OF THE FINANCING COMMITMENT
202. CONTINGENCY PERIOD, BUYER SHALL DELIVER TO SELLER AND ESCROW COMPANY WRITTEN NOTICE THAT BUYER HAS
203. NOT RECEIVED SUCH SATISFACTORY FINANCING COMMITMENT OR BUYER SHALL BE DEEMED TO HAVE WAIVED THE
204. FINANCING COMMITMENT CONTINGENCY AND ANY RIGHT TO CANCEL DUE TO FINANCING.

205. Financing Application: Within ten (10) days after the Opening of Escrow, Buyer shall submit a formal loan application to a lender of
206. Buyer's choice. Buyer and Seller shall promptly provide to such lender all materials and documents lender deems appropriate to
207. facilitate such lender's processing of such loan application. Buyer agrees to pay such fees as required by the lender and all other
208. financing costs. Buyer authorizes the lender to provide financing status updates to Broker(s).


Initials: _____/_____                    ©AAR Form CPC 5/03 K                    Initials: _____
         SELLER   SELLER                          PAGE 4 OF 10                                 BUYER   BUYER

SDI00030

06/08/2006    09:35    6029236200    WCI BROKERS    PAGE    28/27

## TITLE AND ESCROW

209. **Title and Vesting:** Taking title may have significant legal, estate planning and tax consequences. Buyer should obtain
210. legal and tax advice.

211. Buyer will take title as determined before Close of Escrow or ☐ Other: __ _____

212. **Title Commitment and Title Insurance:** Buyer shall be provided at Seller's expense a Standard Owner's Title Insurance Policy show-
213. ing the title vested in Buyer as provided in Line 211. Buyer may acquire extended coverage(s) at Buyer's own additional expense.
214. Escrow Company is hereby instructed to obtain and distribute to Buyer and Broker(s) a Commitment for Title Insurance in sufficient
215. detail for the issuance of an Extended Owner's Title Insurance Policy together with complete and legible copies of all documents that
216. will remain as exceptions to Buyer's policy of title insurance ("Title Commitment"), within fifteen (15) days after Opening of Escrow.
217. Buyer shall have until the expiration of the Due Diligence Period to provide written notice to Seller of any items disapproved. Buyer shall
218. have five (5) days after receipt of any amendments to Title Commitment or notice of any subsequent exceptions to provide Seller
219. written notice of any amendment or exceptions disapproved. REFER TO LINES 66-85 FOR IMPORTANT TERMS.

220. Seller shall convey title by special warranty deed or ☒ _____ deed.

221. **Additional Instructions:** (a) If the Escrow Company is also acting as the title agency but is not the title insurer issuing the title
222. insurance policy, the Buyer and Seller hereby instruct the Escrow Company to deliver to the Buyer and Seller upon Opening of
223. Escrow a closing protection letter from the title insurer indemnifying the Buyer and Seller for any losses due to fraudulent acts or
224. breach of escrow instructions by the Escrow Company. (b) All documents necessary to close this transaction shall be executed
225. promptly by Seller and Buyer in the standard form used by Escrow Company. Escrow Company is hereby instructed to modify such
226. documents to the extent necessary to be consistent with this Contract. (c) All closing and escrow costs, unless otherwise stated
227. herein, shall be allocated equally between Seller and Buyer in accordance with local custom and applicable laws and regulations.
228. (d) Escrow Company is hereby instructed to send to Broker(s) copies of all notices and communications directed to or from Seller or
229. Buyer. Escrow Company shall provide Broker(s) with access to escrowed materials and information regarding the escrow.

230. **Prorations, Expenses and Adjustments:**
231. *Taxes:* Real property taxes payable by the Seller shall be prorated through Close of Escrow, based upon the latest tax bill avail-
232. able. The parties agree that any discrepancy between the latest tax bill available and the actual tax bill when received shall be
233. handled as a Post Closing Matter and Buyer or Seller may be responsible for additional tax payments to each other.
234. *Insurance:* If Buyer takes an assignment of the existing casualty and/or liability insurance that is maintained by Seller, the current
235. premium shall be prorated through Close of Escrow.
236. *Rents, Interest and Expenses:* Rents; interest on existing notes, if transferred; utilities; and operating expenses shall be prorated
237. through Close of Escrow. The Parties agree to adjust any rents received after Close of Escrow as a Post Closing Matter.
238. *Deposits:* All deposits held by Seller pursuant to rent/lease agreement(s) shall be credited against the cash required of Buyer at
239. Close of Escrow or ☐ paid to Buyer by Seller at Close of Escrow.

240. **Post Closing Matters:** The parties shall promptly adjust any item to be prorated that is not determined or determinable at Close of
241. Escrow as a Post Closing Matter by appropriate cash payment to the other party outside of the escrow when the amount due is
242. determined. Seller and Buyer agree that Escrow Company and Broker(s) are relieved of any responsibilities for said adjustments.

243. **Insurance:** Buyer shall insure that any fire, casualty, or other insurance desired by Buyer, or required by any Lender, is in place at
244. Close of Escrow. Buyer specifically releases Broker(s) from any obligations relating to such insurance.

245. **Assessments:** The amount of any assessment that is a lien as of the Close of Escrow, shall be:
246. ☒ paid in full by Seller   ☐ prorated and assumed by Buyer   ☐ paid in full by Buyer.
247. Any assessment that becomes a lien after Close of Escrow is the Buyer's responsibility.

248. **IRS and FIRPTA Reporting:** Seller agrees to comply with IRS reporting requirements. If applicable, Seller agrees to complete,
249. sign, and deliver to Escrow Company a certificate indicating whether Seller is a foreign person or a non-resident alien pursuant to
250. the Foreign Investment in Real Property Tax Act (FIRPTA). Buyer acknowledges that if the Seller is a foreign person, the Buyer (or
251. Escrow Company, as directed by Buyer) must withhold a tax equal to 10% of the purchase price, unless an exemption applies.

252. **RESPA:** The Real Estate Settlement Procedures Act (RESPA) requires that no Seller of property that will be purchased with the
253. assistance of a federally-related mortgage financing shall require, directly or indirectly, as a condition of selling the property, that
254. title insurance covering the property be purchased by the Buyer from any particular title company.

255. **TAX DEFERRED EXCHANGE:** Seller and Buyer are advised to consult a professional tax advisor regarding the advisability of a
256. tax-deferred exchange pursuant to I.R.C. §1031 or otherwise. Seller and Buyer agree to cooperate in a tax deferred exchange pro-
257. vided that Close of Escrow is not delayed. All additional costs in connection with any such tax deferred exchange shall be borne
258. by the party requesting the exchange. The non-requesting party and Broker(s) shall be indemnified and held harmless from any
259. liability that may arise from participation in the tax deferred exchange.

## WARRANTIES

260. **Seller Warranties:** Seller warrants and shall maintain and/or repair the Property so that, at the earlier of possession of the
261. Property or Close of Escrow, all heating, cooling, mechanical, plumbing, and electrical systems (including swimming pool and/or
262. spa, motors, filter systems, cleaning systems, and heaters, if any), and built-in appliances will be in working condition or as
263. otherwise agreed in this Contract. Seller also warrants that, at the earlier of possession of the Property or Close of Escrow, the
264. Property shall be in substantially the same condition as on the date of the mutal execution of the Contract.

265. **Buyer Warranties:** Buyer warrants that Buyer has disclosed to Seller any information that may materially and adversely affect the
266. Buyer's ability to close escrow or complete the obligations of this Contract. At the earlier of the removal of all contingencies, possession
267. of the Property or Close of Escrow, (a) Buyer warrants to Seller that Buyer has conducted all desired independent investigations and
268. accepts the Property and (b) Buyer acknowledges that there will be no Seller warranty of any kind, except as stated in Lines 260-264.

Initials: _____ / _____    ©AAR Form CPC 5/03 K    Initials: _____ / _____
SELLER   SELLER    BUYER   BUYER

PAGE 5 of 9

SDI00031

PAGE 6

269. **Warranties that Survive Closing.** Prior to the Close of Escrow, Seller warrants that payment in full will have been made for all
270. rental and/or privilege taxes, labor, professional services, materials, machinery, fixtures, or tools furnished within the 150 days
271. immediately preceding the Close of Escrow in connection with the construction, alteration, or repair of any structure on or
272. improvement made to the Property. Seller warrants that the information on Lines 131-139 regarding connection to a public sewer
273. system, septic tank or other sanitation system is correct to Seller's knowledge. Seller warrants that Seller has disclosed to Buyer
274. and Broker(s) all material latent defects and any information concerning the Property known to Seller, which materially and
275. adversely affect the consideration to be paid by Buyer.

## REMEDIES

276. **Remedies:** The parties agree to the remedies for breach of Contract indicated below.
277. *If Buyer is in breach: (check one)*

278. ☒ All Rights and Remedies: Seller may cancel this Contract pursuant to Lines 309-313 and/or proceed upon any claim or
279.     remedy that the Seller may have in law or equity.

280. ☐ Liquidated Damages: The parties agree that it would be impracticable or extremely difficult to fix the actual damages that
281.     Seller would suffer if Buyer fails to perform Buyer's obligations pursuant to this Contract. Therefore, if Buyer breaches this
282.     Contract, Seller shall be entitled to the Earnest Money as Seller's sole remedy and Buyer shall be released from any further
283.     liability to Seller. In such event, this Contract shall be cancelled and Seller shall pay any Escrow Company cancellation fees.

284.                              **(INITIALS REQUIRED)**     ‾‾‾‾‾‾   ‾‾‾‾‾‾   ‾‾‾‾‾‾   ‾‾‾‾‾‾
                                                             SELLER    SELLER    BUYER    BUYER
285. *If Seller is in breach:*

286.     All Rights and Remedies: Buyer may cancel this Contract pursuant to Lines 309-313, shall be entitled to the return of the
287.     Earnest Money and/or proceed upon any claim or remedy that the Buyer may have in law or equity.

288. **Mediation:** Buyer and Seller agree to mediate any dispute or claim arising out of or relating to this Contract, any alleged breach of
289. this Contract, or services provided in relation to this Contract, claims for Earnest Money or representations made by the Buyer or
290. Seller in connection with the sale, purchase, financing, condition, or other aspect of the Property to which this Contract pertains,
291. including, without limitation, allegations of concealment, misrepresentation, negligence and/or fraud before resorting to court
292. action. Mediation is a process in which the parties meet with an impartial person who helps to resolve the dispute informally and
293. confidentially. Mediators cannot impose binding decisions. The parties must agree and sign an agreement before any settlement
294. reached at the mediation is binding. Mediation shall take place in the State of Arizona. All mediation costs shall be paid equally by
295. the parties to the Contract.

296. **Exclusions from Mediation:** The following matters are excluded from mediation hereunder: (a) any action brought in the Small
297. Claims Division of an Arizona Justice Court (up to $2,500), so long as the matter is not thereafter transferred or removed from the
298. Small Claims Division; (b) judicial or nonjudicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or
299. agreement for sale; (c) an unlawful entry or detainer action; (d) the filing or enforcement of a mechanic's lien; or (e) any matter
300. that is within the jurisdiction of a probate or bankruptcy court. The filing of a judicial action to enable the recording of a notice of
301. pending action, or order of attachment, receivership, injunction, or other provisional remedies shall not constitute a waiver of the
302. obligation to mediate under this provision, nor shall it constitute a breach of the duty to mediate.

303. **Attorneys Fees and Costs:** If Buyer or Seller files suit against the other to enforce any provision of this Contract or for damages
304. sustained by reason of its breach, all parties prevailing in such action, on trial and appeal, shall receive their reasonable attorney's
305. fees and costs as awarded by the court. In addition, both Seller and Buyer agree to indemnify and hold harmless all Brokers against
306. all costs and expenses that any Broker may incur or sustain in connection with any lawsuit arising from this Contract and will pay
307. the same on demand unless the court grants judgment in such action against the party to be indemnified. Costs shall include,
308. without limitation, reasonable attorney's fees, expert witness fees, fees paid to investigators, and court costs.

309. **Cancellation:** Any party who wishes to cancel this Contract as provided herein or because of any material breach by another
310. party, and who is not in material breach except as occasioned by a material breach by the other party, may cancel this Contract
311. by delivering written notice of cancellation to either the breaching party or to the Escrow Company stating the basis for cancella-
312. tion or nature of the breach. Cancellation shall become effective immediately upon delivery of the written notice of cancellation to
313. either the breaching party or Escrow Company.

314. **Release of Earnest Money:** In the event of a dispute between Buyer and Seller regarding Earnest Money deposited with Escrow
315. Company, Buyer and Seller authorize Escrow Company to release Earnest Money pursuant to the terms and conditions of this
316. Contract. Buyer and Seller specifically authorize Escrow Company to act in its sole and absolute discretion in the release of
317. Earnest Money. Buyer and Seller agree to hold harmless and indemnify Escrow Company against any claim, action or lawsuit of
318. any kind, and from any loss, judgment, or expense, including costs and reasonable attorneys' fees, arising from or relating in any
319. way to the release of Earnest Money.

320. **Recommendations:** If any Broker recommends a builder, contractor, inspector, vendor or any other person or entity to Seller or Buyer
321. for any purpose, such recommendation shall be independently investigated and evaluated by Seller or Buyer, who hereby acknowl-
322. edge that any decision to enter into any contractual arrangements with any such person or entity recommended by any Broker will be
323. based solely upon such independent investigation and evaluation. Seller and Buyer understand that said contractual arrangement may
324. result in a commission or fee to Broker, which shall be disclosed in writing to the Seller and Buyer as required by law.

SDI00032

Initials: ____/____                    ©AAR Form CPC 5/03 K                    Initials: _____
         SELLER   SELLER                                                               BUYER   BUYER

                                        PAGE 6 of 10

06/08/2006  09:35  6029236200                WCI BROKERS                    PAGE  22/27

PAGE 7

**ADDITIONAL TERMS**

325. _CLOSE OF ESCROW FOR THE BUSINESS ASSETS PURCHASE_
326. _AGREEMENT AND THIS REAL PROPERTY MUST BE_
327. _SIMULTANEOUSLY:_
328. _____
329. _____
330. _____
331. _____
332. _____
333. _____
334. _____
335. _____
336. _____
337. _____
338. _____
339. _____
340. _____
341. _____
342. _____
343. _____
344. _____
345. _____
346. _____
347. _____
348. _____
349. _____

350. **Risk of Loss:** If there is any loss or damage to the Property between the date of mutual execution of this Contract and the Close of
351. Escrow or possession of the Property, whichever is earlier, by reason of fire, vandalism, flood, earthquake or act of God, the risk of loss
352. shall be borne by the Seller, provided, however, that if the cost of repairing such loss or damage would exceed ten percent (10%) of
353. the purchase price, either Seller or Buyer may elect to cancel the Contract by written notice pursuant to lines 309-313.

354. **Permission:** Buyer and Seller grant Broker(s) permission to advise the public of the existence of this Contract.

355. **Arizona Law:** This Contract shall be governed by Arizona law and jurisdiction is exclusively conferred on the State of Arizona.

356. **Time is of the essence:** The parties acknowledge that time is of the essence in performance of the obligations described herein.

357. **Broker's Fee:** Buyer and Seller each represent and warrant to the other that he/she/it has had no dealings with any person, firm,
358. broker or finder in connection with the negotiation of this Contract and/or the consummation of the purchase and sale
359. contemplated herein, other than the Broker(s) named herein, and no Broker or other person, firm or entity, other than said
360. Broker(s) is/are entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts
361. of either Buyer or Seller. Buyer and Seller do each hereby agree to indemnify, defend, protect and hold the other harmless from
362. and against any costs, expenses or liability for compensation, commission or charges that may be claimed by any broker, finder
363. or other similar party, other than said named Broker(s) by reason of any dealings or act of the indemnifying party.

364. **Compensation:** Seller and Buyer acknowledge that Broker(s) shall be compensated for services rendered as previously agreed
365. by separate written agreement(s). Any separate written agreement(s) shall be delivered to Escrow Company for payment at Close
366. of Escrow, if not previously paid, and shall constitute an irrevocable assignment of Seller's proceeds at Close of Escrow and/or
367. payment shall be collected from Buyer as a condition to Close, as applicable. If any Broker hires an attorney to enforce the
368. collection of the brokerage fee payable pursuant to this Contract and is successful in collecting some or all of such brokerage fee,
369. the party(ies) responsible for paying such brokerage fee agree(s) to pay such Broker's costs including, but not limited to:
370. reasonable attorneys' fees, expert witness fees, fees paid to investigators, and court costs. COMMISSIONS PAYABLE FOR THE
371. SALE, LEASING, OR MANAGEMENT OF PROPERTY ARE NOT SET BY ANY BOARD OR ASSOCIATION OF REALTORS®
372. OR MULTIPLE LISTING SERVICE, OR IN ANY MANNER OTHER THAN BETWEEN THE BROKER AND CLIENT. THE
373. SELLER AND THE BUYER ACKNOWLEDGE THAT THE BROKER(S) REFERENCED HEREIN ARE THIRD-PARTY
374. BENEFICIARIES OF THIS CONTRACT.

Initials: _____/_____        ©AAR Form CPC 5/03 K        Initials: _____/_____
          SELLER  SELLER                                              BUYER  BUYER

PAGE 7 of 8

SDI00033

06/08/2006  09:35   6029236200               WCI BROKERS

PAGE 8

375. **Additional Compensation:** The Real Estate Settlement Procedures Act ("RESPA") prohibits the paying or receiving of any fee,
376. kickback, or thing of value for the referral of any business related to settlement or closing of a federally regulated mortgage
377. financing, including, but not limited to, any services related to the origination, processing, or funding of a federally regulated mort-
378. gage financing, and includes settlement related business. RESPA does not prohibit fees, salaries, compensation, or other payments
379. for services actually performed. If any Broker performs any such services for a fee, Seller and Buyer consent to the payment of this
380. additional compensation as follows: _____
381. _____ N/A _____
382. _____

383. **Subsequent Offers:** Buyer acknowledges that Seller has the right to accept subsequent offers until Close of Escrow. Seller
384. understands that any subsequent offer accepted by the Seller must be a backup offer, namely, contingent on the cancellation of
385. this Contract.

386. **Entire Agreement:** This Contract, and any addenda and attachments, shall constitute the entire agreement between Seller and
387. Buyer, and shall supersede any other written or oral agreements between Seller and Buyer. This Contract, including any exten-
388. sions of any time periods referenced herein, can be modified only by a writing signed by Seller and Buyer. A fully executed fac-
389. simile copy of the entire Contract shall be treated as an original Contract. This Contract and any other documents required by this
390. Contract may be executed and delivered by facsimile and in any number of counterparts, which shall become effective upon
391. delivery as provided for herein. All counterparts shall be deemed to constitute one instrument, and each counterpart shall be
392. deemed an original. The failure to initial any page of this Contract shall not affect the validity or terms of this Contract. All
393. references to days in this Contract shall be construed as calendar days.

394. **Assignment:** Except in the event of a tax-deferred exchange, Buyer shall not assign this Contract without the prior written
395. consent of Seller. Any such assignment shall not release Buyer from Buyer's obligations under this Contract.

396. **Release of Brokers:** SELLER AND BUYER HEREBY ACKNOWLEDGE THAT THEY HAVE BEEN AND ARE NOW ADVISED
397. BY THE BROKER(S) TO CONSULT AND RETAIN THEIR OWN EXPERTS TO ADVISE AND REPRESENT THEM
398. CONCERNING THE LEGAL AND INCOME TAX EFFECTS OF THIS CONTRACT, AND THE CONDITION OF THE
399. PROPERTY. SELLER AND BUYER HEREBY EXPRESSLY RELEASE, HOLD HARMLESS AND INDEMNIFY ALL
400. BROKER(S) IN THIS TRANSACTION FROM ANY AND ALL LIABILITY AND RESPONSIBILITY REGARDING THE
401. CONDITION, SQUARE FOOTAGE/ACREAGE, LOT LINES OR BOUNDARIES, VALUE, FINANCING, RENT ROLLS, INCOME
402. AND EXPENSE PROJECTIONS OR PROFORMAS, ENVIRONMENTAL CONDITIONS, SANITATION SYSTEMS, ROOF CON-
403. DITION, WOOD INFESTATION AND WOOD INFESTATION REPORT, COMPLIANCE WITH BUILDING CODES, ZONING OR
404. OTHER GOVERNMENTAL REGULATIONS, OR ANY OTHER MATERIAL MATTERS RELATING TO THE PROPERTY.

405.                          **(INITIALS REQUIRED)**   _____    _____    _____    _____
                                                        BUYER     BUYER     SELLER    SELLER

406. **Time for Acceptance:** This is an offer to purchase the Property. Unless acceptance is signed by Seller and a signed copy delivered in
407. person, by private or United States mail, or facsimile, and received by Buyer or by Broker named on Lines 17-18 by:
408. _TUES SEPT 13, 2005_ at _6:00_ AM/PM Mountain Standard Time, or unless this offer to purchase has been
409. previously withdrawn in writing by Buyer, this offer to purchase shall be deemed withdrawn and the Buyer's Earnest Money
410. shall be returned.

411. **THIS CONTRACT CONTAINS NINE (9) PAGES EXCLUSIVE OF ANY ADDENDA AND ATTACHMENTS. PLEASE ENSURE THAT**
412. **YOU HAVE RECEIVED AND READ ALL NINE (9) PAGES OF THIS OFFER AS WELL AS ANY ADDENDA AND ATTACHMENTS.**

413. The undersigned agree to purchase the Property on the terms and conditions herein stated and acknowledge receipt of
414. a copy hereof.

415. _____ _____    _____ _____
       BUYER                    MO/DA/YR                      BUYER                       MO/DA/YR

416. _FRED AUZENNE_
       BUYER NAME PRINTED                                      BUYER NAME PRINTED

417. By: _____

418. Its: _____

419. _7641 N. VIA DEL PARAISO_
       ADDRESS                                                 ADDRESS

420. _SCOTTSDALE AZ 85258_
       CITY, STATE, ZIP CODE                                   CITY, STATE, ZIP CODE

421. Broker: _WCI BROKERS_                                     _CHARLES J TANKO_
                 (COMPANY NAME)                                (LICENSEE)

422. _____ _____ _____ _____
       (ADDRESS)                (TELEPHONE)                   (FAX)                       (E-MAIL)

Initials: _____ / _____                                                        Initials: _____ / _____
         BUYER   SELLER         ©AAR Form CPC 5/03 K                                    BUYER   BUYER

SDI00034

06/08/2006  09:35   60292362°°   WCI BROKERS   PAGE  24/27

**ACCEPTANCE**

423. **Agency Confirmation:** The following agency relationship(s) is hereby confirmed for this transaction:

424. Listing Broker: _CHARLES J TANKO_   _WCI BROKERS_   _____
    (PRINT SALESPERSON'S NAME AND AGENCY CODE)   (PRINT FIRM NAME AND OFFICE CODE)   (TELEPHONE)

425. Is the agent of (check one):  ☒ the Seller exclusively; or  ☐ both the Buyer and Seller

426. **Seller Receipt of Copy:** The undersigned acknowledge receipt of a copy hereof and grant permission to Broker named
427. on Lines 17-18 to deliver a copy to Buyer.

428. ☐ **Counter Offer is attached,** and is incorporated herein by reference. Seller must sign both the Contract and the
429.   Counter Offer. If there is a conflict between this Contract and the Counter Offer, the provisions of the Counter
430.   Offer shall be controlling.

431. The undersigned agree to sell the Property on the terms and conditions herein stated.

432. X_____   X_____
    SELLER                    MO/DAY/YR       SELLER                    MO/DAY/YR

433. _ALAN LEMISCH_____   _KWAH SUNG JIN_____
    SELLER'S NAME PRINTED              SELLER'S NAME PRINTED

434. By: _SEDONA LABORATORIES ET AL_

435. Its: _PRESIDENT_____

436. _218 JUSTIN DRIVE_____   _218 JUSTIN DRIVE_____
    ADDRESS                            ADDRESS

437. _COTTONWOOD AZ 86326_____   _COTTONWOOD AZ 86326._____
    CITY, STATE, ZIP CODE              CITY, STATE, ZIP CODE

438. Broker: _WCI BROKERS_____   _CHARLES J TANKO_____
    (COMPANY NAME)                     (LICENSEE)

439. _4835 E CACTUS, SCOTTSDALE_ _602-903-6300_ _602-903-6200_ _____
    (ADDRESS)              (TELEPHONE)      (FAX)          (E-MAIL)

**ACCEPTANCE BY ESCROW COMPANY**

440. Date of Opening of Escrow: _____

441. The provisions of this Contract are hereby acknowledged and agreed to.

442. Escrow Company: _____

443. By: _____

444. Its: _____


**For Broker Use Only** Brokerage File/Log No. _____ Manager's Initials _____ Broker's Initials _____ Date _____
                                                                                          MO/DAY/YR

SDI00035

This form is available for use by the entire real estate industry. The use of this form is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark that may be used only by real estate licensees who are members of the NATIONAL ASSOCIATION OF REALTORS® and who subscribe to its Code of Ethics.
©Arizona Association of REALTORS® 2003 This Form Available Through Your Local Association of REALTORS® Form CREPC 5/03

| Initials: ___ / ___ |  | ©AAR Form CPC 5/03 K | Initials: _JVAL_ |
| SELLER   SELLER |  |  | BUYER   BUYER |

PAGE 8 of 8

| | |
|---|---|
| **From:** | "Tad Stewart" <production@nutri-health.com> |
| **To:** | "Mo Kang" <mokang@sedonalabs.com>, "Kwan Sung Jin" <APEXAWD@aol.com> |
| **Date:** | 8/29/03 12:29PM |
| **Subject:** | FW: Anti-gas patents |

Message
-----Original Message-----
From: Renee' Norton [mailto:rnorton@nzimes.com]
Sent: Friday, August 29, 2003 7:31 AM
To: Tad Stewart
Subject: FW: Anti-gas patients


-----Original Message-----
From: Renee' Norton
Sent: Friday, August 29, 2003 10:31 AM
To: 'kwan@sedonalabs.com'; 'Susan, Sedona Labs'
Subject: Anti-gas patients


Kwan
I have attached the patents (can fax them if you would like) in reference to
the alpha -G anti gas formula. Nena says that we are ok as long as alpha -g
is in with several other ingredients(simular to the first formula we sent)
as digestive. You would have to be careful about how you positioned the
marketing. Maybe as a digestive formula that attacks gas?? That is just my
thought I do not know if this would fly but if you come up with something I
could inquire with the R&D to get there thoughts. Let me know, it is
obviously a decission that you make, I just wanted to make sure you had any
facts we had on the subject. As always looking forward to hearing from you.
Is there anyway we can get a credit card or faxed copy of a check for the
$13,166 so I can get your big order shipped outtoday, before the holiday?


Renee' Norton
Southwest Region Account Executive
National Enzyme company
15366 US Hwy 160
Forsyth, MO USA 65653
Phone(1.800.825.8545 ext. 2110)
Mobile(1.417.546.0736)
Fax(1.417.546.6433)
rnorton@nzyme.com
www.nationalenzymecompany.com
www.enzymeuniversity.com


_____
----


--
Outgoing mail is certified Virus Free.
Checked by AVG anti-virus system (http://www.grisoft.com).
Version: 6.0.514 / Virus Database: 312 - Release Date: 8/28/03

SDI00036

# EXHIBIT 3

SEDONA LABORATORIES, INC.'S SUPPLEMENTAL PRIVILEGE LOG
*Block Drug Co., Inc. v. Sedona Laboratories, Inc., et al.*
U. S. District Court, District of Delaware
C. A. No. 06-350-XXX

| Date/Bates No. | Description | Privilege Claimed |
|---|---|---|
| 9/2/03 SDI00053 | E-mail from Kwan Jin to attorney Holly Gibeaut regarding marketing of GasAway | Attorney/Client |
| 9/2/03 – 9/10/03 SDI00054 - SDI00055 | E-mails to and from attorney Holly Gibeaut and Susan at Sedona Labs regarding use of name GasAway | Attorney/Client |
| 9/12/03 SDI00056 | E-mails to and from Holly Gibeaut and Susan at Sedona Labs regarding GasAway trademark and label content issues | Attorney/Client |
| 9/23/03 SDI00057 - SDI00058 | Letter from attorney Holly Gibeaut to Alan Lemisch and Kwan Jin regarding trademark applications for several products, and trademark search for GasAway | Attorney/Client and Work Product |
| 9/29/03 SDI00059 | E-mail from attorney David Goldstein to attorney Holly Gibeaut regarding marketing GasAway product | Attorney/Client and Work Product |
| 10/7/03 SDI00060 | E-mails from attorney Holly Gibeaut to Kwan Jin and attorney David Goldstein and David Goldstein to Holly Gibeaut regarding trademark for, and marketing of, GasAway | Attorney/Client and Work Product |
| 10/7/03 SDI00061 - SDI00063 | Letter from attorney Holly Gibeaut to Alan Lemisch and Kwan Jin regarding GasAway trademark and marketing | Attorney/Client and Work Product |
| 2/4/04 SDI00064 - SDI00068 | Letter to Alan Lemisch and Kwan Jin from attorney David Goldstein regarding marketing of GasAway, use of trademarks, and packaging issues | Attorney/Client and Work Product |
| 7/8/04 SDI00069 - SDI00071 | E-mail from attorney Holly Gibeaut to Alan Lemisch and Kwan Jin regarding cease and desist letter from American Red Cross concerning GasAway mark | Attorney/Client and Work Product |
| 6/30/06 SDI00072 - SDI00076 | Agreement Regarding Confidentiality of Shared Opinion | Work Product/Joint Defense and Common Interest |
| 7/14/06 SDI00077 - SDI00110 | Letter to Tracy King from attorney Ronald J. Kisicki | Attorney/Client, Work Product, Joint Defense and Common Interest |

1

SEDONA LABORATORIES, INC.'S SUPPLEMENTAL PRIVILEGE LOG
*Block Drug Co., Inc. v. Sedona Laboratories, Inc., et al.*
U. S. District Court, District of Delaware
C. A. No. 06-350-XXX

| Date/Bates No. | Description | Privilege Claimed |
| --- | --- | --- |
| 11/1/06<br>SDI00111 -<br>SDI00128 | Settlement Agreement and Limited Mutual Release between NHS and SLI | Rule 408 Communication/ Joint Defense and Common Interest |
| 12/15/06<br>SDI00129 -<br>SDI00139 | Joint Defense Agreement | Work Product/Joint Defense and Common Interest |

2

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BLOCK DRUG COMPANY, INC.,

        Plaintiff,

v.

SEDONA LABORATORIES, INC. and
NUTRI-HEALTH SUPPLEMENTS, LLC
d/b/a/ SEDONA LABORATORIES,

        Defendants.

C.A. No.  06-350-KAJ

## DEFENDANT SEDONA LABORATORIES, INC.'S INITIAL DISCLOSURES

Pursuant to Federal Rules of Civil Procedure 26(a)(1) and based on the information now reasonably available, Defendant Sedona Laboratories, Inc. ("Sedona Labs") hereby provides to Plaintiff the following initial disclosures relating to the information that Sedona Labs may use to support its claims or defenses (unless solely for impeachment):

**A.**    **Individuals Likely To Have Discoverable Information That Sedona Labs May Use To Support Its Claims or Defenses**

Sedona Labs identifies the following individuals as likely to have discoverable information that they may use to support their claims or defenses (unless solely for impeachment) pursuant to Federal Rules of Civil Procedure 26(a)(1)(A):

1.    Kwan Jin
c/o Hymson Goldstein & Pantiliat, P.C.
14646 N. Kierland Blvd., Suite 255
Scottsdale, Arizona 85254
Telephone: (480) 991-9077
Subjects of Information: Products Sedona Laboratories, Inc. ("Sedona Labs") manufactured, marketed, and/or sold; the marketing

1

and sales of those products and revenue received from them; Sedona Labs' website; the sale of Sedona Laboratories, Inc.; composition of the GasAway product and genesis of the formulation of that product.

2. Alan Lemish
c/o Hymson Goldstein & Pantiliat, P.C.
14646 N. Kierland Blvd., Suite 255
Scottsdale, Arizona 85254
Telephone: (480) 991-9077
Subjects of Information: Products Sedona Laboratories, Inc. ("Sedona Labs") manufactured, marketed, and/or sold; the marketing and sales of those products and revenue received from them; Sedona Labs' website; the sale of Sedona Laboratories, Inc.; composition of the GasAway product and genesis of the formulation of that product.

3. Fred Auzenne
c/o Jaburg & Wilk, P.C.
3200 N. Central Ave., Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 248-1040
Subjects of Information: The purchase of Sedona Labs; products Nutri-Health Supplements, L.L.C. ("Nutri-Health") manufactures, markets, and/or sells, including GasAway+ and related products; Nutri-Health's marketing and sale of products and agreements made with regard to those sales; website of Sedona Laboratories, Inc.

4. Tracy King
c/o Jaburg & Wilk, P.C.
3200 N. Central Ave., Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 248-1040
Subjects of Information: The purchase of Sedona Labs; products Nutri-Health Supplements, L.L.C. ("Nutri-Health") manufactures, markets, and/or sells, including GasAway+ and related products; Nutri-Health's marketing and sale of products and agreements made with regard to those sales; website of Sedona Laboratories, Inc.

5. Mark Schultz
Address Unknown
Telephone Number Unknown
Subjects of Information: Products Sedona Labs marketed and/or sold, including GasAway+ and related products; Sedona Labs' marketing and sale of products; Sedona Labs' website.

2

6.    James Angus
       Address Unknown
       Telephone: (623) 551-0276
       Subjects of Information: His work with Sedona Labs as an
       independent contractor; products Sedona Labs marketed and/or sold,
       including GasAway+ and related products; marketing and sale of
       Sedona Labs' products and agreements made with regard to those
       sales.

7.    Pat Stewart
       Address Unknown
       Telephone: (928) 634-0582
       Subjects of Information: Products Sedona Labs manufactured,
       marketed, and/or sold; Sedona Labs' marketing and sale of products
       and agreements made with regard to those sales; Sedona Labs'
       website.

8.    William Nist
       Address Unknown
       Telephone: (928) 639-4250
       Subjects of Information: Products Sedona Labs manufactured,
       marketed, and/or sold, including GasAway+ and related products;
       Sedona Labs' marketing and sale of products and agreements made
       with regard to those sales; Sedona Labs' website.

**B.** **Documents, Date Compilations, and Tangible Things In The Possession, Custody, or Control of Sedona Labs That It May Use To Support Their Claims or Defenses**

Sedona Labs identifies the following categories of documents that it may use to support its claims or defenses:

1. GasAway+ document (Bates No. SDI00001)

2. United States Patent No. us 6,344,196 B1 (Bates Nos. SDI00002 - SDI00009)

3. Business Assets Purchase Agreement (Bates Nos. SDI00010 – SDI00023)

4. First Amendment To The Business Purchase Agreement (Bates Nos. SDI00024)

5. Second Amendment To The Business Purchase Agreement (Bates Nos. SDI00025)

6. Third Amendment To The Business Purchase Agreement (Bates Nos. SDI00026)

7. Commercial Real Estate Purchase Contract (Bates Nos. SDI00027 – SDI00035)

8. The patents at issue and their prosecution history

9. Prior art documents

10. Documents related to the damages that Plaintiff claims

Documents produced that contain confidential information will bear the designation "Confidential" or "Confidential – Attorneys Only" pursuant to District of Delaware Local Rule 26.2. Pursuant to Local Rule 26.2, until a protective order is entered by the Court, disclosure of the documents designated "Confidential" or "Confidential – Attorneys Only" is limited to members and employees of the firm of trial

4

counsel who have entered an appearance in the litigation and, where appropriate, have been admitted *pro hac vice*.  Such persons are under an obligation to keep such documents confidential and to use them only for he purposes of litigating the case.

### C.    Computation and Damages

Sedona Labs does not seek damages.

### D.    Insurance Agreements

Sedona Labs is unaware of any insurance agreements that are pertinent to this proceeding.

*    *    *

By these disclosures, Sedona Labs does not represent that it has identified every document, tangible thing, or witness possibly relevant to this lawsuit. Continuing investigation and discovery may alter these disclosures, and Sedona Labs reserves the right to supplement the information disclosed above if additional information becomes available. These disclosures are also not intended to waive any right to object to the production of any document or tangible thing disclosed on the basis of any privilege, the work-product doctrine, relevancy, undue burden, or any other valid objection.

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391
Attorneys for Sedona Laboratories, Inc.

Dated:  November 15, 2006.

## CERTIFICATE OF SERVICE

I, John W. Shaw, hereby certify that on November 15, 2006, I caused to be

electronically filed a true and correct copy of the foregoing document with the Clerk of the Court

using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

| | |
|---|---|
| Steven J. Balick | David S. Eagle |
| John G. Day | Patrick A. Costello |
| Ashby & Geddes | Klehr, Harrison, Harvey, Branzburg |
| 222 Delaware Avenue | & Ellers |
| P.O. Box 1150 | 919 Market Street |
| Wilmington, DE 19899 | Suite 1000 |
| | Wilmington, DE 19801 |

I further certify that on November 15, 2006, I caused a copy of the foregoing

document to be served by hand delivery on the above-listed counsel of record and on the

following non-registered participants in the manner indicated:

### BY FEDERAL EXPRESS

| | |
|---|---|
| Steven D. Glazer | Roger L. Cohen |
| David Greenbaum | Michelle C. Lombino |
| Weil, Gotshal & Manges LLP | Jaburg & Wilk, P.C. |
| 767 Fifth Avenue | 14500 N. Northsight Blvd., Ste 116 |
| New York, NY 10153 | Scottsdale, AZ 85260 |

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
jshaw@ycst.com
Karen E. Keller (No. 4489)
kkeller@ycst.com
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
302-571-6600

065525.1001

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BLOCK DRUG COMPANY, INC.,

Plaintiff,

v.

SEDONA LABORATORIES, INC. and
NUTRI-HEALTH SUPPLEMENTS, LLC
d/b/a/ SEDONA LABORATORIES,

Defendants.

C.A. No.   06-350-***

## SEDONA LABORATORIES, INC.'S
## RESPONSES TO FIRST SET OF INTERROGATORIES

Defendant Sedona Laboratories, Inc. ("SLI"), by and through undersigned
counsel, submits the following Response to the Plaintiff's First Set of Interrogatories.

### PREFATORY STATEMENT

On, or about, January 1, 2006, SLI sold all, or substantially all, of its assets to
Nutrihealth Supplements, LLC and Nutri-Health Real Estate, LLC.  Included in that sale
was the transfer of the vast majority, if not all, of the documents, records, electronically
stored information, and computers used in the operation of the business of SLI were
transferred as part of that sale to the buyers.  As a result, SLI believes that much of the
information responsive to the requests in *Plaintiff's First Set of Interrogatories to Sedona
Laboratories, Inc.* ("Plaintiff's First Interrogatories") is in the possession, custody and
control of Defendant Nutrihealth Supplements, LLC.   SLI will respond to these
interrogatories to the extent responsive information is known to SLI.

## GENERAL OBJECTIONS

Block Drug has exceeded the limit of 25 interrogatories by combining multiple interrogatories and discrete subparts.  SLI objects to Block Drug's interrogatories to the extent they exceed 25 in number.

SLI objects to each interrogatory to the extent that it is overly broad, unduly burdensome, and/or seeks information that is not reasonably calculated to lead to the discovery of evidence relevant to any claim or defense in this action.

SLI objects to each interrogatory to the extent that it seeks to impose requirements or obligations on SLI in addition to or different from those imposed by the Federal Rules of Civil Procedure.  In responding to each interrogatory, SLI will only provide responses, subject to its objections, as may be required and proper under the Federal Rules of Civil Procedure.

SLI objects to each interrogatory to the extent that it seeks the identification of documents and things or other information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity.  Nothing contained in SLI's responses is intended to be, or in any way shall be deemed, a waiver of any such applicable privilege, immunity, or doctrine.

SLI objects to each request to the extent that it seeks information concerning SLI's defense to the charge of willful infringement prematurely.  At the appropriate time, SLI will identify whether it intends to rely on any opinion of counsel in response to the charge or willful infringement.  Information regarding any opinions of counsel will be provided in a privilege log to the extent required by law.

SLI objects to certain definitions in Plaintiff's First Interrogatories, as follows:

SLI objects to the definition of the term "Block Drug" on the ground that it is overbroad, vague and indefinite and calls upon it to apply a definition when it lacks sufficient knowledge to do so.  SLI is not aware of who all the officers, directors,

employees, representatives, partners, corporate parents, subsidiaries, affiliates, predecessors, successors or assigns of Block Drug are.

SLI objects to the definition of the term "SLI" on the ground that it is overbroad and that requiring SLI to respond to interrogatories requesting information that is now in the hands of its successors or assigns requires the production of information that is inaccessible to it.

SLI objects to the definition "NHS" on the ground that it is vague, imprecise and indefinite.

SLI objects to the definition of the terms "relating to or concerning" as overbroad, vague and to each interrogatory that relies on that definition on those grounds.

Nothing in its responses to Plaintiff's First Interrogatories is an admission by SLI regarding the existence, relevance, or admissibility of any documents, things, or other information, or the truth or accuracy of any statement or characterization contained in any request.

SLI's investigations of facts and discovery of information, documents and things at issue in this action are continuing. Accordingly SLI's responses to Plaintiff's First Interrogatories are based only upon SLI's current knowledge and reasonable belief. SLI reserves the right to modify and/or supplement any or all its responses to Plaintiff's First Interrogatories and to assert additional objections to these requests as it deems necessary and/or appropriate.

The foregoing general objections and statements shall be applicable to, and included in SLI's response to every interrogatory propounded by Block Drug, whether or not expressly mentioned in the particular response.

# RESPONSES

Subject to the foregoing Prefatory Statement and General Objections, the following are SLI's responses:

**Interrogatory No. 1:**

Identify the individuals responsible for the manufacture, production, marketing, distribution and sales of each of NHS's alpha-galactosidase products.

Response: SLI objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad, seeks irrelevant information and is not reasonably calculated to lead to the discovery of admissible evidence, and requests information about another entity's product about which SLI has no knowledge. Without waiving these objections, SLI has no information concerning the individuals responsible for the manufacture, production, marketing, distribution and sales of each of NHS's alpha-galactosidase products. Requiring SLI to identify those individuals would require SLI to engage in speculation.

**Interrogatory No. 2:**

Identify the total aggregate sales of NHS's alpha-galactosidase products in or from the United States for each calendar quarter, both in dollar value and number of units sold, as well as the applicable gross and net profit margins, as computed by NHS, and an explanation thereof.

Response: SLI objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad, seeks irrelevant information and is not reasonably calculated to lead to the discovery of admissible evidence, and requests information about another entity's product and sales about which SLI has no knowledge.

Without waiving these objections, SLI has no information concerning NHS's sales of alpha-galactosidase products or NHS's computation of gross and net profit margins, but believe that NHS has already supplied Block Drug with information responsive to this interrogatory.

**Interrogatory No. 3:**

State in detail all factual and legal bases, on a patent-claim-element by patent-claim-element basis, for the allegation pled in SLI's Answer that SLI does not infringe the '196 patent, including, but not limited to any claim that SLI does not infringe either literally or under the doctrine of equivalents, nor contributed to infringement by others, not actively induced others to infringe, the identity of the individual(s) with knowledge regarding the factual bases supporting these allegations, and all documents and other information on which SLI expects to rely to support the allegations.

Response:  SLI objects to this interrogatory on the grounds that it is vague, ambiguous, and requests attorney work-product and other privileged information. Without waiving these objections, SLI does not infringe the '196 patent for the following reasons:

Based on a proper construction of the claims asserted against SLI, SLI does not literally infringe any of the claims.  Independent claims 1, 12, 13 and 16 each include limitations that require a capsule or similarly shaped pill in ingestible form to contain an amount of alpha-galactosidase effective to hydrolyze the sugars in vivo to their simplest absorbable constituents.  The specification states that dosages in which the alpha-galactosidase is present in an amount below 675 GalU have been found to be only somewhat effective to be used to prevent flatulence that might result from an average meal of flatus-producing food.  Thus, in order for the claim not to fail for indefiniteness, an "effective amount" of alpha-galactosidase contained in a single capsule or similarly shaped pill is defined in the specification of the patent as 675 GalU at a minimum. Nothing in the specification or the prosecution history specifically discloses that an effective amount of alpha-galactosidase is less than the lower limit of 675 GalU.  The accused products include only 150 GalU alpha-galactosidase per capsule.

Further, the accused product does not infringe any of the claims of the '196 patent under the doctrine of equivalents.  The amount of alpha-galactosidase contained in each capsule of the accused product is only about 22% of the amount defined in the claims as an "effective amount."  Therefore, the result from ingesting a single capsule of the accused product containing 150GalU by a mammal will not produce substantially the

same result as a mammal ingesting a capsule containing at least 657 GalU of galactosidase.

The accused products also contain ingredients in addition to alpha-galactosidase that may aid in the supplement's palliative effect.

Absent literal infringement of the claims of the '196 patent, or infringement under the doctrine of equivalents, there can be neither contributory infringement, nor inducement of infringement.

Documents and other information known to SLI in support of this position of non-infringement include the patent and its file history along with its parent patent, parent applications and their file histories.

Alan Lemisch and Kwan Jin have information or knowledge relating to this position of non-infringement.  Upon information and belief, Tracy King and Fred Auzenne, both residing in Arizona, have information and knowledge relating to this position.  Upon Information and belief, employees/agents of Block Drug, including the inventor Alan E. Klingerman of the '944 patent and others yet to be identified but known by Block Drug, also have information or knowledge relating to this position.

**Interrogatory No. 4:**

State in detail all factual and legal bases for, and the identity of all documents and other information on which SLI relies or expects to rely to support, each of the following affirmative defenses pled in its Answer:

**Response:** SLI objects to this interrogatory, and all its subparts, on the grounds that it seeks irrelevant information and is not reasonably calculated to lead to the discovery of admissible evidence, and because it seeks information protected by attorney-client privilege and work-product doctrine.  Without waiving these objections, SLI responds to each of the subparts as follows:

(a)    the Delaware Court "lack personal jurisdiction over Defendant Sedona Laboratories, Inc.;"

**Response:** The Delaware long-arm statue does not reach SLI. Even if the long-arm statute reached SLI, jurisdiction in Delaware would not comport with the Due Process Clause of the Fourteenth Amendment.

SLI has never owned or leased any real, personal or mixed property in Delaware, has never had any bank accounts, post office boxes, telephone numbers, agents, employees or representatives in Delaware, and has never sold any product containing alpha-galactosidase to any end-user in Delaware. On information and belief, all of its products containing alpha-galactosidase sold at wholesale were delivered to locations outside of Delaware.

The internet website SLI owned and operated was educational, informational and promotional. It was not an interactive business-to-consumer site. It contained no shopping carts. Customers could not order products through that website.

SLI did not directly sell products to stores, entities or individuals located in Delaware. SLI sold and marketed its products to Eckerd stores through an independent consultant named Jim Angus. Mr. Angus arranged for products to be sold to Eckerd through its national headquarters. On information and belief, at the time he conducted those negotiations, Mr. Angus lived in Arizona and conducted the negotiations by telephone, electronic mail, facsimile and other means and instrumentalities of interstate commerce. SLI sent products sold to Eckerd to a location outside Delaware. Products were shipped to F.O.B. place of shipment, Cottonwood, Arizona. SLI's invoices were sent to Eckerd's national headquarters. SLI did not ship any products sold to Eckerd into Delaware, nor did SLI have actual knowledge or control over Eckerd's distribution of the product from its warehouses, none of which are located in Delaware.

SLI sold all of its assets to NHS. Since the sale, SLI has not been engaged in any business, has not manufactured, encapsulated, or marketed any over-the-counter digestive products and nutritional supplements for consumer use, and has not manufactured, encapsulated or marketed any products containing alpha-galactosidase.

The principals of SLI are located in Arizona. Most of the people who were employed by SLI and are still employed by its successor-in-interest, NHS, reside in Arizona, none are residents of Delaware. All discussions concerning sales to Eckerd Drug Company occurred in Arizona. The records of the sales are located in the computer systems of NHS, which is located in Cottonwood, Arizona. Although incorporated in Delaware, on information and belief, Block Drug's principal place of business is either located in Pennsylvania as alleged in its Complaint or in New Jersey. Block Drug is a subsidiary of GlaxoSmith Kline, a well known multi-national drug company with a great deal of resources. On the other hand, SLI is a very small company that no longer is in business.

*See also*, Declaration of Fred Auzenne, which is Exhibit "C" to NHS's Motion to Dismiss, and Declaration of Jim Angus, which is Exhibit "D" to NHS's Motion to Dismiss.

(b)     Venue is not proper in the District of Delaware;

**Response:** *See* response to Interrogatory No. 6(a), *supra.*

(c)     the District of Delaware is an inconvenient forum for both parties;

**Response:** *See* response to Interrogatory No. 6(a), *supra*

(d)     "Plaintiff is not entitled equitable relief because of laches;"

**Response:** Upon information and belief, Block Drug knew or had reason to know of the alleged infringing activities for an extended period of time prior to filing this action, and that such delay is, or may be, prejudicial to SLI.

(e)     "Plaintiff is not entitled to damages from Sedona by virtue of 35 U.S.C. § 287," and

**Response:** SLI believes it may have learned generally that there were patents applicable to the Beano® product sometime late in August, 2003, but believes it first became aware of Block Drug's '196 patent and any claim for damages when it was furnished with a copy of the May 25, 2006 cease and desist letter sent by Steven Glazer,

one of Block Drug's attorneys, to Tracy King and Fred Auzenne. By that time SLI had

sold all, or substantially all, of its assets to NHS and Nutri-Health Real Estate, LLC and

had not sold any products contain alpha-galactosidase for several months. The nature of

the '196 places it within the ambit of coverage of 35 U.S.C. §287.

    (f)    "Plaintiff is not entitled to equitable relief because of its unclean hands."

**Response:** SLI's defense of unclean hands is based upon Block Drug's

inequitable conduct with regard to its dealings with the patent office in connection with

its '196 patent. More specifically, upon information and belief, agents of Block Drug

committed fraud before the patent office by intentionally withholding material

information from the patent office, knowingly making false statements to the patent

office, and providing misleading information to the patent office during the prosecution

and the application for the '196 patent.

A patent may be rendered unenforceable for inequitable conduct if an applicant,

with the intent to mislead or deceive the examiner, fails to disclose material information

or submits material false information to the patent office during prosecution.

The patent application that matured into the '196 patent was filed on August 8,

2000. On December 28, 2000, the applicant filed a Petition to Make Special declaring, in

a sworn statement made by Anthony Aiuvalasit, Assistant Secretary of Block Drug

Company, Inc., that a "careful and thorough search of the prior art was made, and the

[most pertinent] references were submitted with the application on the filing date of

August 8, 2000 by Attorney for Applicants Hanh T. Pham . . .". Well after the

submission of the Petition, the Applicants submitted an Information Disclosure

Statement, buried within a Second Preliminary Amendment, that disclosed U.S. Patent

No. 5,179,023 ("the '023 reference") and several other references. The failure to disclose

at least the '023 reference at the time of the filing of the application for the '196 patent in

view of the applicant's representation in the Petition, that a careful and thorough search

for the prior art was made and misleading statements made to the patent office when the

'023 referenced was finally disclosed amount to inequitable conduct on the part of the applicant.

Statements made in a Petition to Make Special are deemed material if the statements made succeed in promptly expediting consideration of the application. Since the petition was successful in expediting the examination of the application, the false and misleading statements made in the Petition are deemed material. The Applicant's attempt belatedly to disclose the '023 reference over eight months after initially filing the petition and only 10 days before the Petition was granted was too late for the patent office to consider the impact of the '023 reference on its decision to grant the Petition to Make Special and did not serve to rehabilitate the misleading statements made to the patent office previously.

The '023 reference by itself must be considered material. The '023 reference discloses an alpha-galactosidase enzyme which can be administered in hard or soft shell gelatin capsules or tablets for treating Fabry disease. While the Applicant inaccurately characterized the reference as not relevant in his Second Preliminary Amendment by stating that the reference coated the Alpha-galactosidase to protect it when in the stomach, the reference is material because it, in fact, disclosed that the alpha-galactosidase could be administered in hard and soft gelatin capsules.

The Applicant first became aware of the PCT counterpart (WO-A-9011353) of the '023 reference when it was cited in a European search report related to a European patent application corresponding to the parent application of the '106 patent. The European search report was published on May 6, 1992.

Documents and other information known to SLI in support of this claim of unenforceability due to inequitable conduct include the patent and its file history along with its parent patent, parent applications and their file histories, and all references listed on the patents and any additional references identified in the file histories and not listed on the patents.

It is believed that employees and/or agents of Block Drug, including inventor of the '196 patent Alan E. Kligerman, Assistant Secretary Anthony G. Aiuvalasit, Patent Attorney Hanh T. Pham and other employees/agents yet to be identified but known by Block Drug Company, Inc. have information or knowledge relating to this allegation.

**Interrogatory No. 5:**

State in detail all factual and legal bases for, and the identity of all documents and other information on which SLI expects to rely to support, each of the allegations pled in SLI's Answer that the '196 patent is invalid, including, but not limited to:

(a)     explaining how the '196 patent is "invalid because its subject was neither new, novel, non-obvious, nor original," and how "the alleged invention claimed in the patent was known or obvious in the trade, was patented, in public use, on-sale, and disclosed by publication more than a year before the filing of that application," including an explanation of how Block Drug allegedly failed to comply with any of the provisions of 35 U.S.C. §§102, 103 and 112;"

(b)     identifying each limitation of each '196 patent claim which SLI contends is without enabling disclosure or adequate written description in the specification;

(c)     identifying each piece of prior art, which SLI contends, taken alone or in combination, renders, any claim of the '196 patent anticipated or obvious, indicating which statutory section(s) and subsection(s) apply for each piece of prior art;

(d)     setting forth a comparison claim chart identifying in detail all factual and legal contentions as to which specific portion(s) of each piece of prior art (such as by patent column and line number or article page and paragraph) identified pursuant to subsection (c) above correspond(s) to each specific limitation of each claim of the '106 patent; and

(e)     where appropriate stating all factual and legal bases of SLI's contention that one of ordinary skill in the art would have been suggested or motivated to combine

separate pieces of prior art to obtain the complete invention recited in any claim that SLI contends I invalid as obvious under 35 U.S.C. §103.

**Response:**  SLI objects to this interrogatory on the grounds that it is vague, ambiguous, and seeks privileged information and information protected by the work-product doctrine.  Without waiving these objections, SLI responds as follows:

See SLI's response to Interrogatories Nos. 3 and 4 (f) which are incorporated by reference in this response.

At least claims 1, 3, 12, 13, 16, and 18 are invalid, as obvious under 35 U.S.C. § 103, for at least the following reasons:

In allowing the claims of the '196 patent, the Examiner stated that the claims in the '196 patent are the same as the claims in Applicant's U.S. Patent No. 5,989,544 ("the '544 patent"), except in regard to the ingestible form being a capsule or similarly shaped pill. The examiner further stated that the evidence presented in the '544 patent was drawn to the commercial success and unexpected result of a solid, shaped formulation such as a capsule or tablet.  Commercial success provides a basis for inferring non-obviousness only when the success is attributable to the feature that is the subject of the patent claim. The only evidence of commercial success presented to the patent office during the prosecution of any of the parent patent application related to liquid drops or tablets.  No evidence was present showing non-obviousness through commercial success directed to a capsule containing alpha-galactosidase.  Since the examiner's stated reason for finding non-obviousness is unsupported by the facts, at least claims 1, 3, 12, 13, 16 and 18 are invalid.

Documents and other information known to SLI in support of its claim of invalidity include the patent and its file history alone with its parent patent, parent application and their file histories, and all references listed on the patents and any additional references identified in the file histories and not listed on the patents.

Upon information and belief, employees and/or agents of Bock Drug, including

inventor Alan E. Kligerman, Patent Attorney Hanh T. Pham and other employees/agents

yet to be identified but known by Bock Drug Company, Inc., have information or

knowledge relating to this allegation.

**Interrogatory No. 6:**

Identify all opinions, evaluations or analyses, whether written or oral, that SLI has requested, received or is aware of regarding the '196 patent, including, but not limited to date, author(s), addressee(s), recipient(s), and type (i.e., relating to non-infringement, invalidity, unenforceability or any affirmative defense).

**Response:** SLI objects to this interrogatory on the grounds that it is vague,

ambiguous, overly broad, seeks irrelevant information and is not reasonably calculated to

lead to the discovery of admissible evidence, and seeks information protected by the

attorney-client privilege and work-product doctrine.

SLI also objects to this request to the extent that it seeks information concerning

SLI's defense to the charge of willful infringement prematurely.  At the appropriate time,

SLI will identify whether it intends to rely on any opinion of counsel in response to the

charge or willful infringement.  Information regarding any opinions of counsel will be

provided in a privilege log to the extent required by law.

SLI also received general information regarding Block Drug's patent for its

Beano® product from National Enzyme, Inc.  That information was in the form of an e-

mail which will be produced in response to the request for production of documents

Block Drug propounded to SLI.

**Interrogatory No. 7:**

Set forth all facts on which SLI relies in support of any contention that it did not willfully infringe the '196 patent, including, but not limited to, a statement whether SLI will rely on any opinion of counsel, whether written or oral, to rebut Block Drug's allegation of willful infringement, and the identity of each such opinion (including but not limited to date, author(s), address(s), recipient(s), and type).

**Response:** SLI objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and work-product doctrine.

SLI also objects to this request to the extent that it seeks information concerning SLI's defense to the charge of willful infringement prematurely. At the appropriate time, SLI will identify whether it intends to rely on any opinion of counsel in response to the charge or willful infringement. Information regarding any opinions of counsel will be provided in a privilege log to the extent required by law.

Without waiving these objections, SLI responds as follows:

SLI obtained raw materials (a mixture of various enzymes, and rice starch) which it encapsulated in its GasAway+ and Food Enzyme products from National Enzyme Company in Forsyth, Missouri. Kwan Jin of SLI was contacted by Renee Norton of National Enzyme who was already a supplier of raw materials used in other SLI products. He asked if they could formulate a product that would serve the same function as Beano® but not infringe on any of its rights including patent rights. Rene Norton consulted with technical personnel at, and the legal department of Natural Enzyme, and suggested a food-enzyme product that would contain alpha-galactosidase, but also other active ingredients. Norton advised Kwan Jin that the legal department of National Enzyme had examined the patents in reference to the alpha-galactosdiase anti-gas formula and had concluded that because other active ingredients were included in the formulation National Enzyme proposed, no patent infringement would be present. SLI relied on that information.

SLI has not engaged in the manufacture, marketing, or sale of any product containing alpha-galactosidase since January 1, 2006.

**Interrogatory No. 8:**

Identify each of SLI's past or present distributors, marketers, customers or any third party purchasing or selling SLI's alpha-galactosidase products, including all national and regional retail drug, supermarket and mass merchandise chains such as Eckerd Corp, CVS Corp., Meijer Inc., etc., and separately state for each calendar quarter the number of units shipped, distributed or sold and the volume of sales (both in dollar value and number of units sold) to and by each.

**Response:**     SLI objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad, seeks irrelevant information and is not reasonably calculated to lead to the discovery of admissible evidence, and requests confidential and trade-secret information of SLI. The documentary and electronically stored information that would enable SLI to respond to this Interrogatory is in the possession, custody and control of NHS and is inaccessible to SLI. Identifying each of the individuals who made a mail-order purchase of SLI products containing alpha-galactosidase would be unduly burdensome and oppressive and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, SLI responds as follows:

There are no present product distributors, marketers, customers or any third-party purchasers selling SLI alpha-galactosidase products because SLI stopped doing business when all, or substantially all, of its assets were sold in January 2006. The distributors, marketers, customers and third parties that purchased or sold SLI's alpha-galactosidase products are: James Angus, who marketed SLI's alpha-galactosidase products to Eckerd Drug. Eckerd Drug purchased a product known as "Food-Enzyme" from SLI at wholesale. SLI has no information concerning the number of units shipped, distributed, or sold and the volume of sales. The sale of SLI to NHS included the sale of all documents and files in which that information was stored; therefore, SLI no longer possesses the requested information.

**Interrogatory No. 9:**

Describe in detail all circumstances under which SLI first became aware of the '196 patent, including the date when this occurred, the source of the information, the identity of the person(s) who received the information on behalf of SLI, and the identity of any documents evidencing these events.

**Response**: SLI objects to this interrogatory on the grounds that it is vague and ambiguous. Without waiving these objections, SLI responds as follows:

SLI was generally aware that Block Drug had obtained patents to protect aspects of the Beano® product but was not aware of the '196 patent or any specifics of the patent or the claims included in the patent until it was furnished with a copy of Steven Glazer's cease-and-desist letter dated May 25, 2006. That was how it first learned of that patent. See also the response to interrogatory nos. 6 and 7, which are incorporated in this response by reference.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Karen E. Keller*

OF COUNSEL:

David B. Goldstein
Hymson Goldstein & Pantiliat, P.C.
14646 North Kierland Blvd., Suite 255
Scottsdale, AZ 85254
(480) 991-9077

Dated: January 11, 2007

John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801

Attorneys for Sedona Laboratories, Inc.

## VERIFICATION

I, Kwan Jin, the _____ of Defendant Sedona

Laboratories, Inc. in the above-entitled and numbered cause of action, do verify

that I have read the foregoing Answers to Plaintiff's Interrogatories and the

statements contained therein (with the exception of objections and descriptions of

contentions, which I am not competent to verify) are true to the best of my

knowledge.

I verify under penalty of perjury that the foregoing is true and correct.

DATED this _____ day of _____ 2007.


_____
Kwan JIn

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on January 11, 2007, I caused a copy of the foregoing document to be served on the following counsel of record in the manner indicated:

### BY HAND DELIVERY

Steven J. Balick                         David S. Eagle
John G. Day                              Patrick A. Costello
Ashby & Geddes                           Klehr, Harrison, Harvey,
500 Delaware Avenue                         Branzburg & Ellers
P.O. Box 1150                            919 Market Street, Suite 1000
Wilmington, DE 19899                     Wilmington, DE 19801

I further certify that on January 11, 2007, I caused a copy of the foregoing document to be served on the following in the manner indicated:

### BY FEDERAL EXPRESS

Steven D. Glazer                         Roger L. Cohen
David Greenbaum                          Michelle C. Lombino
Weil, Gotshal & Manges LLP               Jaburg & Wilk, P.C.
767 Fifth Avenue                         14500 N. Northsight Blvd., Ste 116
New York, NY 10153                       Scottsdale, AZ 85260

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Karen E. Keller
John W. Shaw (No. 3362)
jshaw@ycst.com
Karen E. Keller (No. 4489)
kkeller@ycst.com
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
302-571-6600

Attorneys for Sedona Laboratories, Inc.

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

Block Drug Company, Inc.,            :
                                     :
            Plaintiff,               :
                                     :        CIVIL ACTION
      v.                             :        NO. 06-350-KAJ
                                     :
Sedona Laboratories, Inc. and        :
Nutri-Health Supplements, LLC        :
d/b/a Sedona Laboratories,           :
                                     :
            Defendants.              :
_____    :

## DECLARATION OF FRED AUZENNE

I, Fred Auzenne, declare as follows:

1.      I am an adult over the age of eighteen (18) years old, a resident of Arizona, and I make this declaration of my own personal knowledge of each of the matters stated herein and would so testify to the contents hereof.

2.      I am the CEO of Defendant Nutri-Health Supplements, LLC d/b/a Sedona Labs ("NHS"). NHS is organized as a limited liability company in the State of Arizona, with its principal place of business in Cottonwood, Arizona. NHS is neither registered as a foreign corporation in Delaware, nor authorized to do business there.

3.      NHS purchased the assets of Defendant Sedona Labs, Inc., including all rights and interest in the product at issue in this case, in January 2006. Sedona Labs, Inc. ("SLI") is an Arizona corporation, with its principal place of business in Cottonwood, Arizona. To the best of my knowledge and belief, SLI is neither registered as a foreign corporation in Delaware, nor authorized to do business there.

4.      NHS develops, manufactures and distributes dietary and nutritional health supplements for the over-the-counter market, including the product at issue here, which NHS commonly refers to as GasAway+™. GasAway+™ is manufactured at our only manufacturing

facility, which is located in Cottonwood, Arizona. See Exhibit "1", attached hereto, which is a true and correct copy of pages 14 and 15 of our Wholesale Catalog, available on our website at http://www.sedonalabs.com/PDF/SedonaLabsWholesaleCatalog060414.pdf.

5.      NHS generally manufactures its products to meet forecasts for 3-6 months, and maintains that inventory in Arizona. NHS does not own, lease, use or otherwise possess any warehousing facilities, offices, manufacturing plants, sales-showrooms, distribution centers or any other real property in Delaware.

6.      NHS does not have any employees or contractors, salaried or commission-based, which reside in or maintain an office in Delaware. NHS does not have a sales team or sales representative resident in Delaware. NHS does not have a sales strategy that specifically targets Delaware. NHS does not stock any products in Delaware, and does not have a Delaware bank account or telephone number.

7.      NHS currently sells its GasAway+™ products to wholesalers, retailers, natural health stores and pharmacies directly, through a call center located in Arizona, and indirectly through a network of dealers, brokers and independent contractors, none of whom, to the best of my knowledge, are located in Delaware. NHS pays its dealers, brokers and independent contractors commissions based on stated percentages of total sales. NHS also attends trade shows to increase its sales, but has never attended a trade show in Delaware.

8.      All sales of NHS products are subject to review, approval and acceptance by NHS in Arizona. Payment for all sales of NHS products are made to and accepted in Arizona. For fiscal year 2005, sales of GasAway+™ represented less than 1% of total company sales.

9.      NHS maintains an informational website at http://www.sedonalabs.com. NHS products, including GasAway+™, cannot be purchased through that website. The website is hosted and maintained on servers in Arizona.

10.      The NHS website does include a hyperlink to the website http://www.affordable-natural-supplements.com/sedona_labs.html, where certain NHS products, including GasAway+™ may be purchased online. NHS is not the owner of the Affordable

Natural Supplements website, and exercises no control over that website, or the operation of the business that actually owns and operates that website. It is my understanding and belief that that website is owned and operated by a company with its principal place of business at 383 Brick Blvd., Brick, N.J. 08723, telephone (732) 477-3088, as shown in the upper-right hand corner of **Exhibit "2"** attached hereto, which is a true and correct copy of pages at the above-referenced website. ANS is an authorized retailer of NHS products, including GasAway+™. It is also my understanding and belief that Affordable Natural Supplements sells dietary and natural health supplement products from many other manufacturers, including the Beano® product of Plaintiff, Block Drug, Co., Inc. at http://affordable-natural-supplements.com/beano.html. **Exhibit "3"** attached hereto is a true and correct copy of the pages of that website, offering Beano for sale.

11.    NHS has produced a private-labeled version of GasAway+™ for Eckerd Corporation ("Eckerd"), pursuant to a private-labeling agreement entered into by the parties in or around the late winter of 2003 or early spring of 2004.

12.    It is my understanding and belief that the private labeling product agreement with Eckerd was entered into by the parties in Arizona. All orders placed under that agreement are subject to review and acceptance by in Arizona. All product manufactured pursuant to that agreement is and was manufactured in Arizona. Finished product is and was shipped as directed by Eckerd to one of its numerous warehouses located in Florida, Georgia, New York, North Carolina, Pennsylvania or Texas, as shown on **Exhibit "4"** attached hereto, which is a true and correct copy of an excerpt from the billing instructions provided by Eckerd Corp. NHS never shipped the Sedona Labs branded version of GasAway+ or the Eckerd private-labeled version directly into Delaware.

I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

DATED this 15th day of September 2006.

/s/ Fred Auzenne
Fred Auzenne

4